*Howell v. City of Zion, et al.*
**Case No.: 16 CV 3949**

# EXHIBIT B

**Page 1**

1          IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4   ALICE HOWELL, Independent        )
5   Administrator of the Estate      )
6   of JUSTUS HOWELL,                )
7             Plaintiff,     ) No. 16 CV 3949
8        -vs-                        )
9   CITY OF ZION, a municipal        )
10  corporation, OFFICER ERIC        )
11  HILL, (#47),                     )
12            Defendants.    )
13
14          The deposition of RONALD SCOTT, called
15  for examination, taken pursuant to the Federal
16  Rules of Civil Procedure of the United States
17  District Courts pertaining to the taking of
18  depositions, taken before THERESA A. VORKAPIC, a
19  Notary Public within and for the County of Kane,
20  State of Illinois, and a Certified Shorthand
21  Reporter, CSR No. 84-2589, of said state, at 140
22  South Dearborn Street, Chicago, Illinois, on
23  April 4, 2017, at approximately 9:35 a.m.
24

**Page 2**

1   PRESENT:
2          ACTION INJURY LAW GROUP, LLC,
3          191 North Wacker Drive, Suite 2300,
4          Chicago, Illinois 60606,
5          312-578-9390, by:
6          MR. CARLTON ODIM,
7          carlton@actioninjurylawgroup.com,
8          MR. ANDREW M. STROTH,
9          astroth@actioninjurylawgroup.com,
10             -and-
11         EDWIN F. MANDEL LEGAL AID CLINIC,
12         The University of Chicago Law School,
13         6020 S. University Avenue,
14         Chicago, Illinois 60637,
15         773-702-9611, by:
16         MR. CRAIG B. FUTTERMAN,
17         futterman@uchicago.edu,
18             -and-
19
20
21
22
23
24

**Page 3**

1   PRESENT: (Continued)
2
3          STETLER DUFFY & ROTERT, LTD.,
4          10 South LaSalle Street, Suite 2800,
5          Chicago, Illinois 60603,
6          312-338-0217, by:
7          MS. MARIAH E. MORAN,
8          mmoran@sdrlegal.com,
9             appeared on behalf of Plaintiff;
10         ANCEL GLINK DIAMOND BUSH DiCIANNI
11         & KRAFTHEFER,
12         140 South Dearborn Street,
13         Chicago, Illinois 60603,
14         312-782-7606, by:
15         MR. THOMAS G. DiCIANNI,
16         tdicianni@ancelglink.com,
17         MS. ELIZABETH K. BARTON,
18         ebarton@ancelglink.com,
19             appeared on behalf of Defendants.
20
21
22
23
24

**Page 4**

1   ALSO PRESENT:
2          MS. BAHAR T. AZARI, Paralegal,
3             Ancel Glink Diamond Bush DiCianni
4             & Krafthefer;
5          MS. MICA MOORE,
6          MR. ANDREW SOWLE,
7          MR. JEREMY CHEN,
8             University of Chicago Police
9             Accountability Clinic, Law Students.
10
11
12
13
14
15
16
17
18
19  REPORTED BY:  THERESA A. VORKAPIC, CSR, RPR,
20             CSR License No. 84-2589
21
22
23
24



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
5–8

Page 5

1     P R O C E E D I N G S
2          (WHEREUPON, the witness was duly
3     sworn.)
4          RONALD R. SCOTT,
5 called as a witness herein, having been first duly
6 sworn, was examined and testified as follows:
7          EXAMINATION
8 BY MR. DiCIANNI:
9     Q.   Sir, would you state your name for the
10 record, please.
11     A.   First name is Ronald, Ronald, middle
12 initial is R, my last name is Scott, S-c-o-t-t.
13     Q.   Mr. Scott, you have given many
14 depositions before I understand, correct?
15     A.   Several.
16     Q.   If I asked you to estimate, would you
17 be able to do that?
18     A.   In excess of 50. I believe less than a
19 hundred.
20     Q.   How many times would you say you've
21 testified at trial?
22     A.   Approximately 300 times.
23     Q.   300 times. Would that include your
24 time as a law enforcement officer?

Page 6

1     A.   Yes, it would.
2     Q.   So if we excluded times you testified
3 as a police officer, how many times would you say
4 you testified at trial?
5     A.   Between 75 to a hundred, best
6 estimation.
7     Q.   Each one of those would have been in
8 some role as a trial consultant of some type?
9     A.   Yes.
10     Q.   Expert witness?
11     A.   Yes, it would have involved a legal
12 proceeding of some sort.
13     Q.   Did you act as an expert witness in 75
14 to 100 trials where you've testified?
15     A.   Or depositions, but you asked
16 specifically about trials.
17     Q.   Yes.
18     A.   Yes, I did.
19     Q.   You know what we're going to do today,
20 but let me just remind you about a few things.
21     A.   Yes, please do.
22     Q.   I'm going to ask you questions that
23 pertain to the opinions you've given related to
24 this case, okay. When you respond to my

Page 7

1 questions, as you know, you have to do it
2 verbally. The court reporter is taking down what
3 we talk about today. You know that.
4     A.   Yes.
5     Q.   If I ask you a question that you don't
6 understand, which could happen, or you don't hear
7 me or whatever it is, please let me know that
8 because we all want to be able to assume that any
9 answer you give is an answer you intended to give.
10     A.   Understood.
11     Q.   Fair enough?
12     A.   Thank you.
13     Q.   Okay. I have in front of me your
14 report, which we'll get to in a second.
15          You have a business which I believe is
16 just in your name, Ronald R. Scott?
17     A.   Yes, that's correct.
18     Q.   And after your name you have MA and MS.
19          What does MA and MS stand for?
20     A.   That's for Master of Arts and Master of
21 Science.
22     Q.   You have a Master of Arts and a Master
23 of Science?
24     A.   Yes, I do.

Page 8

1     Q.   What is your Master of Arts in?
2     A.   Master of Arts is in criminal justice.
3 My Master of Science is in management.
4     Q.   When did you get your Master of Arts
5 and where?
6     A.   Master of arts was in 1980. Master of
7 Science I believe was 1990.
8     Q.   From where?
9     A.   Master of Arts was in Anna Maria
10 College, in Paxton, Massachusetts, the Master
11 Science in management was from Lesley University
12 in Cambridge, Massachusetts.
13     Q.   That would have been 1990?
14     A.   1990 for the Master of Science.
15     Q.   Where did you go to for your
16 undergraduate education?
17     A.   Northeastern University. I have a
18 Bachelor of Science cum laude in law enforcement.
19 I also have an Associate in Science in I'm not
20 sure what it is, it's either criminal justice or
21 criminology.
22     Q.   What year were you conferred the
23 Bachelor of Science at Northeastern University?
24     A.   1979.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
9–12

Page 9

1    Q. Since graduation in 1979, you have
2 studied further and you've worked in law
3 enforcement and you've worked as a litigation
4 consultant, fair enough?
5 A. Yes.
6    Q. Your current business Ronald R. Scott,
7 is it incorporated?
8    A. No, it's not. Sole proprietor.
9    Q. It's located in Phoenix, Arizona?
10 A. Yes.
11    Q. 37881 North 10th Street is the address
12 of the business?
13 A. Correct.
14    Q. Is it also your home?
15    A. Yes, it is.
16    Q. You have no other business location?
17 A. None.
18    Q. Do you have any employees?
19    A. Myself only.
20    Q. Do you ever use independent contractors
21 or any type of consultants to help you with cases?
22    A. I'll refer them to an attorney, but I
23 don't get involved retaining them personally.
24    Q. Well, I guess I'm not sure you

Page 10

1 understood what I meant.
2       Do you ever engage other experts to
3 help you evaluate cases that you've been hired to
4 consult on?
5    A. Not personally, no.
6    Q. Did you do all the work in this case to
7 prepare your report and arrive at your opinions,
8 do it all yourself?
9    A. I did it, yes, myself.
10    Q. Are you married?
11    A. I am.
12    Q. And your wife?
13    A. My wife is Maria.
14    Q. Is Maria employed outside the home in
15 any way?
16 A. Self-employed.
17    Q. What does she do?
18    A. She owns a sign and truck lettering
19 business, and she also makes jewelry.
20 Q. Children?
21    A. Two adult children.
22    Q. Names and ages.
23    A. David, David is going to be 46 in May.
24 My youngest son is Christopher, '72, he's 44.

Page 11

1    Q. What do they do for a living?
2    A. My youngest son Christopher is a
3 certified public accountant and my oldest son
4 David is a over-the-road truck driver, commercial
5 truck driver.
6    Q. Neither followed you into the law
7 enforcement industry?
8    A. Neither followed me.
9    Q. I notice on your report your logo has
10 Ronald Scott with a microscope in the middle.
11    A. It's a microscope.
12    Q. Forensic ballistics underneath?
13 A. Correct.
14    Q. Is ballistics sort of your primary
15 expertise?
16    A. No. Shooting reconstruction and crime
17 scenes are my primary expertise, but it does
18 involve some aspects of ballistics and I do do
19 some work with engineers and architects and others
20 that involve just pure ballistics work.
21    Q. Why did you highlight ballistics only
22 in your logo?
23    A. I don't know. My wife is the artist
24 and she made that logo and I said that's fine.

Page 12

1    Q. She designed it?
2 A. Yes.
3    Q. How long have you been using the
4 logo?
5    A. That logo?
6    Q. That one.
7    A. I believe since about 2002.
8    Q. Are you a member of any association in
9 which you get referrals for expert witness
10 consultation? Do you know what I'm talking about?
11    A. Yes. I've received referrals from
12 members that are associates of mine, but not from
13 the association itself.
14    Q. So there are and I'm sure you know
15 this, there are organizations or companies really
16 that will advertise themselves as providing expert
17 witnesses in cases. TASA would be an example of
18 that if you are familiar.
19 A. Right.
20    Q. Do you get referrals from any company
21 like that?
22    A. Yes. I've been contacted by some
23 companies like that.
24    Q. Which ones?



Page 13

1    A.   TASA was one. There's another one. I
2  believe it's called Consolidated Consultants. I
3  think there's an additional one, DJS Associates.
4  I think they're in Pennsylvania. There is a local
5  agency in Phoenix that contacted me. I haven't
6  received any referrals from them.
7    Q.   So you've received referrals from the
8  other two. DJS -- other three I should say, TASA,
9  the second one you told me about and then DJS?
10   A.   Yes, that's correct.
11   Q.   Do all of your cases come through these
12  referral programs?
13   A.   No. Very, very few.
14   Q.   Do you advertise?
15   A.   I have a website.
16   Q.   Do you do anything else to promote your
17  business?
18   A.   No. No commercial advertising.
19   Q.   One of the things that we -- I should
20  have mentioned is you're anticipating my questions
21  so you're talking over me, and we're going to
22  drive her crazy and I tend to talk slowly anyway.
23   A.   I'll give her a chance to --
24   Q.   Before she erupts.

Page 14

1         So your website -- in terms of
2  advertisement if we could call it that, your
3  website would be the only way that you market or
4  promote your business?
5    A.   Yes.
6    Q.   Do you speak at conferences and
7  seminars for lawyers?
8    A.   I do if time is available to me, yes.
9    Q.   What organizations -- lawyer
10  organizations have you givens presentations to?
11   A.   The American Academy of Forensic
12  Sciences. Usually it's a joint session of the
13  juris prudence section and the engineering section
14  that I would be giving presentations to.
15   Q.   Any others?
16   A.   Not recently.
17   Q.   Did you ever speak to DRI or ITLA,
18  American College of Trial Lawyers, any of these
19  other organizations that put on seminars?
20   A.   Unfortunately time has not allowed me
21  to do it.
22   Q.   Have you been invited?
23   A.   I have. I just haven't had the
24  opportunity.

Page 15

1    Q.   You just haven't done it. You say on
2  your report, you list at the top and we'll have it
3  in a second, sorry about that, the different areas
4  that you provide consultation in, it starts with
5  firearms and ends with trajectory analysis.
6         You know what I'm talking about?
7    A.   Yes.
8    Q.   You have on here Daubert consultation.
9    A.   Yes.
10   Q.   What do you do in what you call a
11  Daubert consultation?
12   A.   Most of that falls into the category of
13  tool mark methodology, although it can fall into
14  some of the other areas such as the examination of
15  firearms. Some of the cases which I am inquired
16  of involve reviewing conclusions made by crime
17  laboratories or other experts. So one of the
18  areas that I would look if in is what is the
19  methodology that they have done and is it in
20  conformance with the current standards being used
21  in the industry, and then I would provide advice
22  to the counsel as to whether or not there might be
23  an issue they would want to consider exploring.
24   Q.   So if I'm understanding you correctly,

Page 16

1  first you would identify some standard that would
2  govern a methodology that would be applicable to
3  whatever opinion or consultation you're reviewing
4  and then determine if whoever rendered that
5  opinion or did that consultation worked
6  consistently with that standard; is that fair to
7  say?
8    A.   Yes.
9    Q.   What are you looking for in terms of
10  compliance?
11   A.   Specifics?
12   Q.   No, general.
13   A.   For example --
14   Q.   Yes, for example.
15   A.   There are guidelines and the current
16  guidelines are being reviewed at the present time
17  to set new standards for the industry, but the
18  current guidelines as they are set now call for
19  certain methods to be employed in testing and what
20  I'm looking at is have personnel in crime labs
21  doing firearms examinations or crime scene type of
22  work, are they following the current standards as
23  they're currently published in looking to see what
24  conclusions they've reached from what they have



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
17—20

Page 17

1 done. So I'm really looking at what the
2 methodology is that they've employed and what
3 conclusions they've reached.
4      Q. So when you do a Daubert consultation,
5 you give an opinion on whether the methodology is
6 reliable, correct?
7      A. That has occurred, yes.
8      Q. You don't necessarily give an opinion
9 on whether the conclusion you agree with or
10 disagree with, you just focus on the methodology,
11 correct?
12      A. Sometimes it could be a combination. I
13 could be looking not only at the methodology but I
14 could also be actually examining the evidence to
15 see what conclusion I've reached. So it could be
16 a combination of both critiquing the methodology
17 and at the same time testifying to my conclusions
18 based upon the generally accepted methodology that
19 I employ.
20      Q. You would fold that all into a Daubert
21 consultation?
22      A. Well, if that's how it was presented in
23 court. I mean, obviously I can't control the
24 questions, but it's happened, yes.

Page 18

1      Q. Can you give me a case reference in
2 which you actually testified in a Daubert hearing?
3      A. I know I've testified in several over
4 the past year.
5      Q. I'm sorry. You did in the past year?
6      A. In the past year I've testified in
7 several.
8      Q. Daubert hearings?
9      A. Yes. Arizona versus Dean Babbitt I
10 know is one, Arizona versus Linda Frias is
11 another. I know there are some others, but I'd
12 have to look at my records.
13      Q. So these are obviously criminal cases,
14 criminal prosecutions?
15      A. Yes. Those are criminal cases.
16      Q. In these cases, you're called on to
17 testify about -- not to render your own opinions
18 but to testify -- well, I suppose it would be your
19 own opinions but not to render your own opinions
20 on the substance of the case but to testify about
21 the methodology employed by some other expert
22 witness; is that fair to say?
23      A. In the Babbitt case, it was a
24 combination of the methodology employed and my own

Page 19

1 conclusions. In the Frias case, the Frias case
2 wasn't so much methodology as it was presenting
3 testimony regarding some treatises and studies on
4 the aspect of an unintentional or involuntary
5 discharge of a firearm.
6      Q. Were you rendering an opinion about
7 some substantive issue in that case or were you
8 only focusing on whether some other expert's
9 opinions should be admissible based on the Daubert
10 standards, in either one of these cases?
11      A. Right, in the Frias case, I did not
12 testify to anything other than some of the
13 treatises and studies on involuntary discharge,
14 but it did include testifying to some what I call
15 exclusionary opinions based upon the alleged facts
16 of the case and the lack of evidence supporting
17 those facts.
18      In the Babbitt case, the Babbitt case
19 involved critiquing the methodology that employed
20 -- this was a cold case from the 1990s recently
21 brought to trial, so that involved the methodology
22 involved almost 20 years ago at the crime scene,
23 but then reaching my own conclusions based upon
24 the information I had. So that was both.

Page 20

1      Q. Where were those cases?
2      A. Maricopa County Superior Court,
3 Arizona.
4      Q. Have there been other cases where
5 you've testified as a Daubert expert?
6      A. There have been, yes.
7      Q. You have included your case list at
8 least for the last four years in your report.
9 We'll go over that a little bit later, but would
10 we find cases in that list where you testified as
11 a Daubert consultant?
12      A. I would certainly recall them by
13 looking at that list.
14      Q. All right. We'll do that a little bit
15 later. Let's mark your report as Scott Exhibit 1.
16      (WHEREUPON, a certain document was
17      marked Scott Deposition Exhibit
18      No. 1 for identification, as of
19      04/04/2017.)
20 BY MR. DiCIANNI:
21      Q. In the first part of your report, you
22 discuss -- well, your report is broken down based
23 on different aspects of the consultation that you
24 did in the case, correct?



Page 21

1 A. Yes.

2    Q. And in the beginning you talk about
3 your engagement and compensation, and you say you
4 were engaged in this case to examine certain
5 aspects concerning the fatal shooting of Justus
6 Howell by Officer Eric Hill.

7        What did you consider to be your focus
8 or your engagement in this case?

9    A. All the information provided to me
10 which includes reviewing the entire case file, to
11 include visiting the actual scene and making my
12 own measurements and then placing everything into
13 perspective and making my own conclusions as
14 scientifically and reliably as I could.

15    Q. Was it to test the version of the
16 events as described by Officer Hill?

17    A. Yes. I'm looking at the physical
18 evidence and the forensic evidence, tangible and
19 intangible, and then I'm comparing it to the
20 source materials which included the version of
21 events by Officer Hill and others.

22    Q. So in the end, your mission, I'll put
23 it that way, was to evaluate Officer Hill's
24 version of the events in the way that your

Page 22

1 expertise allows you to do, correct?

2    A. That's a fair statement.

3    Q. When were you first engaged in this
4 case?

5    A. My best recollection is late last year,
6 2016. I don't know the exact month. I'd have to
7 estimate in the October to November area would be
8 approximately correct.

9    Q. How were you contacted?

10    A. I believe I was contacted by attorney
11 Cory Rubinstein.

12    Q. Mr. Rubinstein contacted you by
13 telephone, would that be fair?

14    A. I'm not sure if it was telephone or
15 e-mail.

16    Q. So there was an initial communication
17 of some type which caused you to have further
18 communications, that's obvious?

19 A. Yes.

20    Q. What did Mr. Rubenstein tell you in the
21 first consultation?

22    A. I don't recall verbatim of course, but
23 it involved a police-involved shooting,
24 officer-involved shooting, and they were looking

Page 23

1 at either myself or a number of experts to retain
2 to review the case file.

3    Q. Is that when he told you he wanted you
4 to rebut Officer Hill's testimony?

5    A. I wasn't actually retained until I
6 think it was probably a few weeks later.

7    Q. So you were retained for that purpose a
8 few weeks later?

9 A. Yes.

10    Q. And did you have continuing
11 communications with Mr. Rubenstein or any other
12 lawyers representing the plaintiff regarding the
13 case?

14    A. I did.

15    Q. Did you have any -- and then you were
16 provided with materials, correct?

17 A. Yes.

18    Q. Did they provide you -- did any of the
19 attorneys for the plaintiff provide you with any
20 data or other information that you considered in
21 arriving at your conclusions?

22    A. Only the source materials that are
23 listed. No verbal data.

24    Q. That's what I'm asking. The answer

Page 24

1 is no to that question?

2 A. Correct.

3    Q. They didn't provide you with any
4 version verbally during some communication or
5 through an e-mail communication that you
6 considered in arriving at your opinions?

7    A. No, not outside of the source
8 materials.

9    Q. Your report goes on to discuss your
10 qualifications and we'll talk about your CV a
11 little later.

12 A. Okay.

13    Q. Then it goes on to discuss the science
14 of shooting reconstruction generally, correct?

15 A. Yes.

16    Q. How would you define shooting
17 reconstruction as a science?

18    A. Well, it's the application of crime
19 scene analysis, the examination of physical
20 evidence and intangible evidence including time,
21 motion and distance using generally accepted
22 methods employed in the field and then reaching
23 conclusions, scientific conclusions where
24 possible, and where scientific conclusions may not



RONALD SCOTT      April 04, 2017
HOWELL vs CITY OF ZION      25–28

Page 25

1  be as strong as others to clarify that and present
2  them in terms that don't mislead the finder of
3  fact that I would be overstating some aspect of
4  the conclusion.
5       Q.    Do you have any signed of a
6  certification to do shooting reconstruction?
7       A.    I voluntarily submit to independent
8  testing through the Collaborative Testing Service.
9  That's called CTS. It involves firearms and tool
10  mark examinations. As far as other
11  certifications, there's none that I'm aware of,
12  different certifications.
13       Q.    So there's nothing that requires you to
14  have any particular level of competency in the
15  form of a test or something like that and gives
16  you a certificate as a result?
17       A.    That's correct.
18       Q.    That doesn't exist or you've never done
19  it?
20       A.    I think there are some areas that might
21  pick out certain aspects of certain areas like
22  photography or something like that, but nothing in
23  the general aspect of, say, shooting
24  reconstruction, no. There's nothing that I'm

Page 26

1  aware of.
2       Q.    Okay. Is there something in the
3  general forensic sciences, a certification just in
4  the general forensic sciences that you're aware
5  of?
6       A.    No, I'm not.
7       Q.    You're no longer a sworn law
8  enforcement officer?
9       A.    No. I'm retired.
10       Q.    Are you a licensed private
11  investigator?
12       A.    No, I'm not.
13       Q.    Do you have any licenses in Illinois?
14       A.    I do not.
15       Q.    Have you ever provided testimony in
16  Illinois?
17       A.    I have.
18       Q.    How many times?
19       A.    I think it's only one or two times.
20       Q.    Do you remember what those cases were
21  about?
22       A.    I do not.
23       Q.    Do you remember when they were?
24       A.    A long time ago, many years.

Page 27

1       Q.    While you were a consultant, though,
2  not as a law enforcement officer?
3       A.    As a private independent consultant.
4       Q.    Do you know if you're allowed to do
5  shooting reconstruction in Illinois if you're not
6  a licensed investigator in Illinois?
7       A.    I'm not aware.
8       Q.    You haven't researched that?
9       A.    No.
10       Q.    You're not affiliated with any licensed
11  private investigators in Illinois, correct?
12       A.    I am not.
13       Q.    Do you hold any licenses other than a
14  driver's licensing or a fishing licensing, like
15  professional licenses?
16       A.    No, I do not.
17       Q.    You mentioned two authorities in your
18  Section 3 on shooting reconstruction; you talk
19  about Peter DeForest, Robert Gaensslen and
20  Dr. Henry Lee and their treaties, and then you
21  talk about Lucien and Michael Haag in their
22  treatise.
23       Do you consider those two treatises to
24  be authoritative in the area of forensic sciences?

Page 28

1       A.    Yes.
2       Q.    Do you consider them authoritative in
3  shooting reconstruction?
4       A.    The will book by Haag I do, by the
5  Haags, both Haags. I'm not sure of the DeForest.
6  DeForest is more of a crime scene analyst.
7       Q.    Do you consider shooting reconstruction
8  sort of a subcategory or subset of the general
9  forensic sciences?
10       A.    Yes.
11       Q.    Are there any other publications or
12  treatises that you consider to be authoritative in
13  the area of general forensic sciences?
14       A.    Yes. There is another book that I
15  commonly refer to. It's a book by Ed Hueske,
16  H-u-e-s-k-e. That book deals with shooting
17  reconstruction; the book by Dr. Vincent DiMaio,
18  Practical Aspects of Gunshot Wounds. There are a
19  number of other books. I don't recall them all,
20  but those are the main ones that I use.
21       Q.    That you use?
22       A.    That I use.
23       Q.    Is Dr. DiMaio's book authoritative on
24  shooting reconstruction?



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
29–32

Page 29

1    A. In the sense that it deals with gunshot
2 wounds, angles and how to interpret gunshot
3 wounds. He also talks about ammunition, yes, I
4 think it is.
5    Q. He talks about various aspects of
6 forensic sciences that you employ in shooting
7 reconstruction?
8    A. Yes.
9    Q. What would you consider to be the most
10 authoritative book on the overall science, on the
11 general -- I'm sorry. Let me rephrase that.
12       What would you consider to be the most
13 authoritative source on the specific science of
14 shooting reconstruction?
15    A. I think the had Haag book, Lucien Haag
16 and Michael Haag.
17    Q. Your report then goes on to discuss
18 source materials, and you break it down from
19 A to R.
20       Is that everything that you reviewed in
21 your study of this case?
22    A. Yes, it is.
23    Q. You did not review the entire Lake
24 County Major Crimes Task Force investigation?

Page 30

1    A. Whatever is listed is what I received.
2    Q. How was it determined that these would
3 be the only or the source materials that you would
4 review?
5    A. This was provided to me by Attorney
6 Rubenstein.
7    Q. Okay. Obviously because there isn't
8 anything else listed, you didn't ask for anything
9 more; is that fair?
10    A. That's a fair statement.
11    Q. Did everything on this list have some
12 evidentiary value to your opinions?
13    A. No, it did not.
14    Q. Tell me which ones did have some
15 evidentiary value to your opinions?
16    A. By letter? That would be the best way.
17    Q. Yes, letter is fine.
18    A. A, B, C, D, E, F, G, H, I, K, L, M, N,
19 I'm not sure about O at this point, P, Q and R.
20    Q. Now, regarding the autopsy photos and
21 crime scene photos, you didn't identify which ones
22 and I don't know that there would have been an
23 ability for you to do so, but did you bring those
24 with you?

Page 31

1    A. I have them on a disk.
2       (WHEREUPON, Andrew Stroth
3       entered the deposition
4       proceedings.)
5 BY MR. DiCIANNI:
6    Q. That's good because otherwise we were
7 going to be going through this entire book here.
8 So if I could ask you to pull those up and if you
9 want we can take a break while we're doing that.
10 So why don't we take a short break.
11       (WHEREUPON, a recess was had.)
12       (WHEREUPON, Andrew Stroth
13       left the deposition proceedings.)
14    MR. DiCIANNI: We're back on the record.
15 BY MR. DiCIANNI:
16    Q. When we broke, Mr. Scott, we were
17 talking about the autopsy photos and we were
18 hoping that what you brought with you would narrow
19 down the universe of photographs that you looked
20 at in order to determine your opinions, it looks
21 like you have all the autopsy it photos in your
22 file; is that correct?
23    A. Yes.
24    Q. So I guess when we get to the point

Page 32

1 where the autopsy photos were relevant to your
2 opinion, we'll have to go through them one by one
3 and you can tell us what was important for your
4 decision, okay?
5    A. That's okay.
6    Q. All right. Your report contains all of
7 the opinions that you have in this case?
8    A. Yes, as far as I know.
9    Q. Okay. So we won't have to waste time
10 asking about other opinions unless they're in
11 here, all right.
12    A. I think that's a fair statement.
13    Q. As I read your report, I would say that
14 your -- I would summarize your report and your
15 opinions as the following and you can correct me
16 if I'm wrong. As an overall --
17    MR. ODIM: I would object. The report speaks
18 for itself. Your summary is your summary.
19    MR. DiCIANNI: That's fine.
20 BY MR. DiCIANNI:
21    Q. The overall opinion is the shooting
22 didn't occur the way Hill says it did, correct?
23    A. Well, that's one of my opinions, yes.
24    Q. You disagree that Justus Howell turned



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
33—36

Page 33

1 toward Hill in the way Officer Hill described it,
2 correct?
3     A. That's another opinion, yes.
4     Q. You disagree that Officer Hill fired
5 his shot when he said he did; you believe it was
6 later, correct?
7 A. Correct.
8     Q. Do you disagree that Howell was armed?
9     A. I do not know if he was armed.
10     Q. Okay. You have an opinion about the
11 video and we'll talk about that when we get to
12 that, but you don't have an opinion as to whether
13 he was armed or not?
14     A. That's correct.
15     Q. And overall you believe Hill fired his
16 two shots as shown on the video between frames 281
17 to 285 or even 287; is that fair to say? And let
18 me clarify. The video I'm referring to is the
19 surveillance video from the business that was a
20 short distance away?
21     A. I'm not sure I agree with that.
22     Q. What's incorrect about that, about that
23 last statement?
24     A. I know one of my opinions is that a

Page 34

1 shot was fired at or after frame 287. I'm not
2 sure about one of the shots.
3     Q. So you're saying that you believe --
4 you disagree with the part of my reference -- the
5 part of my summary that referred to frames 281 to
6 285, you would make that 281 to 287 or later? Am
7 I understanding that correctly?
8     A. No. I don't think that's what I wrote
9 in my report.
10     Q. Correct me, then, in what that opinion
11 is as to when Officer Hill fired his two shots as
12 shown on the video.
13     A. Well, I know one of the opinions is
14 that the second shot was fired at or later than
15 approximately frame 287. Another shot was fired
16 prior to that. I don't think I've reached a
17 conclusion as to the sequence of frames in which
18 that shot was fired.
19     Q. So your opinion is the second shot was
20 fired at 287 or later; the first shot you're not
21 rendering an opinion on when it was fired?
22     A. I don't have an opinion as to the
23 specific frame sequence.
24     Q. Do you believe it was after frame 281?

Page 35

1     A. I'd have to look at the frame numbers.
2     Q. At some point, we'll get to that, and
3 you can correct me on what I have summarized as
4 your opinion.
5     Now, your opinions are based on as you
6 explained it in your report the security video and
7 comparison with Officer Hill's testimony, correct?
8     A. That's part of it, yes.
9     Q. The autopsy findings regarding the
10 gunshot wound trajectory and angles, correct?
11     A. It that's part of it.
12     Q. The location of the casings?
13 A. Correct.
14     Q. The testimony of Officer Gildea
15 regarding his location?
16 A. Yes.
17     Q. Was there anything else? There's
18 obviously a lot of other information, but in terms
19 of the source materials that you used to derive
20 your opinions, it's those materials, correct?
21     A. Once again, please.
22     Q. Security video in comparison with
23 Officer Hill's testimony?
24     A. That's correct.

Page 36

1     Q. The autopsy findings regarding the
2 gunshot wound trajectory and angles?
3     A. I agree.
4     Q. The location of the casings?
5 A. Correct.
6     Q. Officer Gildea's testimony about his
7 location when he heard the gunshots?
8 A. Correct.
9     Q. And is there anything else?
10     A. My personal inspection of the scene.
11     Q. What part of your opinions did your
12 personal inspection of the scene inform?
13     A. I took measurements.
14     Q. In what part of your -- in which of
15 your opinions did those measurements come into
16 play?
17     A. Those measurements come into play with
18 the location of the discharged cartridge cases,
19 referencing the video in relation to the location
20 of Officer Hill and the victim, and just the
21 general overall perspective of being at the scene
22 and placing everything into context.
23     Q. You didn't give us your measurements.
24 Do you have those?



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017

37–40

Page 37

1    A.    They should have been provided to you.
2  You should have those.
3    Q.    Maybe I'm wrong. Take a look at your
4  report and let me know if you're in here. I don't
5  recall seeing them.
6    A.    They're not in the report. They're on
7  a separate page.
8    Q.    I don't think we got that. Do you have
9  that?
10    A.    I do.
11    Q.    Is that in the form of something you
12  wrote out?
13    A.    I wrote it out and it was converted to
14  a PDF and supplied to Attorney Rubinstein.
15    Q.    Is it on disk or hard copy?
16    A.    I have a hard copy.
17    Q.    Did you take any notes in connection
18  with your study here other than measurements?
19    A.    Only mental.
20    Q.    No written notes?
21    A.    No.
22    Q.    So the next break I will ask you to get
23  out your measurements, okay?
24    A.    Okay.

Page 38

1    Q.    The video -- the security video is
2  important to your opinions, correct?
3    A.    Yes, it is.
4    Q.    If the court were to rule that the
5  video is inadmissible, would you still have a
6  reliable basis for your opinions?
7    A.    I don't know how to answer that. I
8  think that's up to the court, but it would be an
9  important item of evidence.
10    Q.    I'm not asking you for a legal ruling.
11  You're not an attorney. I understand that.
12    I'm talking about from a forensic
13  scientist perspective where you would make an
14  evaluation about whether your methodologies are
15  reliable and whether your conclusions are reliable
16  based on the materials that you reviewed, if the
17  security video is excluded, are your opinions
18  still reliable?
19    A.    Still what?
20    Q.    Can you still provide reliable
21  testimony at trial without using the security
22  video?
23    A.    I think it would be compromised.
24    Q.    To the extent that you would yourself

Page 39

1  say you couldn't say to a reasonable degree of
2  forensic science certainty that they're valid?
3    A.    I think there would be some aspects
4  that I could testify to, but the video is a
5  critical item.
6    Q.    Well, you would not be able to talk
7  about whether Hill -- I'm sorry, whether Justus
8  Howell turned in the way Hill described, correct?
9    A.    I agree.
10    Q.    Would you still be able to give
11  opinions regarding the positioning of the two
12  people at the time of the shooting without the
13  video?
14    A.    It would be difficult, but to some
15  extent I think I could give some partial opinions.
16    Q.    That you would consider to be
17  reliable?
18    A.    Yes.
19    Q.    Would you be able to continue to
20  disagree with Hill's testimony -- well, let me
21  rephrase that.
22    You construe Hill's testimony as being
23  that he fired a shot at frame 257, correct?
24    A.    That's his testimony, at or about 257.

Page 40

1    Q.    At or about 257, right?
2    A.    Yes.
3    Q.    And you disagree with that, right?
4    A.    Yes, I do.
5    Q.    Would you still be able to render an
6  opinion disagreeing with when Hill fired the shot
7  if the video was excluded?
8    MS. MORAN: We're going to object in terms of
9  you're reaching -- you're assuming legal
10  conclusions.
11    MR. DiCIANNI: I am.
12    MS. MORAN: And posturing if the -- positing
13  hypotheticals here.
14    MR. DiCIANNI: First of all, I think we need
15  to clarify who is going to be doing the
16  objections. We can't have two lawyers objecting.
17    MR. ODIM: I'll be doing it.
18    MR. DiCIANNI: No offense.
19    MS. MORAN: None taken.
20  BY MR. DiCIANNI:
21    Q.    I'm not asking you how would the court
22  rule. I want to clarify. I'm not asking you how
23  the court would rule on an opinion. I'm asking
24  you from the perspective of a forensic scientist



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
41–44

1 who holds yourself to a standard in which you will
2 only give opinions if the source materials and the
3 methodology is reliable, correct?
4   A. Yes.
5     Q. That's all I'm asking about. Not how
6 the court would rule.
7   A. Right.
8     Q. So if the video were excluded, would
9 you still have enough of a basis to disagree with
10 Officer Hill as to when you believe he says he
11 fired the shots?
12     MR. ODIM: Again, we'll object here. The
13 court's ruling on admissibility has nothing to do
14 with the expert's review of materials that inform
15 his opinion.
16     MR. DiCIANNI: Okay. I don't agree, but go
17 ahead.
18 BY THE WITNESS:
19     A. The video would be necessary.
20 BY MR. DiCIANNI:
21     Q. To disagree with a version of when he
22 fired the shots given by Officer Hill, is that
23 what you're saying?
24     A. I disagree and I agree. There are some

1 aspects of that I could make opinions on using the
2 other source materials.
3     Q. Using the location of the casings?
4     A. Using the deposition demonstration of
5 Officer Hill as to how Mr. Howell turned.
6     Q. So you still feel like you could give a
7 reliable opinion disagreeing with Hill's testimony
8 about when he fired the shot even without the
9 video?
10   A. Yes.
11     Q. And whether Howell turned or didn't
12 turn, you don't believe that Hill fired at the
13 time Howell would have been turned?
14     A. That's correct.
15     Q. If the court were to rule that you
16 don't have -- for whatever reason your conclusions
17 regarding the autopsy findings and the positioning
18 based on the angles were excluded, how would that
19 affect your opinions?
20     MR. ODIM: Objection. Same as stated before.
21 You're assuming matters that have nothing to do
22 with what an expert can rely on in rendering his
23 opinion, and you're asking this expert to also
24 give an opinion regarding the law.

1 BY MR. DiCIANNI:
2     Q. Go ahead.
3     A. Could I have it once again, please.
4     MR. DiCIANNI: Would you read it back.
5         (WHEREUPON, the record was read by
6         the reporter.)
7 BY MR. DiCIANNI:
8     Q. Do you understand the question?
9     A. I do. The autopsy positions will be
10 necessary.
11 BY MR. DiCIANNI:
12     Q. For your opinions?
13   A. Yes.
14     Q. If the court were to find that your
15 conclusions based on the location of the casings
16 was inadmissible, how would that affect your
17 opinion regarding when Hill fired the shots?
18     MR. ODIM: Tom, just to make this efficient,
19 are you going to --
20     MR. DiCIANNI: You can have a standing
21 objection.
22     MR. ODIM: Standing objection.
23     MR. DiCIANNI: I acknowledge a standing
24 objection to this line of questioning.

1     MR. ODIM: Okay.
2     MR. DiCIANNI: Could you read back the
3 question.
4         (WHEREUPON, the record was read by
5         the reporter.)
6 BY THE WITNESS:
7     A. I would have to reconsider those
8 opinions.
9 BY MR. DiCIANNI:
10     Q. Now, in part five you explain your
11 opinion on why the security video, you call it the
12 surveillance video, same thing, refutes Officer
13 Hill's testimony that Justus Howell turned at some
14 point during the chase; is that correct?
15   A. Yes.
16     Q. You say you don't see a turn in the
17 video, at least when Officer Hill says he saw the
18 turn, you don't see a turn there; is that correct?
19     A. That's right.
20     Q. That's right around 257, correct?
21   A. Yes.
22     Q. I want to talk about what expertise you
23 employ in watching a video.
24         Can't a jury make the same judgment

RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017

45–48

Page 45

1  that you made as to whether there's a turn or not?
2      MR. ODIM: Objection, speculation about what
3  a jury can do. He's not a jury.
4  BY MR. DiCIANNI:
5      Q.   Go ahead.
6      A.   I'm sure a jury can see the video and
7  see what's in the video whereas I'm looking in the
8  video and I'm looking at details of time, motion
9  and distance. I'm looking at postures and
10  orientation. I'm looking at how a person is
11  holding a gun, how a victim is positioned. I'm
12  referring back to the autopsy findings what the
13  trajectory was. I'm placing everything together
14  in the totality of the circumstances and utilizing
15  expertise in shooting reconstruction, trajectory
16  analysis, and placing that into the perspective to
17  draw scientific interpretations from it.
18      Q.   So are you saying that your opinion in
19  part five that Hill's description of how turning
20  at about frame 257 is not based on merely the
21  review of the video, but it also incorporates what
22  you know from the autopsy findings and other
23  source material; is that correct?
24      A.   I don't think I understand what you're

Page 46

1  asking there.
2      Q.   My question is what science are you
3  applying when you tell us that you can tell what's
4  on a video better than the average person and you
5  said you're also incorporating your knowledge of
6  what was discovered at the autopsy.
7          So my follow-up question is you're not
8  saying from the video alone you could tell that
9  Hill did not turn at or around 257; you're saying
10  that based on the video plus other information
11  that you gained in reviewing the file you conclude
12  that he didn't turn at 257?
13      A.   Yes.
14      Q.   So it's not the video alone that leads
15  you to the conclusion that he didn't turn at 257,
16  correct?
17      A.   That's a fair statement.
18      Q.   That's different from what your report
19  says, correct?
20      A.   I don't believe it is.
21      Q.   Well, in part five you don't reference
22  any autopsy findings, right?
23      A.   Not in part five.
24      Q.   So you're imputing the autopsy findings

Page 47

1  into part five without expressing them?
2      A.   Correct.
3      Q.   How do you -- you're aware that other
4  people besides Hill did see a turn at 257? Are
5  you aware of that?
6      A.   I'm not.
7      Q.   Would you agree that not having the
8  knowledge of the autopsy findings as you did
9  reasonable people could disagree that 257 doesn't
10  show a turn?
11      MR. ODIM: Objection. Speculation.
12  BY THE WITNESS:
13      A.   I don't know what other reasonable
14  people could determine, but they could reach their
15  own conclusion.
16  BY MR. DiCIANNI:
17      Q.   Certainly, right.
18      A.   Sure.
19      Q.   And without the knowledge of the
20  autopsy and the application of that knowledge to
21  your interpretation of the video, you would not
22  conclude merely by looking at the video that at
23  257 Justus Howell did not turn?
24      A.   Once again, please.

Page 48

1      MR. DiCIANNI: Would you read it back.
2          (WHEREUPON, the record was read by
3          the reporter.)
4      THE WITNESS: Please once again.
5          (WHEREUPON, the record was read by
6          the reporter.)
7  BY THE WITNESS:
8      A.   Well, I think it's just looking at the
9  video at that point comparing it to Officer Hill's
10  demonstration at the deposition.
11  BY MR. DiCIANNI:
12      Q.   So you're saying looking at the video,
13  you are -- looking at the video alone allows you
14  to say based on your shooting reconstruction
15  expertise that Justus Howell did not turn in the
16  way that Hill described it at 257, correct?
17      A.   That's not quite accurate. That's not
18  what I said.
19      Q.   Correct me.
20      A.   How Officer Hill demonstrated at his
21  deposition and his relationship in regards to the
22  positioning, where he was in relation to the
23  direction they were both moving at the time and
24  how Mr. Howell turned at 257 and it was at that



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
49–52

Page 49

1  point that he saw certain aspects of Mr. Howell's
2  activities. When I compare that to the video, I
3  did not see what Officer Hill is testifying to.
4      Q.   You're not looking at it from the same
5  perspective, correct?
6      A.   I'm looking at what Officer Hill is
7  testifying to and looking at the same frame and
8  I'm not seeing what he's describing nor do I see
9  what he physically demonstrated.
10     Q.   But you're not looking at it from his
11  perspective, are you?
12     MR. ODIM: Objection. Foundation.
13  BY THE WITNESS:
14     A.   I'm looking at the video for what it
15  is. I'm looking at Officer Hill's demonstration
16  and I'm reading his transcript, and I do not see
17  agreement between the video and his deposition
18  testimony and his demonstrative exhibit.
19  BY MR. DiCIANNI:
20     Q.   You can arrive at that conclusion even
21  without applying the knowledge that you have from
22  the autopsy findings?
23     A.   Yes.
24     Q.   So you can't rule out that Justus

Page 50

1  Howell made some kind of a turn at 257 without
2  applying the autopsy findings but what you can say
3  is that he didn't turn in the way Hill described
4  it; is that correct?
5      A.   That's a fair statement.
6      Q.   According to your report, you arrive at
7  your conclusion that disputes Hill's description
8  of the turn from comparing frame 256 to 257; am I
9  reading that correctly?
10     A.   What page, please?
11     Q.   It's Page 10.
12     A.   Any specific area or the whole page?
13     Q.   I'll read it. This would be the second
14  paragraph under B, little i: "Frame 257 depicts
15  Officer Hill located just off the concretes
16  walkway which is in front of the Spaeth's building
17  and it shows Officer Hill has stepped onto the
18  asphalt driveway surface while Howell is running
19  south to southeast several feet before reaching
20  the tree in the front yard of the White residence
21  at frame 257, and multiple frames preceding this
22  clearly show that Justus Howell was constantly
23  facing forward in the direction that he is moving.
24  His right brachium and upper arm between shoulder

Page 51

1  and elbow is silhouetted against the White
2  residence and is shown to be in front of and to
3  the right of his torso and at a right angle to the
4  ground plane. In frame 256 Justus Howell's right
5  arm from his shoulder to his hand is positioned
6  nearly straight downward toward the grounds and
7  slightly out front of his body and this continues
8  to frame 257."
9      So my question was you conclude that
10  Howell didn't turn the way Hill described it by
11  comparing 256 to 257?
12     A.   That's correct.
13     Q.   I don't mean to beat a dead horse.
14      You're refuting Hill's description of
15  the turn merely based on the video?
16     MR. ODIM: Objection. That's not his
17  testimony.
18     MR. DiCIANNI: I think it was.
19  BY MR. DiCIANNI:
20     Q.   Is that correct? You can answer. He
21  can object, but he's not telling you not to
22  answer.
23     A.   I didn't know if the objection was
24  finished.

Page 52

1      Yes. It's my review of the video at
2  that frame in comparison to Officer Hill's
3  testimony at that very same frame.
4      Q.   I want to ask you about the science
5  of -- forensic science aspect of looking at a
6  video.
7      What part of forensic science
8  does reviewing a video and interpreting it fall
9  under?
10     A.   Well, there is forensic video experts.
11  I'm looking at the detail in the video. I'm
12  looking at the motion, the time, postures,
13  movement.
14     Q.   What do forensic video experts do?
15     A.   They can enhance videos, slow them
16  down, create slow motion. I'm not sure exactly
17  what it is they can do in totality, but they can
18  do things that are above and beyond.
19     Q.   They can talk about distortions in the
20  video from reality, correct?
21     A.   Yes.
22     Q.   Caused by the camera, caused by other
23  factors, correct; they do that?
24     A.   I believe so.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
53–56

Page 53

1    Q. Is there any branch of forensic science
2 that allows somebody to just look at a video, look
3 at how people are moving, timing, sequence and
4 interpret what's going on in that video?
5    A. I'm not sure of a specific branch.
6    Q. Is there any study or any treatise
7 or anything at all you can point me to, any source
8 you can point me to that describes the appropriate
9 use of video in forensic shooting reconstruction?
10    A. There have been some studies placed out
11 on video regarding such as with dash cams or body
12 cameras, bank robberies and the like, which can be
13 used to draw certain data from.
14    Q. If a video shows A shooting B, is an
15 appropriate application of forensic science to
16 testify from looking at that video I could tell
17 that A shot B?
18    A. It's possible.
19    Q. What makes it possible?
20    A. It's possible. You might see a muzzle
21 flash. You might see the person fall down. You
22 could see a cartridge case.
23    Q. As a forensic scientist, you would be
24 explaining areas of forensic science that are

Page 54

1 demonstrated in that video such as muzzle flash?
2    A. That would be one, yes.
3    Q. In the absence of some explanation of
4 some forensic science conclusion in the video, is
5 it appropriate -- is that an appropriate
6 application of forensic science to just say what's
7 on the video?
8    MR. ODIM: Objection. Foundation.
9 Multi-part question.
10 BY THE WITNESS:
11    A. I think we could rely on other
12 information such as medical information.
13 BY MR. DiCIANNI:
14    Q. Okay. I'm not questioning it. I'm
15 just questioning if a video sees A shooting B and
16 there's no question about muzzle flash, is it an
17 appropriate application of forensic science for
18 you to get on the stand and testify from my review
19 of the video, A shot B?
20    A. Additional data is needed.
21    Q. Yes, okay. Additional clarification of
22 what's on the video based on forensic science
23 conclusions; is that correct?
24 A. Yes.

Page 55

1    Q. Otherwise a jury can just -- anybody
2 can just tell A shot B, right. Nevermind.
3 Rhetorical question.
4 A. Okay.
5    Q. Let's take a look at 256 and then 257.
6    MR. ODIM: Tom, let's go off for a quick
7 second.
8        (WHEREUPON, discussion was had off
9        the record.)
10    MR. ODIM: Back on the record.
11 BY MR. DiCIANNI:
12    Q. Take a look at 256 and then let's go to
13 257.
14        You don't see a difference between 256
15 and 257?
16    MR. ODIM: Objection. Is that a question?
17    MR. DiCIANNI: Yes.
18    THE WITNESS: I didn't anticipate the
19 comparison.
20    Can we go back to 256?
21 BY MR. DiCIANNI:
22    Q. Yes. Go back to 256.
23        Now that's 256, and is it your opinion
24 that he's running forward at that point?

Page 56

1    A. Yes, it is.
2    Q. Now let's go to 257. You don't see a
3 difference there?
4    A. I see a difference.
5    Q. Doesn't it look that more of his back
6 is facing the camera than in 256?
7    A. I don't see a significant difference.
8    Q. You don't?
9    A. I do not.
10    Q. Isn't his right arm extended out from
11 his body in 257?
12    A. Yes, it is.
13    Q. Do you see the white right there?
14 A. Yes.
15    Q. That's a gap between his arm and his
16 torso, correct?
17    A. Yes, it is.
18    Q. Isn't that different from 256?
19    A. Yes, it is.
20    Q. But you disagree that that demonstrates
21 a turn in the way that Officer Hill described it?
22    A. That's correct.
23    Q. But you don't disagree that it
24 demonstrates a turn?



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017

57—60

Page 57

1    A.    I don't think it's a turn.

2    Q.    You don't think it's a turn?

3    A.    No, I do not.

4    Q.    Tell me everything you base that

5  on.

6    A.    Mr. Howell is running southeast.

7  Officer Howell is moving directly south.

8    Q.    Officer Hill.

9    A.    I'm sorry. Officer Hill is moving

10  south. So there is an orientation of Mr. Howell

11  moving to the southeast in relation to this camera

12  that I see that is showing some of his back, but

13  not of a result of a turn.

14    Q.    Well, tell me how does running

15  southeast reveal more of his back than what, than

16  running straight south?

17    A.    The camera is facing east. If you look

18  at Officer Howell (sic), you'll see that you only

19  see his right side because he's facing directly

20  south. When I look at Mr. Howell who is running

21  southeast, he's running away from the camera at an

22  angle and so his back portion is going to be

23  showing more to the camera by virtue of the

24  compass direction in which he's moving.

Page 58

1    Q.    Let's go back to 256.

2        So in 5/100ths or 6/100ths of a second,

3  merely by running in a southeasterly direction

4  more of his back is going to be revealed in those

5  two frames?

6    A.    I don't see any difference in the

7  amount of his back.

8    Q.    You don't?

9    A.    No, I don't.

10    Q.    If we were to be able to blow those up

11  and do a measurement, a north-south measurement of

12  his back that showed a difference in how much of

13  his back is facing the camera, would you

14  disagree -- would you agree with us then that

15  there is a difference in 256 and 257?

16        MR. ODIM: Objection. That's inappropriate

17  hypothetical.

18  BY THE WITNESS:

19    A.    I would be willing to look at them and

20  reconsider.

21  BY MR. DiCIANNI:

22    Q.    Okay. Thank you.

23        You go on in part five to say that the

24  silver Kimber cannot be seen in the video.

Page 59

1        Did you come to that conclusion merely

2  by looking at the video?

3    A.    Yes.

4    Q.    What forensic shooting reconstruction

5  expertise did you apply in arriving at that

6  conclusion?

7    A.    I'm looking at the contrast of a silver

8  or chrome pistol to see that object in this

9  victim's hand. I can't see it.

10    Q.    Are you ruling out that there is a --

11  you can't see it, but are you ruling out or are

12  you saying that the video demonstrates that he

13  doesn't have a gun in his hand?

14    A.    I'm not saying that.

15    Q.    You're just saying it can't be seen?

16    A.    Correct.

17    Q.    Is the only forensic science principle

18  or forensic science conclusion that you're

19  applying here to determine that the silver Kimber

20  can't be seen in his hand that you don't see any

21  reflections?

22    A.    I don't see any object or reflection.

23    Q.    Have you done any studies regarding

24  what kind of reflection a silver Kimber like this

Page 60

1  one would show in a video like this?

2    A.    Not studies.

3    Q.    Have you done anything that would

4  provide you with some objective evidence that if

5  there was a gun in his hand, silver Kimber in his

6  hand, some reflection would be seen?

7    A.    I don't know if I have an actual

8  estimate of videos in which people have been

9  carrying firearms of different color, but I have

10  seen silver-colored firearms.

11    Q.    Have you seen silver-colored firearms

12  in a video that is similar to this one?

13    A.    Yes, when you say similar, this is

14  unique to itself.

15    Q.    It is unique to itself, isn't it?

16    A.    Yes.

17    Q.    You can't really come to a conclusion

18  that he's not carrying a silver Kimber because you

19  don't see it in this video based on your review of

20  other videos, correct?

21    A.    Correct.

22    Q.    What would be some of the other -- some

23  of the factors that might affect whether a

24  reflection would be shown?



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
61—64

Page 61

1    A. Well, I think the best answer I could
2 give to that is I would either see it or I
3 wouldn't see it, and I just can't see it.
4    Q. Would the location of the sun matter?
5 A. Yes.
6    Q. Would the time of the day matter?
7 A. Yes.
8    Q. Would the camera's ability to pick up a
9 reflection and not have that distorted in some way
10 matter?
11    A. I think that's an aspect that could be
12 considered.
13    Q. And you didn't consider any of those
14 factors in this case?
15    A. Well, I've seen other objects in this
16 video that do reflect.
17    Q. Like what?
18    A. Well, we can see the reflection of the
19 window of that motor vehicle parked on the right
20 side. We can see the frame of the window of
21 Spaeth's Woodworking, both the left large window.
22 We can see all these vehicles from the front with
23 the headlights. We can see the chrome. We can
24 see the white house, and in the part of the video

Page 62

1 we'll see Officer Gildea's badge actually flash.
2    Q. That would be a function of a
3 particular light hitting it at that particular
4 time, right?
5    A. I agree.
6    Q. None of which you can say the same type
7 of light would have would have hit the gun in this
8 video?
9    A. All I can see is say I cannot see a
10 silver object or a reflective object in his hand.
11    Q. You're probably familiar with the gun
12 itself, but you've studied that type of gun?
13    A. I'm familiar with that firearm.
14    Q. How long is it?
15    A. I believe the overall length is about
16 four inches.
17    Q. That's the length?
18    A. It would be from the grip, the bottom
19 part of the grip to the front of the muzzle.
20    Q. How high is it?
21    A. I'd have to look at my notes.
22    Q. Well, from your knowledge? You have
23 notes on that?
24    A. I do.

Page 63

1    Q. I thought you didn't have notes.
2    A. I didn't take notes at the scene. I
3 do --
4    Q. What do you mean?
5    A. I didn't take notes at the scene was
6 the question you'd asked me.
7    Q. No. I asked you if you had any notes.
8    MR. ODIM: Objection. I heard exactly what
9 he told you. You asked him about the scene when
10 he went up to take measurements.
11 BY MR. DiCIANNI:
12    Q. Well, then I'll ask you now.
13        During the course of your study in this
14 case, did you take notes?
15    A. I printed out reference material.
16    Q. Did you take notes?
17    A. Written notes?
18 Q. Yes.
19 A. No.
20    Q. So you have some reference material
21 that on the silver Kimber?
22    A. Yes.
23    Q. And that's what you would refer to?
24    A. Yes.

Page 64

1    Q. And apart from looking at that right
2 now, you can't tell me the height of the gun?
3    A. Given that it's an estimate,
4 approximately three to three-and-a-half inches.
5    Q. It's a tiny gun, right?
6    A. It's very small.
7    Q. Justus had big hands, right?
8    MR. ODIM: Objection. Foundation.
9 BY MR. DiCIANNI:
10    Q. Did you look at the autopsy photographs
11 to determine whether Justus's hands -- how much of
12 the gun would have been shielded from any light
13 that might reflect off of it by --
14    MR. ODIM: Objection, foundation again.
15 Sorry.
16    MR. DiCIANNI: I'm asking if he did it.
17 Objection foundation? What do you mean objection
18 foundation? I'm asking him if he did something.
19 What foundation do you want for that?
20    MR. ODIM: How about the measurement of his
21 hands?
22    MR. DiCIANNI: That's what I'm asking him.
23    MR. ODIM: How --
24    MR. DiCIANNI: I'm asking him if he did it --



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
65–68

Page 65

1 all right. Let's take a break.
2     MR. ODIM: Okay. Let's do that.
3         (WHEREUPON, a recess was had.)
4     MR. DiCIANNI: Could you read back the last
5 question.
6         (WHEREUPON, the record was read by
7           the reporter.)
8 BY MR. DiCIANNI:
9     Q.   You can answer.
10     A.   I did not. I would have hoped that
11 would have been done at the autopsy by the
12 officers, but I haven't read any source materials
13 to that effect.
14     Q.   You would hope that they would do it in
15 the investigation to confirm or refute the
16 testimony by Hill that Howell was carrying a gun,
17 right?
18     A.   Officer Hill described and demonstrated
19 how it was done. Certainly I think that could
20 have been done at the autopsy.
21     Q.   What I'm referring to is you wish the
22 investigation had done something to either confirm
23 or refute that Howell was carrying a gun based on
24 a lack of reflection in the video; is that what

Page 66

1 you're saying?
2     MR. ODIM: Objection. That was not his
3 testimony.
4 BY THE WITNESS:
5     A.   I don't agree with the term refute.
6 What I would like to see is there is a version of
7 events, a simple matter of placing the gun with
8 the precautions, of course, not to transfer DNA
9 and in the person's hands and taking some
10 photographs and document what it would look like
11 according to the way Officer Hill described. That
12 would have been appropriate to do.
13 BY MR. DiCIANNI:
14     Q.   What significance does the opinion that
15 you can't see the gun in Howell's hand have on
16 your opinions in this case?
17     MR. ODIM: Objection. Misstates the
18 evidence. There's no testimony that there was a
19 gun in his hand.
20     MR. DiCIANNI: Would you read back the
21 question.
22         (WHEREUPON, the record was read by
23           the reporter.)
24     MR. ODIM: Sorry.

Page 67

1 BY THE WITNESS:
2     A.   That I did not see the gun?
3 BY MR. DiCIANNI:
4     Q.   Yes.
5     A.   Well, if I saw the gun I would report
6 it. I'm reporting what I can see and what I
7 cannot see that's an important aspect of this
8 shooting.
9     Q.   Whether you can see a gun in Howell's
10 hand in the video doesn't affect your opinion on
11 whether he turned or not, right?
12     A.   Correct.
13     Q.   And it doesn't affect your opinions on
14 the positioning of the two people at the time the
15 shots were fired, right?
16     A.   I agree.
17     Q.   And it doesn't affect your opinion
18 regarding your disagreement with when Hill fired
19 the shots, correct?
20     A.   Correct.
21     Q.   So what significance does it have to
22 your opinions? It's just an independent opinion?
23     A.   I'm reporting what I see. In this case
24 I'm reporting what I don't see. I would report

Page 68

1 either or.
2     Q.   You could report a lot of things that
3 you see or don't see, but you chose to report that
4 particular one.
5     Why is that significant to your
6 opinion?
7     MR. ODIM: I object. You've been beating
8 this dead horse. He had has not been asked to
9 give an opinion about the existence of this gun or
10 nonexistence. So it's outside the task that he
11 was given.
12 BY MR. DiCIANNI:
13     Q.   So you weren't asked to give an opinion
14 on whether Howell is carrying a gun.
15     Why did you render an opinion on
16 whether the video shows Howell carrying a gun?
17     A.   I can see Officer Hill's gun.
18     Q.   That's a different question.
19     A.   I can see a gun. I can't see a silver
20 object or metallic object in the hands of
21 Mr. Howell.
22     Q.   That opinion that you can't see a gun
23 in his hand in the video doesn't have any
24 relevance to any of the other opinions that we've



Page 69

1  discussed; counsel has just said on the record
2  that you weren't asked to give that opinion.
3         Are you only giving that opinion as
4  a means of attempting to attack Hill's
5  credibility?
6     A.  No.
7     Q.  Doesn't the fact that you gave an
8  opinion that's contrary to Hill's testimony and
9  you that you weren't even asked to give, doesn't
10 that indicate a bias on your part against Officer
11 Hill?
12    A.  Not at all.
13    Q.  You disagree?
14    A.  I disagree. Strongly disagree.
15    Q.  Why didn't you discuss any of the
16 factors in your report that could have prevented
17 you from seeing a gun even if he was carrying it?
18    A.  I don't understand that question.
19    Q.  We talked about Howell if he had big
20 hands, it could have completely covered the gun
21 from any light might have reflected off of it,
22 correct?
23    A.  Correct.
24    Q.  Okay. And you didn't do any reflection

Page 70

1  tests on this kind of a gun, correct?
2     A.  Correct.
3     Q.  It's a small gun, correct?
4     A.  It's a small gun.
5     Q.  Why didn't you include -- it doesn't
6  really have a sharp silver -- it's sort of a matte
7  finish, isn't it?
8     A.  Yes.
9     Q.  It's a brushed silver kind of?
10    A.  It's not shiny.
11    Q.  You say in your report that I can't see
12 a gun in his hand, but you don't discuss any of
13 the factors that could have prevented you from
14 seeing a gun if he had gun.
15       Why not?
16    A.  I certainly have some thoughts as to
17 why I can't see a gun.
18    Q.  Why wouldn't you put that in your
19 report?
20    A.  Because there's other possibilities.
21    Q.  Well, there is a possibility that any
22 one of those factors or all of those factors that
23 I just mentioned could have prevented the
24 reflection of a gun in the video, correct?

Page 71

1     A.  That's one aspect, correct.
2     Q.  All right. And wouldn't it be a
3  thorough forensic evaluation to also say I don't
4  see a gun, however, there are reasons why I might
5  not see a gun and list some of those factors?
6  Wouldn't that be a thorough forensic evaluation to
7  make?
8     A.  I think that opens that up to
9  possibilities that could go -- endless
10 possibilities. What I can't see is I cannot see a
11 gun. That's my conclusion from looking at the
12 video.
13    Q.  Right, but there are forensic
14 evaluation as that have to be made that could
15 explain a disagreement between what's shown on the
16 video and what somebody testified to, right?
17    A.  Yes.
18    Q.  That's what you're supposed to do in a
19 forensic evaluation, correct?
20    A.  Not necessarily.
21    Q.  Not necessarily unless your mission is
22 to refute somebody's testimony as opposed to
23 independently making an evaluation, right?
24    A.  Again, you're using the term refute

Page 72

1  testimony, and that's not role in this case.
2        My role in this case is to look at the
3  evidence as I see it. If it agrees with the
4  testimony, that's fine. If it refutes it, that's
5  the way it is.
6     Q.  You didn't see anything that could be
7  interpreted as a gun in Howell's hand?
8     A.  I did not.
9     Q.  What about the way he's running? Does
10 that suggest to you he's carrying something in his
11 right hand?
12    A.  I can't tell.
13    Q.  You say yourself in your report that
14 when he's running for the most part his right arm
15 is down facing the ground, right?
16    A.  I can see the -- yes.
17    Q.  Not facing the ground, extended towards
18 the ground?
19    A.  From the brachium, shoulder to the
20 elbow, I can see that.
21    Q.  Okay. And when people run, normally
22 they run with their arms rotating back and forth?
23    MR. ODIM: Objection, foundation.
24 BY MR. DiCIANNI:



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
73–76

Page 73

1    Q.   Well, I'm asking you.
2    A.   Normally.
3    Q.   Wouldn't it suggest to you that he's
4  running with his right arm down as opposed to
5  rotating back and forth that he's carrying
6  something in his right hand?
7    A.   It's possible.
8    Q.   Why didn't you consider that, though,
9  in your report?
10    A.   Well, I can't see anything in the
11  video.
12    Q.   Well, I know, but there's other
13  explanations for why you can't see anything and
14  there's something else that could suggest that he
15  is carrying something in his right hand, none of
16  which you put in your report?
17    A.   I did not say in my report that he's
18  not carrying anything.
19    Q.   Okay. All right. You agree with
20  counsel that you were not asked to talk about
21  whether he had a gun in his right hand or whether
22  the video shows that he has a gun in his right
23  hand, correct?
24    A.   Once again.

Page 74

1    Q.   You agree with counsel who said that
2  you weren't even asked to evaluate whether the
3  video shows that he has a gun in his right hand?
4    A.   Counsel never asked me to look for a
5  gun.
6    Q.   You do say you can see a gun in Officer
7  Hill's hand?
8    A.   Yes.
9    Q.   Before I get into that, let's show 212
10  to 214 and then we'll -- one at a time.
11         213, you see where his right arm should
12  be located, you can't see it completely because of
13  the fence in the way, but the white little dot
14  here below the -- about two thirds of the way up
15  from the bottom fence post, that's not a post,
16  what do you call the vertical --
17    A.   That's actually the sidewalk you're
18  pointing to.
19    Q.   That's the sidewalk? You think that's
20  the sidewalk?
21    A.   This is the sidewalk right here.
22    Q.   That's the sidewalk, but I'm referring
23  to this right here. That's above the sidewalk.
24  That's about the height of the middle of this car

Page 75

1  that's to the right of it.
2         Couldn't that be a reflection off his
3  gun?
4    A.   I don't see that.
5    Q.   Why not?
6    A.   I see a vertical fence post.
7    Q.   Next to the fence post, you don't see
8  the white dot?
9    A.   I see the two white dots which indicate
10  to me that it's his pants legs.
11    Q.   You think that's his pants leg?
12    A.   Yes, I do.
13    Q.   If his arm was extended all the way
14  down, that's where his right hand would be,
15  wouldn't it?
16    A.   I don't see his right hand.
17    Q.   I know, but if it were extended down
18  all the way, that's about where or almost exactly
19  where his right hand would be, correct?
20    A.   If it's there, it's blocked by that
21  vertical post.
22    Q.   If what's there it's blocked by the
23  vertical post.
24    A.   His arm and hand.

Page 76

1    Q.   His arm. Well, couldn't this brown
2  part here or the colored part, I can't know the
3  color exactly, that's actually his right arm,
4  isn't it? And I'm referring to are the colored
5  figure in the frame that begins just above the
6  horizontal post and comes down to just below the
7  horizontal post, it that's his right arm, isn't
8  it?
9    A.   There's also a tree there so I can't
10  tell whether that's part of the tree.
11    Q.   Part of the tree?
12    A.   That's a tree.
13    Q.   There's something white in the tree
14  like a dove?
15    A.   If you could point out to me exactly
16  what it is you're referring to.
17    Q.   Yes. I'm referring to this right here.
18    MS. MORAN: You're putting your glasses up
19  there. Why don't you use a pointer. It's a
20  little unclear of exactly what you're pointing to.
21  BY MR. DiCIANNI:
22    Q.   I don't have a pointer. I'll use my
23  pen. Right there.
24         Do you see where I'm pointing to?



Page 77

1    A.   Yes.
2    Q.   Why would you rule out that that's a
3  the reflection of a gun?
4    A.   I don't see the shape of a gun and I do
5  not see the skin of a hand of Mr. Howell in that
6  frame.
7    Q.   Well, you can't see his hand or skin in
8  any frames, right?
9    A.   I would have to go through them frame
10  by frame, but in this frame I do not see his arm
11  or his hand or a gun in that frame.
12    Q.   Okay. So let's talk about your opinion
13  that you could see the gun in Hill's hand and
14  you're only pointing that out because you think
15  that if you could see it in Hill's hand, we should
16  be able to see it in Howell's hand; is that
17  correct?
18    A.   There's an additional aspect to that.
19    Q.   What is that?
20    A.   Officer Hill testified that he did not
21  withdraw his firearm from his holster until he had
22  reached the driveway.
23        My viewing of this video shows that he
24  withdraw his firearm as he rounded that corner and

Page 78

1  went behind the tree.
2    Q.   Why is that important?
3    A.   Because his testimony was that he did
4  not withdraw his firearm until he had reached the
5  driveway.
6    Q.   So you're just wanting to point out
7  discrepancies in his testimony whether it's
8  relevant to an opinion or not? That's what you're
9  doing?
10    A.   There's other information in his
11  deposition and his statement in which he stated
12  that he did not point the gun at Mr. Howell until
13  he had reached the driveway, and from the video, I
14  see a different version of events.
15    Q.   That's really not relevant to any of
16  your opinions, though, is it?
17    A.   I'm looking at a shooting
18  reconstruction. At what point did a person have a
19  firearm in his hand whether it be Howell or
20  Officer Hill.
21    Q.   Okay. So you're wanting to point out
22  in Section 5 ii that you could see the gun in
23  Hill's hand is put there not only to support your
24  view that the video doesn't show a gun in Howell's

Page 79

1  hand, but also for another purpose?
2    A.   What page, please?
3    Q.   Page 11.
4    A.   With regards to the question, the
5  purpose is to point out what I see.
6    Q.   What you saw was something that was
7  inconsistent with what you thought his testimony
8  was when you point out where Hill has a gun in his
9  hand?
10    A.   It's not what I think was inconsistent.
11  It's what I know was inconsistent.
12    Q.   You deny that you're bringing these
13  things to light in your report merely to impeach
14  Officer Hill?
15    A.   Yes. I deny that.
16    Q.   You deny that. You deny that you have
17  any bias against Officer Hill?
18    A.   Absolutely deny that strongly.
19    Q.   You deny that you have any advocacy
20  here for the plaintiff?
21    A.   That's correct.
22    Q.   You say that this is a completely
23  independent, full and thorough forensic
24  evaluation?

Page 80

1    A.   Yes.
2    Q.   Let's show 240. You say that in your
3  report Page 11 you say that in frames 240, 252,
4  257, 264, 270 and 275 you can clearly see Officer
5  Hill's pistol, correct?
6    A.   Yes.
7    Q.   We know Officer Hill had a pistol in
8  his hand. There's no disputing that, correct?
9    A.   Well, I can see it, and that's what I
10  reported.
11    Q.   No, I know.
12        So you're saying that independent of
13  our knowledge that he was holding a gun, you can
14  see a gun?
15    A.   Yes.
16    Q.   I'm going to ask you to show me in 240
17  where you see a gun. Do you want the pointer?
18  Eventually we'll use the photographs for this.
19  Let's start with you showing me exactly where you
20  see a gun in his hand.
21    A.   You see a black outline right here,
22  which can be enhanced in this software.
23    Q.   Did you enhance it?
24    A.   I did.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
81—84

Page 81

1    Q.   You did?

2    A.   Sure.

3    Q.   So you know how to enhance it right
4  now?

5    A.   I could try.

6    Q.   Let's do it.

7    A.   What I'd like is to say is I don't know
8  what the resolution is on this screen, but it's
9  different than the monitor that I use on my
10  computer so it's not going to be as clear. I
11  think this is about as good as I'm going to get.

12    Q.   Well, that's better. Although maybe --
13  it's sharper but a little blurrier.

14    A.   A little blurrier, but I can see and it
15  kind of blends in with the line under the window,
16  but there's a black object in his hand.

17    Q.   A black object in his hand? It extends
18  from here to here?

19    A.   Well, again, the resolution on this is
20  not what I see on my computer. I don't know what
21  the resolution would be, but it's clear not as
22  defined as my monitor.

23    Q.   So your monitor shows something
24  different from what my monitor shows?

Page 82

1    A.   I think the resolution on my monitor is
2  significantly greater quality.

3    Q.   Did you run off any photos from your
4  monitor that would show us the better quality?

5    A.   I did not.

6    Q.   Do you have your monitor with you?

7    A.   I didn't use the PC that I have with
8  me.

9    Q.   Let's go back to the way it was. This
10  is sharper but it's blurrier so let's go back to
11  the way it was.

12    A.   Uncheck the image adjust.

13    Q.   That's back to what it was?

14    A.   Right.

15    MR. DiCIANNI: Let's mark this as Exhibit 2.

16        (WHEREUPON, a certain document was
17        marked Scott Deposition Exhibit
18        No. 2 for identification, as of
19        04/04/2017.)

20  BY MR. DiCIANNI:

21    Q.   Let me ask you to turn to frame 240. I
22  might know what you're going to say about this but
23  can you see the gun in this photo?

24    MR. ODIM: What page?

Page 83

1    MR. DiCIANNI: It's frame 240. We didn't
2  number the pages, but they're in order.

3  BY THE WITNESS:

4    A.   Not from the photographs.

5  BY MR. DiCIANNI:

6    Q.   You're saying the resolution on these
7  is not good enough?

8    A.   Very poor.

9    Q.   But on yours you can enhance?

10    A.   Yes.

11    Q.   And if you were to print from your set
12  that you have at your computer at home, would it
13  be as clear as you're seeing on your monitor?

14    A.   No, it would not.

15    Q.   So the only place that we would be able
16  to see what you see is if we all came to your home
17  in Phoenix and looked at your monitor?

18    A.   Or a similar monitor, yes.

19    Q.   Okay. Well, what is that? What was
20  the monitor that you used? It wasn't the computer
21  you used; it's the monitor that made the
22  difference?

23    A.   Well, combination of both, of course,
24  and graphics, the graphics, of course.

Page 84

1    Q.   Tell us what it was.

2    A.   I have two monitors. Let's see. One
3  is an LG monitor, 27-inch. I forget the model.
4  The other one is a Samsung. Again, I don't know
5  the model. It's a 28-inch.

6    Q.   So that doesn't help us too much.

7    MR. DiCIANNI: I'm going to move that we
8  adjourn this meeting to Phoenix, Arizona to your
9  home.

10    MR. ODIM: Of course at your expense.

11    MR. DiCIANNI: I can't promise that.

12  BY MR. DiCIANNI:

13    Q.   I assume that's something you wouldn't
14  be able to show in a courtroom, then, right?

15    A.   I assume I would have to bring my
16  computer and my monitor.

17    Q.   So if you were to bring your computer
18  and your monitor to the courthouse and hook it up,
19  it would show us a clear view of the gun in Hill's
20  hand?

21    A.   I can't speak for what anybody else can
22  see. I can speak to what I can see.

23    Q.   And you clearly see a gun in his
24  hand?



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
85—88

Page 85

1   A.   I clearly see a firearm, a black
2   firearm.
3       Q.   We know there's a gun in the hand.
4   There's no disputing that, but you can clearly see
5   a gun in the hand?
6       A.   Yes.
7       Q.   If I ask you in court to get up and
8   draw the outline of that gun on some exhibit
9   from your good monitor, you would be able to do
10  that?
11      MR. ODIM: Objection. Now you're arguing
12  with him.
13      MR. DiCIANNI: I'm not arguing.
14      MR. ODIM: And badgering him. He's made it
15  clear in this room on your monitor enhancing your
16  image that the outline of the gun is present.
17  You're badgering him.
18  BY MR. DiCIANNI:
19      Q.   No, I don't think I'm -- are you
20  feeling badgered? You're not feeling badgered,
21  are you?
22      MR. ODIM: I think you should just move on.
23  BY THE WITNESS:
24      A.   I'm not going to get involved in

Page 86

1   attorneys's debates.
2   BY MR. DiCIANNI:
3       Q.   You've testified a lot. You're
4   comfortable.
5           You wouldn't let me badger you, would
6   you?
7       A.   I've been badgered.
8       Q.   It doesn't affect you, right?
9       A.   I answer the questions as best I
10  can.
11      Q.   I have a question. Are you feeling
12  badgered right now?
13      A.   No, not necessarily.
14      Q.   Thank you.
15          So your next opinion now relates to the
16  gunshot wound entrance angles, correct?
17      A.   Item C, correct.
18      Q.   If I understand the opinion correctly,
19  you say that based on both Officer Hill's
20  testimony regarding the positioning of he and
21  Howell and the autopsy angles, the autopsy bullet
22  hole angle measurements, you disagree that Howell
23  was turned in the way that Officer Hill said he
24  was at the time that Officer Hill fired; is that

Page 87

1   correct?
2       A.   Well, I'm saying that it's not how
3   he testified. It's how he demonstrated in
4   deposition Exhibit 21.
5       Q.   You would agree with me that a
6   demonstration by a witness on a witness stand is a
7   questionable piece of forensic evidence, correct?
8       MR. ODIM: Objection. Foundation.
9   BY THE WITNESS:
10      A.   I would not agree with that.
11  BY MR. DiCIANNI:
12      Q.   You would not agree with that?
13      A.   No.
14      Q.   So you think that a person who
15  testifies about an event in a highly charged
16  conflicted possibly life-threatening situation
17  would be able to perfectly replicate on the
18  witness stand a position of a person by
19  demonstration?
20      MR. ODIM: Again, objection. Foundation.
21  Multi-part question, and it's ambiguous.
22  BY THE WITNESS:
23      A.   I think if he couldn't he could say so
24  and say I can't do it.

Page 88

1   BY MR. DiCIANNI:
2       Q.   Well, he could do his best and wouldn't
3   you expect him to do his best?
4       A.   I'm sorry?
5       Q.   Wouldn't you expect him as he's
6   testifying to do the best he can to replicate the
7   position that he's asked to replicate?
8       MR. ODIM: Objection. Speculation. You're
9   asking this witness to put himself in the shoes of
10  someone else. He has no idea his thought process.
11  BY THE WITNESS:
12      A.   I'm looking at the demonstration that
13  he did, and that's what I'm using.
14  BY MR. DiCIANNI:
15      Q.   Okay. And my question goes to the
16  validity of basing a forensic evaluation on that
17  type of testimony; you say that it's valid?
18      A.   That's the demonstration that he gave
19  under oath. That's the exhibit that I utilized.
20      Q.   So that's what you're refuting, what he
21  demonstrated at the deposition?
22      MR. ODIM: Objection. That was not his
23  testimony.
24      MR. DiCIANNI: I thought it was.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
89–92

Page 89

1  BY THE WITNESS:
2      A.   I don't think I understand that
3  question.
4  BY MR. DiCIANNI:
5      Q.   Let's back up.
6          Your opinion number C beginning on
7  Page 11 disputes the positions of Hill and Howell
8  based on Hill's testimony and based on autopsy
9  findings, correct?
10     A.   That's two of the factors, correct.
11     Q.   And you're disputing that Howell was in
12  the position that Hill demonstrated at his
13  deposition when Hill shot?
14     A.   I lost you.
15     Q.   Let me say it again.
16         You're disputing that Justus -- I'm
17  going to say Justus instead of Howell, okay.
18         You're disputing that Justus was in the
19  position that Hill described him in at the time
20  that Hill shot based on both Hill's testimony and
21  based on the autopsy findings, right?
22     A.   And based upon the video.
23     Q.   Well, right. And that's what you're
24  disputing, correct? You're disputing that Justus

Page 90

1  was in the position that Hill demonstrated in the
2  video when Hill shot?
3      A.   Correct.
4      Q.   Thank you. And one of the bases for
5  that is the angle that Hill describes between the
6  two of them at the time at the time that he shot,
7  right?
8      A.   Yes.
9      Q.   And that's the one o'clock/two o'clock
10  thing, right?
11     A.   Yes.
12     Q.   And the angle that you believe that
13  would demonstrate would be a 30 to 60-degree
14  angle, right?
15     A.   Yes, that's correct.
16     Q.   With 90-degree being at three o'clock?
17     A.   That's correct.
18     Q.   So that angle would have Hill at the
19  vertex?
20     A.   I'm sorry?
21     Q.   Hill would be at the vertex of the
22  angle?
23     A.   Approximately, between two and three --
24  one to two o'clock I believe was the testimony.

Page 91

1      Q.   Yes, but we're talking about the angle
2  itself. Let's forget the clock for a minute.
3          The angle of 30 degrees to 60 degrees,
4  Hill is at the vertex, right?
5      A.   Now you're talking about an arc.
6      Q.   No. I'm talking about an angle, not an
7  arc.
8      A.   I think I've lost you on -- because I'm
9  going by the face of a clock.
10     Q.   Okay. So Hill is in the middle where
11  the hands are attached to the clock?
12     A.   Correct, yes.
13     Q.   So that's the vertex of the angle,
14  right?
15     A.   Okay, right.
16     Q.   Okay. And the line segment, one line
17  segment is where Justus is standing, right?
18     A.   Correct.
19     Q.   And the other line segment would be at
20  12 o'clock?
21     A.   Well, it's an approximation.
22     Q.   I understand. But that's approximately
23  where the other line angle would go, to
24  12 o'clock?

Page 92

1      A.   One to two o'clock.
2      Q.   That would be where Justus is?
3      A.   Yes.
4      Q.   That's one line segment?
5      A.   Okay.
6      Q.   Hill is at the vertex, right, the other
7  line segment would go up to the 12 o'clock?
8      A.   12 o'clock, correct.
9      Q.   You're saying that these are an
10  approximations?
11     A.   Approximations.
12     Q.   If the angle description that Hill gave
13  is wrong, not one o'clock or two o'clock, let's
14  say it's two minutes after 12, and you credited
15  that testimony, your opinion would not be valid at
16  least based on the testimony?
17     A.   That's the data that I have.
18     Q.   I know.
19     A.   That's the data that I have.
20     Q.   Right. But testimony can be off,
21  correct?
22     A.   I don't evaluate credibility.
23     Q.   Exactly. Exactly. You look at
24  physical evidence.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
93–96

Page 93

1    A.    Right.
2    Q.    Isn't that the danger in a forensic
3  scientist using testimony or oral statements as
4  forensic evidence, that you have to evaluate the
5  credibility of it?
6    A.    That's why we should have the Lake
7  County Task Force doing a better job.
8    Q.    Okay, but you're not rendering any
9  opinions that they didn't do a good job, right?
10  That's not in your report.
11    A.    If you're asking me what it is, I don't
12  think they did a good job.
13    Q.    That's not in your report and I'm not
14  asking you what they did because that's going to
15  be another six hours.
16    MR. ODIM: Let him answer your questions.
17    MR. DiCIANNI: I didn't ask that question.
18    MR. ODIM: Ask different questions. It was
19  certainly related to the question that you asked.
20  BY MR. DiCIANNI:
21    Q.    I don't want to get into that because
22  we don't have enough time to get into that and I
23  don't want to be here longer than I have to be,
24  either? What I am asking you -- I can't remember

Page 94

1  what I'm asking you.
2        Can you read back the last question?
3        (WHEREUPON, the record was read by
4          the reporter.)
5  BY MR. DiCIANNI:
6    Q.    If your testimony regarding the
7  positioning of Justus and Officer Hill with
8  Officer Hill at the vertex and Justus between 30
9  and 60 degrees and with the other line segment
10  going to 12, if Hill was off with his evaluation
11  or his testimony of one o'clock, two o'clock, then
12  that would call your conclusion into question,
13  correct?
14    A.    It would have an effect.
15    Q.    Sure it would. You would have to
16  re-evaluate?
17    A.    I would have to re-evaluate.
18    Q.    And you still have the opinion based on
19  the autopsy angle, right? You used that also as a
20  basis for saying there was a 30-degree, 60-degree
21  orientation between Hill and Justus?
22    A.    Yes, that's correct.
23    Q.    So that's an alternative basis for that
24  opinion?

Page 95

1    A.    Yes.
2    Q.    And you measured that angle by what?
3  What line segments did you use and where was the
4  vertex on establishing that angle?
5    A.    It's looking at the autopsy
6  photographs. It's an estimation. There it wasn't
7  enough data -- the photograph angles of the
8  autopsy precluded me from doing another type of an
9  angle where I use a protractor.
10    Q.    You couldn't use a protractor?
11    A.    I couldn't use the protractor in this.
12    Q.    Regarding the gunshot wound to the
13  right side of Justus's back, you relied on a
14  trajectory rod in the photograph?
15    A.    Yes.
16    Q.    And that would be Exhibit 21, correct,
17  what was that from Thomas Rudd's deposition?
18    A.    I don't know the exhibit -- it's an
19  autopsy photograph.
20    Q.    Did you rely on any autopsy photographs
21  other than what you referenced in your report?
22    A.    Yes.
23    Q.    You did, all right. I was afraid you
24  were going to say that.

Page 96

1        Let's mark this as Exhibit 3.
2        (WHEREUPON, a certain document was
3          marked Scott Deposition Exhibit
4          No. 3 for identification, as of
5          04/04/2017.)
6  BY MR. DiCIANNI:
7    Q.    I'm going to ask you to look through
8  the autopsy photos and ask you to point out which
9  ones you relied upon, and I never will ask a
10  witness to do something during a break because if
11  you're working we're working, okay. So we're
12  going to sit here while you do that, all right,
13  and then we'll take a break.
14    A.    How do you want me to point these out?
15  Take them out? There's no numbers on them.
16    Q.    There are numbers on them but our
17  paralegal has x-ray vision.
18    A.    Do you want me to take them out?
19    Q.    Yes. Why don't we have you take them
20  out.
21    A.    Almost there.
22    Q.    Sure. Take your time.
23    A.    Okay.
24    MR. DiCIANNI: I'm going to suggest we take



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
97–100

Page 97

1 our break now and we'll organize these into
2 exhibits and then we'll come back. How long do
3 you want to take?
4      MS. MORAN: It's 12:15 now. We may just go
5 downstairs.
6      MR. DiCIANNI: 1:15.
7      MS. MORAN: Yes, no later than 1:15.
8           (WHEREUPON, a lunch recess was had
9           from 12:15 to 1:20 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 98

1      A F T E R N O O N  P R O C E E D I N G S
2      MR. DiCIANNI: Let's mark this Exhibit 4.
3           (WHEREUPON, a certain document
4           was marked Scott
5           Deposition Exhibit No. 4 for
6           identification, as of 04/04/2017.)
7           RONALD R. SCOTT,
8 called as a witness herein, having been previously
9 duly sworn and having testified, was examined and
10 testified further as follows:
11           EXAMINATION (Resumed)
12 BY MR. DiCIANNI:
13      Q. Mr. Scott, before we broke, you went
14 through all of the autopsy photographs which we
15 gave you which was the whole group of them and
16 then you picked out the ones that you used in your
17 opinions, correct?
18 A. Yes.
19      Q. And that's now what's been marked as
20 Exhibit No. 4, correct?
21 A. Yes.
22      Q. Your opinion regarding the positioning
23 of Justus and Officer Hill we've already talked
24 about it based on the testimony of Hill, but it's

Page 99

1 also based on calculations you made based on these
2 autopsy photographs, correct?
3 A. Yes.
4      Q. I'm going to ask you to tell us before
5 we go to the photographs your methods for arriving
6 at this calculation.
7      A. Well, I looked at all the photographs
8 that have to do with the wound or what I feel is
9 something that could conceivably show some data or
10 scientific information that I would be interested
11 in. Then I narrowed that down to photographs that
12 are more related to the opinions that I would give
13 and the work that I'm doing. So I picked out all
14 these photographs. These are the ones that I
15 looked at the most, but there are certain
16 photographs that have more value than others.
17      Q. In Exhibit 4?
18 A. Yes.
19      Q. Well, then, just tell us first what it
20 was you did and I'll back up for a second.
21           Based on the autopsy findings, you
22 arrived at a conclusion, I believe, that the
23 orientation positioning between Officer Hill and
24 Justus was within that 30 degrees to 60 degrees

Page 100

1 angle, correct?
2 A. Yes.
3      Q. Tell us how it is that you came to that
4 calculation based on these photographs before you
5 show us what's in the photographs. Just tell us.
6      A. I evaluated Officer Hill's statements
7 and his testimony and I evaluated the
8 demonstrative position that he demonstrated as to
9 how Mr. Howell had turned and then I look at the
10 gunshot wound evidence and I attempt to
11 synchronize the testimony to the trajectory rods
12 while looking at the video of course to see what
13 the posture of Mr. Howell is at various points in
14 the video and at points that would be consistent
15 with where the cartridge cases were found, and then
16 I keep narrowing it down testing that theory until
17 I can see those photographs that best support
18 Officer Hill's version of events or if they don't
19 support it, that as well. And that's what I did
20 in this case here.
21           I also looked at -- I did pick out some
22 photos in here that showed the bullets and one of
23 the issues with the bullets, I'm just looking at
24 the bullet for the purposes of seeing if there's



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
101–104

1 anything in there that would indicate a gunshot
2 had struck the tree or there had been a deflexion.
3 So I'm looking at the shape and size of the bullet
4 to see did the bullet expand as it's designed to
5 do in soft tissue.
6    Q. Or whether it's pristine?
7    A. Or whether it's pristine or whether it
8 has damage.
9    Q. So am I understanding that just based
10 on the gunshot wound angles, which to the extent
11 they can be determined from the autopsy findings,
12 you are not able to come to a conclusion regarding
13 the positioning of the two people?
14    A. I can come to a position of the two
15 people, certain parts of it.
16    Q. When I asked you about the methodology,
17 you mentioned the angles the autopsy findings
18 showed. You also mentioned the positioning of the
19 casings. You also mentioned various data you got
20 from the video.
21       My question is if you were excluding
22 the casings and the video, does the gunshot wound
23 angles from the autopsy themselves provide you
24 with the data you need to render an opinion that

1 there was a 30 to 60-degree orientation between
2 Justus and Hill?
3    A. Yes, partially, partially.
4    Q. What's partial about it? What part?
5    A. The trajectory rods do show a left to
6 right. Of course, I'm using it in conjunction
7 with the actual autopsy report and the medical
8 examiner's description of the pathway of the
9 wound.
10 Q. Okay.
11    A. So I'm looking at that and looking at
12 and then I'm looking at the trajectory rods to see
13 what he's describing in his report to see the
14 photographic evidence of exactly what he's talking
15 about because sometimes they talk upward and left
16 right, but trajectory rod is actually going to
17 show you a much better definition of what he's
18 saying in his typewritten report.
19       So I'm looking at that and when I see
20 the trajectory rods, I can see that the gunshot is
21 barely coming from the left of Mr. Howell. It's
22 going upward. Both of them are going upward, one
23 more than the other, and they're going back to
24 front. So that helps place -- if we take the

1 trajectory rod and we back -- reverse engineer it,
2 the trajectory rod if we followed the imaginary
3 line on that trajectory rod out to the point where
4 the shooter should be, that gives us the bullet
5 path prior to it striking the body.
6    Q. So the medical examiner's report only
7 concluded that the shots were left to right and
8 upward, correct?
9    A. And front to back.
10    Q. And front to back, correct?
11    A. Correct.
12    Q. It didn't put angles -- it didn't come
13 to any conclusions regarding angles?
14    A. I don't recall reading angles in his
15 report.
16    Q. So you concluded regarding the 30 to
17 60-degree angle based on using the trajectory rods
18 as one of the line segments in the angle, correct?
19 A. Yes.
20    Q. With Officer Hill at the vertex?
21 A. Yes.
22    Q. And where would the other line segment
23 be, straight south from Officer Hill?
24    A. Straight south, yes.

1    Q. So show me where -- let's talk about
2 the one on the right side. There's two gunshot
3 wounds, right?
4 A. Yes.
5    Q. One is on the right side and one is on
6 the left side?
7 A. Yes.
8    Q. Show me the photographs that you relied
9 on to arrive at these angles regarding the
10 right-sided gunshot wound.
11    A. I have autopsy 011, autopsy 012, 013,
12 021 and 022 I've looked at. They don't have
13 trajectory rods, but it does show evidence of an
14 angle, 02 -- strike that. 029, 030, 031, and I
15 believe that's it for the upper right back.
16    Q. So from the bullet holes themselves
17 without the trajectory rods, are you able to come
18 to a measurement of an angle?
19    A. A general angle.
20    Q. How do you do that?
21    A. You look at the abrasion ring, you look
22 at what is called the lead-in, the lead-in
23 abrasion ring which in this case is inferior on
24 the wound or it's at the lower part of the wound.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
105–108

Page 105

1  It's like if you had a tub of butter, margarine,
2  and you took your finger and you pushed it in at
3  an angle, you'd see that the lower portion has a
4  lead-in where your finger first touches it and
5  then it goes into the margarine.
6          When a bullet is striking a person or
7  any object at an angle, it will strike as opposed
8  to a 90-degree angle, say it strikes at a
9  45-degree angle, what happens is the side of the
10  bullet that first strikes the object or the skin
11  is going to create a lead-in abrasion until the
12  rest of the bullet goes in.
13          When I see the wounds without the
14  trajectory rod, for example, on if we look at 031
15  and we see the trajectory rod, and then we look at
16  a photograph of that same gunshot wound which I
17  believe is 024 and 023, yes, 022, if you look at
18  how the trajectory rod is positioned in 031,
19  you'll see that he's got the rod going across the
20  lead in or this small defect, I'll point it out if
21  I can, it's this area here as you're looking at it
22  on this photo it looks like it's about 10:00.
23      Q.   023?
24      A.   Yes.

Page 106

1      Q.   There's like a little nub of some type?
2      A.   Right. That's where the bullet would
3  first strike the skin because it's striking it at
4  an angle.
5          So when I'm looking at this, I'm
6  looking at it to see has the medical examiner
7  placed the trajectory rod across the lead-in; in
8  other words, I'm not trying to evaluate his
9  medical expertise, I'm looking at it from a
10  firearms perspective to see has he placed that
11  trajectory rod accurately so that the trajectory
12  rod is accurately reflecting the point at which
13  the bullet first struck the body. So that would
14  be the first thing I'm looking for.
15          Then through some of the other
16  photographs of the upper right gunshot, I'm taking
17  into account the testimony of Officer Hill and I'm
18  testing and I'm evaluating the testimony that
19  Mr. Howell is at one to two o'clock while he's in
20  the center of the clock and does that trajectory
21  rod -- is that consistent with the testimony of
22  Officer Hill, and from what I can see, it appears
23  to be consistent at least as far as the angle, not
24  the upwards angle, at least as far as the angle,

Page 107

1  the direction left to right.
2      Q.   So the bullet hole itself absent the
3  trajectory rod will tell you the point of entry
4  based on the 10:00 nub that we talked about but no
5  more about the measurement of the angle, is that
6  fair to say?
7      MR. ODIM: Objection. That was not his
8  testimony.
9  BY THE WITNESS:
10      A.   Well, the trajectory rod enhances it.
11  I would have to know the position of the gun, but
12  I could put them both together and come up with a
13  general -- it would be less specific than it is
14  when the trajectory rod is available.
15  BY MR. DiCIANNI:
16      Q.   Well, that's my point.
17          The bullet hole itself doesn't give you
18  the measurement of the angle?
19      A.   It gives you a general direction,
20  right.
21      Q.   Yes. Okay. You need the trajectory
22  rod to give you the measurement of the angle,
23  right?
24      A.   That gives it a more accurate data to

Page 108

1  work with.
2      Q.   And how do you -- the trajectory rod is
3  put into the bullet hole in a way that it could
4  deviate from the path, the actual path of the
5  bullet, correct?
6      MR. ODIM: Objection, foundation.
7  BY MR. DiCIANNI:
8      Q.   From your experience.
9      A.   Well, I think that falls into the
10  medical examiner's prerogative.
11      Q.   So you would defer to the medical
12  examiner regarding the reliability of the
13  trajectory rod as an indication of the angle of
14  entry?
15      A.   Well, the pathway of the bullet in the
16  body, that would be the area for the medical
17  examiner to determine.
18      Q.   Right. We understand that, but my
19  question is to the extent that the trajectory rods
20  are an accurate reflection of the angle of entry,
21  you would defer to the medical examiner's
22  opinion or judgment regarding how accurate that
23  would be?
24      A.   That's correct.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
109–112

Page 109

1    Q.   So which of the photographs that you've
2  identified regarding the right-side bullet wound
3  would be the one that was most probative or most
4  revealing to you regarding the angle?
5    A.   031, 030, 029.
6    Q.   I'm sorry, you said 031. What else?
7    A.   029 and 013, 012, 011. I think that's
8  it.
9    Q.   Let's just use 029. Obviously there's
10  an angle formed by the ruler or yardstick and the
11  trajectory rod, correct?
12    A.   Yes.
13    Q.   And is that the angle you would have
14  relied on or determined was an accurate depiction
15  of the positioning between the two people?
16    A.   I looked at them all. I looked at them
17  in the aggregate. I don't think anyone gives you
18  a single ability to come up with that angle. If
19  you look at them in the totality, which is what I
20  did, evaluated them in total.
21    Q.   That's what I want to understand. I
22  want to understand how these different photographs
23  with the measurements, with the trajectory rod led
24  you to the 30 to 60 percent angle, I'm sorry, 30

Page 110

1  to 60-degree angle that you concluded.
2         So 029 was one of them, right?
3    A.   029 was one.
4    Q.   Did you put a protractor on here to
5  measure that angle?
6    A.   No, I did not.
7    Q.   What were some of the other ones? Let
8  me back up.
9         Did you use a protractor regarding any
10  of them, any of the angles?
11    A.   I did not.
12    Q.   How did 029 tell you that this was
13  between 30 and 60 degrees, that's just an eyeball
14  estimate?
15    A.   It's an estimate, but you've got to
16  look at it in conjunction with the other
17  photographs.
18    Q.   Tell me about the other ones.
19    A.   For example, 031 I think is a better
20  photograph.
21    Q.   Did you measure that?
22    A.   I did not. Preferably we would have
23  liked to have seen an overhead photograph going
24  down which was not taken.

Page 111

1    Q.   Directly overhead?
2    A.   Directly overhead and even from the
3  feet up would have been more accurate. These give
4  us a general estimation, but they are aren't as
5  accurate as I would like to see them.
6    Q.   From this you conclude or at least it
7  supports your opinion that there was a 30 to
8  60-degree angle created by the positions of Hill
9  and Justus?
10    A.   It's consistent with what Officer Hill
11  testified that the position was of Mr. Howell in
12  relation to him as they moved south.
13    Q.   What does the -- did you measure if any
14  angles or were you able to determine any angles of
15  upward trajectory?
16    A.   There was insufficient data in the
17  photographs for me to do that.
18    Q.   Regarding the wound on the left side,
19  tell me which photographs gave you the information
20  you needed to draw conclusions about that.
21    A.   008, 009, 010, 027, 028. That's it.
22    Q.   Did the angle measurement you came to
23  regarding the right sided bullet wound tell you
24  the positioning between the two, did it tell you

Page 112

1  anything about what frame the shot would have
2  occurred in on the video?
3    A.   The right side.
4    Q.   The right side?
5    A.   No. I was unable to determine
6  sequence.
7    Q.   On the left side you were unable to
8  determine the angle so it didn't tell you anything
9  about orientation between the two from a
10  north-south -- I'm sorry, let me rephrase that.
11         From the left side bullet wound, you
12  couldn't determine the angle so it didn't tell you
13  anything about their positioning based on a
14  north-south orientation, correct?
15    A.   It appears to be consistent with the
16  right side.
17    Q.   In what way?
18    A.   In the left to right -- general left to
19  right.
20    Q.   Generally left to right?
21    A.   Right, but only on the left to right
22  limitation, not the front to back or upward.
23    Q.   Okay. You couldn't say it was 30 to
24  60 degrees, only that it was left to right?



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
113—116

Page 113

1    A. It was roughly generally the same as
2 the upper right.
3    Q. How did you determine that?
4    A. By looking at two photographs.
5    Q. Which ones?
6    A. I'm going to take photograph 008 to
7 start and then I'm going to take photograph 011.
8    Q. 011 and 008.
9 A. Right.
10    Q. Okay. So tell me what the comparison
11 of those two photographs tells you about the angle
12 of entry.
13    A. Similar, in other words, differences
14 in -- differences in the positioning of the rods
15 would be accountable to either movement of the
16 shooter, movement of the victim or a combination
17 of both.
18    Q. The comparison of these two photographs
19 doesn't tell you that the bullet entry on the
20 right side -- I'm sorry, on the left side
21 indicates a 30 to 60-degree orientation between
22 the two, correct?
23    A. Just generally consistent with each
24 other, not exact, not exact.

Page 114

1    Q. Consistent to the extent that they were
2 both left to right?
3 A. Yes.
4    Q. Now, you were unable to make a
5 determination based on the angles regarding the
6 right side wound as to the frame in the video in
7 which that shot would have taken place, but it
8 seems like you are making a determination
9 regarding the left side injury regarding what that
10 indicates in regards to the frame in which it was
11 shot, am I understanding that correctly?
12    MR. ODIM: Objection. Foundation and it
13 misstates his testimony and his opinions and
14 observations as expressed in the report.
15 BY MR. DiCIANNI:
16    Q. You can answer.
17    A. I think you're misunderstanding. I'm
18 talking at this point only of the left-to-right
19 angle. The upward angle is a completely different
20 category.
21    Q. What do you mean?
22    A. Okay. If we take -- if we were to take
23 Mr. Howell in the anatomical position that he's in
24 now and stand him erect, stand up straight up, the

Page 115

1 only way those gunshots can occur is if we follow
2 that trajectory rod and then follow an imaginary
3 line down and the gun would have to have been on
4 the ground facing upward.
5    So when I look at that in the video, I
6 can see Officer Hill clearly has his pistol over
7 from his shoulder, generally I call it horizontal
8 so, in other words, the arm is generally
9 horizontal, and the gun is vertical, in other
10 words, it's not canted to the left or right or
11 downward.
12    When I look at that and then I look at
13 the gunshot trajectory rods placed by medical
14 examiner, that tells me that these gunshot wounds
15 have been caused by the orientation of
16 Mr. Howell's body to the gun and not gun being
17 down on the ground shooting upwards.
18    Q. So what are you saying?
19    A. I'm saying that Mr. Howell in both of
20 these instances had his back to the gun, at least
21 the left side of his back to the gun and he was
22 bent over to some degree. In the process of
23 bending over, in the process of falling or having
24 fallen to the ground.

Page 116

1    Q. Are you saying Hill shot him after he
2 fell to the ground?
3    A. It's possible. Yes, I am.
4    Q. What do you mean it's possible?
5    A. That the trajectory rod would line up
6 because of it's acute upward -- he would either
7 have to be -- his upper body would have to be
8 parallel to the ground bent over at the waist or
9 falling or he could have been on the ground when
10 he was shot.
11    Q. But you can't say that to a reasonable
12 degree of scientific certainty that he shot him
13 when he was on the ground?
14    A. I could say that it's a possibility.
15    Q. Can you say which frame or which range
16 of frames the second shot occurred in based on
17 your measurements?
18    A. I'm not giving a sequence of shots
19 as to which one of these shots were first to
20 second.
21    Q. I'm not asking you. Okay. Good point.
22    You are not rendering any opinions
23 about the sequence of the shots?
24 A. Correct.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
117–120

Page 117

1    Q.    You're unable to say which frame the
2  right side wound shot occurred? We've already
3  been through that.
4    A.    I can include the frames that are
5  possibilities, and I can exclude the frames that
6  would not have produced it.
7    Q.    For the right side?
8    A.    To the right side, correct.
9    Q.    Tell me what those frames would
10 be.
11   A.    I have to just look at those still
12 photos again.
13   Q.    Okay.
14   A.    I'm talking about the video frames.
15   Q.    We could do it either on the hard
16 copies or on the video itself.
17   A.    Exhibit 2.
18   Q.    Exhibit 2, yes, that's the series of
19 frames.
20   A.    The gunshot which could be excluded
21 would be from 259 backwards going back to 231.
22   Q.    So are you only talking about the right
23 side or either side?
24   A.    At this point I'm only talking about

Page 118

1  the right side.
2    Q.    In your opinion, the right side could
3  not have occurred from 231 to 259?
4    MR. ODIM: Ron, would this be clearer on the
5  screen?
6    MR. DiCIANNI: We could do it that way if you
7  want.
8  BY THE WITNESS:
9    A.    Move up to 257 or you could move up to
10 259. Now, at 258 it's possible for the gunshot in
11 the right shoulder to have occurred. The problem
12 is there's a discharged cartridge case that is
13 some 12 feet forward of the gun so that's
14 inconsistent of it happening at this point.
15 BY MR. DiCIANNI:
16   Q.    Let's just focus, though, on what the
17 angles tell us, okay.
18         The right side bullet wound could have
19 occurred at 258 based on the angles?
20   A.    Yes.
21   Q.    What about the left side?
22   A.    The left side you would have to move up
23 to -- beginning at 275, only the angle, but this
24 is not consistent with the cartridge case location

Page 119

1  so it is in disagreement.
2    Q.    We'll deal with that as, well, but
3  okay.
4         Just the angles now, what is the
5  angles -- what does the angle tell you about when
6  these the left-sided shot could have occurred?
7    A.    Well, it shows Justus Howell went over
8  at the waist. It shows Officer Hill with his
9  firearm and arms extended horizontally and the gun
10 vertical, in the vertical plane, and when I look
11 at Justus Howell in this position, a gunshot that
12 struck him on the left side could produce the
13 upward angle into his body because he's bent over
14 at the waist and that would extrapolate back to
15 the muzzle of the gun.
16   Q.    The way in which he's pointing the gun
17 in all of the frames would rule out that he shot
18 Justus while he was on the ground; isn't that
19 correct?
20   A.    That's not correct.
21   Q.    Show me a frame in which you think it
22 would be possible that he shot him while he was on
23 the ground?
24   A.    We would have to move up to where

Page 120

1  Mr. Howell was on the ground, however, we cannot
2  see Officer Hill behind the tree.
3    Q.    I see. So what frame are you referring
4  to? You've got the book in front of you.
5    A.    At 282, from 282 if we move up to --
6  this only goes up to 285, but if we move up to
7  the 287 area and now we see Officer Hill
8  beginning to move towards the tree and
9  unfortunately at this point here you'll become
10 obstructed, but at that point you can still see
11 him now he's obstructed.
12   Q.    At 292 he's obstructed?
13   A.    He's obstructed and Howell was on the
14 ground.
15   Q.    Keep going. Let's keep going.
16         He comes out from behind the tree --
17 well, it was before what we're looking at now.
18         What's the first frame where he comes
19 out from behind the tree? Is it 309?
20   A.    I think it's about 304.
21   Q.    In each of the frames before he goes
22 behind the tree and each of the frames after he
23 comes out from behind the tree, his gun is pointed
24 in a direction which would be inconsistent with



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
121–124

Page 121

1  Justus being shot on the ground, correct?
2      A.   I don't know what effect the recoil has
3  on Officer Hill at that point.
4      Q.   What do you mean?
5      A.   When you shoot a gun, there is recoil,
6  both linear recoil and vertical recoil.
7      Q.   What are you suggesting here?
8      A.   I can't tell if Officer Hill has fired
9  from behind the tree. What I'm saying is looking
10 only at Mr. Howell, if he was on the ground that
11 could produce that upward angle. If Officer
12 Howell (sic) has fired from behind the tree and
13 the cartridge case indicates that he did fire from
14 behind the tree.
15     Q.   The firing from behind the -- well, the
16 direction that we can see the gun pointed in in
17 every instance is inconsistent with Justus being
18 shot while he was on the ground unless there was a
19 recoil that would have redirected the direction of
20 the gun, correct?
21     A.   Except from when he was behind the
22 tree, correct.
23     Q.   We can't see what happens behind the
24 tree?

Page 122

1      A.   Correct.
2      Q.   Did you look at the computer animation
3  I'll call it that was put together by the expert
4  that the Task Force retained to do that?
5      A.   I don't recall seeing anything in that
6  line, no.
7      Q.   Obviously you have no opinion on that
8  opinion?
9      A.   I don't even know what you're talking
10 about.
11     Q.   That's a good way to cut off an entire
12 line of questioning.
13          It looks like you read Thomas Rudd's
14 deposition and relied on it for at least
15 something.
16          What did you rely on Rudd's deposition
17 for?
18     A.   I wanted to see if there was any
19 changes in his testimony. I believe it that's
20 Dr. Rudd.
21     Q.   Dr. Rudd.
22     A.   I wanted to see if there was anything
23 in there that conflicted with his autopsy report.
24     Q.   Was it your understanding that Dr. Rudd

Page 123

1  did the autopsy?
2      A.   I don't have a good recollection of
3  what doctor did the autopsy.
4      Q.   So you only read Dr. Rudd's deposition
5  for purposes of seeing if he had some observation
6  from the autopsy that would have been inconsistent
7  with your opinions; is that fair to say?
8      A.   Well, inconsistent with the photographs
9  of the autopsy, with the trajectory rods and the
10 autopsy report itself.
11     Q.   Did you find anything in his deposition
12 that was inconsistent with any of those sources?
13     A.   Nothing significant that would affect
14 my opinions.
15     Q.   Is it appropriate it from a forensic
16 perspective to rely on the deposition testimony of
17 Dr. Rudd?
18     A.   Yes.
19     Q.   Would it affect your opinion if
20 you understood that he was not a medical
21 examiner?
22     A.   I would certainly want to reconcile if
23 any significant conflicts and obviously have to
24 refer that to counsel to look at from a different

Page 124

1  perspective.
2      Q.   Would it affect your opinion at all if
3  you knew that he was under indictment for perjury?
4      MR. ODIM: Objection. Irrelevant.
5  BY THE WITNESS:
6      A.   I can only take the information that I
7  have. That's what I had at the time I was doing
8  my evaluation.
9  BY MR. DiCIANNI:
10     Q.   Would it affect your opinion if you
11 knew he didn't do the autopsy?
12     A.   That's an issue of credibility.
13     Q.   The location of the casings seems to be
14 crucial to your opinions; is that fair to say?
15     A.   It's an important factor, yes.
16     Q.   You conclude from the location of the
17 casings that Officer Hill shot at a later point
18 than when he says he does on or around 257 as you
19 read it?
20     A.   That's correct.
21     Q.   And it's your opinion that Officer Hill
22 would have completed both shots in a quarter of a
23 second from 257 based on his testimony; is that
24 what you're concluding?



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
125–128

Page 125

1   A.   At or about 257.
2   Q.   You disagree based on the ejection
3   patterns that you would expect from that gun to
4   the right and to the rear, correct?
5   A.   Correct.
6   Q.   Are you aware of any cautions in the
7   forensic world about putting too much reliance on
8   the location of shell casings?
9   A.   Yes, I am.
10   Q.   What are those based on?
11   A.   Grip, orientation of the pistol.
12   That's why I always spoke for both horizontal and
13   vertical orientation that I see the officer in
14   with his pistol, height of the pistol above the
15   ground, the canting upward or downward, the
16   direction of the pistol when shooting, tightness
17   of the grip to a novice as opposed to an
18   experienced person, and then there's the issue of
19   the ground surface and there's two aspects to
20   that. There's the point of impact and then
21   there's the final resting location.
22        The additional aspect that has to come
23   into play is the possibility of dislocation
24   through the arrival of medical personnel or people

Page 126

1   that should not be in the crime scene area. That
2   has to be taken into account.
3   Q.   All those factors have to be taken into
4   consideration if you're going to rely on the
5   casings?
6   A.   Correct.
7   Q.   Even though they're designed to go
8   right and rear, they don't always go right and
9   rear, correct?
10   A.   Generally they do.
11   Q.   Are you familiar with studies about
12   casing ejection and the rate at which they go
13   right and rear when they're designed to go right
14   and rear?
15   A.   It depends upon the pistol model and
16   the physical design.
17   Q.   Did you do any studies regarding
18   Officer Hill's -- well, did you review any
19   ejection studies regarding the rates and ejection
20   pattern regarding Officer Hill's weapon?
21   A.   Unfortunately the Lake County task
22   force once again failed to do a basic forensic
23   test contiguous with this shooting incident.
24   Ideally they should have done it -- for me

Page 127

1   20 months later after the pistol has been
2   returned to him, that would not be the ideal
3   situation. The next best alternative is to use
4   the studies and treatises available for that
5   design of gun.
6   Q.   So did you refer to some studies and
7   treatises available for that type of gun?
8   A.   Yes, I did.
9   Q.   For that particular make and model?
10   A.   Yes.
11   Q.   Tell me what those studies were.
12   A.   I believe I provided them to
13   Mr. Rubinstein. They should have been disclosed.
14   Q.   You did?
15   A.   Yes.
16   Q.   Are they in your report, then?
17   A.   They're not in the report.
18   Q.   Why are they not in the report?
19   A.   They're supporting materials.
20   Q.   Doesn't Rule 26 require you to disclose
21   what you based your opinion on?
22   A.   They should have been disclosed.
23   Q.   Would you agree your report is
24   defective based on it not containing a very

Page 128

1   important fact or a very important source
2   regarding your opinion?
3   A.   No. I believe this --
4        MR. ODIM: Objection. This is the
5   attorney -- an attorney's issue. He's not an
6   expert on the court rules, and if we do have
7   those, then we will certainly tender them as soon
8   as --
9   BY MR. DiCIANNI:
10   Q.   You didn't sign your report?
11   A.   I did.
12   Q.   I don't see a signature on it.
13   A.   I did sign it.
14   Q.   Take a look at Exhibit 1 and show me
15   where your signature should be found. Maybe I
16   missed it somehow.
17   A.   There is no signature on Exhibit 1.
18   Q.   You've been an expert witness for a
19   long time.
20        You've familiar with Rule 26?
21   A.   Yes.
22   Q.   You know that it's required to be
23   signed by the expert?
24   A.   I signed my report and forwarded it to



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
129–132

Page 129

1  Mr. Rubenstein.
2      MR. ODIM: And we will get you that version.
3  BY MR. DiCIANNI:
4      Q.    Do you know if that version is any
5  different from the version that's been presented
6  to us unsigned?
7      A.    It better not be. It certainly
8  shouldn't.
9      Q.    You put the report -- you put these
10  studies in the report you completed?
11      A.    Well, I made reference to the studies
12  in my report and then I submitted the studies as
13  supporting materials. I'll see if I can find that
14  for you. Page 12, Section D and it's the
15  paragraph under the two smaller paragraphs
16  beginning with: "This pistol was not tested..."
17      Q.    You talk about treatise sources had no
18  mechanical design of the weapon.
19          You don't identify the actual treatise
20  sources or known -- or define information,
21  correct?
22      A.    Correct, although I did mention that in
23  my qualification section with regards to the SIG
24  Sauer pistols.

Page 130

1      Q.    Tell me these studies that you relied
2  on regarding this particular pistol.
3      A.    There were two videos which I provided
4  and then there were a number of articles from I
5  believe it might have been Mr. Haag's book or
6  Mr. Hueske's or both. There was an article that
7  I provided from the Indiana Engineering Journal by
8  a gentleman by the name of John Nixon. There may
9  have been another study. I just don't recall what
10  it is right now.
11      Q.    What do these studies say about the
12  I'll call it the error rate regarding the ejection
13  of casings from this type of a pistol to the right
14  to the rear? What do they say about that?
15      A.    I don't recall the error rates.
16      Q.    We talked about the different factors
17  that can affect where casings end up, correct?
18      A.    Yes.
19      Q.    We talked about the way the officer is
20  holding the gun, what did you call that?
21      A.    Grip.
22      Q.    Grip. How did you determine that the
23  grip couldn't have affected where the -- strike
24  that.

Page 131

1          Your opinion assumes that the grip
2  utilized in this case did not affect the location
3  of the casings, correct?
4      A.    I'm looking at Mr. Hill's training
5  record. It indicated he would be a highly
6  qualified marksman and well above average
7  police-trained shooter.
8      Q.    That tells you that his grip would be
9  conventional?
10      A.    It would be conventional and he would
11  be better trained than the average trained police
12  officer which most of the studies are based on?
13      Q.    That would suggest to you that his grip
14  would not have altered the right rear pattern,
15  ejection pattern?
16      A.    That's a fair statement.
17      Q.    That was your conclusion?
18      A.    Yes.
19      Q.    It's an assumption based on your
20  knowledge of Officer Hill's qualifications?
21      A.    Correct.
22      Q.    It could also have been affected by the
23  wind?
24      A.    The wind?

Page 132

1      Q.    Yes.
2      A.    Insignificant.
3      Q.    Why do you say that?
4      A.    Cartridge case is not going to be
5  affected by the wind unless it is after the point
6  of impact.
7      Q.    Why would that matter?
8      A.    Because the cartridge case is not going
9  to be involved -- is not going to have a
10  significant -- it's going to be ejected through
11  momentum of the mechanical action of the gun and
12  it's going to fall to its point of impact through
13  gravity. Wind is not going to have a significant
14  effect on a cartridge case in such a short
15  distance.
16      Q.    Well, are there studies that you base
17  that opinion on, that winds will not have an
18  effect?
19      A.    I'm not aware of any studies.
20      Q.    So where do you derive that opinion
21  that the wind can't affect location?
22      A.    Experience and training with the SIG
23  Sauer line of pistols.
24      Q.    You fired SIG Sauer pistols outdoors in



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
133—136

Page 133

1 the wind?

2 A. Yes.

3 Q. When?

4    A. Carried SIG Sauer pistols as a police
5 officer and this is in my report, in 1987 and 1988
6 I was involved in the State Police evaluation of
7 transitioning from revolvers to semiautomatic
8 pistols. SIG Sauer was one of the pistols we
9 evaluated.

10       After the SIG Sauer was chosen for the
11 department firearm, I carried that for
12 approximately at least ten years, fired it every
13 year, yearly qualification, and just by virtue of
14 my work in the forensic laboratory, I've had
15 literally hundreds of occasions to fire the SIG
16 Sauer pistol. I own a SIG Sauer pistol. I
17 actually purchased the one that I carried when I
18 was with the police and I still own it today and
19 I'm very familiar with them, been involved in
20 competitions with them.

21    Q. None of the studies discussed wind
22 effect?

23    A. The wind is not an effect. I have not
24 seen any effect of winds on the cartridge case

Page 134

1 ejection patterns except after point of impact.

2    Q. So studies, I'm asking about studies.
3 You haven't seen any studies that can have some
4 impact on --

5    A. I have not seen any studies.

6    Q. When you qualified as a police officer
7 with the SIG Sauer, that was indoors, right?

8    A. That was outdoors and indoors.

9    Q. Did you ever have a shooting incident
10 as a police officer?

11    A. Thankfully no.

12    Q. You never had to shoot anybody?

13    A. In the service.

14    Q. I'm talking about as a police officer.

15 A. No.

16    Q. Never was involved in a shoot-don't
17 shoot scenario as a police officer?

18    A. A real situation or --

19    Q. A real situation, not training, real
20 situation.

21    A. Well, I've been involved where I've had
22 my firearm out, but I didn't have to shoot.

23    Q. You didn't to make a decision on
24 whether to shoot?

Page 135

1    A. Well, I made the decision not to
2 shoot.

3    Q. Are you familiar with any studies that
4 have -- well, did you take into consideration any
5 effect that Officer Hill's movement might have on
6 the location of the casings?

7 A. Yes.

8    Q. What did you do to take that into
9 consideration?

10    A. Movement would have a slight impact on
11 its point of impact. What it would not have is
12 any variation in its forward movement to the
13 extent I see in this particular shooting.

14    Q. Define for me point of impact.

15    A. Point of impact is where the cartridge
16 case has been ejected, the first time it strikes
17 the ground.

18    Q. Strikes anything?

19    A. Strikes anything.

20    Q. You're saying that that would
21 only affect -- movement would not affect how
22 casings could be ejected or the direction in which
23 they could be ejected except after it hit
24 something, that's what you're saying?

Page 136

1    A. No, that's not what I'm saying. It
2 would be minimal alteration in the ejection
3 pattern because we're talking about the timing
4 of the ejection, we're talking about 1/16th to 1/8th
5 of a second, so whatever that movement is, that's
6 within that 1/8th to 1/16th of a second would
7 change that point of impact, and there is a
8 general area of impact which could be six to eight
9 feet.

10    Q. Hill is running at the time he's
11 shooting, right?

12    A. Not necessarily.

13    Q. Let's look at it.

14       You disagree that's running? Doesn't
15 that video slow clearly that he's running?

16    A. He's moving fast.

17    Q. So you distinguish that from running?

18    MR. ODIM: Is that a question?

19 BY THE WITNESS:

20    A. It looks walking fast to me.

21 BY MR. DiCIANNI:

22    Q. Okay. Well, we can differ on that
23 opinion. I'm no physicist, but Newton's laws of
24 motion tells us that everything that's moving in a



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
137–140

Page 137

1 direction that is going to continue moving in that
2 direction until something stops it, correct?
3    A. That's correct.
4    Q. So why doesn't that affect the ejection
5 pattern in this case that he's moving quickly, you
6 say walking fast, I say running, but he's moving
7 it quickly why wouldn't that affect it?
8    A. It would within that 1/8th to 1/16th of
9 a second.
10    Q. But where do you come up with those
11 numbers?
12    A. That's the amount of time it takes the
13 cartridge case to get ejected from the gun.
14    Q. 1/8th to what?
15    A. I think it's 1/16th to 1/8th of a
16 second. I'll have to look at my report. I want
17 to be accurate on that.
18    Q. So it's going to move forward with the
19 gun for 1/8th -- 1/16th to 1/8th of a second?
20    A. That would be the area that it would
21 be, whatever movement that gun has completed in
22 that 1/8th to 1/16th, that would be the movement
23 forward.
24    Q. How do you know that the momentum --

Page 138

1 using general physics principles, how do you know
2 that the momentum isn't going to affect its
3 movement forward movement?
4    A. Because the mechanical action of the
5 gun is under it spring tension. That's what's
6 pulling it out and it's operating under recoil.
7    Q. Is there hang time on this?
8    A. What's that?
9    Q. Is there hang time on these ejected
10 casings?
11    A. No. It's instant.
12    Q. Are you aware of any studies that have
13 been done regarding the effect of casing ejection
14 based on a running police officer?
15    A. I can't say there aren't any. I think
16 I may have read some, but I don't recall them
17 now.
18    Q. So you wouldn't have applied any of
19 those in your opinions in this case if you can't
20 remember them?
21    A. No. I didn't apply them in this case
22 because they wouldn't apply.
23    Q. So your opinion assumes that the
24 movement of Officer Hill in a forward direction

Page 139

1 didn't affect the location of the casings?
2    A. There was a minor alteration as opposed
3 to being standing still, but it's that 1/8th of a
4 second so it might change it by a foot, a foot or
5 two.
6    Q. How do you quantify that?
7    A. Because he is moving, the gun is moving
8 and then we have the point of impact so it would
9 be whatever he's moving within that 1/8th of a
10 second and I can't tell how fast he's moving in
11 that video.
12    Q. But the one foot impact you're just
13 speculating about that?
14    A. No. That would be the variance --
15 because the ejected cartridge case doesn't come
16 out exactly at the same angle of the shot. It
17 comes out generally to the right and rear.
18 There's going to be a slight variation.
19    Q. Right. Even under the most controlled
20 situations there could be variations?
21    A. But the variation would not include
22 going forward under any circumstances, not
23 according to the.
24    Q. You have studies to prove that?

Page 140

1    A. Yes, I've submitted them.
2    Q. If I told you that there are studies
3 that show that 24 percent of the time the gun like
4 this will not eject right and to the rear but will
5 eject sometimes forward, sometimes to the left,
6 sometimes elsewhere, would you disagree with
7 that?
8    MR. ODIM: Objection. Foundation.
9 BY THE WITNESS:
10    A. Please show them to me. I'd like to
11 share them with my colleagues.
12 BY MR. DiCIANNI:
13    Q. All right. So the answer then is no,
14 you don't agree with that if you don't believe
15 there are such things, there are such reports?
16    A. Not in the conventional horizontal and
17 vertical plane that I see Officer Hill in.
18    Q. Which you're assuming that that's based
19 on his experience and his qualifications and
20 capabilities, you're assuming he was in that
21 perfectly conventional grip?
22    A. That's what the video shows.
23    Q. You can't see his grip in the video.
24    A. I can see what I see in the video.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
141–144

Page 141

1    Q. Is that because you have that
2 enhanced -- that special monitor at home that
3 tells you -- you can even see his grip?
4    A. I can see his arms parallel to the
5 ground. I can see him in a traditional police
6 shooting position. I have no -- there is no
7 evidence that that gun is tilted or canted to the
8  left or to the right that it would effect the
9 normal ejection pattern.
10    Q. How do you know what's not canted to
11 the left or to the right?
12    A. I can see his hands in the video.
13    Q. You can see whether his hands are
14 straight up or certain degrees to the right or
15 left?
16    A. I see him walking in a very static
17 weaver stance type motion it forward moving fast.
18    Q. And that allows you to assume the grip
19 that he's using?
20    A. Yes. It's not an assumption. I can
21 see it, and that's how police are trained.
22    Q. So that's what you're basing it on, not
23 the super monitor that you have?
24    A. And that as well. That as well.

Page 142

1    Q. What about the cartridges bounced off
2 Hill, you're assuming that they didn't bounce off
3 Hill as he's moving forward?
4    A. I don't see any evidence that they
5 would have bounced off Hill.
6    Q. Right. So you're assuming that they
7 didn't?
8    A. The ejection pattern with his arms
9 fully extended the ejection pattern in my opinion
10 the cartridges would not be bouncing off him.
11    Q. Why not?
12    A. He has his arms fully extended. I know
13 I've looked at his height and I took into account
14 the fact his arms were approximately 34 inches
15 long so that his pistol would be out further than
16 his hands. So we've got about a three foot
17 distance from his body and with the ejection
18 taking place in about 1/8th of a second, even with
19 him moving forward the cartridge case and the gun
20 is designed to prevent cartridge casings from
21 coming back striking the shooter.
22    Q. So your opinions regarding the location
23 of the casings and what that tells you about when
24 the shots were fired assumes that he held the gun

Page 143

1 in a particular way that it wasn't canted, that
2 wind had no effect on it, that it didn't bounce
3 off Hill, that his running wouldn't have affected
4 it in any significant way, and that some other
5 outside source didn't affect where it ended up,
6 correct?
7    MR. ODIM: Objection. That's an incomplete
8 rendition of what his testimony was.
9 BY THE WITNESS:
10    A. I didn't address the issue of outside
11 source.
12 BY MR. DiCIANNI:
13    Q. Okay. Well, you would have had to
14 assume that no outside source did anything to
15 affect its location in order to use those
16 locations as a basis for an opinion, correct?
17    A. At least as far as the cartridge case
18 next to the tree, that's correct.
19    Q. What makes you so certain that
20 somebody, an EMT or somebody at the scene couldn't
21 have affected it?
22    A. It's possible that the cartridge case
23 on the sidewalk could have been disclosed by
24 location of an officer or one of the cruisers that

Page 144

1 actually pulled up onto the sidewalk.
2    As far as the cartridge case next to
3 the tree, even if a person had dislocated with his
4 foot, this was in a grassy area with some roots
5 with a tree. It would not have been dislocated
6 more than a foot or two from where it had -- its
7 final resting place.
8    Q. So where would you expect the casings
9 to end up had Hill fired as you say within .25 of
10 a second from 257 or thereabouts? Where would you
11 think they would end up?
12    A. In the driveway.
13    Q. On the surface of the driveway?
14    A. Point of impact on the surface of the
15 driveway somewhere approximately mid center about
16 six to eight feet of his right or right rear,
17 mostly to the right rear. And then from the point
18 of impact, it's possible it could have rolled.
19    Q. How confident are you with the .25
20 second firing calculation that you've used?
21    A. I am very confident with that.
22    Q. What do you base that on?
23    A. Officer Hill -- first of all, there are
24 studies that show the average trained police



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
145–148

Page 145

1 officer can fire four to five shots per second,
2 which averages out to quarter of a second or less.
3 Officer Hill in my opinion is a very highly
4 qualified officer. It's my opinion that he could
5 easily match that standard. Based upon the
6 training record that I've read, SWAT team and his
7 frequency of training, I believe he would be able
8 to exceed the quarter of a second.
9    Q.   Per shot?
10    A.   For two shots he could most likely do
11 it less than a quarter of a second.
12    Q.   Less than a quarter of a second?
13    A.   Less than a quarter of a second.
14    Q.   Do you know what Fitt's law is?
15    A.   I don't.
16    Q.   So you did not apply Fitt's law at all
17 in this case; obviously you didn't?
18    A.   I didn't.
19    MR. DiCIANNI: Let's take a break.
20       (WHEREUPON, a recess was had.)
21    MR. DiCIANNI: What was the last question?
22       (WHEREUPON, the record was read by
23       the reporter.)
24 BY MR. DiCIANNI:

Page 146

1    Q.   Did you consider the type of bullet
2 that was in Hill's gun in your determination about
3 the effect it might have on the location of the
4 casing?
5    A.   I took it into account.
6    Q.   What type of bullet was it?
7    A.   I can't remember right now what it was.
8 It was a 45 automatic jacketed hollow point, but I
9 forget the manufacturer.
10    Q.   What did the type of bullet tell you on
11 the effect it could have on the ejected casing?
12    A.   It wouldn't be the type of bullet
13 itself. It would be the pressure that's
14 generated.
15    Q.   Well, wouldn't the weight of the casing
16 differ based on the type of bullet?
17    A.   No.
18    Q.   Not at all?
19    A.   The casing is set by industry standard.
20 The bullet can change in weight but diameter will
21 not change.
22    Q.   What about the casing?
23    A.   The casing is standard.
24    Q.   So it's only the bullet that affects

Page 147

1 the weight of the full bullet and casing, not the
2 casing?
3    A.   And the amount of propellant, but the
4 propellant wouldn't really have much in the way of
5 weight.
6    MR. DiCIANNI: Let's mark this as the next
7 exhibit as Exhibit 5.
8       (WHEREUPON, a certain document was
9       marked Scott Deposition Exhibit
10       No. 5 for identification, as of
11       04/04/2017.)
12 BY MR. DiCIANNI:
13    Q.   Take a look at Exhibit No. 5. Can you
14 identify that document?
15    A.   Yes.
16    Q.   What is it?
17    A.   This is a shooting scene measurements
18 form that I made up prior to going out to the
19 scene.
20    Q.   You made it prior to going out to the
21 scene, are you talking about columns one and two?
22    A.   Everything except for the measurement.
23    Q.   Everything except for column three, the
24 measurement column?

Page 148

1    A.   Right.
2    Q.   You went out to the scene and you made
3 these measurements which are somewhat self
4 explanatory, right?
5    A.   Yes.
6    Q.   And from the frames, you were able to
7 determine a precise location of, for example,
8 Officer Hill at 257, 262, correct?
9    A.   Yes, yes.
10    Q.   And did you have any assistance with
11 this?
12    A.   Yes.
13    Q.   Who helped you?
14    A.   Michael Clancy.
15    Q.   Who is Michael Clancy?
16    A.   Michael Clancy, I think he's a retired
17 Chicago police officer. My understanding is he
18 does some investigative work for the law firm of
19 SDR.
20    Q.   You mean was the Duffy, now it's -- now
21 it's Stetler & Rotert. So they put you in touch
22 with this Michael Clancy and he helped you with
23 the measurements?
24    A.   He drove me out and basically I just



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
149–152

Page 149

1 told him step on the tape measure over there I
2 want to take a measurement, but I took the actual
3 measurements.
4    Q. Which of your opinions did these
5 measurements have some impact on?
6    A. Once again, please.
7    Q. Which of your opinions did these
8 measurements have some effect on?
9    A. I believe all of them.
10    Q. In what way?
11    A. Do you want me to go down each one.
12 Q. Sure?
13    A. The discharged cartridge case on the
14 sidewalk, I measured it approximately 26 feet from
15 where Officer Hill was located, approximately
16 where he was located in the video. And so I was
17 looking at the 26 feet and that seemed a little
18 unusual from the point of impact, but then I
19 allowed for the arrival of the cruiser which drove
20 up on the -- it actually drove up through the
21 driveway where I would expect the cartridge case
22 to have been and then the officer got out of the
23 vehicle so there might have been some movement and
24 that was the cartridge case that was found

Page 150

1 underneath the cruiser after he had backed off.
2    Q. So let me stop you for a second.
3        Is Officer Hill in the same place at
4 257 and 262?
5    A. I think he's moved a couple of feet.
6 Q. Slightly?
7    A. Yes, forward, south he's moved south.
8    Q. Go ahead. Next one.
9    A. Then I made the same frames to the
10 cartridge case next to the tree and that came to
11 19 to 21 feet and this is where we eliminate the
12 ejection pattern going that far forward if Officer
13 Hill is in the driveway where he stated he made
14 the decision to shoot.
15    Q. What accounts for this range from 19 to
16 21?
17    A. Officer Hill testified that it was at
18 257 where he demonstrated Justus Howell turned
19 towards him with the gun and it was at that point
20 he had made the decision to shoot and so I
21 allowed -- from 257 to 262 I made an allowance for
22 the reaction time. From the time the brain said
23 pull the trigger to the time he actually is
24 capable of mechanically pulling the trigger takes

Page 151

1 about .31 or 1/3 of a second so I took 1/3 of the
2 15 frames and I added the -- those five frames to
3 come up to 262 as the possible location where he
4 may have fired a shot at least according to his
5 testimony. Then I look at that in relation to
6 could the cartridge case have gone 21 feet
7 forward, that's what that measurement was for.
8    Q. Do you quarrel with Officer Hill's
9 testimony that he made the decision to shoot at or
10 around 257?
11    A. Have a quarrel with it?
12    Q. Do you disagree with that?
13    A. That's his testimony.
14    Q. Does your study dispute that?
15    A. I don't believe he did.
16    Q. You don't believe he did?
17 A. Yes.
18    Q. Where do you believe he made the
19 decision to shoot?
20    A. Maybe I misunderstood the question.
21 The trajectory rods, in other words, the position
22 of Justus Howell at that point in time when I look
23 at 257 and I allow the one third of a second, when
24 I look at Justus Howell's posture, if he had fired

Page 152

1 at that point in time, those trajectory rods could
2 not -- the gunshot wounds as shown in the autopsy
3 would not -- the results would not have occurred
4 as they are shown.
5    Q. Yes. I understand that. And you think
6 he shot later?
7 A. Yes.
8    Q. We've been through that. We won't go
9 through it again.
10 A. Okay.
11    Q. So to you it's irrelevant as to when
12 the decision to shoot would have been, that
13 doesn't play a role in your analysis at all; your
14 focus is on when he shot?
15    A. I want to look at everything because I
16 want to be as accurate as I can.
17    Q. I'll come back to my question, then.
18        Do you dispute in any way or does your
19 study in any way dispute that Officer Hill decided
20 to shoot at 257?
21    A. No, not as far as his decision.
22    Q. And then 262, you get that number or
23 that frame based on the one third of a second that
24 it would take him to shoot?



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
153–156

Page 153

1    A.    Yes, if he had actually pulled the
2  trigger.
3    Q.    What was the next one that you had?
4    A.    The next one would be -- I'm actually
5  looking at both of these, Officer Hill at frame
6  257 and Officer Hill at frame 262 so I'm taking
7  them separately but I'm looking at the distance of
8  Mr. Howell from him at that point. I just wanted
9  to get a reference. I didn't know whether it
10  would be important or not but I want to get a
11  reference while I'm at the scene.
12       The next one is the center of the
13  concrete pathway in front of the residence,
14  directly -- directly each of the cartridge case
15  placard number two next to the tree, that's ten
16  feet. What I'm unable to determine in the video
17  is the exact location Officer Hill is in relation
18  to that cartridge case next to the tree so I've
19  taken the neutral position of the center of the
20  pathway and used that as a determination to see
21  what effect that would have on the point of impact
22  of the cartridge case and when I look at it eight
23  to ten feet, what I actually was looking at here
24  was is there a possibility that the cartridge case

Page 154

1  could have struck the tree and bounced back and
2  it's possible but it doesn't seem probable given
3  the ten feet, the cartridge case would point of
4  impact be more closely to the six to eight foot
5  distance from officer Howell. I then -- I'm
6  sorry, that's the 12-foot, that's the next one,
7  the 12-foot. The cartridge case was actually at
8  ten feet.
9       I then looked at -- there's a tree limb
10  that's directly above the cartridge case. I
11  wanted to see whether or not if Officer Hill was
12  directly next to the tree, could the cartridge
13  case have ejected upward far enough to obstruct
14  the tree that was growing on an angle. I wasn't
15  able to make a determination at that but it did
16  show that it's possible.
17    Q.    You know, I'm going to stop you there
18  because I'm not following you on that. I think we
19  should pull up the scene and you could explain to
20  me what you mean by that.
21       What did you mean?
22    A.    Actually I was looking at still
23  photographs. There's actually several photographs
24  that show the exact location of this discharged

Page 155

1  cartridge case and it shows the tree.
2    Q.    The crime scene photo?
3    A.    Yes, correct.
4    Q.    I'm going to hand you and this ask you
5  to -- oh, you have it. Okay. Point out the
6  photograph that you're referring to.
7    A.    I came to it right away. I don't know
8  what photograph it is.
9    Q.    We'll identify it.
10  MS. AZARI: It's 837 I believe.
11  BY THE WITNESS:
12    A.    Actually the next photo is just as
13  good.
14  BY MR. DiCIANNI:
15    Q.    Is that it?
16    A.    Yes, it is, and the next photo is shows
17  the placard a little bit better.
18  MR. DiCIANNI: I'm going to mark these two as
19  the next two exhibits and then we're going to put
20  them up on the screen.
21       (WHEREUPON, certain documents were
22       marked Scott Deposition Exhibit
23       Nos. 6 & 7 for identification, as
24       of 04/04/2017.)

Page 156

1  BY MR. DiCIANNI:
2    Q.    We were talking about distance from the
3  ground, distance to tree limb, is that where we
4  were?
5    A.    Yes. The tree limb is on the left side
6  of this first photo so I measured at a point that
7  went directly up above the placard number two,
8  straight up, you can see it comes to a little bit
9  of a bend, it begins to arc upwards and I in
10  measured in that again area, five to six feet just
11  up above the cartridge case.
12    Q.    The bottom of that limb, how is it five
13  to six feet?
14    A.    Five to six feet because I'm accounting
15  for a little bit of the curvature as it goes
16  upwards.
17    Q.    Did that play any role in any of your
18  conclusions?
19    A.    It's my belief that the discharged
20  cartridge case would not have struck that tree
21  limb.
22    Q.    Based on what?
23    A.    The height of the gun above the ground
24  and I looked at Officer Hill's height, for a



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
157–160

Page 157

1 person of his height, the gun would have been
2 approximately 49 inches, 47 to 50 inches above the
3 ground if he was holding it level and so for the
4 cartridge case to come out of the pistol where he
5 would have been located over on the pathway, that
6 limb would not have been an obstruction that it
7 would have struck on its ejection path.
8      Q. Wouldn't be a determination that you
9 would make by measuring east to west?
10      A. No because I'm placing -- I don't know
11 the specific position and I'm placing Officer Hill
12 in as neutral a position as I can which is the
13 center of the concrete pathway and that's also
14 based upon his own testimony that when he was
15 moving south in Spaeth's he continued south across
16 the driveway and the concrete pathway in front of
17 that house is in line with the concrete pathway in
18 front of Spaeth's.
19      Q. Go ahead.
20      A. I did this before I went there. I
21 didn't know what value it might have but I did
22 want to find out what was the space that Officer
23 Hill might have had in between the parked motor
24 vehicle that we see in the vehicle that are in

Page 158

1 front of Spaeth's Woodworking, I measured it,
2 that's not data that is important to me in this
3 case.
4      Q. Next one.
5      A. The discharged cartridge case on the
6 sidewalk in relation to the north south linear
7 distance of cartridge case number two is seven
8 feet, not accounting for east west and the last
9 one I took Officer Hill in front of Spaeth's with
10 his arms race in what I call the primed to shoot
11 orientation to the location at the beginning of
12 the asphalt driveway where Officer Hill is seen in
13 frame 257, this is based upon his testimony that
14 he did not -- my recollection is he stated that he
15 did not aim his pistol at Justus Howell until he
16 had reached the driveway. The video to me shows
17 that he exited from behind the tree in front of
18 Spaeth's and he actually had his pistol out
19 pointed at least in a southerly direction 14 feet
20 before the driveway.
21      Q. Before he says he did?
22 A. Yes.
23      Q. And that is because you wanted to make
24 him out to be a liar?

Page 159

1      MR. ODIM: Objection.
2 BY THE WITNESS:
3      A. I'll answer that. I don't want to make
4 anybody out to be a liar. I just want to present
5 the physical evidence the way it is and let the
6 finder of fact make that decision.
7 BY MR. DiCIANNI:
8      Q. Did this last determination, the
9 14 feet measurement, did that play any role in any
10 of your opinions?
11      A. Well, I know I mention in my report
12 that it's inconsistent with Officer Hill's
13 testimony.
14      Q. I know but --
15      A. I mean --
16      Q. In what way is that relevant to any of
17 your opinions?
18      A. Well, it just shows that Officer Hill
19 had his pistol out before he testified that he
20 even saw the gun.
21      Q. Okay. And in what way is that relevant
22 to your opinions?
23      A. Well, I'm just pointing out the
24 scientific facts, what the video shows.

Page 160

1      Q. It doesn't affect your opinion that
2 Officer Hill shot later than he -- you contend his
3 testimony established?
4      A. No. I'm just regard recording -- what
5 I'm doing is I'm documenting a crime scene
6 unfortunately 20 months later, but I'm documenting
7 as best I can based upon the available evidence
8 I've got to look at.
9      Q. There's dozens of things you can
10 document at a scene so you make some evidentiary
11 evaluation as to what you're going to document,
12 correct?
13      MR. ODIM: Objection. That's not what his
14 testimony is.
15 BY MR. DiCIANNI:
16 Q. Correct?
17      A. Like I said, I did this before I went
18 to the scene. What evidentiary value it might
19 have later would be something I would be glad that
20 I took the measurement in case I needed it.
21      Q. And it turned out you really didn't?
22      MR. ODIM: Objection. Is that a question?
23      MR. DiCIANNI: Yes.
24 BY MR. DiCIANNI:



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
161–164

Page 161

1    Q.   It turns out you really didn't need it,
2  right?
3    A.   It is what it is and if I'm asked to
4  testify to it, it's of value to someone else.
5    Q.   Your report goes on to discuss -- your
6  opinion goes on to talk about Officer Gildea's
7  location when he heard the gunshots and you
8  believe that contradicts Officer Hill's account of
9  when he fired those shots; is that accurate?
10    A.   Yes.
11    Q.   You base that on the video, correct?
12    A.   On the video and Officer Gildea's
13  testimony.
14    Q.   And the video would show that on or
15  around 257 Gildea is still in the video and
16  doesn't disappear from the video until about 273,
17  74?
18    A.   Correct.
19    Q.   So you want to draw a coordination
20  between when Gildea says he heard the shots and
21  the frames on the video, correct?
22    A.   Well, I'm looking at his testimony and
23  I'm comparing it to the frames on the video.
24    Q.   This kind of gets back to the question

Page 162

1  that I asked that we talked about earlier about
2  the peril in using testimony or oral statements as
3  forensic evidence. That's what you're doing here,
4  right?
5    A.   No.
6    Q.   In what way are you not doing that?
7    A.   We can see Officer Gildea in the video
8  up to where he disappears from view at
9  approximately 273 to 274. So when we evaluate the
10  testimony that he did not hear the gunshots until
11  he reached the southeast corner, actually it was
12  the south part of the house near the electrical
13  box on 24th Avenue I believe it is that he heard
14  the gunshots. When I look at the distance where
15  Officer Gildea is located in the video and then to
16  where he stated he heard the gunshots, it's a
17  distance of approximately 35 to 40 feet. So what
18  that's telling me is there is an issue of time
19  involved, how long does it take Officer Gildea to
20  cover 40-some odd feet and does that conflict or
21  support the fact that Officer Hill hired at a
22  later time than he claims to have fired. So what
23  I'm pointing out in this is the time frame that it
24  takes Officer Gildea to leave the video, go out of

Page 163

1  side of the video until he gets around to the
2  south side of the house. That's the approximate
3  time that officer Howell is obstructed by the tree
4  and that's the point at which the victim is on the
5  ground.
6    Q.   Did you measure his strides in the
7  video?
8    A.   I did not.
9    Q.   Are you familiar with any studies that
10  would support the conclusion you made in this case
11  that Officer Gildea's testimony would be reliable
12  forensic evidence to base an opinion on in this
13  instance?
14    A.   I know there's studies on police
15  officers' physical standards and there are studies
16  on athletes covering getting to first base,
17  et cetera so I try to make a logical conclusion
18  based upon that.
19    Q.   Did you apply any of those studies?
20    A.   I did.
21    Q.   Which ones?
22    A.   Well, I took the amount of time it
23  would take the average person to cover
24  approximately 40 feet and it's about one to one

Page 164

1  and a half seconds.
2    Q.   What about an officer who is carrying
3  gear?
4    A.   I didn't account for that.
5    Q.   Are you familiar with any of the
6  studies about the time it takes an officer
7  carrying gear to travel from A to B on foot?
8    A.   I didn't use those in this shooting
9  incident.
10    Q.   Are you aware of any of the studies on
11  the effect of -- lit me rephrase that.
12       Are you familiar with any of the
13  studies that discuss the discrepancy between the
14  actual and the recalled path of travel of
15  witnesses?
16    MR. ODIM: Objection. Foundation.
17  BY THE WITNESS:
18    A.   I think that's beyond the role of my
19  retainment in this case.
20  BY MR. DiCIANNI:
21    Q.   So you didn't apply any of those
22  studies?
23    A.   I did not.
24    Q.   You did not apply any study regarding a



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
165–168

Page 165

1  standard deviation from time travel on foot that
2  results from a person being in a conflict
3  situation and trying to remember the details?
4       MR. ODIM: Objection. Foundation and totally
5  ambiguous.
6  BY THE WITNESS:
7    A.  I did not apply that.
8  BY MR. DiCIANNI:
9    Q.  So putting all of your conclusions
10  together, based on all of the evidence that you
11  considered, tell us what you think happened in
12  this case.
13       MR. ODIM: Objection. This witness has given
14  certain opinions, those opinions are encompassed
15  in this report. The question goes way beyond what
16  he is stating an opinion about.
17  BY MR. DiCIANNI:
18    Q.  Go ahead.
19    A.  My report stands for itself.
20    Q.  So if I can summarize it, you believe
21  that Officer Hill shot -- well, strike that.
22       You've testified earlier about based on
23  your opinions when the left-sided shot took place
24  in the frames, correct, which frames those shots

Page 166

1  had taken place in?
2    A.  Yes.
3    Q.  And then you testified before regarding
4  which of the frames the right sided shot could
5  have taken place in, correct?
6    A.  I think I made an exclusion on one part
7  of that based upon the posture of Mr. Howell. I
8  don't recall what the frames were but I recall
9  that.
10    Q.  When you say exclusion, you mean that
11  you only identify the frames where the right-sided
12  shot couldn't have occurred?
13    A.  Correct.
14    Q.  So you're not -- you're unable to say
15  with any degree of scientific certainty when the
16  right sided shot could have occurred?
17    A.  I think I did point out some
18  possibilities where his orientation and the
19  posture of his body made it possible for those
20  trajectory rods to line up with the muzzle of the
21  gun.
22    Q.  I don't recall that, but I know we've
23  been through it. So I don't think we need to go
24  through it again.

Page 167

1       I know you excluded it as something you
2  considered and you relied on in arriving at your
3  opinions, but tell me what Item J is on your
4  source materials, the reports of measurements by
5  the Lake County major crimes task force?
6    A.  There is a document I believe it's
7  called that, measurements by the Lake County task
8  force, I looked at that document and in my opinion
9  it was completely no reference point, no diagram,
10  no diagram of where evidence was located,
11  measurements from the middle of the yard to
12  another point, basically they were of no value
13  whatsoever.
14    Q.  Is that in your records, those
15  measurements?
16    A.  I have the document. I copied it over.
17  It's on the disk.
18    Q.  It's on the disk?
19    A.  It's on the disk.
20    Q.  Let's pull it up.
21    A.  When I copied it over, the properties
22  did not copy.
23       MS. MORAN: Off the record for a minute.
24       (WHEREUPON, discussion was had off

Page 168

1       the record.)
2  BY MR. DiCIANNI:
3    Q.  No. 67, Biodynamics Engineering, do you
4  know what that is?
5    A.  I don't know what that is. I didn't
6  use it.
7    Q.  Could you pull that up? So earlier I'd
8  asked you about whether you had seen or relied on
9  or responded to a computer diagram such as this,
10  right, and you said you didn't?
11    A.  Yes, and that was incorrect now that I
12  see it but I don't remember looking at this.
13    Q.  You didn't analyze it in any way?
14    A.  No, I didn't.
15    Q.  Why not?
16    A.  Because I'm doing an independent
17  examination.
18       MS. MORAN: For the record, you referred to
19  it as an animation earlier.
20  BY MR. DiCIANNI:
21    Q.  You knew what I meant?
22    A.  Actually I didn't.
23    Q.  You didn't?
24    A.  Right.



RONALD SCOTT                                    April 04, 2017
HOWELL vs CITY OF ZION                          169–172

Page 169

1     MS. MORAN: He told you he didn't at the time
2 as the report will reflect.
3 BY MR. DiCIANNI:
4     Q. What we just looked at bioengineering,
5 that's not J?
6     A. That's not J.
7     Q. We want to pull up J and see what that
8 is.
9        What would it be listed as on your
10 files?
11     A. I'm going to take a guess here. It
12 might be in the technician reports. Measurements,
13 Kueber's measurements, that's probably it there.
14     Q. Is that what J is?
15     A. Yes, that's one of them.
16     Q. What's the other one?
17     A. That's the other one. There's no
18 reference point. It's meaningless.
19     Q. What was Honda Fit?
20     A. I don't know.
21     Q. You didn't use it or refer to it for
22 any of your opinions?
23     A. I looked at it but I didn't use it.
24     Q. You disagree that using testimony or

Page 170

1 using a witness statement is an inappropriate use
2 of -- it's inappropriate to use a witness
3 statement or testimony as forensic evidence?
4     MR. ODIM: Objection. Asked and answered.
5 BY THE WITNESS:
6     A. I don't use witness statements as the
7 basis for scientific conclusions, correct.
8 BY MR. DiCIANNI:
9     Q. But you use them as forensic evidence?
10     A. I use them -- I would compare the
11 scientific evidence to the statements to see
12 whether they agree.
13     Q. Okay. You did that with Gildea's
14 statement, right?
15     A. I did that -- I took Gildea's statement
16 and I took the video and the distance factor and I
17 synchronized that.
18     Q. Why didn't you read the witness
19 statements that confirm that Justus was running
20 with a gun in his hand down Galilee?
21     A. Witness statements?
22     Q. Are you aware there's witnesses who saw
23 him running down the street with a gun in his
24 hand?

Page 171

1     A. Civilian witnesses?
2 Q. Yes.
3     A. I understand there were. I'm not
4 familiar with their statements.
5     Q. Why wouldn't you have reviewed those
6 and used that as forensic evidence to shed light
7 on your opinion regarding Howell running down the
8 street with a gun in his hand?
9     A. Actually I think you just answered your
10 own question with the previous question. I
11 wouldn't use witness statements by themselves, in
12 and of themselves I wouldn't use witness
13 statements.
14     Q. You would use a witness statement in
15 connection with the video, correct?
16     A. Because they're in the video.
17     Q. Who is in the video?
18     A. Officer Gildea is in the video.
19     Q. That's how you make -- that's where you
20 draw the line, if he's in the video you'll use his
21 statement as forensic evidence?
22     A. Well, it shows where he is. It's
23 evidence.
24     Q. Your opinion that the video does not

Page 172

1 show Howell turning in the way that Hill describes
2 it in his deposition, how would you test that
3 opinion?
4     A. By looking at the demonstration done by
5 Officer Hill and then looking at the video and
6 seeing if I can see the same or similar turn which
7 I tested.
8     Q. So it's what you did?
9     A. It's what I did and I couldn't find it.
10     Q. And your opinion that Hill fired later
11 than you believe his testimony demonstrates, how
12 would you test that?
13     A. By the location of the discharged
14 cartridge cases, by the synchronization of the
15 trajectory rods from the autopsy in conjunction
16 with the posture of Mr. Howell at the point that
17 Officer Hill stated that he shot him.
18     Q. Now you didn't do anything to test
19 those opinions outside of your review of the
20 evidence, correct?
21 A. Correct.
22     Q. So looking at your CV, you were in the
23 military?
24     A. I was.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
173–176

Page 173

1    Q. And that would have been from '63 to
2 '66?
3    A. Yes, sir.
4    Q. And did you see combat?
5    A. I did.
6    Q. Where?
7    A. Dominican Republic 1965.
8    Q. What was that?
9    A. That was called Operation Power Pack.
10 I can't recall too much about it. I was only 18,
11 19 at the time. The armed forces had been sent
12 down to protect I believe it was American students
13 that attending school in the Dominican Republic
14 and to withdraw them from what was a civil
15 insurrection at the time.
16    Q. Did you actually get into some type of
17 a fight?
18    A. I was in combat.
19    Q. Did you shoot somebody?
20    A. I did.
21    Q. Who did you shoot?
22    A. I don't know who it was.
23    Q. Was it one of the rebels?
24    A. It was.

Page 174

1    Q. What were the circumstances?
2    A. Shot him with a 50 caliber machine gun,
3 two of them.
4    Q. What were they doing?
5    A. They were shooting out of the window of
6 the Holiday Inn hotel at us.
7    Q. You were on the ground?
8    A. I was on the ground.
9    Q. Did you fire up into the window at
10 them?
11    A. Yes.
12    Q. Did you get them?
13    A. Yes.
14    Q. How do you know?
15    A. Fell out of the window.
16    Q. Any other types of combat?
17    A. No.
18    Q. When you got out of the Army in '66,
19 what did you do?
20    A. I went into mechanical engineering at
21 the General Electric company, went through the
22 apprenticeship program, a combination of
23 mechanical engineering and learning manufacturing
24 processes, manufacturing jet engines.

Page 175

1    Q. When did you start college?
2    A. Well, I started junior college right
3 after I got out of the service, is sometime I
4 believe in 1967, actually during mechanical
5 engineering program that also considered part
6 of college, part of Wentworth Institute.
7    Q. You worked for General Electric it was?
8    A. Yes, it was.
9    Q. You were a full-time employee?
10    A. Yes.
11    Q. And you joined the Massachusetts State
12 Police in 1973?
13    A. Yes, I did.
14    Q. Was that directly from General
15 Electric?
16    A. No, it was not.
17    Q. What did you do in between?
18    A. In between I had know position in
19 mechanical engineering. I worked for a large firm
20 out of New York, rise letter lap incorporation,
21  heating ventilating air conditioning on a 35 story
22 office tower building doing mechanical work.
23    Q. You don't have an engineering degree?
24    A. No, no.

Page 176

1    Q. No engineering certificates?
2    A. I didn't complete it. Then I went into
3 accounting and finance, career change.
4    Q. Another career change to go into the
5 police?
6    A. Yes, I did.
7    Q. Was that your first law enforcement job
8 in Massachusetts?
9    A. Yes, it was.
10    Q. You weren't military police or anything
11  like that?
12    A. No.
13    Q. So you served according to your CV as
14 a -- would it be a patrol officer from '73 to '79?
15    A. I served in a rural State Police
16 barracks. We had very little patrol. We did
17 police services, the towns are very small; they
18 had no police department, in the evening and
19 midnight hours.
20    Q. What town was it?
21    A. There was a number of towns. I can
22 list them for you if you want.
23    Q. Where were you born and raised?
24    A. I was born in Lynn, Massachusetts,



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
177–180

Page 177

1  L-y-n-n.
2  Q.   Is that where you lived until college?
3  A.   I moved to Peabody, Massachusetts.
4  Q.   In '79 you went to the ballistics
5  section of the Massachusetts State Police?
6  A.   Correct.
7  Q.   And you served there until '92 when you
8  became the shift commander at JHQ?
9  A.   Correct.
10  Q.   What were your duties there?
11  A. At GHQ?
12  Q.   Yes.
13  A.   I was in charge of the 9/11 system,
14  civilian dispatchers, state wide dispatch system
15  and I was overseeing the deployment of resources
16  to local police department, helicopter, SWAT
17  teams, et cetera.
18  Q.   So that did not involve forensic
19  evaluations or analysis?
20  A.   I was continuing to do some old cases
21  at the time and I did internal police shooting
22  investigations.
23  Q.   As part of -- in a supervisory role?
24  A.   Yes.

Page 178

1  Q.   Did you do the actual investigation
2  yourself or you got reports from the investigators
3  and make decisions based on that?
4  A.   I did the actual internal
5  investigation.
6  Q.   It looks like from '92 until you left
7  in would it have been '98?
8  A.   1998.
9  Q.   You did not have a role as an
10  investigator?
11  A.   I did. An internal investigator.
12  Q.   I see. Staff inspector position?
13  A.   And in the positions of shift
14  commander, I conducted internal investigations,
15  mostly misconduct and civilian complaints.
16  Q.   So the majority of your experience in
17  forensic evidence evaluation took place from '79
18  to '92 in the ballistic section, at least when you
19  were a police officer?
20  A.   The forensic aspect of it and my
21  independent work since 2002.
22  Q.   From '92 until you left the department
23  you were basically an administrator?
24  A.   Yes, I was considered a commissioned

Page 179

1  officer.
2  Q.   But you were in an administrative role?
3  A.   Yes.
4  Q.   Why did you leave in '98?
5  A.   My wife and I had the business that she
6  still has, it was Eclipse Signs and Truck
7  Lettering at the time and I had finish my 25 years
8  and four months and it was time to move on to the
9  next phase of my life.
10  Q.   Her business is truck lettering?
11  A.   Signs and truck lettering.
12  Q.   She makes signs?
13  A.   Gold leaf signs, window lettering,
14  boats, planes, trailer trucks, airplanes.
15  Q.   She did that in Massachusetts and then
16  in Arizona?
17  A.   Yes.
18  Q.   Still does?
19  A.   Still does.
20  Q.   You have as professional employment
21  from '67 to -- when did you start your business?
22  A.   2002.
23  Q.   What did you do from '98 to '02?
24  A.   I worked with my wife in the signs and

Page 180

1  truck lettering business. I did a few cases for
2  some attorneys that I knew but very few. I'm
3  talking less than probably less than 15.
4  Q.   Did you do any consultation, expert
5  witness type consultation while you were a police
6  officer?
7  A.   Not permitted.
8  Q.   So you didn't start doing that until
9  you left?
10  A.   Correct.
11  Q.   Did you do any of that in
12  Massachusetts?
13  A.   I did not.
14  Q.   So before you actually set up what
15  would be a formal business, you did some
16  consultation occasionally?
17  A.   Yes.
18  Q.   And then in '02 you launched your
19  business?
20  A.   That's correct.
21  Q.   Have you ever had any partners?
22  A.   I have not.
23  Q.   Have you ever had any employees?
24  A.   Well, I don't want to consider my wife



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
181–184

Page 181

1  an employee, but she helps me on occasion with
2  some of the administrative and she's the
3  accountant shall we say.
4      Q.   Other than that, no employees?
5      A.   That's correct.
6      Q.   And that's been the case since you
7  started the business?
8      A.   Correct.
9      Q.   How many cases a year do you generally
10  handle roughly?
11      A.   It's been -- it's increased over the
12  last five years significantly. I average over the
13  last five years 40 to 50 cases, 35 to 45 cases per
14  year.
15      Q.   These would all be litigation
16  consultations?
17      A.   Criminal cases. Some of them involve
18  working with architects and engineers conducting
19  testing. I do work for the military.
20      Q.   I'll include all of that in litigation,
21  if there is a case involved, criminal, civil --
22      A.   I do some voluntary work for innocence
23  projects and families on occasion.
24      Q.   You don't teach?

Page 182

1      A.   I try to do one presentation per year
2  if time permits. It's been difficult.
3      Q.   Have you published at all?
4      A.   I do not publish.
5      Q.   Never published?
6      A.   Never published.
7      Q.   Why not?
8      A.   First of all, with the State Police it
9  was prohibited by the rules and regulations and I
10  prefer to give scientific oral verbal
11  presentations with abstracts as opposed to formal
12  publications.
13      Q.   On Page 4 of your report you say you've
14  personally conducted of generally accepted tests
15  for terming discharged cartridge case ejection
16  patterns including actual testing of semiautomatic
17  pistols, full automatic pistols and machine guns
18  and submachine guns. That's an accurate
19  statement?
20      A.   Yes, it is.
21      Q.   Where did you conduct these tests?
22      A.   I conduct them currently as needed.
23  The majority of them I conducted with the
24  Massachusetts State Police, and I've worked with

Page 183

1  the military on some prototype weapons.
2      Q.   Did you do any of these tests in
3  connection with cases you were consulting on?
4      A.   Yes.
5      Q.   How many of them approximately?
6      A.   Since 2002?
7      Q.   Yes.
8      A.   Or are you including State Police?
9      A.   No, since '02.
10      A.   I would say less than 50.
11      Q.   So 50 times you were asked to give an
12  opinion regarding some ejection issue, and you did
13  a test?
14      A.   I misunderstood your question.
15          I've given testimony on ejection
16  patterns without conducting tests, but in 50 cases
17  or less, I've actually conducted the actual
18  testing.
19      Q.   In connection with your consultation?
20      A.   Right.
21      Q.   I did understand.
22          Why have you not published anything
23  regarding your tests?
24      A.   I just don't care to publish material.

Page 184

1  I prefer scientific presentations.
2      Q.   Well, on Page 5 you say you have
3  presented peer-reviewed scientific forensic
4  presentations at numerous college and
5  universities, seminars for district attorneys and
6  private attorneys, et cetera. I'm not understand
7  peer-reviewed in that context.
8          What do you mean by peer-reviewed?
9      A.   This goes outside of the scope of
10  ejection pattern testing?
11      Q.   Yes.
12      A.   Okay. So this would include all
13  forensic testing, tool marks, gunshot distance
14  determination, how it's done, the generally
15  accepted methodology, determining shooter
16  orientation, movement of the muzzle of the gun how
17  much does that mean being off target at various
18  distances, talking about evidence collection,
19  preservation, talking with EMTs, describing to
20  them that when they see gunshot holes in clothing,
21  preferably they wouldn't take the scissors, that
22  type of work, and then I've been over to the
23  colleges and universities at the request of some
24  of the professors, a lot of the district attorneys



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
185–188

Page 185

1 and assistant district attorneys were adjunct
2 professors. I've been over to Harvard with Dr. --
3 Professor Dershowitz, moot court for the students,
4 that type of thing.
5    Q. I get the picture.
6       I guess what I don't understand is how
7 are these presentations peer-reviewed?
8    A. Oh, they were approved the State Police
9 approved -- the State Police would get a request.
10 I would prepare an abstract. The abstract would
11 be reviewed for accuracy and then be approved for
12 me to, then, present it.
13    Q. In your State Police days?
14 A. Yes.
15    Q. Not since then?
16    A. Since then I just submit abstracts to a
17 committee such as the American Academy of Forensic
18 Sciences, and it's reviewed by them.
19    Q. And they invite you to speak?
20    A. They review the abstract and then they
21 make a decision whether or not I can present it.
22    Q. You consider that peer-reviewed?
23 A. Yes.
24    Q. Going to your case list, first of all,

Page 186

1 you didn't give us bill records, you said you
2 charge $395 an hour, is that generally what you
3 charge for all of your consultation cases?
4 A. Yes.
5    Q. That's what you're charging in this
6 case?
7 A. Yes.
8    Q. Did that includes whatever the task is
9 that you perform in connection with the case?
10    A. My travel time is at a lower rate,
11 and out-of-pocket expenses would be just at
12 cost.
13    Q. But your $395 per hour applies to
14 testimony, to whatever you're doing?
15    A. Professional work, correct.
16    Q. How many hours have you put in in this
17 case so far?
18    A. I don't know if I can tell you the
19 hours. I can tell you the amount.
20    Q. Okay. What's the amount?
21    A. Which includes out-of-pocket expenses,
22 I think have received a total of $14,000 which
23 includes part of this travel for this deposition
24 and from that would be approximately $3,000 in

Page 187

1 out-of-pocket airfare, expenses, lodging,
2 et cetera.
3    Q. So about 11,000 in fees?
4    A. I think so, yes.
5 Q. Roughly?
6 A. Yes.
7    Q. Do you keep time records?
8    A. I do, right.
9    Q. Is there a software program you use?
10    A. I use a software program.
11    Q. What's it called?
12    A. I actually developed it on Microsoft
13 Word for Windows. I developed my own program.
14    Q. Do you have all your task activities
15 that you itemized?
16    A. I do.
17    Q. So 11,000 in fees and that doesn't
18 include today?
19    A. It does not include today.
20    Q. And it would not include any work going
21 forward or any trial testimony, correct?
22    A. That's correct.
23    Q. Are you expecting to do a rebuttal
24 opinion in this case based on any experts we might

Page 188

1 disclose?
2    MR. ODIM: Objection. There's been no
3 disclosure of anything.
4 BY MR. DiCIANNI:
5    Q. That wasn't my question. Go ahead.
6 You can answer.
7    A. I have not been asked to do anything
8 beyond this deposition.
9    Q. What do you roughly make per case,
10 roughly? What would be an average amount that you
11 would charge per case?
12    A. It's going to depend upon the evidence
13 and the complexity of it. I think it could
14 average from -- I think the most in one case was
15 over $30,000 and there are some cases I do pro
16 bono, but it's anywheres in between, but I would
17 say that I think the best way I could put it is
18 15 hours would be what my starting point would be,
19 do the best I can within that and then if more
20 time is necessary, I work from there.
21    Q. So 50 an hour is on the simplest type
22 of case and $30,000 would be the more -- the most
23 complex type of case?
24    A. Yeah, and that includes travel like to



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
189–192

Page 189

1 Florida and very complex testing.

2　Q. How does this case rank in terms of
3 complexity? Is it at the top end or the low end?

4　A. It's not complex to me. I don't want
5 to say it's on the low end, but it's less than
6 medium.

7　Q. So below the middle?

8 A. Yes.

9　Q. I want to look at your case list.

10　　We talked earlier in the deposition
11 about Daubert consultations that you've done and
12 one of the things you mentioned the Linda Frias
13 case?

14 A. Correct.

15　Q. And you mentioned the Babbitt case on
16 the following page, correct?

17 A. Yes.

18　Q. And you mentioned that this list would
19 refresh your memory about other Daubert
20 consultations you've done?

21　A. Yes, it would.

22　Q. So I'm going to ask you to tell us
23 which cases on this list would be cases where you
24 did a Daubert consultation?

Page 190

1　A. First page December 2016, AZ versus
2 Nicholas Lopez in Gila County. It's listed as a
3 Daubert hearing. Frias case has already been
4 testified to, D. Babbitt I testified to, that's on
5 the second page. I'm not sure about Arizona
6 versus Cory Candler. I know I testified at a
7 trial. I'm not sure if there was a Daubert
8 hearing involved during the trial.

9　Q. Which one?

10　A. About half way down, January 2016, AZ
11 versus Cory Candler.

12　Q. Arizona follows Daubert I assume?

13　A. Yes, it does.

14　Q. What else?

15　A. December of 2014, N.G. and L.G. Minors
16 by and through their Guardian ad Litem, et cetera,
17 it's plaintiff's versus the county of Los Angeles,
18 that included a Daubert issue. I don't recall
19 actually testifying at it, but there was a Daubert
20 motion before the court.

21　Q. When you say a Daubert motion, are any
22 of these cases where you were being challenged
23 based on Daubert, some of them were?

24　A. Yes, yes.

Page 191

1　Q. Not where you were brought in to be a
2 consultant where somebody else is challenging an
3 expert?

4　A. Correct. Let's see. October of 2014
5 I'm not sure, Munoz, I did not testify but there
6 may have been a Daubert issue for me, but I did
7 not testify except at a deposition. March 2014,
8 this is in numerical order by date, Torres versus
9 Albuquerque Police Department, that was a Daubert
10 hearing and a bench trial combined. I testified
11 at that.

12　Q. Daubert challenge to your testimony?

13　A. Correct, yes. The January 2014,
14 Kentucky versus Pharo Wilson. My recollection is
15 I have it listed as a trial, but I believe there
16 was a Daubert issue involved in that at the time.

17　Q. Again, challenging your testimony?

18　A. Challenging my testimony. As a matter
19　of fact, it's actually listed in the next -- it's
20 in the next line, it says Daubert hearing.

21　Q. Sure.

22　A. That's it.

23　Q. Have you ever done a Daubert
24 consultation where you were the person who was

Page 192

1 challenging somebody else's testimony?

2　A. I have.

3　Q. Is it on this list?

4　A. They've occurred prior to that.

5　Q. Prior to this?

6 A. Yes.

7　Q. Do you remember the names?

8　A. I would have to go back to my files. I
9 know one was in Indiana. I don't remember the
10 name of the case.

11　Q. Do you remember the area of forensic
12 examination that was involved?

13　A. Tool marks, tool mark identification.

14　Q. Has your testimony ever been excluded?

15 A. No.

16 Q. Never?

17 A. No.

18　Q. What about on the Sam Pomier case, was
19 your evidence excluded in that case?

20　A. I don't recall a Daubert hearing, but I
21 testified in that case.

22　Q. So have you ever had part of your
23 testimony excluded?

24　A. Not from a qualification perspective.



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
193—196

Page 193

1 There have been some rulings where the content of
2 my testimony was excluded for whatever reason, the
3 judge decided is that it was not to be admitted to
4 the jury.
5 MR. DiCIANNI: I'm going to take a break. We
6 may be done.
7 (WHEREUPON, a recess was had.)
8 MR. DiCIANNI: We don't have further
9 questions.
10 MR. ODIM: No questions. We're reserving
11 signature.
12 FURTHER DEPONENT SAITH NOT.
13
14
15
16
17
18
19
20
21
22
23
24

Page 194

1 DEPOSITION ERRATA SHEET
2 Assignment No. J0540621
3 ALICE HOWELL, Independent )
4 Administrator of the Estate )
5 of JUSTUS HOWELL, )
6 Plaintiff, ) No. 16 CV 3949
7 -vs- )
8 CITY OF ZION, a municipal )
9 corporation, OFFICER ERIC )
10 HILL, (#47), )
11 Defendants. )
12 DECLARATION UNDER PENALTY OF PERJURY
13 I declare under penalty of perjury that
14 I have read the entire transcript of my deposition
15 taken in the captioned matter or the same has been
16 read to me, and the same is true and accurate,
17 save and except for changes and/or corrections, if
18 any, as indicated by me on the DEPOSITION ERRATA
19 SHEET hereof, with the understanding that I offer
20 these changes as if still under oath.
21 Signed on the _____ day of
22 , 20 .
23 _____
24 RONALD SCOTT

Page 195

1 DEPOSITION ERRATA SHEET
2 Page No.    Line No.    Change to:
3 _____
4 Reason for change:
5 Page No.    Line No.    Change to:
6 _____
7 Reason for
8 change: _____
9 Page No.    Line No.    Change to:
10 _____
11 Reason for change:
12 Page No.    Line No.    Change to:
13 _____
14 Reason for change:
15 Page No.    Line No.    Change to:
16 _____
17 Reason for change:
18 Page No.    Line No.    Change to:
19 _____
20 Reason for change:
21
22
23 SIGNATURE:                    DATE:
24 RONALD SCOTT

Page 196

1 DEPOSITION ERRATA SHEET
2 Page No.    Line No.    Change to:
3 _____
4 Reason for change:
5 Page No.    Line No.    Change to:
6 _____
7 Reason for change:
8 Page No.    Line No.    Change to:
9 _____
10 Reason for change:
11 Page No.    Line No.    Change to:
12 _____
13 Reason for change:
14 Page No.    Line No.    Change to:
15 _____
16 Reason for change:
17 Page No.    Line No.    Change to:
18 _____
19 Reason for change:
20 Page No.    Line No.    Change to:
21 _____
22 Reason for change:
23 SIGNATURE:                    DATE:
24 RONALD SCOTT



**Page 197**

```
1   STATE OF ILLINOIS  )
2                      ) SS:
3   COUNTY OF K A N E  )
4           I, THERESA A. VORKAPIC, a Notary Public
5   within and for the County of Kane, State of
6   Illinois, and a Certified Shorthand Reporter, CSR
7   License No. 84-2589, of said state, do hereby
8   certify:
9           That previous to the commencement of
10  the examination of the witness, the witness was
11  duly sworn to testify the whole truth concerning
12  the matters herein;
13          That the foregoing deposition
14  transcript was reported stenographically by me,
15  was thereafter reduced to typewriting under my
16  personal direction and constitutes a true record
17  of the testimony given and the proceedings had;
18          That reading and signing was requested;
19  that the said deposition was taken before me at
20  the time and place specified;
21          That I am not a relative or employee or
22  attorney or counsel, nor a relative or employee of
23  such attorney or counsel for any of the parties
24  hereto, nor interested directly or indirectly in
```

**Page 198**

```
1   the outcome of this action.
2           IN WITNESS WHEREOF, I do hereunto set
3   my hand of office at Chicago, Illinois, this 16th
4   day of April, 2017.
5
6
7               Theresa A. Vorkapic
8               Notary Public, Kane County,
9               Illinois.
10              My commission expires 11/6/19.
11
12
13  CSR License No. 84-2589.
14
15
16
17
18
19
20
21
22
23
24
```

**Page 199**

```
1                   EXAMINATION
2                                   Page    Line
3   RONALD R. SCOTT
4   Examination                        5      7
5   By Mr. DiCianni
6
7
8               E X H I B I T S
9       Exhibit No. 1 .............   20     17
10      Exhibit No. 2 .............   82     17
11      Exhibit No. 3 .............   96      3
12      Exhibit No. 4 .............   98      5
13      Exhibit No. 5 .............  147      9
14      Exhibit Nos. 6 & 7          155     22
15      ***ORIGINAL EXHIBITS RETAINED BY COUNSEL***
16
17
18
19
20
21
22
23
24
```



RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
Index: $14,000..256

**$**

**$14,000**
186:22

**$3,000**
186:24

**$30,000**
188:15,22

**$395**
186:2,13

**0**

**008**
111:21
113:6,8

**009**
111:21

**010**
111:21

**011**
104:11
109:7
113:7,8

**012**
104:11
109:7

**013**
104:11
109:7

**02**
104:14
179:23
180:18
183:9

**021**
104:12

**022**
104:12

105:17

**023**
105:17,23

**024**
105:17

**027**
111:21

**028**
111:21

**029**
104:14
109:5,7,9
110:2,3,
12

**030**
104:14
109:5

**031**
104:14
105:14,18
109:5,6
110:19

**04/04/2017**
20:19
82:19
96:5 98:6
147:11
155:24

**1**

**1**
20:15,18
128:14,17

**1/16th**
136:4,6
137:8,15,
19,22

**1/3**
151:1

**1/8th**
136:4,6
137:8,14,
15,19,22
139:3,9
142:18

**10**
50:11

**100**
6:14

**10:00**
105:22
107:4

**10th**
9:11

**11**
79:3 80:3
89:7

**11,000**
187:3,17

**12**
91:20,24
92:7,8,14
94:10
118:13
129:14

**12-foot**
154:6,7

**12:15**
97:4,9

**14**
158:19
159:9

**15**
151:2
180:3
188:18

**18**
173:10

**19**
150:11,15

173:11

**1965**
173:7

**1967**
175:4

**1973**
175:12

**1979**
8:24 9:1

**1980**
8:6

**1987**
133:5

**1988**
133:5

**1990**
8:7,13,14

**1990s**
19:20

**1998**
178:8

**1:15**
97:6,7

**1:20**
97:9

**2**

**2**
82:15,18
117:17,18

**20**
19:22
127:1
160:6

**2002**
12:7
178:21
179:22
183:6

**2014**
190:15
191:4,7,
13

**2016**
22:6
190:1,10

**21**
87:4
95:16
150:11,16
151:6

**212**
74:9

**213**
74:11

**214**
74:10

**231**
117:21
118:3

**24**
140:3

**240**
80:2,3,16
82:21
83:1

**24th**
162:13

**25**
144:9,19
179:7

**252**
80:3

**256**
50:8
51:4,11
55:5,12,
14,20,22,
23 56:6,
18 58:1,

15

**257**
39:23,24
40:1
44:20
45:20
46:9,12,
15 47:4,
9,23
48:16,24
50:1,8,
14,21
51:8,11
55:5,13,
15 56:2,
11 58:15
80:4
118:9
124:18,23
125:1
144:10
148:8
150:4,18,
21
151:10,23
152:20
153:6
158:13
161:15

**258**
118:10,19

**259**
117:21
118:3,10

**26**
127:20
128:20
149:14,17

**262**
148:8
150:4,21
151:3
152:22
153:6

**264**
80:4

**27-inch**
84:3

**270**
80:4

**273**
161:16
162:9

**274**
162:9

**275**
80:4
118:23

**28-inch**
84:5

**281**
33:16
34:5,6,24

**282**
120:5

**285**
33:17
34:6
120:6

**287**
33:17
34:1,6,
15,20
120:7

**292**
120:12

_____

**3**

_____

**3**
27:18
96:1,4

**30**
90:13

91:3 94:8
99:24
102:1
103:16
109:24
110:13
111:7
112:23
113:21

**30-degree**
94:20

**300**
5:22,23

**304**
120:20

**309**
120:19

**31**
151:1

**34**
142:14

**35**
162:17
175:21
181:13

**37881**
9:11

_____

**4**

_____

**4**
98:2,5,20
99:17
182:13

**40**
162:17
163:24
181:13

**40-some**
162:20

**44**
10:24

**45**
146:8
181:13

**45-degree**
105:9

**46**
10:23

**47**
157:2

**49**
157:2

_____

**5**

_____

**5**
78:22
147:7,10,
13 184:2

**5/100ths**
58:2

**50**
5:18
157:2
174:2
181:13
183:10,
11,16
188:21

_____

**6**

_____

**6**
155:23

**6/100ths**
58:2

**60**
91:3 94:9
99:24
109:24

110:13
112:24

**60-degree**
90:13
94:20
102:1
103:17
110:1
111:8
113:21

**63**
173:1

**66**
173:2
174:18

**67**
168:3
179:21

_____

**7**

_____

**7**
155:23

**72**
10:24

**73**
176:14

**74**
161:17

**75**
6:5,13

**79**
176:14
177:4
178:17

_____

**8**

_____

**837**
155:10

**9**

**9/11**
177:13

**90-degree**
90:16
105:8

**92**
177:7
178:6,18,
22

**98**
178:7
179:4,23

**A**

**ability**
30:23
61:8
109:18

**abrasion**
104:21,23
105:11

**absence**
54:3

**absent**
107:2

**Absolutely**
79:18

**abstract**
185:10,20

**abstracts**
182:11
185:16

**Academy**
14:11
185:17

**accepted**

17:18
24:21
182:14
184:15

**account**
106:17
126:2
142:13
146:5
161:8
164:4

**accountable**
113:15

**accountant**
11:3
181:3

**accounting**
156:14
158:8
176:3

**accounts**
150:15

**accuracy**
185:11

**accurate**
48:17
107:24
108:20,22
109:14
111:3,5
137:17
152:16
161:9
182:18

**accurately**
106:11,12

**acknowledge**
43:23

**act**
6:13

**action**
132:11

138:4

**activities**
49:2
187:14

**actual**
21:11
60:7
102:7
108:4
129:19
149:2
164:14
178:1,4
182:16
183:17

**acute**
116:6

**ad**
190:16

**added**
151:2

**additional**
13:3
54:20,21
77:18
125:22

**address**
9:11
143:10

**adjourn**
84:8

**adjunct**
185:1

**adjust**
82:12

**administrative**
179:2
181:2

**administrator**

178:23

**admissibility**
41:13

**admissible**
19:9

**admitted**
193:3

**adult**
10:21

**advertise**
12:16
13:14

**advertisement**
14:2

**advertising**
13:18

**advice**
15:21

**advocacy**
79:19

**affect**
42:19
43:16
60:23
67:10,13,
17  86:8
123:13,19
124:2,10
130:17
131:2
132:21
135:21
137:4,7
138:2
139:1
143:5,15
160:1

**affected**
130:23
131:22

132:5
143:3,21

**affects**
146:24

**affiliated**
27:10

**afraid**
95:23

**agency**
13:5

**ages**
10:22

**aggregate**
109:17

**agree**
17:9
33:21
36:3 39:9
41:16,24
47:7
58:14
62:5 66:5
67:16
73:19
74:1
87:5,10,
12 127:23
140:14
170:12

**agreement**
49:17

**agrees**
72:3

**ahead**
41:17
43:2 45:5
150:8
157:19
165:18
188:5

**aim**
158:15

RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
Index: air..arm

air
175:21

airfare
187:1

airplanes
179:14

Albuquerque
191:9

alleged
19:15

allowance
150:21

allowed
14:20
27:4
149:19
150:21

alteration
136:2
139:2

altered
131:14

alternative
94:23
127:3

ambiguous
87:21
165:5

American
14:11,18
173:12
185:17

ammunition
29:3

amount
58:7
137:12
147:3
163:22
186:19,20
188:10

analysis
15:5
24:19
45:16
152:13
177:19

analyst
28:6

analyze
168:13

anatomical
114:23

Andrew
31:2,12

Angeles
190:17

angle
51:3
57:22
86:22
90:5,12,
14,18,22
91:1,3,6,
13,23
92:12
94:19
95:2,4,9
100:1
103:17,18
104:14,
18,19
105:3,7,
8,9
106:4,23,
24 107:5,
18,22
108:13,20
109:4,10,
13,18,24
110:1,5
111:8,22
112:8,12
113:11
114:19

118:23
119:5,13
121:11
139:16
154:14

angles
29:2
35:10
36:2
42:18
86:16,21
95:7
101:10,
17,23
103:12,
13,14
104:9
110:10
111:14
114:5
118:17,19
119:4,5

animation
122:2
168:19

Anna
8:9

anticipate
55:18

anticipating
13:20

anywheres
188:16

appears
106:22
112:15

applicable
16:2

application
24:18
47:20
53:15

54:6,17

applied
138:18

applies
186:13

apply
59:5
138:21,22
145:16
163:19
164:21,24
165:7

applying
46:3
49:21
50:2
59:19

apprenticeship
174:22

approved
185:8,9,
11

approximate
163:2

approximately
5:22 22:8
34:15
64:4
90:23
91:22
133:12
142:14
144:15
149:14,15
157:2
162:9,17
163:24
183:5
186:24

approximation
91:21

approximations
92:10,11

arc
91:5,7
156:9

architects
11:19
181:18

area
22:7
27:24
28:13
50:12
105:21
108:16
120:7
126:1
136:8
137:20
144:4
156:10
192:11

areas
15:3,14,
18 25:20,
21 53:24

arguing
85:11,13

Arizona
9:9 18:9,
10 20:3
84:8
179:16
190:5,12

arm
50:24
51:5
56:10,15
72:14

73:4
74:11
75:13,24
76:1,3,7
77:10
115:8

**armed**
33:8,9,13
173:11

**arms**
72:22
119:9
141:4
142:8,12,
14 158:10

**Army**
174:18

**arrival**
125:24
149:19

**arrive**
10:7
49:20
50:6
104:9

**arrived**
99:22

**arriving**
23:21
24:6 59:5
99:5
167:2

**article**
130:6

**articles**
130:4

**artist**
11:23

**arts**
7:20,22
8:1,2,4,
6,9

**aspect**
19:4
25:3,23
52:5
61:11
67:7 71:1
77:18
125:22
178:20

**aspects**
11:18
20:23
21:5
25:21
28:18
29:5 39:3
42:1 49:1
125:19

**asphalt**
50:18
158:12

**assistance**
148:10

**assistant**
185:1

**Associate**
8:19

**associates**
12:12
13:3

**association**
12:8,13

**assume**
7:8
84:13,15
141:18
143:14
190:12

**assumes**
131:1
138:23
142:24

**assuming**
40:9
42:21
140:18,20
142:2,6

**assumption**
131:19
141:20

**athletes**
163:16

**attached**
91:11

**attack**
69:4

**attempt**
100:10

**attempting**
69:4

**attending**
173:13

**attorney**
9:22
22:10
30:5
37:14
38:11
128:5

**attorney's**
128:5

**attorneys**
23:19
180:2
184:5,6,
24 185:1

**attorneys's**
86:1

**authoritati
ve**
27:24
28:2,12,
23 29:10,

13

**authorities**
27:17

**automatic**
146:8
182:17

**autopsy**
30:20
31:17,21
32:1 35:9
36:1
42:17
43:9
45:12,22
46:6,22,
24 47:8,
20 49:22
50:2
64:10
65:11,20
86:21
89:8,21
94:19
95:5,8,
19,20
96:8
98:14
99:2,21
101:11,
17,23
102:7
104:11
122:23
123:1,3,
6,9,10
124:11
152:2
172:15

**Avenue**
162:13

**average**
46:4
131:6,11
144:24

163:23
181:12
188:10,14

**averages**
145:2

**aware**
25:11
26:1,4
27:7
47:3,5
125:6
132:19
138:12
164:10
170:22

**AZ**
190:1,10

**AZARI**
155:10

———————

**B**

———————

**Babbitt**
18:9,23
19:18
189:15
190:4

**Bachelor**
8:18,23

**back**
31:14
43:4 44:2
45:12
48:1
55:10,20,
22 56:5
57:12,15,
22 58:1,
4,7,12,13
65:4
66:20
72:22
73:5

RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
Index: backed..box

82:9,10,
13 89:5
94:2
95:13
97:2
99:20
102:23
103:1,9,
10 104:15
110:8
112:22
115:20,21
117:21
119:14
142:21
152:17
154:1
161:24
192:8

**backed**
150:1

**backwards**
117:21

**badge**
62:1

**badger**
86:5

**badgered**
85:20
86:7,12

**badgering**
85:14,17

**ballistic**
178:18

**ballistics**
11:12,14,
18,20,21
177:4

**bank**
53:12

**barely**
102:21

**barracks**
176:16

**base**
57:4
132:16
144:22
161:11
163:12,16

**based**
17:18
19:9,15,
23 20:22
35:5
38:16
42:18
43:15
45:20
46:10
48:14
51:15
54:22
60:19
65:23
86:19
89:8,20,
21,22
92:16
94:18
98:24
99:1,21
100:4
101:9
103:17
107:4
112:13
114:5
116:16
118:19
124:23
125:2,10
127:21,24
131:12,19
138:14
140:18
145:5
146:16

152:23
156:22
157:14
158:13
160:7
163:18
165:10,22
166:7
178:3
187:24
190:23

**bases**
90:4

**basic**
126:22

**basically**
148:24
167:12
178:23

**basing**
88:16
141:22

**basis**
38:6 41:9
94:20,23
143:16
170:7

**beat**
51:13

**beating**
68:7

**beginning**
21:2 89:6
118:23
120:8
129:16
158:11

**begins**
76:5
156:9

**belief**
156:19

**bench**
191:10

**bend**
156:9

**bending**
115:23

**bent**
115:22
116:8
119:13

**bias**
69:10
79:17

**big**
64:7
69:19

**bill**
186:1

**Biodynamics**
168:3

**bioengineer
ing**
169:4

**bit**
20:9,14
155:17
156:8,15

**black**
80:21
81:16,17
85:1

**blends**
81:15

**blocked**
75:20,22

**blow**
58:10

**blurrier**
81:13,14
82:10

**boats**
179:14

**body**
51:7
53:11
56:11
103:5
106:13
108:16
115:16
116:7
119:13
142:17
166:19

**bono**
188:16

**book**
28:4,14,
15,16,17,
23 29:10,
15 31:7
120:4
130:5

**books**
28:19

**born**
176:23,24

**bottom**
62:18
74:15
156:12

**bounce**
142:2
143:2

**bounced**
142:1,5
154:1

**bouncing**
142:10

**box**
162:13

**brachium**
  50:24
  72:19

**brain**
  150:22

**branch**
  53:1,5

**break**
  29:18
  31:9,10
  37:22
  65:1
  96:10,13
  97:1
  145:19
  193:5

**bring**
  30:23
  84:15,17

**bringing**
  79:12

**broke**
  31:16
  98:13

**broken**
  20:22

**brought**
  19:21
  31:18
  191:1

**brown**
  76:1

**brushed**
  70:9

**building**
  50:16
  175:22

**bullet**
  86:21
  100:24
  101:3,4

  103:4
  104:16
  105:6,10,
  12 106:2,
  13 107:2,
  17 108:3,
  5,15
  109:2
  111:23
  112:11
  113:19
  118:18
  146:1,6,
  10,12,16,
  20,24
  147:1

**bullets**
  100:22,23

**business**
  7:15 9:6,
  12,16
  10:19
  13:17
  14:4
  33:19
  179:5,10,
  21 180:1,
  15,19
  181:7

**butter**
  105:1

————————————

          **C**

————————————

**calculation**
  99:6
  100:4
  144:20

**calculation
s**
  99:1

**caliber**
  174:2

**call**
  14:2
  15:10
  16:18
  19:14
  44:11
  74:16
  94:12
  115:7
  122:3
  130:12,20
  158:10

**called**
  5:5 13:2
  18:16
  25:9 98:8
  104:22
  167:7
  173:9
  187:11

**Cambridge**
  8:12

**camera**
  52:22
  56:6
  57:11,17,
  21,23
  58:13

**camera's**
  61:8

**cameras**
  53:12

**cams**
  53:11

**Candler**
  190:6,11

**canted**
  115:10
  141:7,10
  143:1

**canting**
  125:15

**capabilitie
s**
  140:20

**capable**
  150:24

**car**
  74:24

**care**
  183:24

**career**
  176:3,4

**carried**
  133:4,11,
  17

**carrying**
  60:9,18
  65:16,23
  68:14,16
  69:17
  72:10
  73:5,15,
  18 164:2,
  7

**cartridge**
  36:18
  53:22
  100:15
  118:12,24
  121:13
  132:4,8,
  14 133:24
  135:15
  137:13
  139:15
  142:19,20
  143:17,22
  144:2
  149:13,
  21,24
  150:10
  151:6
  153:14,
  18,22,24
  154:3,7,

  10,12
  155:1
  156:11,20
  157:4
  158:5,7
  172:14
  182:15

**cartridges**
  142:1,10

**case**
  6:24 10:6
  18:1,20,
  23 19:1,
  7,11,16,
  18,20
  20:7,24
  21:4,8,10
  22:4
  23:2,13
  29:21
  32:7
  53:22
  61:14
  63:14
  66:16
  67:23
  72:1,2
  100:20
  104:23
  118:12,24
  121:13
  131:2
  132:4,8,
  14 133:24
  135:16
  137:5,13
  138:19,21
  139:15
  142:19
  143:17,22
  144:2
  145:17
  149:13,
  21,24
  150:10
  151:6

153:14,
18,22,24
154:3,7,
10,13
155:1
156:11,20
157:4
158:3,5,7
160:20
163:10
164:19
165:12
181:6,21
182:15
185:24
186:6,9,
17 187:24
188:9,11,
14,22,23
189:2,9,
13,15
190:3
192:10,
18,19,21

**cases**
9:21 10:3
12:17
13:11
15:15
18:13,15,
16 19:10
20:1,4,10
26:20
36:18
100:15
172:14
177:20
180:1
181:9,13,
17 183:3,
16 186:3
188:15
189:23
190:22

**casing**
126:12

138:13
146:4,11,
15,19,22,
23 147:1,
2

**casings**
35:12
36:4 42:3
43:15
101:19,22
124:13,17
125:8
126:5
130:13,17
131:3
135:6,22
138:10
139:1
142:20,23
144:8

**category**
15:12
114:20

**caused**
22:17
52:22
115:15

**cautions**
125:6

**center**
106:20
144:15
153:12,19
157:13

**certainty**
39:2
116:12
166:15

**certificate**
25:16

**certificates**
176:1

**certification**
25:6 26:3

**certifications**
25:11,12

**certified**
11:3

**cetera**
163:17
177:17
184:6
187:2
190:16

**challenge**
191:12

**challenged**
190:22

**challenging**
191:2,17,
18 192:1

**chance**
13:23

**change**
136:7
139:4
146:20,21
176:3,4

**charge**
177:13
186:2,3
188:11

**charged**
87:15

**charging**
186:5

**chase**
44:14

**Chicago**
148:17

**children**
10:20,21

**chose**
68:3

**chosen**
133:10

**Christopher**
10:24
11:2

**chrome**
59:8
61:23

**circumstances**
45:14
139:22
174:1

**civil**
173:14
181:21

**civilian**
171:1
177:14
178:15

**claims**
162:22

**Clancy**
148:14,
15,16,22

**clarification**
54:21

**clarify**
25:1
33:18
40:15,22

**clear**
81:10,21
83:13
84:19
85:15

**clearer**
118:4

**clock**
91:2,9,11
106:20

**closely**
154:4

**clothing**
184:20

**cold**
19:20

**Collaborative**
25:8

**colleagues**
140:11

**collection**
184:18

**college**
8:10
14:18
175:1,2,6
177:2
184:4

**colleges**
184:23

**color**
60:9 76:3

**colored**
76:2,4

**column**
147:23,24

**columns**
147:21

**combat**
173:4,18
174:16

**combination**
17:12,16
18:24

83:23
113:16
174:22

**combined**
191:10

**comfortable**
86:4

**commander**
177:8
178:14

**commercial**
11:4
13:18

**commissioned**
178:24

**committee**
185:17

**commonly**
28:15

**communication**
22:16
24:4,5

**communications**
22:18
23:11

**companies**
12:15,23

**company**
12:20
174:21

**compare**
49:2
170:10

**comparing**
21:19
48:9 50:8
51:11
161:23

**comparison**
35:7,22
52:2
55:19
113:10,18

**compass**
57:24

**compensation**
21:3

**competency**
25:14

**competitions**
133:20

**complaints**
178:15

**complete**
176:2

**completed**
124:22
129:10
137:21

**completely**
69:20
74:12
79:22
114:19
167:9

**complex**
188:23
189:1,4

**complexity**
188:13
189:3

**compliance**
16:10

**compromised**
38:23

**computer**
81:10,20

83:12,20
84:16,17
122:2
168:9

**conceivably**
99:9

**conclude**
46:11
47:22
51:9
111:6
124:16

**concluded**
103:7,16
110:1

**concluding**
124:24

**conclusion**
17:9,15
25:4
34:17
46:15
47:15
49:20
50:7 54:4
59:1,6,18
60:17
71:11
94:12
99:22
101:12
131:17
163:10,17

**conclusions**
15:16
16:24
17:3,17
19:1,23
21:13
23:21
24:23,24
38:15
40:10
42:16

43:15
54:23
103:13
111:20
156:18
165:9
170:7

**concrete**
153:13
157:13,
16,17

**concretes**
50:15

**conditioning**
175:21

**conduct**
182:21,22

**conducted**
178:14
182:14,23
183:17

**conducting**
181:18
183:16

**conferences**
14:6

**conferred**
8:22

**confident**
144:19,21

**confirm**
65:15,22
170:19

**conflict**
162:20
165:2

**conflicted**
87:16
122:23

**conflicts**

123:23

**conformance**
15:20

**conjunction**
102:6
110:16
172:15

**connection**
37:17
171:15
183:3,19
186:9

**consideration**
126:4
135:4,9

**considered**
23:20
24:6
61:12
165:11
167:2
175:5
178:24

**consistent**
100:14
106:21,23
111:10
112:15
113:23
114:1
118:24

**consistently**
16:6

**Consolidated**
13:2

**constantly**
50:22

**construe**
39:22

consult
  10:4

consultant
  6:8 9:4
  20:11
  27:1,3
  191:2

consultants
  9:21 13:2

consultatio
n
  12:10
  15:4,8,11
  16:3,5
  17:4,21
  20:23
  22:21
  180:4,5,
  16 183:19
  186:3
  189:24
  191:24

consultatio
ns
  181:16
  189:11,20

consulting
  183:3

contacted
  12:22
  13:5
  22:9,10,
  12

contend
  160:2

content
  193:1

context
  36:22
  184:7

contiguous
  126:23

continue
  39:19
  137:1

continued
  157:15

continues
  51:7

continuing
  23:10
  177:20

contractors
  9:20

contradicts
  161:8

contrary
  69:8

contrast
  59:7

control
  17:23

controlled
  139:19

conventiona
l
  131:9,10
  140:16,21

converted
  37:13

coordinatio
n
  161:19

copied
  167:16,21

copies
  117:16

copy
  37:15,16
  167:22

corner
  77:24

162:11

correct
  5:14 7:17
  9:13
  11:13
  13:10
  17:6,11
  20:24
  22:1,8
  23:16
  24:2,14
  25:17
  27:11
  31:22
  32:15,22
  33:2,6,7,
  14 34:10
  35:3,7,
  10,13,20,
  24 36:5,8
  38:2
  39:8,23
  41:3
  42:14
  44:14,18,
  20 45:23
  46:16,19
  47:2
  48:16,19
  49:5 50:4
  51:12,20
  52:20,23
  54:23
  56:16,22
  59:16
  60:20,21
  67:12,19,
  20 69:22,
  23 70:1,
  2,3,24
  71:1,19
  73:23
  75:19
  77:17
  79:21
  80:5,8

86:16,17
87:1,7
89:9,10,
24 90:3,
15,17
91:12,18
92:8,21
94:13,22
95:16
98:17,20
99:2
100:1
103:8,10,
11,18
108:5,24
109:11
112:14
113:22
116:24
117:8
119:19,20
121:1,20,
22 122:1
124:20
125:4,5
126:6,9
129:21,22
130:17
131:3,21
137:2,3
143:6,16,
18 148:8
155:3
160:12,16
161:11,
18,21
165:24
166:5,13
170:7
171:15
172:20,21
177:6,9
180:10,20
181:5,8
186:15
187:21,22
189:14,16

191:4,13

correctly
  15:24
  34:7 50:9
  86:18
  114:11

Cory
  22:11
  190:6,11

cost
  186:12

counsel
  15:22
  69:1
  73:20
  74:1,4
  123:24

county
  20:2
  29:24
  93:7
  126:21
  167:5,7
  190:2,17

couple
  150:5

court
  7:2 17:23
  20:2
  38:4,8
  40:21,23
  41:6
  42:15
  43:14
  85:7
  128:6
  185:3
  190:20

court's
  41:13

courthouse
  84:18

courtroom
84:14

cover
162:20
163:23

covered
69:20

covering
163:16

crazy
13:22

create
52:16
105:11

created
111:8

credibility
69:5
92:22
93:5
124:12

credited
92:14

crime
11:16
15:16
16:20,21
19:22
24:18
28:6
30:21
126:1
155:2
160:5

crimes
29:24
167:5

criminal
8:2,20
18:13,14,
15
181:17,21

criminology
8:21

critical
39:5

critiquing
17:16
19:19

crucial
124:14

cruiser
149:19
150:1

cruisers
143:24

CTS
25:9

cum
8:18

current
9:6 15:20
16:15,18,
22

curvature
156:15

cut
122:11

CV
24:10
172:22
176:13

_____

_____ D _____

_____

damage
101:8

danger
93:2

dash
53:11

data
23:20,23
53:13
54:20
92:17,19
95:7 99:9
101:19,24
107:24
111:16
158:2

date
191:8

Daubert
15:8,11
17:4,20
18:2,8
19:9
20:5,11
189:11,
19,24
190:3,7,
12,18,19,
21,23
191:6,9,
12,16,20,
23 192:20

David
10:23
11:4

day
61:6

days
185:13

dead
51:13
68:8

deal
119:2

deals
28:16
29:1

Dean
18:9

debates
86:1

December
190:1,15

decided
152:19
193:3

decision
32:4
134:23
135:1
150:14,20
151:9,19
152:12,21
159:6
185:21

decisions
178:3

defect
105:20

defective
127:24

defer
108:11,21

define
24:16
129:20
135:14

defined
81:22

definition
102:17

deflexion
101:2

Deforest
27:19
28:5,6

degree
39:1
115:22
116:12

166:15
175:23

degrees
91:3 94:9
99:24
110:13
112:24
141:14

demonstrate
90:13

demonstrate
d
48:20
49:9 54:1
65:18
87:3
88:21
89:12
90:1
100:8
150:18

demonstrate
s
56:20,24
59:12
172:11

demonstrati
on
42:4
48:10
49:15
87:6,19
88:12,18
172:4

demonstrati
ve
49:18
100:8

deny
79:12,15,
16,18,19

department
133:11

176:18
177:16
178:22
191:9

**depend**
188:12

**depends**
126:15

**depiction**
109:14

**depicts**
50:14

**deployment**
177:15

**DEPONENT**
193:12

**deposition**
20:17
31:3,13
42:4
48:10,21
49:17
78:11
82:17
87:4
88:21
89:13
95:17
96:3 98:5
122:14,16
123:4,11,
16 147:9
155:22
172:2
186:23
188:8
189:10
191:7

**depositions**
5:14 6:15

**derive**
35:19
132:20

**Dershowitz**
185:3

**describes**
53:8 90:5
172:1

**describing**
49:8
102:13
184:19

**description**
45:19
50:7
51:14
92:12
102:8

**design**
126:16
127:5
129:18

**designed**
12:1
101:4
126:7,13
142:20

**detail**
52:11

**details**
45:8
165:3

**determinati
on**
114:5,8
146:2
153:20
154:15
157:8
159:8
184:14

**determine**
16:4
31:20
47:14
59:19

64:11
108:17
111:14
112:5,8,
12 113:3
130:22
148:7
153:16

**determined**
30:2
101:11
109:14

**determining**
184:15

**developed**
187:12,13

**deviate**
108:4

**deviation**
165:1

**diagram**
167:9,10
168:9

**diameter**
146:20

**Dicianni**
5:8 20:20
31:5,14,
15 32:19,
20 40:11,
14,18,20
41:16,20
43:1,4,7,
11,20,23
44:2,9
45:4
47:16
48:1,11
49:19
51:18,19
54:13
55:11,17,
21 58:21

63:11
64:9,16,
22,24
65:4,8
66:13,20
67:3
68:12
72:24
76:21
82:15,20
83:1,5
84:7,11,
12 85:13,
18 86:2
87:11
88:1,14,
24 89:4
93:17,20
94:5
96:6,24
97:6
98:2,12
107:15
108:7
114:15
118:6,15
124:9
128:9
129:3
136:21
140:12
143:12
145:19,
21,24
147:6,12
155:14,18
156:1
159:7
160:15,
23,24
164:20
165:8,17
168:2,20
169:3
170:8
188:4
193:5,8

**differ**
136:22
146:16

**difference**
55:14
56:3,4,7
58:6,12,
15 83:22

**differences**
113:13,14

**difficult**
39:14
182:2

**Dimaio**
28:17

**Dimaio's**
28:23

**direction**
48:23
50:23
57:24
58:3
107:1,19
120:24
121:16,19
125:16
135:22
137:1,2
138:24
158:19

**directly**
57:7,19
111:1,2
153:14
154:10,12
156:7
175:14

**disagree**
17:10
32:24
33:4,8
34:4
39:20

RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
Index: disagreeing..education

40:3
41:9,21,
24 47:9
56:20,23
58:14
69:13,14
86:22
125:2
136:14
140:6
151:12
169:24

disagreeing
40:6 42:7

disagreement
67:18
71:15
119:1

disappear
161:16

disappears
162:8

discharge
19:5,13

discharged
36:18
118:12
149:13
154:24
156:19
158:5
172:13
182:15

disclose
127:20
188:1

disclosed
127:13,22
143:23

disclosure
188:3

discovered
46:6

discrepancies
78:7

discrepancy
164:13

discuss
20:22
24:9,13
29:17
69:15
70:12
161:5
164:13

discussed
69:1
133:21

discussion
55:8
167:24

disk
31:1
37:15
167:17,
18,19

dislocated
144:3,5

dislocation
125:23

dispatch
177:14

dispatchers
177:14

dispute
151:14
152:18,19

disputes
50:7 89:7

disputing
80:8 85:4

89:11,16,
18,24

distance
24:21
33:20
45:9
132:15
142:17
153:7
154:5
156:2,3
158:7
162:14,17
170:16
184:13

distances
184:18

distinguish
136:17

distorted
61:9

distortions
52:19

district
184:5,24
185:1

DJS
13:3,8,9

DNA
66:8

doctor
123:3

document
20:16
66:10
82:16
96:2 98:3
147:8,14
160:10,11
167:6,8,
16

documenting
160:5,6

documents
155:21

Dominican
173:7,13

dot
74:13
75:8

dots
75:9

dove
76:14

downstairs
97:5

downward
51:6
115:11
125:15

dozens
160:9

draw
45:17
53:13
85:8
111:20
161:19
171:20

DRI
14:17

drive
13:22

driver
11:4,5

driver's
27:14

driveway
50:18
77:22
78:5,13

144:12,
13,15
149:21
150:13
157:16
158:12,
16,20

drove
148:24
149:19,20

Duffy
148:20

duly
5:2,5
98:9

duties
177:10

E

e-mail
22:15
24:5

earlier
162:1
165:22
168:7,19
189:10

easily
145:5

east
57:17
157:9
158:8

Eclipse
179:6

Ed
28:15

education
8:16

effect
  65:13
  94:14
  121:2
  132:14,18
  133:22,
  23,24
  135:5
  138:13
  141:8
  143:2
  146:3,11
  149:8
  153:21
  164:11

efficient
  43:18

eject
  140:4,5

ejected
  132:10
  135:16,
  22,23
  137:13
  138:9
  139:15
  146:11
  154:13

ejection
  125:2
  126:12,19
  130:12
  131:15
  134:1
  136:2,4
  137:4
  138:13
  141:9
  142:8,9,
  17 150:12
  157:7
  182:15
  183:12,15
  184:10

elbow
  51:1
  72:20

Electric
  174:21
  175:7,15

electrical
  162:12

eliminate
  150:11

else's
  192:1

employ
  17:19
  29:6
  44:23

employed
  10:14
  16:19
  17:2
  18:21,24
  19:19
  24:22

employee
  175:9
  181:1

employees
  9:18
  180:23
  181:4

employment
  179:20

EMT
  143:20

EMTS
  184:19

encompassed
  165:14

end
  21:22
  130:17

144:9,11
  189:3,5

ended
  143:5

endless
  71:9

ends
  15:5

enforcement
  5:24 8:18
  9:3 11:7
  26:8 27:2
  176:7

engage
  10:2

engaged
  21:4 22:3

engagement
  21:3,8

engineer
  103:1

engineering
  14:13
  130:7
  168:3
  174:20,23
  175:5,19,
  23 176:1

engineers
  11:19
  181:18

engines
  174:24

enhance
  52:15
  80:23
  81:3 83:9

enhanced
  80:22
  141:2

enhances
  107:10

enhancing
  85:15

entered
  31:3

entire
  21:10
  29:23
  31:7
  122:11

entrance
  86:16

entry
  107:3
  108:14,20
  113:12,19

erect
  114:24

Eric
  21:6

error
  130:12,15

erupts
  13:24

established
  160:3

establishin
g
  95:4

estimate
  5:16 22:7
  60:8 64:3
  110:14,15

estimation
  6:6 95:6
  111:4

evaluate
  10:3
  21:23

74:2
  92:22
  93:4
  106:8
  162:9

evaluated
  100:6,7
  109:20
  133:9

evaluating
  106:18

evaluation
  38:14
  71:3,6,
  14,19,23
  79:24
  88:16
  94:10
  124:8
  133:6
  160:11
  178:17

evaluations
  177:19

evening
  176:18

event
  87:15

events
  21:16,21,
  24 66:7
  78:14
  100:18

Eventually
  80:18

evidence
  17:14
  19:16
  21:18
  24:20
  38:9 60:4
  66:18
  72:3 87:7

92:24
93:4
100:10
102:14
104:13
141:7
142:4
159:5
160:7
162:3
163:12
165:10
167:10
170:3,9,
11 171:6,
21,23
172:20
178:17
184:18
188:12
192:19

**evidentiary**
30:12,15
160:10,18

**exact**
22:6
113:24
153:17
154:24

**examination**
5:7 15:14
24:19
98:11
168:17
192:12

**examinations**
16:21
25:10

**examine**
21:4

**examined**
5:6 98:9

**examiner**
106:6
108:12,17
115:14
123:21

**examiner's**
102:8
103:6
108:10,21

**examining**
17:14

**exceed**
145:8

**excess**
5:18

**exclude**
117:5

**excluded**
6:2 38:17
40:7 41:8
42:18
117:20
167:1
192:14,
19,23
193:2

**excluding**
101:21

**exclusion**
166:6,10

**exclusionary**
19:15

**exhibit**
20:15,17
49:18
82:15,17
85:8 87:4
88:19
95:16,18
96:1,3
98:2,5,20

99:17
117:17,18
128:14,17
147:7,9,
13 155:22

**exhibits**
97:2
155:19

**exist**
25:18

**existence**
68:9

**exited**
158:17

**expand**
101:4

**expect**
88:3,5
125:3
144:8
149:21

**expecting**
187:23

**expense**
84:10

**expenses**
186:11,21
187:1

**experience**
108:8
132:22
140:19
178:16

**experienced**
125:18

**expert**
6:10,13
12:9,16
18:21
20:5
42:22,23

122:3
128:6,18,
23 180:4
191:3

**expert's**
19:8
41:14

**expertise**
11:15,17
22:1
44:22
45:15
48:15
59:5
106:9

**experts**
10:2
15:17
23:1
52:10,14
187:24

**explain**
44:10
71:15
154:19

**explained**
35:6

**explaining**
53:24

**explanation**
54:3

**explanations**
73:13

**explanatory**
148:4

**exploring**
15:23

**expressed**
114:14

**expressing**

47:1

**extended**
56:10
72:17
75:13,17
119:9
142:9,12

**extends**
81:17

**extent**
38:24
39:15
101:10
108:19
114:1
135:13

**extrapolate**
119:14

**eyeball**
110:13

———————

**F**

**face**
91:9

**facing**
50:23
56:6
57:17,19
58:13
72:15,17
115:4

**fact**
25:3 69:7
128:1
142:14
159:6
162:21
191:19

**factor**
124:15
170:16

| | | | | |
|---|---|---|---|---|
| **factors** | 12:18 | 116:2 | 89:9,21 | 42:8,12 |
| 52:23 | 62:11,13 | 174:15 | 99:21 | 43:17 |
| 60:23 | 126:11 | **fence** | 101:11,17 | 67:15,18 |
| 61:14 | 128:20 | 74:13,15 | **fine** | 86:24 |
| 69:16 | 133:19 | 75:6,7 | 11:24 | 121:8,12 |
| 70:13,22 | 135:3 | **field** | 30:17 | 132:24 |
| 71:5 | 163:9 | 24:22 | 32:19 | 133:12 |
| 89:10 | 164:5,12 | **fight** | 72:4 | 142:24 |
| 126:3 | 171:4 | 173:17 | **finger** | 144:9 |
| 130:16 | **families** | **figure** | 105:2,4 | 151:4,24 |
| **facts** | 181:23 | 76:5 | **finish** | 161:9 |
| 19:15,17 | **fast** | **file** | 70:7 | 162:22 |
| 159:24 | 136:16,20 | 21:10 | 179:7 | 172:10 |
| **failed** | 137:6 | 23:2 | **finished** | **firing** |
| 126:22 | 139:10 | 31:22 | 51:24 | 121:15 |
| **fair** | 141:17 | 46:11 | **fire** | 144:20 |
| 7:11 9:4 | **fatal** | **files** | 121:13 | **firm** |
| 16:6 | 21:5 | 169:10 | 133:15 | 148:18 |
| 18:22 | **feel** | 192:8 | 145:1 | 175:19 |
| 22:2,13 | 42:6 99:8 | **final** | 174:9 | **fishing** |
| 30:9,10 | **feeling** | 125:21 | **firearm** | 27:14 |
| 32:12 | 85:20 | 144:7 | 19:5 | **Fit** |
| 33:17 | 86:11 | **finance** | 62:13 | 169:19 |
| 46:17 | **fees** | 176:3 | 77:21,24 | **Fitt's** |
| 50:5 | 187:3,17 | **find** | 78:4,19 | 145:14,16 |
| 107:6 | **feet** | 20:10 | 85:1,2 | **flash** |
| 123:7 | 50:19 | 43:14 | 119:9 | 53:21 |
| 124:14 | 111:3 | 123:11 | 133:11 | 54:1,16 |
| 131:16 | 118:13 | 129:13 | 134:22 | 62:1 |
| **fall** | 136:9 | 157:22 | **firearms** | **Florida** |
| 15:13 | 144:16 | 172:9 | 15:5,15 | 189:1 |
| 52:8 | 149:14,17 | **finder** | 16:21 | **focus** |
| 53:21 | 150:5,11 | 25:2 | 25:9 | 17:10 |
| 132:12 | 151:6 | 159:6 | 60:9,10, | 21:7 |
| **fallen** | 153:16,23 | **findings** | 11 106:10 | 118:16 |
| 115:24 | 154:3,8 | 35:9 36:1 | **fired** | 152:14 |
| **falling** | 156:10, | 42:17 | 33:4,15 | **focusing** |
| 115:23 | 13,14 | 45:12,22 | 34:1,11, | 19:8 |
| 116:9 | 158:8,19 | 46:22,24 | 14,15,18, | **fold** |
| **falls** | 159:9 | 47:8 | 20,21 | 17:20 |
| 15:12 | 162:17,20 | 49:22 | 39:23 | **follow** |
| 108:9 | 163:24 | 50:2 | 40:6 | 115:1,2 |
| **familiar** | **fell** | | 41:11,22 | |

**follow-up**
46:7

**foot**
139:4,12
142:16
144:4,6
154:4
164:7
165:1

**force**
29:24
93:7
122:4
126:22
167:5,8

**forces**
173:11

**forensic**
11:12
14:11
21:18
26:3,4
27:24
28:9,13
29:6
38:12
39:2
40:24
52:5,7,
10,14
53:1,9,
15,23,24
54:4,6,
17,22
59:4,17,
18 71:3,
6,13,19
79:23
87:7
88:16
93:2,4
123:15
125:7
126:22
133:14

162:3
163:12
170:3,9
171:6,21
177:18
178:17,20
184:3,13
185:17
192:11

**forget**
84:3 91:2
146:9

**form**
25:15
37:11
147:18

**formal**
180:15
182:11

**formed**
109:10

**forward**
50:23
55:24
118:13
135:12
137:18,23
138:3,24
139:22
140:5
141:17
142:3,19
150:7,12
151:7
187:21

**forwarded**
128:24

**found**
100:15
128:15
149:24

**foundation**
49:12

54:8
64:8,14,
17,18,19
72:23
87:8,20
108:6
114:12
140:8
164:16
165:4

**frame**
34:1,15,
23,24
35:1
39:23
45:20
49:7
50:8,14,
21 51:4,8
52:2,3
61:20
76:5
77:6,9,
10,11
82:21
83:1
112:1
114:6,10
116:15
117:1
119:21
120:3,18
152:23
153:5,6
158:13
162:23

**frames**
33:16
34:5,17
50:21
58:5 77:8
80:3
116:16
117:4,5,
9,14,19
119:17

120:21,22
148:6
150:9
151:2
161:21,23
165:24
166:4,8,
11

**frequency**
145:7

**Frias**
18:10
19:1,11
189:12
190:3

**front**
7:13
50:16,20
51:2,7
61:22
62:19
102:24
103:9,10
112:22
120:4
153:13
157:16,18
158:1,9,
17

**full**
79:23
147:1
182:17

**full-time**
175:9

**fully**
142:9,12

**function**
62:2

─────────────
**G**
─────────────

**Gaensslen**

27:19

**gained**
46:11

**Galilee**
170:20

**gap**
56:15

**gave**
69:7
88:18
92:12
98:15
111:19

**gear**
164:3,7

**general**
16:12
25:23
26:3,4
28:8,13
29:11
36:21
104:19
107:13,19
111:4
112:18
136:8
138:1
174:21
175:7,14

**generally**
17:18
24:14,21
112:20
113:1,23
115:7,8
126:10
139:17
181:9
182:14
184:14
186:2

**generated**

146:14

**gentleman**
130:8

**GHQ**
177:11

**Gila**
190:2

**Gildea**
35:14
161:15,20
162:7,15,
19,24
171:18

**Gildea's**
36:6 62:1
161:6,12
163:11
170:13,15

**give**
7:9 13:23
17:5,8
18:1
36:23
39:10,15
41:2
42:6,24
61:2
68:9,13
69:2,9
99:12
107:17,22
111:3
182:10
183:11
186:1

**givens**
14:10

**giving**
14:14
69:3
116:18

**glad**
160:19

**glasses**
76:18

**Gold**
179:13

**good**
31:6
81:11
83:7 85:9
93:9,12
116:21
122:11
123:2
155:13

**govern**
16:2

**graduation**
9:1

**graphics**
83:24

**grassy**
144:4

**gravity**
132:13

**greater**
82:2

**grip**
62:18,19
125:11,17
130:21,
22,23
131:1,8,
13
140:21,23
141:3,18

**ground**
51:4
72:15,17,
18 115:4,
17,24
116:2,8,
9,13
119:18,23

120:1,14
121:1,10,
18
125:15,19
135:17
141:5
156:3,23
157:3
163:5
174:7,8

**grounds**
51:6

**group**
98:15

**growing**
154:14

**Guardian**
190:16

**guess**
9:24
31:24
169:11
185:6

**guidelines**
16:15,16,
18

**gun**
45:11
59:13
60:5
62:7,11,
12 64:2,
5,12
65:16,23
66:7,15,
19 67:2,
5,9 68:9,
14,16,17,
19,22
69:17,20
70:1,3,4,
12,14,17,
24 71:4,
5,11 72:7

73:21,22
74:3,5,6
75:3
77:3,4,
11,13
78:12,22,
24 79:8
80:13,14,
17,20
82:23
84:19,23
85:3,5,8,
16 107:11
115:3,9,
16,20,21
118:13
119:9,15,
16 120:23
121:5,16,
20 125:3
127:5,7
130:20
132:11
137:13,
19,21
138:5
139:7
140:3
141:7
142:19,24
146:2
150:19
156:23
157:1
159:20
166:21
170:20,23
171:8
174:2
184:16

**guns**
182:17,18

**gunshot**
28:18
29:1,2
35:10

36:2
86:16
95:12
100:10
101:1,10,
22 102:20
104:2,10
105:16
106:16
115:13,14
117:20
118:10
119:11
152:2
184:13,20

**gunshots**
36:7
115:1
161:7
162:10,
14,16

---

**H**

**H-U-E-S-K-E**
28:16

**Haag**
27:21
28:4
29:15,16

**Haag's**
130:5

**Haags**
28:5

**half**
164:1
190:10

**hand**
51:5
59:9,13,
20 60:5,6
62:10
66:15,19

67:10
68:23
70:12
72:7,11
73:6,15,
21,23
74:3,7
75:14,16,
19,24
77:5,7,
11,13,15,
16 78:19,
23 79:1,9
80:8,20
81:16,17
84:20,24
85:3,7
155:4
170:20,24
171:8

**handle**
181:10

**hands**
64:7,11,
21 66:9
68:20
69:20
91:11
141:12,13
142:16

**hang**
138:7,9

**happen**
7:6

**happened**
17:24
165:11

**happening**
118:14

**hard**
37:15,16
117:15

**Harvard**

185:2

**headlights**
61:23

**hear**
7:6
162:10

**heard**
36:7 63:8
161:7,20
162:13,16

**hearing**
18:2
190:3,8
191:10,20
192:20

**hearings**
18:8

**heating**
175:21

**height**
64:2
74:24
125:14
142:13
156:23,24
157:1

**held**
142:24

**helicopter**
177:16

**helped**
148:13,22

**helps**
102:24
181:1

**Henry**
27:20

**high**
62:20

**highlight**

11:21

**highly**
87:15
131:5
145:3

**Hill**
21:6,16,
21 32:22
33:1,4,15
34:11
36:20
39:7,8
40:6
41:10,22
42:5,12
43:17
44:17
46:9 47:4
48:16,20
49:3,6
50:3,15,
17 51:10
56:21
57:8,9
65:16,18
66:11
67:18
69:11
77:20
78:20
79:8,14,
17 80:7
86:23,24
89:7,12,
13,19,20
90:1,2,5,
18,21
91:4,10
92:6,12
94:7,8,
10,21
98:23,24
99:23
102:2
103:20,23
106:17,22

111:8,10
115:6
116:1
119:8
120:2,7
121:3,8
124:17,21
136:10
138:24
140:17
142:2,3,5
143:3
144:9,23
145:3
148:8
149:15
150:3,13,
17 152:19
153:5,6,
17 154:11
157:11,23
158:9,12
159:18
160:2
162:21
165:21
172:1,5,
10,17

**Hill's**
21:23
23:4
35:7,23
39:20,22
42:7
44:13
45:19
48:9
49:15
50:7
51:14
52:2
68:17
69:4,8
74:7
77:13,15
78:23

80:5
84:19
86:19
89:8,20
100:6,18
126:18,20
131:4,20
135:5
146:2
151:8
156:24
159:12
161:8

**hired**
10:3
162:21

**hit**
62:7
135:23

**hitting**
62:3

**hold**
27:13

**holding**
45:11
80:13
130:20
157:3

**holds**
41:1

**hole**
86:22
107:2,17
108:3

**holes**
104:16
184:20

**Holiday**
174:6

**hollow**
146:8

**holster**
   77:21

**home**
   9:14
   10:14
   83:12,16
   84:9
   141:2

**Honda**
   169:19

**hook**
   84:18

**hope**
   65:14

**hoped**
   65:10

**hoping**
   31:18

**horizontal**
   76:6,7
   115:7,9
   125:12
   140:16

**horizontally**
   119:9

**horse**
   51:13
   68:8

**hotel**
   174:6

**hour**
   186:2,13
   188:21

**hours**
   93:15
   176:19
   186:16,19
   188:18

**house**
   61:24

157:17
162:12
163:2

**Howell**
   21:6
   32:24
   33:8 39:8,
   13 44:13
   47:23
   48:15,24
   50:1,18,
   22 51:10
   57:6,7,
   10,18,20
   65:16,23
   68:14,16,
   21 69:19
   77:5
   78:12,19
   86:21,22
   89:7,11,
   17 100:9,
   13 102:21
   106:19
   111:11
   114:23
   115:19
   119:7,11
   120:1,13
   121:10,12
   150:18
   151:22
   153:8
   154:5
   158:15
   163:3
   166:7
   171:7
   172:1,16

**Howell's**
   49:1 51:4
   66:15
   67:9 72:7
   77:16
   78:24

115:16
151:24

**Hueske**
   28:15

**Hueske's**
   130:6

**hundred**
   5:19 6:5

**hundreds**
   133:15

**hypothetical**
   58:17

**hypotheticals**
   40:13

────────────

**I**

────────────

**idea**
   88:10

**ideal**
   127:2

**Ideally**
   126:24

**identification**
   20:18
   82:18
   96:4 98:6
   147:10
   155:23
   192:13

**identified**
   109:2

**identify**
   16:1
   30:21
   129:19
   147:14
   155:9

166:11

**ii**
   78:22

**Illinois**
   26:13,16
   27:5,6,11

**image**
   82:12
   85:16

**imaginary**
   103:2
   115:2

**impact**
   125:20
   132:6,12
   134:1,4
   135:10,
   11,14,15
   136:7,8
   139:8,12
   144:14,18
   149:5,18
   153:21
   154:4

**impeach**
   79:13

**important**
   32:3
   38:2,9
   67:7 78:2
   124:15
   128:1
   153:10
   158:2

**imputing**
   46:24

**inadmissible**
   38:5
   43:16

**inappropriate**

58:16
170:1,2

**inches**
   62:16
   64:4
   142:14
   157:2

**incident**
   126:23
   134:9
   164:9

**include**
   5:23
   19:14
   21:11
   70:5
   117:4
   139:21
   181:20
   184:12
   187:18,
   19,20

**included**
   20:7
   21:20
   190:18

**includes**
   21:10
   186:8,21,
   23 188:24

**including**
   24:20
   182:16
   183:8

**incomplete**
   143:7

**inconsistent**
   79:7,10,
   11 118:14
   120:24
   121:17
   123:6,8,

RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
Index: incorporated..job

12 159:12

incorporated
9:7

incorporates
45:21

incorporating
46:5

incorporation
175:20

incorrect
33:22
168:11

increased
181:11

independent
9:20 25:7
27:3
67:22
79:23
80:12
168:16
178:21

independently
71:23

Indiana
130:7
192:9

indication
108:13

indictment
124:3

indoors
134:7,8

industry
11:7
15:21

16:17
146:19

inferior
104:23

inform
36:12
41:14

information
19:24
21:9
23:20
35:18
46:10
54:12
78:10
99:10
111:19
124:6
129:20

initial
5:12
22:16

injury
114:9

Inn
174:6

innocence
181:22

inquired
15:15

Insignifica
nt
132:2

inspection
36:10,12

inspector
178:12

instance
121:17
163:13

instances

115:20

instant
138:11

Institute
175:6

insufficien
t
111:16

insurrectio
n
173:15

intangible
21:19
24:20

intended
7:9

interested
99:10

internal
177:21
178:4,11,
14

interpret
29:2 53:4

interpretat
ion
47:21

interpretat
ions
45:17

interpreted
72:7

interpretin
g
52:8

investigati
on
29:24
65:15,22
178:1,5

investigati
ons
177:22
178:14

investigati
ve
148:18

investigato
r
26:11
27:6
178:10,11

investigato
rs
27:11
178:2

invite
185:19

invited
14:22

involuntary
19:4,13

involve
11:18,20
15:16
177:18
181:17

involved
6:11 9:23
19:19,21,
22 22:23
85:24
132:9
133:6,19
134:16,21
162:19
181:21
190:8
191:16
192:12

involves
25:9

irrelevant
124:4
152:11

issue
15:23
19:7
124:12
125:18
128:5
143:10
162:18
183:12
190:18
191:6,16

issues
100:23

item
38:9 39:5
86:17
167:3

itemized
187:15

ITLA
14:17

_____

J

jacketed
146:8

January
190:10
191:13

jet
174:24

jewelry
10:19

JHQ
177:8

job
93:7,9,12
176:7

**John**
130:8

**joined**
175:11

**joint**
14:12

**Journal**
130:7

**judge**
193:3

**judgment**
44:24
108:22

**junior**
175:2

**juris**
14:13

**jury**
44:24
45:3,6
55:1
193:4

**justice**
8:2,20

**Justus**
21:5
32:24
39:7
44:13
47:23
48:15
49:24
50:22
51:4 64:7
89:16,17,
18,24
91:17
92:2
94:7,8,21
98:23
99:24
102:2

111:9
119:7,11,
18 121:1,
17 150:18
151:22,24
158:15
170:19

**Justus's**
64:11
95:13

———————

——————— **K**

**Kentucky**
191:14

**Kimber**
58:24
59:19,24
60:5,18
63:21

**kind**
50:1
59:24
70:1,9
81:15
161:24

**knew**
124:3,11
168:21
180:2

**knowledge**
46:5
47:8,19,
20 49:21
62:22
80:13
131:20

**Kueber's**
169:13

———————

——————— **L**

**L-Y-N-N**

177:1

**L.G.**
190:15

**laboratorie
s**
15:17

**laboratory**
133:14

**labs**
16:20

**lack**
19:16
65:24

**Lake**
29:23
93:6
126:21
167:5,7

**lap**
175:20

**large**
61:21
175:19

**late**
22:5

**laude**
8:18

**launched**
180:18

**law**
5:24 8:18
9:2 11:6
26:7 27:2
42:24
145:14,16
148:18
176:7

**laws**
136:23

**lawyer**

14:9

**lawyers**
14:7,18
23:12
40:16

**lead**
105:20

**lead-in**
104:22
105:4,11
106:7

**leads**
46:14

**leaf**
179:13

**learning**
174:23

**leave**
162:24
179:4

**led**
109:23

**Lee**
27:20

**left**
31:13
61:21
102:5,15,
21 103:7
104:6
107:1
111:18
112:7,11,
18,20,21,
24 113:20
114:2,9
115:10,21
118:21,22
119:12
140:5
141:8,11,
15 156:5

178:6,22
180:9

**left-sided**
119:6
165:23

**left-to-
right**
114:18

**leg**
75:11

**legal**
6:11
38:10
40:9

**legs**
75:10

**length**
62:15,17

**Lesley**
8:11

**letter**
30:16,17
175:20

**lettering**
10:18
179:7,10,
11,13
180:1

**level**
25:14
157:3

**LG**
84:3

**liar**
158:24
159:4

**licensed**
26:10
27:6,10

**licenses**

26:13
27:13,15

licensing
27:14

life
179:9

life-
threatening
87:16

light
62:3,7
64:12
69:21
79:13
171:6

limb
154:9
156:3,5,
12,21
157:6

limitation
112:22

Linda
18:10
189:12

linear
121:6
158:6

list
15:2
20:7,10,
13 30:11
71:5
176:22
185:24
189:9,18,
23 192:3

listed
23:23
30:1,8
169:9
190:2

191:15,19

lit
164:11

Litem
190:16

literally
133:15

litigation
9:3
181:15,20

lived
177:2

living
11:1

local
13:4
177:16

located
9:9 50:15
74:12
149:15,16
157:5
162:15
167:10

location
9:16
35:12,15
36:4,7,
18,19
42:3
43:15
61:4
118:24
124:13,16
125:8,21
131:2
132:21
135:6
139:1
142:22
143:15,24
146:3
148:7

151:3
153:17
154:24
158:11
161:7
172:13

locations
143:16

lodging
187:1

logical
163:17

logo
11:9,22,
24 12:4,5

long
12:3
26:24
62:14
97:2
128:19
142:15
162:19

longer
26:7
93:23

looked
31:19
83:17
99:7,15
100:21
104:12
109:16
142:13
154:9
156:24
167:8
169:4,23

Lopez
190:2

Los
190:17

lost
89:14
91:8

lot
35:18
68:2 86:3
184:24

low
189:3,5

lower
104:24
105:3
186:10

Lucien
27:21
29:15

lunch
97:8

Lynn
176:24

———————

M

———————

MA
7:18,19

machine
174:2
182:17

made
11:24
15:16
45:1 50:1
71:14
83:21
85:14
99:1
129:11
135:1
147:18,20
148:2
150:9,13,
20,21

151:9,18
163:10
166:6,19

main
28:20

major
29:24
167:5

majority
178:16
182:23

make
34:6
38:13
42:1
43:18
44:24
71:7
114:4
127:9
134:23
154:15
157:9
158:23
159:3,6
160:10
163:17
171:19
178:3
185:21
188:9

makes
10:19
53:19
143:19
179:12

making
21:11,13
71:23
114:8

management
8:3,11

**manufacturer**
146:9

**manufacturing**
174:23,24

**March**
191:7

**margarine**
105:1,5

**Maria**
8:9
10:13,14

**Maricopa**
20:2

**mark**
15:13
20:15
25:10
82:15
96:1 98:2
147:6
155:18
192:13

**marked**
20:17
82:17
96:3
98:4,19
147:9
155:22

**market**
14:3

**marks**
184:13
192:13

**marksman**
131:6

**married**
10:10

**Massachusetts**
8:10,12
175:11
176:8,24
177:3,5
179:15
180:12
182:24

**Master**
7:20,22
8:1,2,3,
4,6,9,10,
14

**match**
145:5

**material**
45:23
63:15,20
183:24

**materials**
21:20
23:16,22
24:8
29:18
30:3
35:19,20
38:16
41:2,14
42:2
65:12
127:19
129:13
167:4

**matte**
70:6

**matter**
61:4,6,10
66:7
132:7
191:18

**matters**
42:21

**meaningless**
169:18

**means**
69:4

**meant**
10:1
168:21

**measure**
110:5,21
111:13
149:1
163:6

**measured**
95:2
149:14
156:6,10
158:1

**measurement**
58:11
64:20
104:18
107:5,18,
22 111:22
147:22,24
149:2
151:7
159:9
160:20

**measurements**
21:12
36:13,15,
17,23
37:18,23
63:10
86:22
109:23
116:17
147:17
148:3,23
149:3,5,8
167:4,7,
11,15
169:12,13

**measuring**
157:9

**mechanical**
129:18
132:11
138:4
174:20,23
175:4,19,
22

**mechanically**
150:24

**medical**
54:12
102:7
103:6
106:6,9
108:10,
11,16,21
115:13
123:20
125:24

**medium**
189:6

**meeting**
84:8

**member**
12:8

**members**
12:12

**memory**
189:19

**mental**
37:19

**mention**
129:22
159:11

**mentioned**
13:20
27:17
70:23
101:17,

18,19
189:12,
15,18

**metallic**
68:20

**methodologies**
38:14

**methodology**
15:13,19
16:2
17:2,5,
10,13,16,
18 18:21,
24 19:2,
19,21
41:3
101:16
184:15

**methods**
16:19
24:22
99:5

**Michael**
27:21
29:16
148:14,
15,16,22

**microscope**
11:10,11

**Microsoft**
187:12

**mid**
144:15

**middle**
5:11
11:10
74:24
91:10
167:11
189:7

**midnight**

176:19

military
172:23
176:10
181:19
183:1

mine
12:12

minimal
136:2

minor
139:2

Minors
190:15

minute
91:2
167:23

minutes
92:14

misconduct
178:15

mislead
25:2

missed
128:16

mission
21:22
71:21

misstates
66:17
114:13

misundersta
nding
114:17

misundersto
od
151:20
183:14

model
84:3,5

126:15
127:9

momentum
132:11
137:24
138:2

monitor
81:9,22,
23,24
82:1,4,6
83:13,17,
18,20,21
84:3,16,
18 85:9,
15 141:2,
23

monitors
84:2

month
22:6

months
127:1
160:6
179:8

moot
185:3

MORAN
40:8,12,
19 76:18
97:4,7
167:23
168:18
169:1

motion
24:21
45:8
52:12,16
136:24
141:17
190:20,21

motor
61:19
157:23

move
84:7
85:22
118:9,22
119:24
120:5,6,8
137:18
179:8

moved
111:12
150:5,7
177:3

movement
52:13
113:15,16
135:5,10,
12,21
136:5
137:21,22
138:3,24
149:23
184:16

moving
48:23
50:23
53:3
57:7,9,
11,24
136:16,24
137:1,5,6
139:7,9,
10 141:17
142:3,19
157:15

Multi-part
54:9
87:21

multiple
50:21

Munoz
191:5

muzzle
53:20
54:1,16

62:19
119:15
166:20
184:16

————————

N

————————

N.G.
190:15

names
10:22
192:7

narrow
31:18

narrowed
99:11

narrowing
100:16

necessarily
17:8
71:20,21
86:13
136:12

needed
54:20
111:20
160:20
182:22

neutral
153:19
157:12

Nevermind
55:2

Newton's
136:23

Nicholas
190:2

Nixon
130:8

nonexistenc
e
68:10

normal
141:9

north
9:11
158:6

north-south
58:11
112:10,14

Northeaster
n
8:17,23

Nos
155:23

notes
37:17,20
62:21,23
63:1,2,5,
7,14,16,
17

notice
11:9

November
22:7

novice
125:17

nub
106:1
107:4

number
23:1
28:19
83:2 89:6
130:4
152:22
153:15
156:7
158:7
176:21

numbers
  35:1
  96:15,16
  137:11

numerical
  191:8

numerous
  184:4

————————

O

————————

o'clock/two
  90:9

oath
  88:19

object
  32:17
  40:8
  41:12
  51:21
  59:8,22
  62:10
  68:7,20
  81:16,17
  105:7,10

objecting
  40:16

objection
  42:20
  43:21,22,
  24 45:2
  47:11
  49:12
  51:16,23
  54:8
  55:16
  58:16
  63:8
  64:8,14,
  17 66:2,
  17 72:23
  85:11
  87:8,20

88:8,22
107:7
108:6
114:12
124:4
128:4
140:8
143:7
159:1
160:13,22
164:16
165:4,13
170:4
188:2

objections
  40:16

objective
  60:4

objects
  61:15

observation
  123:5

observations
  114:14

obstruct
  154:13

obstructed
  120:10,
  11,12,13
  163:3

obstruction
  157:6

obvious
  22:18

occasion
  181:1,23

occasionally
  180:16

occasions

133:15

occur
  32:22
  115:1

occurred
  17:7
  112:2
  116:16
  117:2
  118:3,11,
  19 119:6
  152:3
  166:12,16
  192:4

October
  22:7
  191:4

odd
  162:20

ODIM
  32:17
  40:17
  41:12
  42:20
  43:18,22
  44:1 45:2
  47:11
  49:12
  51:16
  54:8
  55:6,10,
  16 58:16
  63:8
  64:8,14,
  20,23
  65:2
  66:2,17,
  24 68:7
  72:23
  82:24
  84:10
  85:11,14,
  22 87:8,
  20 88:8,

22 93:16,
18 107:7
108:6
114:12
118:4
124:4
128:4
129:2
136:18
140:8
143:7
159:1
160:13,22
164:16
165:4,13
170:4
188:2
193:10

offense
  40:18

office
  175:22

officer
  5:24 6:3
  21:6,16,
  21,23
  23:4 26:8
  27:2
  33:1,4
  34:11
  35:7,14,
  23 36:6,
  20 41:10,
  22 42:5
  44:12,17
  48:9,20
  49:3,6,15
  50:15,17
  52:2
  56:21
  57:7,8,9,
  18 62:1
  65:18
  66:11
  68:17

69:10
74:6
77:20
78:20
79:14,17
80:4,7
86:19,23,
24 94:7,8
98:23
99:23
100:6,18
103:20,23
106:17,22
111:10
115:6
119:8
120:2,7
121:3,8,
11
124:17,21
125:13
126:18,20
130:19
131:12,20
133:5
134:6,10,
14,17
135:5
138:14,24
140:17
143:24
144:23
145:1,3,4
148:8,17
149:15,22
150:3,12,
17 151:8
152:19
153:5,6,
17 154:5,
11 156:24
157:11,22
158:9,12
159:12,18
160:2
161:6,8,
12 162:7,

15,19,21,
24 163:3,
11 164:2,
6 165:21
171:18
172:5,17
176:14
178:19
179:1
180:6

**officer-
involved**
22:24

**officers**
65:12

**officers'**
163:15

**oldest**
11:3

**opens**
71:8

**operating**
138:6

**Operation**
173:9

**opinion**
16:3,5
17:5,8
19:6
32:2,21
33:3,10,
12 34:10,
19,21,22
35:4
40:6,23
41:15
42:7,23,
24 43:17
44:11
45:18
55:23
66:14
67:10,17,

22 68:6,
9,13,15,
22 69:2,
3,8 77:12
78:8
86:15,18
89:6
92:15
94:18,24
98:22
101:24
108:22
111:7
118:2
122:7,8
123:19
124:2,10,
21 127:21
128:2
131:1
132:17,20
136:23
138:23
142:9
143:16
145:3,4
160:1
161:6
163:12
165:16
167:8
171:7,24
172:3,10
183:12
187:24

**opinions**
6:23 10:7
18:17,19
19:9,15
24:6
30:12,15
31:20
32:7,10,
15,23
33:24
34:13

35:5,20
36:11,15
38:2,6,17
39:11,15
41:2
42:1,19
43:12
44:8
66:16
67:13,22
68:24
78:16
93:9
98:17
99:12
114:13
116:22
123:7,14
124:14
138:19
142:22
149:4,7
159:10,
17,22
165:14,23
167:3
169:22
172:19

**opportunity**
14:24

**opposed**
71:22
73:4
105:7
125:17
139:2
182:11

**oral**
93:3
162:2
182:10

**order**
31:20
83:2
143:15

191:8

**organizatio
ns**
12:15
14:9,10,
19

**organize**
97:1

**orientation**
45:10
57:10
94:21
99:23
102:1
112:9,14
113:21
115:15
125:11,13
158:11
166:18
184:16

**out-of-
pocket**
186:11,21
187:1

**outdoors**
132:24
134:8

**outline**
80:21
85:8,16

**over-the-
road**
11:4

**overhead**
110:23
111:1,2

**overseeing**
177:15

**overstating**
25:3

**owns**
10:18

_____

**P**
_____

**p.m.**
97:9

**Pack**
173:9

**pages**
83:2

**pants**
75:10,11

**paragraph**
50:14
129:15

**paragraphs**
129:15

**paralegal**
96:17

**parallel**
116:8
141:4

**parked**
61:19
157:23

**part**
20:21
34:4,5
35:8,11
36:11,14
44:10
45:19
46:21,23
47:1 52:7
58:23
61:24
62:19
69:10
72:14
76:2,10,
11 102:4

104:24
162:12
166:6
175:5,6
177:23
186:23
192:22

**partial**
39:15
102:4

**partially**
102:3

**partners**
180:21

**parts**
101:15

**past**
18:4,5,6

**path**
103:5
108:4
157:7
164:14

**pathway**
102:8
108:15
153:13,20
157:5,13,
16,17

**patrol**
176:14,16

**pattern**
126:20
131:14,15
136:3
137:5
141:9
142:8,9
150:12
184:10

**patterns**
125:3

134:1
182:16
183:16

**Paxton**
8:10

**PC**
82:7

**PDF**
37:14

**Peabody**
177:3

**peer-**
**reviewed**
184:3,7,8
185:7,22

**pen**
76:23

**Pennsylvani**
**a**
13:4

**people**
39:12
47:4,9,14
53:3 60:8
67:14
72:21
101:13,15
109:15
125:24

**percent**
109:24
140:3

**perfectly**
87:17
140:21

**perform**
186:9

**peril**
162:2

**perjury**
124:3

**permits**
182:2

**permitted**
180:7

**person**
45:10
46:4
53:21
78:18
87:14,18
105:6
125:18
144:3
157:1
163:23
165:2
191:24

**person's**
66:9

**personal**
36:10,12

**personally**
9:23 10:5
182:14

**personnel**
16:20
125:24

**perspective**
21:13
36:21
38:13
40:24
45:16
49:5,11
106:10
123:16
124:1
192:24

**pertain**
6:23

**Peter**
27:19

**Pharo**
191:14

**phase**
179:9

**Phoenix**
9:9 13:5
83:17
84:8

**photo**
82:23
105:22
155:2,12,
16 156:6

**photograph**
95:7,14,
19 105:16
110:20,23
113:6,7
155:6,8

**photographic**
102:14

**photographs**
31:19
64:10
66:10
80:18
83:4
95:6,20
98:14
99:2,5,7,
11,14,16
100:4,5,
17 104:8
106:16
109:1,22
110:17
111:17,19
113:4,11,
18 123:8
154:23

**photography**
25:22

**photos**
30:20,21
31:17,21
32:1 82:3
96:8
100:22
117:12

**physical**
21:17
24:19
92:24
126:16
159:5
163:15

**physically**
49:9

**physicist**
136:23

**physics**
138:1

**pick**
25:21
61:8
100:21

**picked**
98:16
99:13

**picture**
185:5

**piece**
87:7

**pistol**
59:8
80:5,7
115:6
125:11,
14,16
126:15
127:1
129:16
130:2,13
133:16
142:15

157:4
158:15,18
159:19

**pistols**
129:24
132:23,24
133:4,8
182:17

**placard**
153:15
155:17
156:7

**place**
83:15
102:24
114:7
142:18
144:7
150:3
165:23
166:1,5
178:17

**placing**
21:12
36:22
45:13,16
66:7
157:10,11

**plaintiff**
23:12,19
79:20

**plaintiff's**
190:17

**plane**
51:4
119:10
140:17

**planes**
179:14

**play**
36:16,17
125:23
152:13

156:17
159:9

**point**
30:19
31:24
35:2
44:14
48:9 49:1
53:7,8
55:24
76:15
78:6,12,
18,21
79:5,8
96:8,14
103:3
105:20
106:12
107:3,16
114:18
116:21
117:24
118:14
120:9,10
121:3
124:17
125:20
132:5,12
134:1
135:11,
14,15
136:7
139:8
144:14,17
146:8
149:18
150:19
151:22
152:1
153:8,21
154:3
155:5
156:6
163:4
166:17
167:9,12

169:18
172:16
188:18

**pointed**
120:23
121:16
158:19

**pointer**
76:19,22
80:17

**pointing**
74:18
76:20,24
77:14
119:16
159:23
162:23

**points**
100:13,14

**police**
6:3
131:11
133:4,6,
18 134:6,
10,14,17
138:14
141:5,21
144:24
148:17
163:14
175:12
176:5,10,
15,17,18
177:5,16,
21 178:19
180:5
182:8,24
183:8
185:8,9,
13 191:9

**police-
involved**
22:23

**police-
trained**
131:7

**Pomier**
192:18

**poor**
83:8

**portion**
57:22
105:3

**positing**
40:12

**position**
87:18
88:7
89:12,19
90:1
100:8
101:14
107:11
111:11
114:23
119:11
141:6
151:21
153:19
157:11,12
175:18
178:12

**positioned**
45:11
51:5
105:18

**positioning**
39:11
42:17
48:22
67:14
86:20
94:7
98:22
99:23
101:13,18
109:15

111:24
112:13
113:14

**positions**
43:9 89:7
111:8
178:13

**possibiliti
es**
70:20
71:9,10
117:5
166:18

**possibility**
70:21
116:14
125:23
153:24

**possibly**
87:16

**post**
74:15
75:6,7,
21,23
76:6,7

**posture**
100:13
151:24
166:7,19
172:16

**postures**
45:9
52:12

**posturing**
40:12

**Power**
173:9

**Practical**
28:18

**precautions**
66:8

preceding
    50:21

precise
    148:7

precluded
    95:8

prefer
    182:10
    184:1

preferably
    110:22
    184:21

prepare
    10:7
    185:10

prerogative
    108:10

present
    16:16
    25:1
    85:16
    159:4
    185:12,21

presentation
    182:1

presentations
    14:10,14
    182:11
    184:1,4
    185:7

presented
    17:22
    129:5
    184:3

presenting
    19:2

preservation
    184:19

pressure
    146:13

prevent
    142:20

prevented
    69:16
    70:13,23

previous
    171:10

previously
    98:8

primary
    11:14,17

primed
    158:10

principle
    59:17

principles
    138:1

print
    83:11

printed
    63:15

prior
    34:16
    103:5
    147:18,20
    192:4,5

pristine
    101:6,7

private
    26:10
    27:3,11
    184:6

pro
    188:15

probable
    154:2

probative
    109:3

problem
    118:11

proceeding
    6:12

proceedings
    31:4,13

process
    88:10
    115:22,23

processes
    174:24

produce
    119:12
    121:11

produced
    117:6

professional
    27:15
    179:20
    186:15

Professor
    185:3

professors
    184:24
    185:2

program
    174:22
    175:5
    187:9,10,
    13

programs
    13:12

prohibited
    182:9

projects
    181:23

promise
    84:11

promote

13:16
14:4

propellant
    147:3,4

properties
    167:21

proprietor
    9:8

prosecutions
    18:14

protect
    173:12

prototype
    183:1

protractor
    95:9,10,
    11 110:4,
    9

prove
    139:24

provide
    15:4,21
    23:18,19
    24:3
    38:20
    60:4
    101:23

provided
    21:9
    23:16
    26:15
    30:5 37:1
    127:12
    130:3,7

providing
    12:16

prudence
    14:13

public
    11:3

publications
    28:11
    182:12

publish
    182:4
    183:24

published
    16:23
    182:3,5,6
    183:22

pull
    31:8
    150:23
    154:19
    167:20
    168:7
    169:7

pulled
    144:1
    153:1

pulling
    138:6
    150:24

purchased
    133:17

pure
    11:20

purpose
    23:7
    79:1,5

purposes
    100:24
    123:5

pushed
    105:2

put
    14:19
    21:22
    70:18
    73:16
    78:23

88:9
103:12
107:12
108:3
110:4
122:3
129:9
148:21
155:19
186:16
188:17

**putting**
76:18
125:7
165:9

**Q**

**qualificati
on**
129:23
133:13
192:24

**qualificati
ons**
24:10
131:21
140:19

**qualified**
131:6
134:6
145:4

**quality**
82:2,4

**quantify**
139:6

**quarrel**
151:8,11

**quarter**
124:22
145:2,8,
11,12,13

**question**
7:5 24:1
43:8 44:3
46:2,7
51:9
54:9,16
55:3,16
63:6 65:5
66:21
68:18
69:18
79:4
86:11
87:21
88:15
89:3
93:17,19
94:2,12
101:21
108:19
136:18
145:21
151:20
152:17
160:22
161:24
165:15
171:10
183:14
188:5

**questionabl
e**
87:7

**questioning**
43:24
54:14,15
122:12

**questions**
6:22 7:1
13:20
17:24
86:9
93:16,18
193:9,10

**quick**
55:6

**quickly**
137:5,7

**R**

**race**
158:10

**raised**
176:23

**range**
116:15
150:15

**rank**
189:2

**rate**
126:12
130:12
186:10

**rates**
126:19
130:15

**re-evaluate**
94:16,17

**reach**
47:14

**reached**
16:24
17:3,15
34:16
77:22
78:4,13
158:16
162:11

**reaching**
19:23
24:22
40:9
50:19

**reaction**
150:22

**read**
32:13
43:4,5
44:2,4
48:1,2,5
50:13
65:4,6,12
66:20,22
94:2,3
122:13
123:4
124:19
138:16
145:6,22
170:18

**reading**
49:16
50:9
103:14

**real**
134:18,19

**reality**
52:20

**rear**
125:4
126:8,9,
13,14
130:14
131:14
139:17
140:4
144:16,17

**reason**
42:16
193:2

**reasonable**
39:1
47:9,13
116:11

**reasons**
71:4

**rebels**
173:23

**rebut**
23:4

**rebuttal**
187:23

**recall**
20:12
22:22
28:19
37:5
103:14
122:5
130:9,15
138:16
166:8,22
173:10
190:18
192:20

**recalled**
164:14

**received**
12:11
13:6,7
30:1
186:22

**recently**
14:16
19:20

**recess**
31:11
65:3 97:8
145:20
193:7

**recoil**
121:2,5,
6,19
138:6

**recollectio
n**
22:5
123:2
158:14

191:14

reconcile
123:22

reconsider
44:7
58:20

reconstruction
11:16
24:14,17
25:6,24
27:5,18
28:3,7,
17,24
29:7,14
45:15
48:14
53:9 59:4
78:18

record
5:10
31:14
43:5 44:4
48:2,5
55:9,10
65:6
66:22
69:1 94:3
131:5
145:6,22
167:23
168:1,18

recording
160:4

records
18:12
167:14
186:1
187:7

redirected
121:19

refer
9:22

28:15
63:23
123:24
127:6
169:21

reference
18:1 34:4
46:21
63:15,20
129:11
153:9,11
167:9
169:18

referenced
95:21

referencing
36:19

referral
13:12

referrals
12:9,11,
20 13:6,7

referred
34:5
168:18

referring
33:18
45:12
65:21
74:22
76:4,16,
17 120:3
155:6

reflect
61:16
64:13
169:2

reflected
69:21

reflecting
106:12

reflection
59:22,24
60:6,24
61:9,18
65:24
69:24
70:24
75:2 77:3
108:20

reflections
59:21

reflective
62:10

refresh
189:19

refute
65:15,23
66:5
71:22,24

refutes
44:12
72:4

refuting
51:14
88:20

regard
160:4

regulations
182:9

related
6:23
93:19
99:12

relates
86:15

relation
36:19
48:22
57:11
111:12
151:5
153:17

158:6

relationship
48:21

relevance
68:24

relevant
32:1
78:8,15
159:16,21

reliability
108:12

reliable
17:6
38:6,15,
18,20
39:17
41:3 42:7
163:11

reliably
21:14

reliance
125:7

relied
95:13
96:9
104:8
109:14
122:14
130:1
167:2
168:8

rely
42:22
54:11
95:20
122:16
123:16
126:4

remember
26:20,23
93:24

138:20
146:7
165:3
168:12
192:7,9,
11

remind
6:20

render
18:17,19
40:5
68:15
101:24

rendered
16:4

rendering
19:6
34:21
42:22
93:8
116:22

rendition
143:8

rephrase
29:11
39:21
112:10
164:11

replicate
87:17
88:6,7

report
7:14 10:7
11:9 15:2
20:8,15,
21,22
24:9
29:17
32:6,13,
14,17
34:9 35:6
37:4,6
46:18

50:6
67:5,24
68:2,3
69:16
70:11,19
72:13
73:9,16,
17 79:13
80:3
93:10,13
95:21
102:7,13,
18 103:6,
15 114:14
122:23
123:10
127:16,
17,18,23
128:10,24
129:9,10,
12 133:5
137:16
159:11
161:5
165:15,19
169:2
182:13

**reported**
80:10

**reporter**
7:2 43:6
44:5
48:3,6
65:7
66:23
94:4
145:23

**reporting**
67:6,23,
24

**reports**
140:15
167:4
169:12
178:2

**representin g**
23:12

**Republic**
173:7,13

**request**
184:23
185:9

**require**
127:20

**required**
128:22

**requires**
25:13

**researched**
27:8

**reserving**
193:10

**residence**
50:20
51:2
153:13

**resolution**
81:8,19,
21 82:1
83:6

**resources**
177:15

**respond**
6:24

**responded**
168:9

**rest**
105:12

**resting**
125:21
144:7

**result**
25:16
57:13

**results**
152:3
165:2

**Resumed**
98:11

**retain**
23:1

**retained**
23:5,7
122:4

**retaining**
9:23

**retainment**
164:19

**retired**
26:9
148:16

**returned**
127:2

**reveal**
57:15

**revealed**
58:4

**revealing**
109:4

**reverse**
103:1

**review**
23:2
29:23
30:4
41:14
45:21
52:1
54:18
60:19
126:18
172:19
185:20

**reviewed**
16:16

29:20
38:16
171:5
185:11,18

**reviewing**
15:16
16:3
21:10
46:11
52:8

**revolvers**
133:7

**Rhetorical**
55:3

**right-side**
109:2

**right-sided**
104:10
166:11

**ring**
104:21,23

**rise**
175:20

**robberies**
53:12

**Robert**
27:19

**rod**
95:14
102:16
103:1,2,3
105:14,
15,18,19
106:7,11,
12,21
107:3,10,
14,22
108:2,13
109:11,23
115:2
116:5

**rods**
100:11
102:5,12,
20 103:17
104:13,17
108:19
113:14
115:13
123:9
151:21
152:1
166:20
172:15

**role**
6:8 72:1,
2 152:13
156:17
159:9
164:18
177:23
178:9
179:2

**rolled**
144:18

**Ron**
118:4

**Ronald**
5:4,11
7:16 9:6
11:10
98:7

**room**
85:15

**roots**
144:4

**rotating**
72:22
73:5

**Rotert**
148:21

**roughly**
113:1
181:10

187:5
188:9,10

**rounded**
77:24

**Rubenstein**
22:20
23:11
30:6
129:1

**Rubinstein**
22:11,12
37:14
127:13

**Rudd**
122:20,
21,24
123:17

**Rudd's**
95:17
122:13,16
123:4

**rule**
38:4
40:22,23
41:6
42:15
49:24
77:2
119:17
127:20
128:20

**ruler**
109:10

**rules**
128:6
182:9

**ruling**
38:10
41:13
59:10,11

**rulings**
193:1

**run**
72:21,22
82:3

**running**
50:18
55:24
57:6,14,
16,20,21
58:3
72:9,14
73:4
136:10,
14,15,17
137:6
138:14
143:3
170:19,23
171:7

**rural**
176:15

——————

**S**

——————

**S-C-O-T-T**
5:12

**SAITH**
193:12

**Sam**
192:18

**Samsung**
84:4

**Sauer**
129:24
132:23,24
133:4,8,
10,16
134:7

**scenario**
134:17

**scene**
16:21
19:22

21:11
24:19
28:6
30:21
36:10,12,
21 63:2,
5,9 126:1
143:20
147:17,
19,21
148:2
153:11
154:19
155:2
160:5,10,
18

**scenes**
11:17

**school**
173:13

**science**
7:21,23
8:3,7,11,
14,18,19,
23 24:13,
17 29:10,
13 39:2
46:2
52:4,5,7
53:1,15,
24 54:4,
6,17,22
59:17,18

**sciences**
14:12
26:3,4
27:24
28:9,13
29:6
185:18

**scientific**
24:23,24
45:17
99:10

116:12
159:24
166:15
170:7,11
182:10
184:1,3

**scientifica
lly**
21:14

**scientist**
38:13
40:24
53:23
93:3

**scissors**
184:21

**scope**
184:9

**Scott**
5:4,12,13
7:16 9:6
11:10
20:15,17
31:16
82:17
96:3
98:4,7,13
147:9
155:22

**screen**
81:8
118:5
155:20

**SDR**
148:19

**seconds**
164:1

**section**
14:13
27:18
78:22
129:14,23
177:5

178:18

**security**
35:6,22
38:1,17,
21 44:11

**sees**
54:15

**segment**
91:16,17,
19 92:4,7
94:9
103:22

**segments**
95:3
103:18

**Self-
employed**
10:16

**semiautomat
ic**
133:7
182:16

**seminars**
14:7,19
184:5

**sense**
29:1

**separate**
37:7

**separately**
153:7

**sequence**
34:17,23
53:3
112:6
116:18,23

**series**
117:18

**served**
176:13,15
177:7

RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
Index: service..SIG

**service**
25:8
134:13
175:3

**services**
176:17

**session**
14:12

**set**
16:17,18
83:11
146:19
180:14

**shape**
77:4
101:3

**share**
140:11

**sharp**
70:6

**sharper**
81:13
82:10

**shed**
171:6

**shell**
125:8

**shielded**
64:12

**shift**
177:8
178:13

**shiny**
70:10

**shoes**
88:9

**shoot**
121:5
134:12,
17,22,24

135:2
150:14,20
151:9,19
152:12,
20,24
158:10
173:19,21

**shoot-don't**
134:16

**shooter**
103:4
113:16
131:7
142:21
184:15

**shooting**
11:16
21:5
22:23,24
24:14,16
25:6,23
27:5,18
28:3,7,
16,24
29:6,14
32:21
39:12
45:15
48:14
53:9,14
54:15
59:4 67:8
78:17
115:17
125:16
126:23
134:9
135:13
136:11
141:6
147:17
164:8
174:5
177:21

**short**
31:10
33:20
132:14

**shot**
33:5
34:1,14,
15,18,19,
20 39:23
40:6 42:8
53:17
54:19
55:2
89:13,20
90:2,6
112:1
114:7,11
116:1,10,
12,16
117:2
119:6,17,
22 121:1,
18 124:17
139:16
145:9
151:4
152:6,14
160:2
165:21,23
166:4,12,
16 172:17
174:2

**shots**
33:16
34:2,11
41:11,22
43:17
67:15,19
103:7
116:18,
19,23
124:22
142:24
145:1,10
161:9,20
165:24

**shoulder**
50:24
51:5
72:19
115:7
118:11

**show**
47:10
50:22
60:1 74:9
78:24
80:2,16
82:4
84:14,19
99:9
100:5
102:5,17
104:1,8,
13 119:21
128:14
140:3,10
144:24
154:16,24
161:14
172:1

**showed**
58:12
100:22
101:18

**showing**
57:12,23
80:19

**shown**
33:16
34:12
51:2
60:24
71:15
152:2,4

**shows**
50:17
53:14
68:16
73:22

74:3
77:23
81:23,24
119:7,8
140:22
155:1,16
158:16
159:18,24
171:22

**sic**
57:18
121:12

**side**
57:19
61:20
95:13
104:2,5,6
105:9
111:18
112:3,4,
7,11,16
113:20
114:6,9
115:21
117:2,7,
8,23
118:1,2,
18,21,22
119:12
156:5
163:1,2

**sided**
111:23
166:4,16

**sidewalk**
74:17,19,
20,21,22,
23 143:23
144:1
149:14
158:6

**SIG**
129:23
132:22,24

| | | | | |
|---|---|---|---|---|
| 133:4,8,<br>10,15,16<br>134:7 | **similar**<br>60:12,13<br>83:18<br>113:13<br>172:6 | **small**<br>64:6<br>70:3,4<br>105:20<br>176:17 | 57:7,10,<br>16,20<br>103:23,24<br>111:12<br>150:7 | **specificall<br>y**<br>6:16 |
| **sign**<br>10:18<br>128:10,13 | **simple**<br>66:7 | **smaller**<br>129:15 | 157:15<br>158:6<br>162:12<br>163:2 | **Specifics**<br>16:11<br>**speculating**<br>139:13 |
| **signature**<br>128:12,<br>15,17<br>193:11 | **simplest**<br>188:21 | **soft**<br>101:5 | **southeast**<br>50:16 | **speculation**<br>45:2<br>47:11<br>88:8 |
| **signed**<br>25:5<br>128:23,24 | **single**<br>109:18<br>**sir**<br>5:9 173:3 | **software**<br>80:22<br>187:9,10 | 57:6,11,<br>15,21<br>162:11 | **spoke**<br>125:12 |
| **significanc<br>e**<br>66:14<br>67:21 | **sit**<br>96:12 | **Sole**<br>9:8<br>**somebody's**<br>71:22 | **southeaster<br>ly**<br>58:3 | **spring**<br>138:5 |
| **significant**<br>56:7 68:5<br>123:13,23<br>132:10,13<br>143:4 | **situation**<br>87:16<br>127:3<br>134:18,<br>19,20<br>165:3 | **son**<br>10:24<br>11:2,3<br>**sort**<br>6:12<br>11:14 | **southerly**<br>158:19<br>**space**<br>157:22 | **Staff**<br>178:12<br>**stance**<br>141:17 |
| **significant<br>ly**<br>82:2<br>181:12 | **situations**<br>139:20 | 28:8 70:6<br>**source**<br>21:20<br>23:22 | **Spaeth's**<br>50:16<br>61:21<br>157:15,18<br>158:1,9,<br>18 | **stand**<br>7:19<br>54:18<br>87:6,18<br>114:24 |
| **signs**<br>179:6,11,<br>12,13,24 | **size**<br>101:3<br>**skin**<br>77:5,7 | 24:7<br>29:13,18<br>30:3<br>35:19 | **speak**<br>14:6,17<br>84:21,22<br>185:19 | **standard**<br>16:1,6<br>41:1<br>145:5<br>146:19,23<br>165:1 |
| **silhouetted**<br>51:1 | 105:10<br>106:3 | 41:2 42:2<br>45:23<br>53:7 | **speaks**<br>32:17 | **standards**<br>15:20 |
| **silver**<br>58:24<br>59:7,19,<br>24 60:5,<br>18 62:10<br>63:21<br>68:19<br>70:6,9 | **slight**<br>135:10<br>139:18<br>**slightly**<br>51:7<br>150:6 | 65:12<br>128:1<br>143:5,11,<br>14 167:4<br>**sources**<br>123:12<br>129:17,20 | **special**<br>141:2<br>**specific**<br>29:13<br>34:23<br>50:12<br>53:5<br>107:13<br>157:11 | 16:17,22<br>19:10<br>163:15<br>**standing**<br>43:20,22,<br>23 91:17<br>139:3 |
| **silver-<br>colored**<br>60:10,11 | **slow**<br>52:15,16<br>136:15<br>**slowly**<br>13:22 | **south**<br>50:19 | | **stands**<br>165:19 |

start
  80:19
  113:7
  175:1
  179:21
  180:8

started
  175:2
  181:7

starting
  188:18

starts
  15:4

state
  5:9 133:6
  175:11
  176:15
  177:5,14
  182:8,24
  183:8
  185:8,9,
  13

stated
  42:20
  78:11
  150:13
  158:14
  162:16
  172:17

statement
  22:2
  30:10
  32:12
  33:23
  46:17
  50:5
  78:11
  131:16
  170:1,3,
  14,15
  171:14,21
  182:19

statements
  93:3

100:6
162:2
170:6,11,
19,21
171:4,11,
13

static
  141:16

stating
  165:16

step
  149:1

stepped
  50:17

Stetler
  148:21

stop
  150:2
  154:17

stops
  137:2

story
  175:21

straight
  51:6
  57:16
  103:23,24
  114:24
  141:14
  156:8

street
  9:11
  170:23
  171:8

strides
  163:6

strike
  104:14
  105:7
  106:3
  130:23

165:21

strikes
  105:8,10
  135:16,
  18,19

striking
  103:5
  105:6
  106:3
  142:21

strong
  25:1

strongly
  69:14
  79:18

Stroth
  31:2,12

struck
  101:2
  106:13
  119:12
  154:1
  156:20
  157:7

students
  173:12
  185:3

studied
  9:2 62:12

studies
  19:3,13
  53:10
  59:23
  60:2
  126:11,
  17,19
  127:4,6,
  11
  129:10,
  11,12
  130:1,11
  131:12
  132:16,19

133:21
134:2,3,5
135:3
138:12
139:24
140:2
144:24
163:9,14,
15,19
164:6,10,
13,22

study
  29:21
  37:18
  53:6
  63:13
  130:9
  151:14
  152:19
  164:24

subcategory
  28:8

submachine
  182:18

submit
  25:7
  185:16

submitted
  129:12
  140:1

subset
  28:8

substance
  18:20

substantive
  19:7

suggest
  72:10
  73:3,14
  96:24
  131:13

suggesting
  1,077

121:7

summarize
  32:14
  165:20

summarized
  35:3

summary
  32:18
  34:5

sun
  61:4

super
  141:23

Superior
  20:2

supervisory
  177:23

supplied
  37:14

support
  78:23
  100:17,19
  162:21
  163:10

supporting
  19:16
  127:19
  129:13

supports
  111:7

suppose
  18:18

supposed
  71:18

surface
  50:18
  125:19
  144:13,14

surveillanc
e

33:19
44:12

**SWAT**
145:6
177:16

**sworn**
5:3,6
26:7 98:9

**synchroniza
tion**
172:14

**synchronize**
100:11

**synchronize
d**
170:17

**system**
177:13,14

―――――――――

**T**

―――――――――

**takes**
137:12
150:24
162:24
164:6

**taking**
7:2 66:9
106:16
142:18
153:6

**talk**
7:3 13:22
21:2
24:10
27:18,21
33:11
39:6
44:22
52:19
73:20
77:12

102:15
104:1
129:17
161:6

**talked**
69:19
98:23
107:4
130:16,19
162:1
189:10

**talking**
12:10
13:21
15:6
31:17
38:12
91:1,5,6
102:14
114:18
117:14,
22,24
122:9
134:14
136:3,4
147:21
156:2
180:3
184:18,19

**talks**
29:3,5

**tangible**
21:18

**tape**
149:1

**target**
184:17

**TASA**
12:17
13:1,8

**task**
29:24
68:10

93:7
122:4
126:21
167:5,7
186:8
187:14

**teach**
181:24

**team**
145:6

**teams**
177:17

**technician**
169:12

**telephone**
22:13,14

**telling**
51:21
162:18

**tells**
113:11
115:14
131:8
136:24
141:3
142:23

**ten**
133:12
153:15,23
154:3,8

**tend**
13:22

**tender**
128:7

**tension**
138:5

**term**
66:5
71:24

**terming**
182:15

**terms**
14:1 16:9
25:2
35:18
40:8
189:2

**test**
21:15
25:15
126:23
172:2,12,
18 183:13

**tested**
129:16
172:7

**testified**
5:6,21
6:2,4,14
18:2,3,6
20:5,10
71:16
77:20
86:3 87:3
98:9,10
111:11
150:17
159:19
165:22
166:3
190:4,6
191:10
192:21

**testifies**
87:15

**testify**
18:17,18,
20 19:12
39:4
53:16
54:18
161:4
191:5,7

**testifying**
17:17

19:14
49:3,7
88:6
190:19

**testimony**
19:3 23:4
26:15
35:7,14,
23 36:6
38:21
39:20,22,
24 42:7
44:13
49:18
51:17
52:3
65:16
66:3,18
69:8
71:22
72:1,4
78:3,7
79:7
86:20
88:17,23
89:8,20
90:24
92:15,16,
20 93:3
94:6,11
98:24
100:7,11
106:17,
18,21
107:8
114:13
122:19
123:16
124:23
143:8
151:5,9,
13 157:14
158:13
159:13
160:3,14
161:13,22

RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
Index: testing..travel

162:2,10
163:11
169:24
170:3
172:11
183:15
186:14
187:21
191:12,
17,18
192:1,14,
23 193:2

**testing**
16:19
25:8
100:16
106:18
181:19
182:16
183:18
184:10,13
189:1

**tests**
70:1
182:14,21
183:2,16,
23

**Thankfully**
134:11

**theory**
100:16

**thereabouts**
144:10

**thing**
44:12
90:10
106:14
185:4

**things**
6:20
13:19
52:18
68:2
79:13

140:15
160:9
189:12

**thirds**
74:14

**Thomas**
95:17
122:13

**thought**
63:1 79:7
88:10,24

**thoughts**
70:16

**three-and-
a-half**
64:4

**tightness**
125:16

**tilted**
141:7

**time**
5:24
14:8,20
16:16
17:17
24:20
26:24
32:9
39:12
42:13
45:8
48:23
52:12
61:6 62:4
67:14
74:10
86:24
89:19
90:6
93:22
96:22
124:7
128:19

135:16
136:10
137:12
138:7,9
140:3
150:22,23
151:22
152:1
162:18,
22,23
163:3,22
164:6
165:1
169:1
173:11,15
177:21
179:7,8
182:2
186:10
187:7
188:20
191:16

**times**
5:20,22,
23 6:2,3
26:18,19
183:11

**timing**
53:3
136:3

**tiny**
64:5

**tissue**
101:5

**today**
6:19 7:3
133:18
187:18,19

**told**
13:9 23:3
63:9
140:2
149:1
169:1

**Tom**
43:18
55:6

**tool**
15:13
25:9
184:13
192:13

**top**
15:2
189:3

**Torres**
191:8

**torso**
51:3
56:16

**total**
109:20
186:22

**totality**
45:14
52:17
109:19

**totally**
165:4

**touch**
148:21

**touches**
105:4

**tower**
175:22

**town**
176:20

**towns**
176:17,21

**traditional**
141:5

**trailer**
179:14

**trained**

131:11
141:21
144:24

**training**
131:4
132:22
134:19
145:6,7

**trajectory**
15:5
35:10
36:2
45:13,15
95:14
100:11
102:5,12,
16,20
103:1,2,
3,17
104:13,17
105:14,
15,18
106:7,11,
20 107:3,
10,14,21
108:2,13,
19
109:11,23
111:15
115:2,13
116:5
123:9
151:21
152:1
166:20
172:15

**transcript**
49:16

**transfer**
66:8

**transitioni
ng**
133:7

**travel**

164:7,14          6:14,16          type              38:11            upper
165:1                             6:8 9:21         43:8             50:24
186:10,23       trigger           16:21            45:24            104:15
188:24            150:23,24        22:17            69:18            106:16
                  153:2            62:6,12          86:18            113:2
treaties                          88:17            89:2             116:7
27:20           truck             95:8             91:22
                  10:18            106:1            108:18          upward
treatise          11:4,5           127:7            109:21,22        102:15,22
27:22             179:6,10,        130:13           152:5            103:8
53:6              11 180:1         141:17           171:3            111:15
129:17,19                          146:1,6,         183:21           112:22
                trucks             10,12,16         184:6            114:19
treatises         179:14           173:16           185:6            115:4
19:3,13                            180:5                             116:6
27:23           tub                184:22          understandi       119:13
28:12             105:1            185:4           ng                121:11
127:4,7                            188:21,23        15:24            125:15
                turn                                34:7             154:13
tree              42:12           types             101:9
50:20             44:16,18         174:16           114:11         upwards
76:9,10,          45:1                              122:24          106:24
11,12,13          46:9,12,        typewritten       148:17          115:17
78:1              15 47:4,         102:18                            156:9,16
101:2             10,23                            understood
120:2,8,          48:15           _____       7:10 10:1      utilized
16,19,22,         50:1,3,8                          123:20          88:19
23 121:9,         51:10,15             U                            131:2
12,14,22,         56:21,24        _____     unintention
24 143:18         57:1,2,13                        al              utilizing
144:3,5           82:21           unable            19:4            45:14
150:10            172:6            112:5,7
153:15,18                          114:4          unique           _____
154:1,9,        turned             117:1           60:14,15
12,14             32:24            153:16                               V
155:1             39:8             166:14         universe         _____
156:3,5,          42:5,11,                         31:19
20 158:17         13 44:13        Uncheck                          valid
163:3             48:24            82:12          universitie       39:2
                  67:11                           s                 88:17
trial             86:23           unclear          184:5,23         92:15
5:21 6:4,         100:9            76:20
8 14:18           150:18                          University       validity
19:21             160:21          undergradua      8:11,17,         88:16
38:21                             te               23
187:21          turning            8:16                            variance
190:7,8           45:19                           unsigned          139:14
191:10,15         172:1           underneath       129:6
                                   11:12                           variation
trials          turns              150:1          unusual           135:12
                  161:1                            149:18           139:18,21
                                  understand
                                   5:14 7:6                        variations

RONALD SCOTT
HOWELL vs CITY OF ZION

April 04, 2017
Index: vehicle..window

139:20

**vehicle**
61:19
149:23
157:24

**vehicles**
61:22

**ventilating**
175:21

**verbal**
23:23
182:10

**verbally**
7:2 24:4

**verbatim**
22:22

**version**
21:15,20,
24 24:4
41:21
66:6
78:14
100:18
129:2,4,5

**versus**
18:9,10
190:1,6,
11,17
191:8,14

**vertex**
90:19,21
91:4,13
92:6 94:8
95:4
103:20

**vertical**
74:16
75:6,21,
23 115:9
119:10
121:6
125:13

140:17

**victim**
36:20
45:11
113:16
163:4

**victim's**
59:9

**video**
33:11,16,
18,19
34:12
35:6,22
36:19
38:1,5,
17,22
39:4,13
40:7
41:8,19
42:9
44:11,12,
17,23
45:6,7,8,
21 46:4,
8,10,14
47:21,22
48:9,12,
13 49:2,
14,17
51:15
52:1,6,8,
10,11,14,
20 53:2,
4,9,11,
14,16
54:1,4,7,
15,19,22
58:24
59:2,12
60:1,12,
19 61:16,
24 62:8
65:24
67:10
68:16,23

70:24
71:12,16
73:11,22
74:3
77:23
78:13,24
89:22
90:2
100:12,14
101:20,22
112:2
114:6
115:5
117:14,16
136:15
139:11
140:22,
23,24
141:12
149:16
153:16
158:16
159:24
161:11,
12,14,15,
16,21,23
162:7,15,
24 163:1,
7 170:16
171:15,
16,17,18,
20,24
172:5

**videos**
52:15
60:8,20
130:3

**view**
78:24
84:19
162:8

**viewing**
77:23

**Vincent**
28:17

**virtue**
57:23
133:13

**vision**
96:17

**visiting**
21:11

**voluntarily**
25:7

**voluntary**
181:22

———————

**W**

———————

**waist**
116:8
119:8,14

**walking**
136:20
137:6
141:16

**walkway**
50:16

**wanted**
23:3
122:18,22
153:8
154:11
158:23

**wanting**
78:6,21

**waste**
32:9

**watching**
44:23

**weapon**
126:20
129:18

**weapons**
183:1

**weaver**
141:17

**website**
13:15
14:1,3

**weeks**
23:6,8

**weight**
146:15,20
147:1,5

**Wentworth**
175:6

**west**
157:9
158:8

**whatsoever**
167:13

**white**
50:20
51:1
56:13
61:24
74:13
75:8,9
76:13

**wide**
177:14

**wife**
10:12,13
11:23
179:5,24
180:24

**Wilson**
191:14

**wind**
131:23,24
132:5,13,
21 133:1,
21,23
143:2

**window**

61:19,20,
21 81:15
174:5,9,
15 179:13

**Windows**
187:13

**winds**
132:17
133:24

**withdraw**
77:21,24
78:4
173:14

**witnesses**
12:17
164:15
170:22
171:1

**Woodworking**
61:21
158:1

**Word**
187:13

**words**
106:8
113:13
115:8,10
151:21

**work**
10:6
11:19,20
16:22
99:13
108:1
133:14
148:18
175:22
178:21
181:19,22
184:22
186:15
187:20
188:20

**worked**
9:2,3
16:5
175:7,19
179:24
182:24

**working**
96:11
181:18

**world**
125:7

**wound**
35:10
36:2
86:16
95:12
99:8
100:10
101:10,22
102:9
104:10,24
105:16
109:2
111:18,23
112:11
114:6
117:2
118:18

**wounds**
28:18
29:2,3
104:3
105:13
115:14
152:2

**written**
37:20
63:17

**wrong**
32:16
37:3
92:13

**wrote**
34:8

37:12,13

_____

**X**
_____

**x-ray**
96:17

_____

**Y**
_____

**yard**
50:20
167:11

**yardstick**
109:10

**year**
8:22
18:4,5,6
22:5
133:13
181:9,14
182:1

**yearly**
133:13

**years**
19:22
20:8
26:24
133:12
179:7
181:12,13

**York**
175:20

**youngest**
10:24
11:2