*Howell v. City of Zion, et al.*
**Case No.: 16 CV 3949**

# EXHIBIT E

JAMIE BORDEN                                    August 25, 2017

Page 1

 1              UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                   EASTERN DIVISION

 4   ALICE HOWELL, Independent          )
     administrator of the estate of     )
 5   JUSTUS HOWELL, deceased,           )
                                        ) CASE NO. 16-cv-03949
 6         Plaintiff,                   )
                                        )
 7            vs.                       )
                                        )
 8   CITY OF ZION, a municipal          )
     corporation, OFFICER ERIC          )
 9   14ILL,(#47),                       )
                                        )
10         Defendants.                  )
                                        )

11

12

:L:

14

15

16

17            DEPOSITION OF JAMIE BORDEN

18         Taken on Friday, August 25, 2017

19                 At 10:40 a.m.

20          At All-American Court Reporters

21            1160 N Town Center Drive

22                   Suite 300

23              Las Vegas, Nevada

24

25   REPORTED BY  SHIFRA MOSCOVITZ, CCR NO. 938

JAMIE BORDEN                                        August 25, 2017

Page 2

1 APPEARANCES:
2   POr Alice Rowell!
3                 CARLıpN phim, ESQ,
                  06;M LAW OFFICES
                  225 N, washington Street
                  Suite 2200
                  Chicago, Illinois 60606
                  012)570-9390

7
a
0   For Officer Eric Hill;
                  THIONAB DICIANNI, HQ,
                  AKIN, O.310K  DIAMOND BUSK  DICIANNI & KRAFTREFER
10                140 South Dearborn Street
                  Chicago, Illinois 60603
11                (3121782.7606
12
13
14
15
16
17
16
19
20
21
22
23
24
25

Page 3

1                      5RAMINATICIN
2 WITNESS;                                    PAPE
    Jamie Borden

    Examination by
    mr. ()dim

6

9                      EXH/RITE
1$  MIETT                                     PAGE
11  Exhibit 1    Came Review and Analysiq     46
12  Exhibit 2    R8BUME,                        5
1]  Exhibit 3    Directory Structure          49
14
15
16
17
19
19
20
21
22
23
24
25

Page 4

1         LA8 VE2A8, NEVADA; AUGUST 25, 2017
2              10:40 A.M.
3
4   (NRCP Rule 30(b)(4) waived by the parties prior to the
5 commenCemant of the deposition.)
6   (FRCP Rule 30(1:)(5) waived by the parties prior to the
7   COMMenCeMent of the deposition.)
8 Thereupon--
9                   JAMIE PORDEN,
10 was called as a witness,  and having been first duly sworn,
11 was examined and testified as follows:
12                   MICIATION
13 HY MR. ODIN:
14      Q. Good morning, Officer Borden.
15      A.   Good Morning.
16      Q. This is your deposition in the context of
17 you being designated as en expert witness by the
18 Defendants in the case of Howell versus Zion et al,
19 correct?
20      A.  Yes, sir,
21      Q. Have you taken a deposition before?
22      A,  Yea, sir.
23      Q. How many tinal?
24      A, Between arbitration and normal
25 depositions, approximately eight times.

Page 5

1       Q.   Okay. So you understand the banjo ground
2 rules?
3       A. Yes.
4       Q.   You can verbalize your responses, and if
  you don't understand anything ask ma?
5       A.  Yes, sir.
6
7       Q.   Or I will aasume that you did understand
8 it?
9       A.   Yes, sir.
10      Q.   Okay. I am going to show you what we are
11 going to mark as Exhibit 2, a copy of your resume.
12 And Exhibit 2 is a copy of your resume, correct?
13      A.   Yns, air.
14              (Exhibit 2 was marked for
15              identification.)
16      Q.   And is this a current resume, meaning, one
17 that includes information within the last three
  months?
19      A-   Yes, sir, with the exception of a couple
20 of speaking engagements that have happened since
21 then. On your hard drive is the most recent.
22      Q.   Okay. So the difference would be between
23 Exhibit 2 and what is on the hard drive, the
24 difference would be speaking engagements?
25      A.   And T have taken on one additional case

aAMIE BORDEN                                              August 25, 2017

Page 6

that's listed on there.
2      Q-    Okay. What case is that?
       A.    Padia versus Oxnard.
3      Q.    Where is that case pending?
5      A.    In I believe in the jurisdiction of
6   Oxnard.
7      ?-    California?
8      A.    Yes, sir.
9      Q.    And what is your role in **that** case?
10     A.    Expert witness.
11     p.    And export witness on what topics?
12     A.    In that case, police procedures, use of
13  force.
14     Q.    Underlying facts involve what?
15     A.    The use of a tamer.
16     Q.    Have you prepared a **report in** that case?
17     A.    I have prepared an initial report, yes,
18  sir,
19     Q.    Did the suspect die in that case?
20     A.    No, air.
21     Q.    **And** than there was no other use of farce
22  in that case involving **the** discharge of any device?
23     A.    **No, sir.**
24     Q.    Look at Ddlibit 2, now, your resume, and
25  because it's a mouthful we will just call it a

Page 7

1   resume?
2      A.    Yes, sir.
3      Q.    **You** were a police officer with the
4   genderaon, Nevada Police Force from 1997 **to 2001,**
5   **correct?**
6      **A.    Yes, sir.**
7      Q.    And from 2008 to 2016?
8      A.    To current date, yet, sir.
9      Q.    To **the current date. So** the entry, 2008
10  to 2016, that should be 2008 to the present.
11     A.    To present, yes.
12     Q.    Okay. There is a gap in your employment
13  with the Henderson, Nevada Police Department from
14  2001 to 2008, correct?
15     A.    Yes, sir.
16     Q.    Why were you no longer employed with the
17  **Henderson Nevada Police** Department in 2001?
18     A.    I resigned for family issues. I was at
19  the time I resigned, I was a narcotics officer and
20  at the time I was requiring me to be involved in,
21  very involved in investigations, it was taking away
22  from my ability to take care of my father who was
23  ailing, who then passed away in 2003, and then I
24  just stayed with what I was doing until 2008 when
25  decided to so back to the police Department.

Page

1      Q.    Okay, Were you under any investigation?
2      A.    No, six-
3      Q.    Just prior to you resigning in 20017
4      A,    No, sir.
       Q.    Had any complaints been filed against you
6   just prior to **your resigning in 2001?**
7      A.    There was a, well, it was I think it was
8   more a complaint against my wife. She was a police
9   officer at the time. There was, I was parked in a
10  pick up zone to pick up my wife at the airport and
11  one of the security guards told me to move on, my
12  wife was getting into the truck, I told him that she
13  was loading, and he waived me on. And I said, hey,
14  hold on a minute, I am. Any ways my badge was
15  laying in the dashboard and that ended up in a
16  complaint with IA, which was unfounded.
17     Q.    okay.
18     A.    That's the only investigation I have been
19  involved in, in my career with the **Police**
20  Department.
21     Q. You anticipated my next set of questions
22  BO we can move on.
23     A.    Okay.
24     Q. So between 2001 and 2008, were you
25  employed?

Page 9

       **A.    Yes, air.**
2      Q.    And give me the chronology?
       A.    Self-employed, professional musician.
4      **Q.    You were a drummer and still are?**
       **A.    Still am, yes, sir.**
       **Q,    You don't reflect your employment, self**
employment as a drummer on this resume. Is there a
8   reason for that?
9      A.    It's irrelevant to the work that T do as
10  an expert witness and a police officer.
11     **Q.    While you were employed as a drummer, did**
you, I mean I sea that you have listed, I will ask
12  another question. }low did you **get** back on the force
14  in 2008?
15     A.    I unfortunately had to test and go through
16  a second academy, which was a task and then I was
17  back in the department.
18     Q.    And what was your first job position when
19  you got back on there?
20     A.    Patrol.
21           Patrol?
22     A.    Yes.
23     p. How long did you hold that position as
24  patrol officer?
25     A.    I believe two years, I was back in patrol

U.S. Legal Support, Inc.
(312) 236-8352

JAMIE BORDEN                                              August 25, 2017

---

rage 10

1   for two years, 2008 until late 2010.
2   Q. Okay. And after you were a patrol officer
3   what position did you take with the force?
4   A,  I promoted Into the training bureau.
5   Q. That was in 2011?
6   A.  Yes, I believe it was 2011, late 2011.
7   Yes, sir, or I am sorry, lake 2010, I believe.
8   Q. Late 2010. And would that entry in this
    resume he the first entry under professional
9   assignments, to the left it says 2010 to the
10  present?
11
12  A.  Professional assignments, I have 2000,
13  yes, sir, yes, I see to the left that was the
14  assignment. So it would be 2010, I believe, it was
15  mid to late 2010, I don't have exact dates on that.
16  Q. And you have been in that training bureau
17  since late 2010. correct?
18  A.  Yes, sir, that's right.
19  Q. Did you apply for that position?
20  A.  I did.
21  Q.  And do you recall what the job
22  requirements were in the announcement of the?
23  A.  I don't.
24  Q. When you initially took the position what
25  were your job responsibilities?

---

Page 11

1   A.  That of a standard training officer,
2   in-service training participation in the academy,
3   citizens' academy, entry academy. So it's as a
4   general training officer.
5   Q. And what is a general training officer, as
6   opposed to a non general training officer?
7   A.  We have training officers that are
8   specialized that after an amount of time they become
9   oriented with firearms or master taser instructor,
10  that doesn't mean they don't handle other training
11  assignments, but it means they have a particular
12  specialty in a particular thing. A master taser
13  inspector for instance or a master defensive tactic
14  instructor. Otherwise you participate and become
15  certified as an instructor in all of these things,
16  but you are not necessarily the lead instructor.
17  Q. At some point you became a non general, I
18  mean, yes a non general?
19  A. Yes, my focus became use of force.
20  Q. When did that happen during your tenure,
21  between 2010 and the present?
22  A.  It's kind of duct tailed in everything
23  else. I was on for about six months before I
24  started taking on the adjunct portion of use of
25  force, and then it grew from there. So I don't have

---

Page 12

1   exact dates but six to eight months before I started
2   working on a niche assignment.
3   Q. Okay.  And at some point after that you
4   became certified in the niche assignment?
5   A.  I did, yes.
6   Q. And when did you become certified in the
7   niche assignment and I assume we are talking about
8   the use of force niche assignment?
9   A.  Yes, the certifications, there is no
10  particular certification for use of force. So I was
11  certified in things like as a taxer instructor, I
12  was certified in baton instruction, I was certified
13  with things that had to do with use of force, but
14  moreover, as I became more in-tuned and entrenched
15  in use of force, I began to study case law, I began
16  to study the science behind human factors,
17  behavioral science became certified through the For
18  Science Institute, their pwwam as certified a
19  analyst and then an advanced specialist. So those
20  certifications that were related to use of force is
21  where my specialty began.
22  Q.  I just for now want to focus on the
23  Henderson department?
24  A. Okay,  And that is with the Henderson
25  department.

---

Page 13

1   Q.  That is the niche training assignments?
2   A. Right.
3   Q.  So you testified that there would be a
4   hew one?
5   A.  Yee, I was a certified taser instructor,
6   but not a master taser instructor_
7   Q.  So between 2010 and the present, what are,
8   what would be the niche training categories for
9   which an officer may become certified in by the
10  Henderson Police Department?
11  A.  Any number of things. You have to be a
12  certified instructor to teach firearms, to be a
13  firearms safety officer. There is just a number,
14  everything that has to do with training, you have to
15  be approved by the Henderson Police Department to do
16  that. And that's trained by the existing trainers.
17  So there is no global certification, it's just that
18  the department gives you the blessing of being that
19  person that's designated to do that, based on your
20  skill set and your ability as proven to the
21  leadership for the training bureau.
22  Q.  I am trying to get a handle on structure
23  and labels hero. So you started out as a general?
24  A.  Yea, right-
25  Q.  At some point you assumed same adjunct or

---

U.S. Legal Support, Inc.
(312) 236-8352

JAMIE BORDEN                                                    August 25, 2017

Page 14

as you call it niche role for certain subjects?

2  A.  Right.

8  Q. Was one of those subjects ever taser
4  training or taser?

5  A.  It was one of the general assignments that
6  I had, I wasn't a certified baser instructor.

7  Q. And when you use certified here, you said
certified by taster, you mean?

B  A. Right.

10  Q. You mean the company?

11  A. Yee,

12  Q. Certified, not the Henderson Police
13  Department?

14  A.  Right, taxer is a different beast than.
15  Yes, taser has to certify you as a taxer instructor,
16  the Polite Department cannot do that.

17  Q. Baton use?

18  A.  Yes.

19  Q. Certification as a niche training area?

20  A. Not niche, no, I was a general trainer of
21  baton. So lead instructors would be on hand as we
22  were training the use of baton.

23  Q. Okay.  What were the areas of training
24  involving firearm in the Henderson Police
25  Department from 2010 to the present?

Page 15

A. Can you be more specific with that
2 question, I am not sure?

3  Q. At some point you were training in
4  firearm?

5  A.  Yes, sir.

6  Q. And the use of firearms in the context of
7  a police officer'a contact with civilian population?

8  A. Right.

9  Q. Doe0 the Henderson Police Department
10  distinguish various vane of firearms for training
11  and certification purposes of its officers?

12  A.  Not various uses, it's just the use of
13  firearms. There is different firearm
14  Certifications. Have you to be certified by the NRA
15  to be a full-time instructor or range master, which
16  you are certified in, and the use of the department
17  issued hand guns,

18  Q. But again strictly now in the Henderson
19  Police Department, does the Henderson Police
20  Department provide any certifications for its
21  officers, training other officers in the use of
22  firearms?

23  A. No, they are just designated as the
24  training officers because of their skill set and
25  their abilities as proven to the leadership.

Page 16

1  Q. And this form of designation comes how?

2  A. Through qualifications, through training
3  within the department.

4  Q. Would the department, for instance, send a
5  letter saying you are now designated as a firearms
6  trainer?

7  A.  Not necessarily, it's an internal
8  designation.

9  Q.  So it could be oral?

10  A.  It could be.

11  Q. Do you have any written record of you
12  being designated as a firearms trainer with?

13  A.  I have a certification through NRA.

14  Q.  mean through the Henderson Police
15  Department?

16  A.  AO an employee of the Henderson Police
17  Department I was certified through the NRA for my
18  position as a range master.

19  Q. Did your certification with the NRA, was
20  that part of your qualifications for getting the
21  position that you had?

22  A.  Yes, it helped.

23  Q. At the Henderson Police Department?

24  A.  Absolutely, it was part of the deal.

25  Q. And when did the NRA give you this

Page 3,7

1  certification?

2  A.  I can't give you a date, I don't remember,

3  Q. Roughly?

4  A.  It had to have been 2011, 2012, time
5  frame,

6  Q.  And did you do anything with the NRA prior
7  to getting the certification?

8  A. No, sir.

9  Q.  How did you get the certification with the
10  NRA?

11  A. Through the class.

12  Q. And its an NRA class?

13  A.  It is, it's an PRA lesson plan.

14  Q. Is that lesson plan listed in your resume,
15  Exhibit 2?

16  A.  NO.

17  Q. Is the certification for the NRA, that you
18  got from the NRA listed in your resume?

19  A.  No, sir.

20  Q.  The clog that you took, was it an in
21  person class?

22  A.  Yee, sir.

23  Q.  And do you recall where you took it?

24  A,  Yes, I do. It was at the range that
25  Fendareon use to maintain in Henderson, Nevada, in

JAMIE BORDEN                                               August 25, 2017

Page 18

1  One of the classrooms there.
2      Q. And did the NRA give you a written
3  certificate or piece of paper saying you have
4  successfully completed this course?
5      A.  I would assume there was one in my
6  training tile, but I couldn't be certain about that.
7      Q. Okay. From 2018 to the present, you list
8  on your resume that you are senior instructor at
9  Force Science Institute?
10     A.  Yes.
11     Q. And from 2013 through 2016, you are
12 instructor at Force Science Institute?
13     A. Yes.
14     Q. What is the Force Science Institute?
15     A.  It's an institute that is based in the
16 study of human fatoro and human behavioral science.
17 And what they focus on; police work, law
18 Enforcement.
19     Q. And is the Force Science Institute
20 accredited by any accreditation body in. the United
21 States?
22     A.  Not to my knowledge,
23     Q. Is the Force Science Institute a not for
24 profit educational institute?
25     A.  I am not certain if they are or not.

Page 19

1      Q. Would it surprise you if I told you they
2  are a for profit entity?
3      A.  It wouldn't.
4      Q. What did you dl in order to become an
5  instructor at Force Science Institute in 2000 --
6  Just prior to 2013?
7      A.  t told them that I would when they asked
8  me if I was interested.
9      Q. Who asked, which individual?
10     A.  Dr. Rill Lewinski.
11     Q. Do you know why he asked you?
12     A.  I am assuming beceuee of my time spent
13 with him in the advanced certification course. And
14 in his words I showed an intuitive understanding of
15 the application of the empirical date end the
16 sciences behind human behavior, and the science
17 behind action, reaction times and how that applies
18 to a police officer in a critical incident.
19     Q. What is the advanced certification course?
20     A.  when I went through it, it was
21 approximately a four hundred hour study in
22 Kinesiolcgy and decision making, adult learning,
23 with an additional focus on the empirical data
24 gained by scientific studies of human movement,
25 human dynamics, human action and human reaction,

Page 20

1  action versus reaction.
2      Q. Is that a course that was presented by or
3  made available by Force Science Institute?
4      A. Yes.
5      Q. And L,ewinski taught that course?
6      A.  Yes, sir.
7      Q. And that's how you had your first
8  interaction with him?
9      A.  No, that was not my first interaction. I
10 was certified a$ an analyst in the one week course
11 prior to that,
12     Q. Okay. The certification as an analyst,
13 does that appear in this?
14     A.  Yes.
15     Q.  It appears it's May, 2012?
16     A.  Correct.
17     0, When you are a force science analyst?
18     A. Yes.
19     Q. You took a course in order to be certified
20 as that analyst?
21     A. Yes.
22     Q. At Force Science?
23     A. Yes.
24     Q.  Did Lewinaki teach that course, as well?
25     A.  Yes, him and several other Ph.D.'s and

Page 21

1  people that were responsible for other areas of
2  instruction that had to do with psychology.
3      Q. So basically after your having taken with
4  one or more courses with Force Science, Lawinski
5  said, this ie bright egg, picked you out of the lot?
6      MR, DICIANNI: So it seems.
7      Q. So you accepted his offer to become an
8  instructor and you were an instructor fдr the period
9  2013 to 2016. What is the difference between an
10 instructor and the capacity that you now hold senior
11 instruct or, with Force Science?
12     A.  The biggest difference is the time, the
13 second difference is, I have been promoted to senior
14 instructor, so I am not, they don't have me teach
15 another instructor. I am teaching the full two day
16 courses on my own. I mm involved in the development
17 of other classes for Force Science, through
18 basically the application of time had become a
19 senior member of their instruction staff. Which in
20 my invoices on it now says senior instructor, I
21 think that's the main difference.
22     Q. Since you took the position in the
23 training bureau in 2010, have your duties at the
24 training bureau changed?
25     A,  Yes, they have changed.

U,S. Legal Support, Inc.
(312) 236-8352

JAMIE BORDEN                                                    August 25, 2017

Page 22

1    Q. Okay, would you take me through the
2  changes from 2010 to the present?
3    A.  I can. It's, there is not exact dates
4  because the way the training bureau has worked.
5  After my certifications with the Force Science
6  Institute and my continued studies in case law, my
7  continued studies in psychology, and all of the
8  relevant information that goes towards my position
9  at the Police Department, the chief of police at the
10  time asked ma to be the catalyst far a specific
11  unit, which as time was moving on I became more and
12  more focused on use of force because the subject
13  matter is very important for many different reasons,
14  transparency, for the well-being of the department,
15  the well-being of the training aspect of use of
16  force. So that became more and more of my focus,
17  and I began reviewing the use of force with the
18  department and as that job began to expand that unit
19  then became, or the position that I had formed, the
20  use of form training and analyst officer
21  subsequently became a unit and we started to form
22  the unit and just like any other large corporation,
23  these things don't happen over night there is
24  protocol, there are procedures that have to be
25  identified, there is executive privileges, what is a

Page 23

1  work product, how are we doing what we are doing and
2  why, When that was identified the chief then gave
3  me another officer to work with me, who wag now
4  feathered in part-time and started to take some of
5  those tasks, as I started to develop the protocols
6  and procedures for identifying use of force issues,
7  creating training, disseminating that training and
8  making certain that was a nimble task that we
9  weren't waiting because lessons that are learned,
10  good, bad or indifferent needed to be disseminated
11  quickly, and that's one of the things that pot cur
12  department on the map, so to speak, with the
13  dissemination of training because that's how we
14  became a better department. As that progressed I
15  then promoted to sergeant, and the police chief kept
16  me in place as the sergeant over the now use of
17  force training and analysis unit, which basically is
18  responsible for reviewing every use of force that
19  occurs on the Police Department through an
20  accountability software, that it's referred to as
21  Blue Team through IA Pro. That is a C.A.L.E.A.E.
22  standard, a statistical tracking device, if you
23  will, And my position there led to many different
24  changes, it led to periodic review and updated force
25  of our use of force policies, to make sure we were

Page 24

1  identifying trends in use of force and approaching
2  that from a training aspect and improving policy
3  through the department; improving our training
4  through the department, improving our use of force
5  in-service, training, improving our use of force
6  academy, citizens academy, any contacts we had with
7  the city of municipality as far as the training they
8  were to have to understand what we are doing as a
9  police department. So over time it has grown into
10  what it is today, and I am currently the sergeant
11  over the use of force and training analysis unit,
12  which encumbers all of the things I spoke shoat,
13  And as of last week I became the sergeant over the
14  entire training bureau, which includes under that
15  umbrella the use of force training and analysis
16  unit, so I have taken on several mare direct reports
17  and several more responsibilities,
18    O, Okay. Just I want to have you give me
19  more information about a couple of terms that you
20  used and names that I am not familiar with?
21    A. Okay.
22    O. I saw it in one of your document, you
23  talked about C.4-14,E,A,E, standard, what is that,
24  spoil that?
25    A,  C-A-L-E-A-E, I believe, it's a standard

Page 25

1  that Police Department strive for, for
2  accreditation, it's basically an accreditation
3  standard for the police department, and we are
4  currently a gold standard department accredited
5  through the C.A.L.E.A.E.
6      MR. DICIANNIr Committee on accreditation
7   of law Enforcement agencies,
8    Q. Committee of what organization?
9      MR, DICLANNI: It's own.
10    A. Honestly, I have forgotten what the
11  acronym, because we just have a C.A.L.E.A.E.
12  standard unit and it literally is one of the loan
13  standing accreditation companies for Police
14  Departments nationwide.
15    Q. It's a private entity or is it, you know,
16  for instance like OSEA may have a committee or
17  certain kind of standard?
18    A. They work with IACP, International
19  Association of Chiefs of Police, and I honestly
20  don't know their structural make up.
21    Q. 1 got you. And you maid you used the
22  phrase blue team software?
23    A.  Yes, it's a reporting software, it's a
24  reporting platform that is statistically tracks use
25  of force. It's simply one of the things that is

JAMIE BORDEN                                                    August 25, 2017

Page 26

1   required by C.A.L.E.A.E. to track the use of force
2   on the department, effective use of force, what is
3   not effective, how many times a tamer was used, it's
4   simply a statistical tracking software.
5       Q, It's a proprietary, **private** proprietary
6   software that Henderson buys or licenses?
7       A.   we license it just like any other
8   department, many departments across the country use
9   blue team and LA Pro.
10      Q. And the statistical analysis that you or
11  your team do is statistical analysis that is
12  basically performed by the algorithms in the blue
13  team software which is based upon the data that your
14  team inputs into that software?
15      A.   No, it's based on the data that's put into
16  the software by the reporting officers, which this
17  is one of the items that I have developed with my
18  unit, is that every sergeant is required to do an on
19  scene use of force investigation, which then comes
20  to me and my team, we verify that all that
21  information is there and that the proper protocols
22  have been followed and that information sits as is
23  as reported in the field. We don't create the data.
24  The data is available on the White House website in
25  the portal, The Data Initiative for Police

Page 27

1   Departments. So the main reason for that
2   statistical analysis is so we might put that
3   transparent information into the data portal for the
4   white house under the 21st century police.
5       Q. So the data set that is subject to the
6   **analysis in the** blue team software is Henderson
7   police data?
8       A.   It's all Henderson, it's specific to our
9   department, that's correct.
10      Q. And so when you used the word earlier
11  trends, trends in the use of force, these are trends
12  **that are specific to Henderson?**
13      A.   Correct, sir.
14      Q.   No other police force?
15      A. No other Police Department. If I had to
16  worry about another Police Department they couldn't
17  print enough money.
18      Q. Would you turn to Page 4 of exhibit 2?
19      A. Yes.
20      Q. And the second on the underlined topic
2a  heading says Critical Incident Investigations?
22      A.   Yes, sir.
23      Q. Does the phrase Critical Incident
24  investigation mean anything more than your business,
25  CIR7

Page 28

1       A.   No, the name of my business, CIR is simply
2   Critical Inoident Review, this has nothing to do
3   with my business. My business is an entity
    completely outside of the Police Department.
5       Q. Okay.
6       A.   Critical incident investigations is simply
7   a task.
        Q.   Within your?
8       A.   Within my position at the Police
10  Department.
11      Q.   At the Police Department, So none of the
12  information contained on Page 4 of Exhibit 2 is
13  **related to your business as** critical incident
14  review?
15      A.   No, those are simply tasks I handle at the
16  Police Department.
17          MR, DICIANNI! Just suggestion, you guys
        are little bit talking over each other, and she
19      is going to have a problem with that.
20      Q.   Let me ask you about your business. CIR,
21  on the first page of Exhibit 2, **CIR stands for**
22  Critical Incident Review?
23      A.   Yes.
24      Q. Is that a trade name or an incorporated
25  entity?

Page 2P

a   A.   It's under the umbrella doing business as
1   under my production company, which is Studio 824,
2   O,   This is the drumming studio or music
4   studio?
5       A.   Recording studio, as well as a video
6   studio.
7       Q.   And is Studio 824 an incorporated entity?
8       A.   Yes, sir.
9       Q.   And Studio 624 is doing business as CIR,
10  correct?
11      A.   CIR, it's Studio 824 is the company and I
12  am doing business as **Critical** Incident Review.
13      Q.   Okay. It's not Jamie Borden doing
14  business as Critical Incident Review?
15      A.   No, sir. I used the federal ID number
16  from Studio 824, that should sum it up.
17      Q. Okay.
18      A.   It's all about those numbers.
19      Q.   And when did Studio 824 begin doing
20  business as CIR?
21      A,   I believe in 2014 was my first actual
22  report, and that could be early 2015 just seems like
23  life is a blur and those dates just don't seem to
24  make sense to me.
25      Q.   And the Page 116, Exhibit 2 lists cases 11

JAMIE BORDEN                                                August 25, 2017

Page 30

1 and 12, correct?

2      A.  Yes, sir.

3      Q. Are all of the cases listed on 11 and 12

4 of Exhibit 2 cases that were apart of the portfolio

5 of Critical Incident Review?

6      A.  Yea, sir, those are with my personal

7 business.

8      Q.  Okay, Now look at Page 8 of the resume,

9 the special assignments position, everything under

10 special assignments forward/positioned are related

11 to your job at the Henderson Police Department?

12     A.  Yes, sir. That is the special assignment

13 at the Police Department, as the use of force

14 training and analysis officer between those dates.

15 Those are some of the more pointed, more prominent

16 tasks.

17     Q. And look towards the bottom of that page,

18 it says public instructor, speaking instructor,

19 commission, 2002 to 2008, and private sector. Does

20 this mean anything in context with your job duties

21 at the Henderson Police Department?

22     A. No, sir. That is public speaking and

23 instructor, that I am a certified public speaker and

24 commissioned the music industry. And that just goes

25 to my public speaking experience, And that was all

Page 31

1 not to do with the Police Department, but just

2 outside. That's why I have those dates listed as

3 2002 to 2008,

4      Q. Okay. Bo of the items that are listed

5 under special assignments for/position, the public

6 speaking one is the only one that's not related to

7 your Henderson job duties?

8      A.  In this, yes, in this portion, yes.

9      Q.  Now, Page 9 of the resume, under the

10 public speaking and presentation forward/instruction

11 related to police use of force.

12     A.  Yes, sir.

13     Q. Are all these presentations and

14 instruction things that you presented or instructed

15 on rather than you attended to listen to?

16     A. No, these are public speaking and

17 presentation instruction related. Those are all of

18 the classes 1 taught. Public speaking engagement,

19 NTA, ATO. All those are where I have been retained

20 or hired to come in and speak about the subject of

21 the use of force,

22     Q. Now, Z don't notice any certifications,

23 diplomas, degrees from accredited academic

24 institutes, do you have any diploma, certifications

25 or degrees from accredited academic institution?

Page 32

1      A. Diploma, as far as high school, I got my

2 Obvious requirements to get the job. As far as a

3 degree, no, I have no degree. I have a few more

4 credits to go to get my CRJ, with focus on

5 psychology, but time has been evasive, so I am still

6 only close, I am not there.

7      Q. What is the acronym, CFO?

8      A.  Criminal justice.

9      Q. And was that University of Nevada?

10     A.  CSN.

11     Q, what is that?

12     A. Community of Southern Nevada.

13     Q. When did you begin that program?

14     A. The initial credit came from the

15 attendance of the academy, which goes towards your

16 CRJ degree, and then there is additional classes

17 that have to ha taken. The class and the advanced

18 specialist course was transferred into credits

19 through CSN for college credits and was applied

20 towards my CRJ degree. And that's all through CSN.

21 That all began in 2008 when I initially re-entered

22 the academy.

23     Q.  So am I reading this correctly that you,

24 the credit hours that you have towards the CRJ in

25 psychology are not credit hours from classes taken

Page 33

1 at CSN?

2      A.  Na, CSN recognized the advanced specialist

3 course.

4      Q.  And let's look at the calms that you have

5 been involved in now.  Page 11 and 12 of Exhibit 27

6      A.  Yes, sir.

7      Q.  The first one, Darren Mikum versus Brown.

8 What role did you or are you claiming in that case?

9      A.  That was expert witness.

10     Q.  And in what area?

11     A.  Use of force, use of force and human

12 factors, is what the report was focused on.

13     Q.  And use of force and human factors is the

14 same focus of the report that you have provided for

15 the defendants it the Zion 6388, correct?

16     A.  Yes, sir. The human factors and the human

17 dynamics are the interplay between the two as they

18 relate to the use of force applied.

19     Q.  And have you actually written a report in

20 the Darren Brawn case?

21     A.  Yes, sir.

22     Q.  Have you testified in this case?

23     A.  It was summary judgment_

24     Q.  The next case, Solinas Todd versus Citrus

25 Heights, you provided a report in this case,

JAMIE BORDEN                                      August 25, 2017

Page 34

1 correct?
2      A.   Report only, yes, sir.
3      Q. You did not give deposition testimony or
4 trial testimony?
5      A.   NO, air, that was a special case where the
6 federal trial had already taken place and one of the
7 stipulations was that a criminal charge was going to
8 be added after the fact- And my report was about
9 the facts of that case, as it was to be presented to
10 the D.A. in the process of making the decision
11 whether or not to criminally charge the officer
12 after the fact. It was a strange case, but there
13 was no testimony on my part.
14      Q. And the report was, again, use of force?
15      A.   It was, yes, same.
16      Q. Same human factors?
17      A. Action, reaction time, visual principal,
18 those types of things.
19      Q. Do you know whether the officer was
24 charged?
21      A.   He was not, the D,A. opted not to press
22 oharges.
23      Q. Was your report supportive of the
24 officer's version of events in the Citrus Heights
25 case?

Page 35

1      A.   I can't say that it was supportive because
2 my report was simply taking the facts from the case
3 and putting those together objectively. I did not
4 do a scene visit on that particular case, I only had
5 the statements from officers on the scene at the
6 time, depositions from the original federal, trial.
7 So it was, the report was indicative of the
8 information that I had at the time. So I can't say
9 it's in support of or against, it was simply an
10 objective report,
11      Q.   In the Darren Mikum Versus Brown cage, you
12 were hired as an expert for the defense, correct?
13      A.   Yes, sir.
14      Q. And defense was Brown. Is Brown a police
15 officer?
16      A.   No, air, Darren Mikum is the corrections
17 officer that was involved in this use of force.
19      Q.   Who is Brown, do you know?
19      A.   He was the subject of the use of force.
20      Q.   And I am just trying to understand why the
21 officer was suing Brown?
22      A.   You know what, that's just how the case
23 was listed on the paperwork that I have, so I put it
24 in that way- It was a lawsuit against the
25 corrections facility in Las Vegas, Nevada.

Page a6

1 Apologies for the confusion. I am looking at that
2 going, I don't know how.
3      Q. Let me short circuit some of the questions
4 that I would have asked.  The cases that are listed
5 on Page 11 and 12 of this exhibit, did you provide
6 expert, an expert report or expert testimony on
7 behalf of anyone other than the officer involved in
8 the shooting?
9      A- Not on the cases listed, no.
10      Q. You said not on the cases listed, with an
11 emphasis that suggests that there may be cases that
12 are not listed, that have your involvement with some
13 entity, other than the shooting police officer?
14      A. I have been asked to review cases from the
15 plaintiff's side. AM I have reviewed those cases,
16 and I don't have them written down because they
17 opted after my initial, and it's not a report that
18 do, I do based on the existing information and the,
19 I guess, the incident itself, I give a breakdown of
20 where the objective report is going to land. And as
21 I begin that process and I give that information to
22 Plaintiff's counsel, they either opt to retain me or
23 not retain me. And I have not been retained by
24 Plaintiff's counsel as of yet. I have a potential
25 case out of, I believe, it's Florida. It was very

Page 37

1 vague, the attorney that called me on it, it's a
2 criminal defense case involving an officer that used
3 a taxer, and in what appeared to be excessive amount
4 of times. Without all of the information on the
5 report I told him I can't tell you, but as an expert
6 witness I am not about defense or offense, I am
7 about an objective report. So based on that the
8 plaintiffs counsel on that has agreed to send me
9 the initial information, I have not received it yec.
10      Q. okay.  Las Vegas Police Protective
11 Association case that you have listed on Page 11,
12 did you provide a report or testimony in that case?
13      A. Both,
14      Q. Both, And again, this was a use of force
15 and human faotors report?
16      A.   Yes, sir,
17      Q. Did this involve a'shooting?
18      A.   No, sir.
19      Q. What kind of force was used in this case,
20 do you recall?
21      A.   I believe it was it was excessive use of
22 hands, fists and feet. Sir, let me expand on that,
23 LVPPA Association hired me- There were two officers
24 involved. My objective report on the first officer
25 did not have the objective information that was

JAMIE BORDEN                                          August 25, 2017

Page 38

1   required for defense of that officer. So they
2   reduced my involvement to the secondary officer, who
    was actually not involved in the use of force, but
3   was a witness. And it had more to do with the
    forensic video evidence from body cams, and the
5   ability to focus attention and intervene in the uae
6   of force. So my involvement in that case was
7   minimised based on my objective report of the
    original officer's use of force, which, well, it
9   just didn't work out, my objective report was not
10  supportive of defense.
11
12      Q,   Okay, I just want to backtrack. In the
13  Mikum versus Brown case, that involved a shooting?
14      A.   No, sir, that was use of hands, fists and
15  feet in a lai3.
16      Q.   And Solinas was a tamer?
17      A.   Solinas was a shooting, but that was a
18  report only.
19      Q.   was there a decedent in that case?
20      A.   Yea, sir.
21      Q.   The second Les Vegas police protective
22  association case that you have listed, P.O Rose?
23      A.   Yes, sir.
24      Q.   I assume Police Officer Rose?
25      A.   Yes.

Page 39

1       Q. Did thin involve a shooting?
2       A.   No, sir.
3       p.   What did this involve?
4       A.   Use of forceful retention, control holds.
5       Q.   The third las Vegas Police Protection
6   Association involving CO Smith?
7       A.   Female correction, sorry, female
8   corrections officer, et the LVNPD Corrections
9   Facility, and just simply an excessive use of force
10  claim.
11      Q.   No Shooting?
12      A.   No shooting, sir.
13      Q,   okay. The next case, A John versus
14  Riverside County, did this involve a shooting?
15      A,   Yes, sir.
16      Q. Decedent?
17      A.   Yes, sir.
18      Q.   And what was your role in this case or
19  what was or is your role in this case?
20      A.   Expert witness.
21      Q.   Providing use of force again, with the
22  human factors?
23      A.   Yes, and I need to explain that too
24  because it sounds like there is several areas of
25  expertise that I am covering. How this is, how this

Page 40

1   works together is that there are issues that happen
2   within a use of force incident that create and
3   define human factors and human behavioral science.
    So to speak about one, I have to speak to the other.
5   So that's why my expertise in use of force ties in
6   with my human factors expertise and how that
7   interaction plays together.
8       Q.   So we have A John, which was a decedent
9   and you were hired by the defense again in this
10  case?
11      A.   Yee, sir,
12      Q.   The Rodarte versus Victorville cast, what
13  role did you play in this case?
14      A.   Expert witness, again, again, human.
15  factors, action, reaction time.
16      Q.   was there death in this case?
17      A.   Yes, sir.
18      Q.   A shooting death?
19      A. Yes, sir, descendant was Rodarte.
20      Q.   The Rodriguez versus County of Riverside
21  case, was that a death case?
22      A.   Yes, sir, also a shooting.
23      Q. And what role did you or are you playing
24  in this case?
25      A. That case is settled and I was the expert

Page 41

1   witness, again in the same realm.
2       Q.   Did you provide a report in this cans?
3       A.   I did, sir,
        Did you give deposition testimony?
5       A.   I believe I did on that one. I gave
6   deposition testimony on Rodarte. I cannot be
7   certain, sir, it's kind of blended together here,
a       Q.   Okay. So possibly?
9       A.   Possibly, yes. I completed the report.
10      Q.   The Kevin Young versus County of San
11  Bernardino case, what was your role in that case?
12      A.   Again, expert witness, human factors and
13  use of force concerning action, reaction times.
14  There was no decedent in that case.
15      Q.   Did you give any deposition testimony in
16  this case?
17      A.   I did, and testified.
18      Q.   You testified at trial?
19      A.   Yes, sir. I did not realize I have done
20  so many cases.
21      Q.   off the record.
22           (Whereupon, an off the record
23  discussion was held.)
24           Okay, we left off at Kevin Young, you
25  said you testified at trial in that case?

JAMIE BORDEN                                             August 25, 2017

Page 42

1    A.   Yes, sir.
2    Q. Of the prior cases that we have talked
3 about, correct, there were, there was no trial
4 testimony on behalf?
5    A. Rodarte, Carlos Rodarte was a trial.
6    Q. 8o you gave trial testimony. You are
7 qualified then as an expert in both those cases,
8 Roderte and Young?
9    A.   Yes, sir.
10   Q.   Did you face in either one of those cases
11 a motion to disqualify you as an Expert?
12   A.   NO, sir. In Rodarte they had me on deck
13 for testimony, and I never took the stand, So I was
14 in the courtroom ready to take the stand and they
15 ended up settling that.
16   Q.   So you never actually testified?
17   A.   I didn't get on the stand on that, Kevin
18 Young, I was qualified as an expert witness.
15   Q. And again no, there was no motion to
20 disqualify you?
21   A, No, sir, I believe that was Dale Oalipo,
22 that was on that case.
23   0. And Young, was there a motion by the
24 opposing side to strike any of your opinions?
25   A.   No, sir.

Page 43

1    Q.   Letrs look at, let's talk about Sawyer
2 versus City of Riverside, what role did you have
3 playing in that case?
4    A.   Again, that was, it's the same use of
5 force, human factors, human behavioral science.
6    0. Did you provide a report?
7    A.   I did,
           And was there a decedent in this case?
9    A.   There was.
10        Shooting decedent?
11   A.   Yes, sir.
12   0.   Did you testify at a deposition and/or an
13 open court?
14   A.   No, sir, that was settled.
15   Q·   Hockerday versus City of Oxnard?
16   A.   Yes, sir.
17   0.   Did this involve a death?
18   A.   It did, sir.
19   Q.   And you provided an expert report on use
20 of force and human factors, human dynamics?
21   A.   Yes.
22   Q.   Did you testify in deposition or in trial
23 in this case?
24   A.   No, sir, that also settled prior to trial.
25   0.   Centennial versus City of Fresno, did this

Page (14

1 case involve a decedent?
2    A-   Yes, it did.
3    Q.   Did you provide an, and you provided an
4 expert report?
5    A.   Yes, sir.
6    Q.   And again, an expert report on use of
7 force and human factors, human dynamics?
8    A.   That's correct.
9    Q. Did you testify at a deposition or trial?
10   A.   No, sir, that also settled.
11   Q·   Aaron Forgash?
12   A.   Yes.
13   0. Versus City of Riverside, did this case
14 involve a decedent?
15   A.   It did.
16   Q.   Did you provide an expert report?
17   A.   I did.
18   Q.   And did you provide testimony at a
19 deposition or at trial?
20   A.   No, sir, and this report was based in
21 forensic video evidence regarding the use of force,
22 which was a shooting death.
23   0.   Did you review reports in this or in the
24 Forgash case or just the video?
25   A.   Just the video, sir.

Page 45

1    0.   The last case you have in your list is
2 Rodriguez Ayala versus City of Riverside, did this
3 involve a death?
4    11"  No, air.
5    0.   Did it involve the use of force?
6    A-   Yes, sir.
7    Q.   And claim of excessive use of force?
8    A.   It involved a shooting.
9    0.   You provided a report in this case?
10   A.   Yes, sir, I provided actually two full
11 reports, my initial report and basically a response
12 to interrogatories.
13   Q.   Okay. Did you provide testimony in this
14 case?
15   A.   NO, sir, it was a close one, just about
16 ready to and they settled that case, The case
17 that's not listed an this that is listed on your
18 version on the hard drive is Podia versus, I believe
19 it's, Oxnard or Riverside, without having it in
20 front of me I can't remember.  That was the tasering
21 case where there was no decedent, no shots fired.
22   Q.   Did you spend any time working in
23 California?
24   A,   No, sir, performing as drummer, yes,
25 plenty of time, but not as a police officer.  And

JAMIE BORDEN                                                    At gUst 25, 2017

Page 46

1 sir, I need to add in the cases that are not listed
2 here ate the cases I am handling for my Police
3 Department internally. Internal investigations,
4 which are not part of my private company's work, as
5 the use of force investigator, and basically in
6 those cases, although I might identify issues on
7 those shootings and be the catalyst for my discipline,
8 which happened on a number of occasions, they are
9 not listed on this case load.
10      Q. Information from those cases would not
11 necessarily be information that you could talk about
12 publically?
13      A.  Correct, sir, yes, sir.
14      Q. And you don't profit in any way
15 financially from the work you do Un the cases that
16 are internal to the department?
17      A.  Not outside of my salary, sir, yes, sir,
18 that's my task.
19      Q. I wasn't suggesting anything?
20      A.  No, I got you.
21      Q. I am going to show you what we will mark
22 am Plaintiff's RAhihit 1.
23              (Exhibit 1 was marked for
24                  identification.)
25              Would you identify plaintiff's

Page 47

1 Exhibit 1, please?
2      A. This is my case review and analysis
3 experts opinion for Justus Howell versus City of
4 Zion, et at.
5      0. At Page 2, Page 3, rather of Exhibit 1,
6 going over to Page 4, you list documents that you
7 reviewed and you have handed me today a thumb drive
8 with other documents that include this listing?
9      A. Yes, those documents are in these file
10 names on this document.
11      Q. Okay. So the only information that you
12 had prior to preparing your report is on the thumb
13 drive you gave me?
14      A. Other than being aware of the case, I
15 didn't.
16      0. What do you mean by other than being aware
17 of the case?
18      A.  I didn't get the invitation to work this
19 case until sometime after the case, after it had
20 happened. So I was aware that this shooting
21 occurred in Chicago prior to getting the report, but
22 I had no information about it.
23      Q. Haw were you aware of the case prior to
24 getting it?
25      A.  It's a police shooting, and I am just, I

Page 48

1 have google alert set up on all the police
2 shootings.
3      Q. To it was a media thing?
4      A.  Yes, I was only aware of the shooting
5 through normal channels.
6      Q.  No one from the Zion Police Department
7 called you?.
8          A. No.
9      Q. Okay.  Got you. Did you ask anyone for
10 any other information prior, other than what is on
11 this thumb drive and which is partially listed on
12 the Page 3 and 4 of Exhibit 1 for additional
13 information?
14      A.  The only information that would have been
15 necessary for my opinions and there was nothing else
16 available that's not on the hard drive or the disk
17 that I gave.
18      0, So after you got the thumb drive, I don't
19 want to misstate what you just said, but did you ask
20 the lawyers who hired you or anyone else to give you
21 additional information?
22      A. Not that I recall, we have had discussions
23 about the case.
24      Q. Dcn't tall me what you said?
29      A. No, no, I am aware of the rule, but I

Page 49

1 don't recall specifically any item that was missing.
2      Q.  I am just?
3      A,  Hold on, yes, no, I am, I didn't mean to
4 cut you off. I did ask for, if there was any
5 available for me to view, any forensic, any corners,
forensic information that was available, and I did
6 not get any of that, other than what was already
existing.
9      Q.  Okay.
10      A.  Just protocol information on my side,
11 anything that Z receive goes into a particular file
12 and that is a copy of the entire file.
13      Q.  Okay. I am going to mark as Plaintiff's
14 Exhibit 3 a screen shot of the directory structure
15 of the thumb drive that you just gave me, And I am
16 going to show that directory structure to you now.
17 Is that an accurate directory listing of the files
18 that are on the thumb drive?
19              (Exhibit 3 was marked for
20                  identification.)
21      A.  Yes, sir.
22      Q.  Okay.  And may I ask you to open each of
23 the folders on that directory structure and tell me
24 whether the documents in those folders are the only
25 documents that are in the folder as presented on the

JAMIE BORDEN                                          August 25, 2017

Page 50

thumb drive?

2    MR. DICIANIE: Are we going to be able to
3    print this?
4         MR. ODIM: Yea, I am printing this. Well,
     I have just done the screen shot, I will send
6    the e-mail to them and she will print it.
          MR. DICIANNI! Okay.
9         MR. ˚DIM; Off the record.
9         (whereupon, an off the record discussion
10   was held.)
11    Q.    You refer to the enhanced video at tab
12   number six on Page 37
13    A.    Yes, sir.
14    Q.    Did you, is tab number six the enhanced
15   version of tab number 12?
16    A.    TO my knowledge, yes, sir. Those are the
17   way I received the videos, that's the actual title
18   on the video. So I received the enhanced version,
19   which included a time frame and frame rate at the
20   bottom of the video, which is what I used in the
21   process of.
22    Q.    So you didn't do any enhancement?
23    A.    NO, sir.
24    Q.    In this process?
25    A,    No, because even the video that's listed

Page 51

1    as the Original video is not the original video, as
2    far as digital recording goes, It's a copy of a
3    video that was originally given to Plaintiff, but I,
4    in my forensic video side, there is things that you
5    look for, for original video. So original video is
8    s. original rod digital data, which doesn't exist in
7    either of these videos.
8         Q.    Am I correct in saying that copying of
9    digital data from source A to source B produces an
10   exact same copy?
11        A. You are not correct in saying that.
12        Q.    That's why I asked it that way?
13        A. Yes.
14        Q.    So haw is it that you are able to tell
15   that the original video listed at tab 12 is not, is
16   not the same as the source video from which it was?
17        A.    I didn't do a full forensic analysis of
18   the video, only the content of the video, but the
19   compression rate is different and there is data
20   that's missing, and it's impossible to look at a
21   video and identify GOP's which is a group of
22   pictures, which can be anywhere from 10 to 30. When
23   you have a digital copy, it's a different
24   compression rate, which entails a different code and
25   in that process digital video gets rid of what it

Page 52

1    doesn't need to streamline the copy. So now, and
2    this is unless that video is the rod data from the
3    device, which is very hard to come by, you are
4    getting a copy of it, and that copy is a different
5    compression rate and things happen to the video in a
6    compression rate which is a very extensive process,
7    but in this case neither the enhanced video or the
8    original video is actually original, it's a copy of
9    the original.
10        Q. So that's where I am going, so the word
11   original is really not an accurate descriptor of the
12   tab 12?
13        A.    Exactly, and that's the video that was
14   supplied to me.
15        Q. To you?
16        A. And that's the video that every one has,
17   so it's what is available to us.
18        Q. Is the codex for the enhanced video
19   different from the codex on the original video
20   supplied to you?
21        A. That I didn't check, The enhanced video
22   is not enhanced video content wise, the enhanced
23   video is put into a 30 per second rate for timing
24   purposes, and a timer was added. That in my opinion
25   is what is enhancing that video because there i$ no

Page 53

1    enhancement in the video or in the clarity, the
2    enhancement in the norm al state of the word is not
3    occurring on that enhancement video, it's simply
4    enhanced for the forensic evidence that's displayed
5    On it time wise.
6         Q. So there is no codex that's sampled for a
7    particular purpose to get to that enhancement?
8         A. No, that is not what is.
9         Q. The enhancement is a package, it's how the
10   frames are?
11        A. On this particular video, that's what the
12   enhancement is, correct.
13        Q.    The enhancement was an MP4 or?
14        A.    I think so, and I didn't put a lot of
15   emphasis on how it was packaged or how it was copied
16   or how it was transferred, I just needed to
17   understand for my review of the video that it wasn't
18   original and why certain things were happening in
19   the video that I was observing-    As I reviewed and
20   analyzed the contents of the video, which means the
21   movement and interaction and the interplay between
22   the individuals on the video. So my knowledge in
23   forensic video analysis was helpful to me to
24   understand what I was looking at as a use of force
29   and human behavioral expert to identify what I am

JAMIE BORDEN                                          August 25, 2017

Page 54

1  viewing content wise, if you understand the
2  difference between the two.
3       Q.  I do.
4       A.  Thank you.
5       Q.  Looking at Page 4 of  thibit 1?
6       A.  Yes, sir.
7           It reads, I am informed and believe that I
   have received all disclosures and discovery
8  responses produced in this case.  What do you Mean
10 by that?
11      A. Meaning that I have everything that I need
12 from defense in order to complete my objective
13 report. In some cases there are things that are
14 withheld for whatever reason. I don't understand
15 the all the rules, but in this case I was informed
16 that this is the material that's available to ma and
17 I trust that is the material that is available to
18 me.
19      Q.  You have used the phrase, objective report
20 a couple of times or more than a couple of **times**
21 during this session?
22      A.  Yes, sir.
23      Q.  And what do you mean by Objective, when
24 you u29 it in the phrase objective report?
25      A.  The objective report is simply based not

Page 55

1  on my opinion of what the facts are, but what the
2  facts are that I am seeing in the video and any
3  information in the reports. Meaning, when I am
4  doing my report I can only take the information
5  that's available to me and create my opinion, which
6  could be deemed as subjective, but from objective
7  information in the report. So I guess in essence
8  what that means is that from my standpoint,
9  regardless of when, whether I am creating a report
10 for a defense or a plaintiff, the report is going to
11 read the same way, because it's based on the factual
12 evidence that I have been given. The statements
13 that I have been given and my opinions come from
14 those facts and my experience in the field of human
15 factors, human behavioral science, police procedure,
16 use of force, things of that nature.
17      Q.  Is it fair to say that deposition
18 testimony **of an officer presented to you** objectively
19 on a piece of paper?
20      A. Yes.
21      Q. With ink on it, is **different from** whether
22 or not the testimony of the officer is in fact
23 objective?
24      A. Yes, air, and if I have actually a caveat
25 to that at the back of this report, that I am not

Page 56

1  perusing the report for truthfulness issues on the
2  information that I only have the officer's
3  statement. I can only take what the statement is, I
4  can't see into the statement, I can't refute
5  information from that statement, I have to take that
6  evidence because I wasn't there. I have to take
7  that statement and use that statement in my
8  objective report. So yes, there are places where
9  that crosses the line. In many case, and especially
10 in the case of an officer giving his testimony, that
11 testimony in some cases is subjective because that
12 officer is giving you their perception of what they
13 believe is the truth in that critical incident. So
14 the difference between truth and fact may very well
15 be that the officeros perception at the moment on
16 what has hooked his or her attention is now the
17 truth that that officer believes happened, which may
18 vary from the fact at some point. And so there is a
19 subjective side to the testimony, but I only have
20 that to work with. I did not interview the
21 officers, I didn't get any information refuted from
22 the officer in the report, I never discussed those
23 with anyone outside of me getting the clarification
24 and then creating my own report, objectively, based
25 on the information supplied.

Page 57

1       Q.  So you are not using **objectives synonomoua**
2  with true !acts, you are using objective in **the**
3  sense of you're having received a certain data set,
4  which you accept as accurate for the purposes of
5  doing your report, does that make sense?
6       A.  It does, and it's that is a double edge
7  sword, as well. Accuracy, again, an officer's
8  perceptions or their subjective view of the truth,
9  which may differ from the fact has to be compated
10 through out the entire case, where there is a common
11 thread that creates a probable occurrence. So I am
12 taking, again, the facts as they are given to me by
13 the defendants and I am creating my report, based
14 off of those. Now, I can't make the determination
15 and my opinions read as such, that there are
16 determinative factors that are without variability,
17 so my opinions will encompass that as well.
18      Q.  Okay. With number 27, when you say I am
19 not tasked with identifying potential **truthfulness**
20 **issues,** it's at Page 38, the last page?
21      **A.  Yes, that's the** one I was going to turn
22 to.
23      Q.  Let me start again. Paragraph 72 reads in
24 part "I am not tasked with identifying potential
25 truthfulness issues in the statements reviewed and

JAMIE BORDEN                                                    August 25, 2017

---

Page 58

1  do not offer any opinion on the truthueeee on the
2  interviews or the accuracies of the transcribed
3  documents that I reviewedᴀ. This ie what you mean
4  by you're taking as objective for the purpose of
5  your work, the statements made and the statements
6  presented in the documents given to you?
7       A. Correct, sir. And where the connective
8  tissue is in that statement is that I am not
9  creating my reports specifically off of one
10 officer's statement. I em taking all of the
11 collective evidence, whether it be forensic evidence
12 from the scene, what is usable evidence from the
13 video. And my opinions come ft m a combination of
14 what the officer's perception of the fact was and
15 the factual data that exists to me in the form of
16 video or other context and create my report from all
17 of the evidence, where I am not being tasked to
18 identify the officer's truthfulneee in this case,
/9 simply identifying the fact pattern as perceived by
20 the officer.
21      Q.   Okay. Do you recall the testimony of
22 Gildea in this case and the testimony of Hill in
23 this case about where Rill was located when the
24 shots were fired?
25      A. I have, I have that in my report to draw

---

Page 59

1  that out of thin air is asking a lot of me.
2       Q.   Look at paragraph, your paragraph numbered
3  16?
4       A,   Do you have a page number?
5       Q.   Page 24.
6       A. Okay. Page 24, Paragraph 16.
7       Q. Yes, I am sorry, did I say 16, I am sorry
   17.
8       MR. DICIANNI: Page 17.
9       MR- ODIM; Off the record.
10      (whereupon, an off the record discussion
11      was held.)?
12
13      A.   I have paragraph 17, Page 9.
14      Q.   Oildea, you report that Gildea eve that
15 he was at a particular place when he heard the shots
16 fired.
17
18                  (Exhibit 3 was marked for
19                   identification.)
20          Okay, Officer Borden, I am showing
21 you what has been marked as Exhibit 3?
22      A.   Yes.
23      Q.   Would you look at that and confirm that
24 this is a directory listing of all the documents on
25 the thuds drive you gave me?

---

Page 60

1       A.   It appears to be, but it also appears that
2  some things are net on this print out, unless it's
3  in another folder. Yes, sir, this is. Does it
4  appear that things look as they do on the hard drive
5  to you here?
6       Q.   Well, for instance the scene photos are
7  broken down, so that file has not been opened.
8       A. Right.
9       Q.   And then the second page, the top, the
10 crime scene, photos, secondary set, that file has
11 not been opened?
12      A.   Right.
13      Q•   So they are quite a few?
14      A.   Yes, and that's the way this is set up.
15 So there is not 35 pages of, so it's listed in
16 subsets and all of those thumb drives that I
17 received in reference to this case are listed here
18 and all of those subsets are listed on your hard
19 drive so Officer Oildea'e deposition, the Hill
20 deposition, those were all major files inside of
21 that hard drive, which are all listed in directory
22 form. And I am learning from this little piece of
23 this efteounter that's probably not the best way to
24 list it on these sheets.
25      Q.   Okay. Let's go back to that line of

---

Page 61

1  questioning regarding officer Gildea's testimony and
2  officer Hill's testimony. You recall, do you not,
3  that Officer Rill says that he was on the driveway?
4       A. In the area of the driveway, yea.
5       Q. When he did the shooting?
6       A.   Yee-
7       Q. That officer Gildea says that he was at a
8  location when he first heard the shooting, which
9  would have made it impossible for Hill to where
10 he says he was when the shots occurred, do you
11 recall that?
12      A.   Yes, I do. Officer Glides, stated that he
13 was at the southeast corner of the building, and
14 again, that, well let me let you continue asking
15 these questions.
16      0,   So those two different statements from two
17 different officers conflict, correct?
18      A. Yes.
19      Q.   why did you not accept Gildeaⁱ's version as
20 the accurate statement of where Hill would have been
21 when the shooting occurred as opposed to accepting
22 Hill's version?
23      A. Good question. When I say that I take the
24 statements from each officer as the subjective
25 version of what they recall, understanding that

---

JAMIE BORDEN                                      August 25, 2017

Page 62

1 there is many other focuses of attention on this and
2 I cannot sit here and tell you what those focuses of
3 attention were because I wasn't there, I wasn't in
4 their head, knowing what they know. But there is
5 evidence on the video that supports the fact that
6 certain things happened at certain times on the
7 video. So regardless of where, and this is
8 regardless of where Hill states that he shot as
9 opposed to where Officer Gildea says he heard shots
10 fired and where Hill could have been at that time,
11 the evidence reflected on the video that we are
12 viewing and what is available to us on video is the
13 information that I am using to tie the statements
14 together. And in those statements there were two
15 shots fired, two shots were heard, two shots were
16 fired, and there was a resulting death. Those are
17 the facts, as we know them. Where officers were at
18 when those shots were fired becomes almost ancillary
19 to the fact that shots were fired and that Justus
20 Howell was hit and killed with shots fired by
21 officer Hill. That is the fact pattern that exists.
22 Witnesses were constrained waives and focuses of
23 attention and recall, and the way that we formulate
24 memories, down to the chaotic event of the way sound
25 travels and echo, and all of these different things.

Page 63

1 There is a substantial difference in the position of
2 Officer Gildea and his statements and the position
3 of Officer Hill. But the evidence that is reflected
4 on the video puts together a probable chain of
5 events that ended up in officer Hill's shooting
6 Justus Howell, resulting in his death. So that's
7 what I am looking at. The statements that we are
8 looking at from Gildea and the difference between
9 officer Hill, there is a difference and there is no
10 explanation for that difference. It doesn't moan
11 that either one of them are lying, it means that
12 their acceptance of what they believe is the truth
13 in this chaotic critical mass incident where
14 consequences of life and death are occurring that
15 that's what they remember,
16     Q. But it doesn't mean that they are, that
17 one or the other is telling the truth, does it?
18     A.  It's their telling the truth the way they
19 remember it.
20     Q. Na, Well, do you know that for a fact?
21     A. I do know that the officers are giving
22 their account of this incident.
23     Q. But you don't know whether either Gildea
24 or Hill is telling a lie?
25     A. It's impossible for me to say whether they

Page 64

1 are telling a lie for the sake of lying. A lie is a
2 different stipulation than the truth as perceived,
3 differs from fact.
4     Q. Well, you don't know whether they are
5 telling the truth as perceived, Dither Gildea or
6 Hill?
7     A.  I don't. I don't know that they are
8 telling the truth, and I don't know that they are
9 telling a lie, but as it attaches itself to the
10 video evidence that I have available to me, the
11 statements coincide, generally, and the conson
12 thread is that two shots were fired by Officer Hill
13 at a location behind, to some extent, Justus Howell,
14 the round struck him and he went darn and he was
15 deceases.
16     Q. Wouldn't human dynamics, as you talk about
17 in your report, be different if Officer Hill or the
18 human dynamic analysis different if Officer Hill was
19 shooting from a distance as opposed to shooting when
20 he was standing over?
21     A.  I am not sure I understand the question,
22 is it a statement or question, I am sorry?
23     Q. Would the human dynamic analysis, might
24 the human dynamic analysis conclude a different
25 conclusion if Officer Hill had shot Howell from a

Page 65

1 distance as opposed to shooting Howell almost
2 standing over him?
3         MR. DICLANNI: I will object to the form
4     of the question. You can answer.
5     A.  Yes, I am a little lost on the form of the
6 question. The obvious answer is, yes, the dynamic
7 would change if there was conclusive forensic data
8 that said or that reflected that he was standing
9 over Justus Howell when he fired his weapon, it
10 would be a different dynamic, yes.
11     Q. Do you know how far Officer Hill says he
12 was from Justus Howell, well, let me re-ask that.
13 Does Officer Hill ever say how far he was from
14 Justus Howell when he shot?
15     A.  I don't recall a specific distance, I only
16 recall that he stated that there were a series of
17 turns and I can read it from the report, a series of
18 turns, but not being there and having a triangular
19 sector to get an actual distance, I don't remember
20 him saying exactly how far he was.
21     Q. Did you arrive at some --
22     A.  I never stated --
23     Q. Consideration of how far Hill was when he
24 shot Howell?
25     A. No, I never make a statement abut the

aAMIE BORDEN                                    August 25, 2017

Page 66

1   distance between the two when shots are fired.
2        Q. But you would agree that if Hill was, that
3   the human dynaadas would be different, the farther
4   away Hill was from Howell when he shot?
5            MR. DICIANNIr I will make the same
6   objection to the form of the question.
7            MR. ˚DIM: Okay.
8        A. That's a broad straw question. The human
9   dynamic, I can't predict human dynamics based on
10  different evidence than I see. I can only run
11  analysis the human dynamics that exist in the
12  evidence that I am looking at, am I convoluting that
13  too much?
14       Q. No, not anymore than my question. Let me
15  ask it this way- what factor does distance have in
16  your opinions and conclusions about the Hill
17  shooting of Howell?
18       A. Distance.
19           MR. DICIANNI: I am going to object to
20  form of the question.
21       A. I can tell you that distance in and of
22  itself only creates a potential for a longer
23  decision making process, but that again that
24  decision making process that is occurring during
25  this critical incident is happening and it's nearly

Page 87

1   impossible to make a determination where decisions
2   are being made. If there is distance of any sort
3   between the shooter and the subject, what comes into
4   play is distance creating an issue of time and a
5   additional time to be accurate, or to ensure that
6   accuracy is in place, And that's what Fitt's law
7   is, it simply says that distance creates in
8   potential situations additional time to gather your
9   target. And these are tests that are done in
10  controlled environments, most of them on a computer.
11  It's simply a concept that distance can potentially
12  create more time in the decision making process.
13       Q. Would that be the only factor that
14  distance would have in your consideration of the
15  facts in this case?
16       A. As far as the human factors?
17       Q. Yes.
18       A. The distance is not so much a part of the
19  human factor, the factors that we are talking about
20  is the interplay between two subjects and a critical
21  incident. So distance has that effect. It has the
22  potential to create a longer decision making
23  process. And when I say longer, I am talking about
24  milliseconds. As an example, it's very quick to
25  draw and shoot at a target that's three to five

Page 68

1   feet, say the distance that you and I are. A flash
2   shoot, where you are drawing your weapon and firing,
3   you are literally punching your weapon out onto
4   target at the same time you are pulling a trigger,
5   so it's a very rapid process because distance isn't
6   an issue in the decision to he accurate, it's going
7   to be accurate based on your ability to use that
8   weapon_ Now, you add distance and that becomes now
9   an issue where the weapon comes out and you have to
10  take time to aim, it's a very simple concept. So
11  that part of the dynamic, and remember the human
12  dynamics, again, I can't create human dynamics and
13  try to put them into the template, I have to look
14  into the template an extract the dynamics that
15  exist. There is distance at all times between
16  Officer Hill and Justus Howell during this video up
17  to a certain point where Justus Howell goes down.
18       Q. You don't know what that distance was?
19       A.  I don't, I don't know that distance, it's
20  chaotic, there is movement involved, all we have is,
21  if we knew the distance of the driveway, and I
22  didn't take time to get a, first of all a seen
23  visit, where I can get a distance of the driveway
24  and make calculations as to approximately how far,
25  that never happened. But it also doesn't change my

Page 69

1   opinions on the way that distance affected the
2   interplay between the two.
3        Q. How would you know that measurements that
4   you didn't take wouldn't affect your opinion?
5        A. Because what I am seeing on the video
6   exists, the shots were fired and the shots were
7   accurate, and there is a window of time in there
8   that the decision had to he made for those shots to
9   be fired. So I can only take what I see and what
10  statements I have to collectively come up with what
11  is the most probable fact pattern.
12       Q. But you don't see the distance on the
13  video?
14       A.  You see distance, you don't see the
15  distance.
16       Q. What is your consideration of the distance
17  that you see, how many feat?
18       A,  I can't make just a guess about that, that
19  would he irresponsible, but that distance doesn't
20  affect my opinion that shots were fired in that
21  window Of time-
22       Q. I understand. But if you had gone to the
23  scene you would have played measurements, correct?
24       A.  If I had been at the scene, yes.
25       Q. And would you have made measurements in

JAMIE BORDEN                                    August 25, 2017

Page 70

1  feet and yards?
2      A.   Yes, and I would have, had that been
3  important to my opinions, but it wasn't.
4      Q. And the reason distance and feet and yards
5  is not important to your opinion is precisely what?
6      A.   It's just, it doesn't change the fact that
7  shots were fired and Justus Howell was hit
8  accurately with those two rounds and that he went
9  down in a specific location, which is depicted in
10 the photographs of the scene. So an exact footage
11 isn't going to change any of those facts.
12     Q.   Okay.
13     A. And allow me to continue just for a
14 moment, The amount of feet between the two doesn't
15 change any of the facts that this occurred, and it
16 doesn't affect the ultimate decision, in my opinion,
17 to use deadly form. The feet in distance doesn't
18 apply to that opinion. Had he been any closer or
19 any farther away, by one foot or five feet, because
20 I can give you, I can give you a guess, but that
21 would be within plus or minus ten to 15 feet, but
22 that ten to 15 feet doesn't make the difference in
23 the fact pattern I derived.
24     Q. You used the phrase accurately, how do you
25 know that Hill was aiming to kill?

Page 72

1      Q.   Okay. And if he didn't say he was firing
2  two rounds to stop Justus Howell, right, then you
3  are making an assumption that he was shooting to hit
4  Justus Howell?
5      A. No, the police procedure, my experience in
6  police work and an officer of the law involved in a
7  critical incident will never fire their weapon to
8  not hit someone.
9      Q. I am not talking about the generalities, I
10 am talking about this specific officer in this
11 specific situation, and I am asking you to put aside
12 what you generally assume or know or is policy and I
13 am asking you, do you know for a fact what this
14 officer's intention was, no, do you know for a fact
15 that this officer's intention was to hit Justus
16 Howell with his bullets?
17     Yes.
18     Q.   And you know that because Officer Hill
19 said so?
20     A.   officer Hill said yes, that he feared for
21 his life, he drew his weapon and he shot alstus
22 Howell.
23     Q.   I am not asking whether he shot?
24     A.   That's what he stated, I can only tell
25 you.

Page 72

1      A.   I don't know that he was aiming to kill, I
2  **only** know that he was aiming to hit Justus Howell.
3      **Q. How do you know that?**
4      A,   Because that's what his statements are.
5      Q. He said he was aiming to hit?
6      A. He feared for his life and used deadly
7  force to stop Justus Howell,
8      Q. But you are making an assumption that he
9  was shooting to kill?
10     **A.    No, I** didn't say shooting to kill.
11     Q. Okay. You are making an **assumption that**
12 he was shooting to hit Howell?
13     A.   Absolutely making that an assumption
14 because when an officer fires his weapon, at least
15 procedurally speaking, when an officer draws his
16 weapon and fires it, the intention is to hit the
17 target,
18     Q. But you don't know that was his intention?
19     A.   Yes, I do.
20     Q.   You are assuming?
21     A.   No, it is definitively his intention,
22     Q. How do you know that?
23     A. **Because** he stated he drew his weapon, his
24 weapon was drawn, he saw a deadly threat and he
25 fired two rounds to stop ilustus Howell.

Page 73

1      Q.   No.
2      MR. **DICIANNI: Let's** get a question and
3      then an answer.
4      Q.   I am not asking you whether he drew his
5      weapon.
6      A. Okay.
7      Q.   I am not asking you whether he feared for
8  his life?
9      A. Okay.
10     Q.   I an not asking you whether he pointed his
11 gun **at** JUntua Howell?
12     A. Okay.
13     Q.   I an asking you whether or not you know
14 for a fact that when he drew his **weapon and** feared
15 for his life that he was airing to hit Justus Howell
16 with his gun with his weapon?
17     A.   Yes, definitively.
18     Q.   **And** you know that not because Hill said
19 that?
20     A.   Yes, that's because of his statements.
21     Q.   He didn't say that he was airing to shoot
22 **Jtatus Howell, did he?**
23     A.   I don't remember exactly what he said.
24     Q.    You are, in fact, making an assumption
25 about his intention at any time, isn't that what is

jANITM BORDFN                                                      August 25, 2017

t'nge 74

1 happening here?
2      A. No.
3      Q, Wouldn't distance matter here if in
4 determining whether or not Hill was telling the
5 troth about where he was when he shot Howell,
6 wouldn't it matter?
7      MR. DICIANNI: I will object.
8      Q.  Wouldn't it matter to your assessment of
9 whether or not to agree with Hill that Hill was
10 standing on the driveway when he shot Howell?
11     A. Can you refine the question for me,
12 counsel, I am sorry?
13     Q.  If Hill was not, if Hill, was closer to
14 Justus Howell, when he fired his shots, which is the
15 caaclusian that you would have to draw if Gildea's
16 version of what happened is accurate. wouldn't that
17 matter in your consideration of whether or not to
18 believe Hill's version?
19     A. I consider both statements in this and
20 then I did a full analysis of the contents of the
21 video and the interplay between human beings
22 reflected on digital video. So the statements that
23 are made are perceptions that the officers recall
24 and made statements about. The evidence that is
25 reflected on the video is the facts, as they

Page 75

1 occurred and are reflected on digital video. The
2 statements about these things and how the interplay
3 goes on are relevant to the investigation, but the
4 occurrence that happened is reflected on video tape
5 and cannot be refuted. So I can only assume that
6 somebody is recalling information, that's an
7 assumption, that is recalling information, recalling
8 it from memory about where they were at when the
9 occurrence took place. We have one person that is
10 separated by an entire building that is actively
11 pursuing and working in concert with another officer
12 that's chasing an armed subject.  Their recall of it
13 varies from Officer Hill's recall of it. Officer
14 Hill's recall of it lines up nearly perfectly with
15 the dynamic of human movement and timing with shots
16 fired, placement of the shots and the subject going
17 down and a catastrophic incident occurring, causing
18 the subject to go down, that's reflected on video
19 from comparison of frame to frame activity. So, yes
20 the statements are important, but the fact of the
21 matter is, is that what happened on video happened
22 and that's the only thing I can do is take that
23 information, I can't take officer Gildea's statement
24 to try to create something different on video. The
25 video exists, so Officer Gildea's statements can't

Page 76

1 change what happened on the video. It can change
2 what the perception of where Officer Hill was at.
3 Officer Hill's statement may not even be very
4 accurate, but what is reflected on the video cannot
5 he changed by either statement. And thatle the one
6 thing that we have in this case is we have video
7 evidence that reflects an occurrence. That is
8 happening in real time. So that being the factual
9 evidence to the point that video evidence can be
10 factual, I can't have either statement Change what I
11 am seeing on the video.
12     Q. Okay. You have a eetticin in your report
13 about distance, don't you, your paragraph numbering
14 24, which is at, I think, Page 14, you consider
15 distance important enough to have a separate section
16 on it, didn't you?
17     A. Thetis distance from the camera to the
18 location where the occurrence happened. That has to
19 do more with the defined articulable visible
20 evidence from the video as it relates to the
21 distance from the camera to the scene, which I also
22 don't have an exact distance, hut what I do have is
23 enough distance where the available data on the
24 video is profoundly affected by that distance. we
25 know that camera is not close to the scene, we know

Page 77

1 it's a distance away from the scene, which causes
2 artifacts on. the video, which causes a lack of
3 articulable edges in the video. The distance T am
4 referring to here ie in the camera distance from the
5 scene, not the distance between two players in the
6 scene.
7     Q. Okay. Do you have any ballistics
A training?
9     A, No, I have no ballistics training.
10     Q. Do you}mow, you know that two bullets hit
11 Justus Howell, correct?
12     A.  Yes, Sir-
13     Q. Do you know which of those two bullets hit
14 firsO
15     A.  That's imposeible to knew.
16     Q. Do you know?
17     A.  It's impossible to know.
18     Q. So it's impossible for you to know?
19     A. It's impossible for anyone to know.
20     Q. Do you have ballistic training?
21     A.  I do not.
22     Q. How can you, without Ballistic training
23 make a statement as definitive as you just made that
24 it is impossible for anyone to know?
25     A.  Ballistics training doesn't identify gaps

JAMIE BORDEN                                          August 25, 2017

Page 78

```
    in time or things of that nature. There were two
 2  shots fired in rapid succession, based on the
 3  statements we see or we read, and based on the
 4  evidence that's visible to us Qn video, Ballistics
 5  is the study of the impact of a bullet on a surface.
    The Ballistics of a bullet, the speed in which it
 7  travels. There is no possible way for anyone, in my
    opinion, to make a determination which of two
 8
 9  bullets fired in rapid succession hits a subject
10  first or second.
11      Q. Do you know where the bullets, the two
12  bullets hit OUstus Howell?
13      A.  I don't have exact location.
14      Q. Do you have any location?
15      A, I actually don't, I remembered talking
16  about it on the phone with counsel, but there was,
17  had no diagrams, I had nothing to work from on that.
18  The important part of my synopsis of this, again, I
19  am not a ballistics expert, I work with ballistics
20  experts, and my expertise comes from the use of
21  force, and the interplay between subject and
22  officer.
23      Q. Ballistics also includes the trajectory
24  of, you know, a moving bullet through the air?
25      A. Sure-
```

Page 79

```
 1      Q. To it's target?
 2      A. Right.
 3      Q, Were you aware that Lewinaki did a report
 4  in this case?
 5      A.  Dr. Lewinski is the one who suggested me
    for the case.
 6      Q.  Were you aware that he did a report on
    this case?
 9      A. You know what, yes, I was aware that he
10  did a report.
11      Q. Have you read that report?
12      A.  I briefly glanced au it.
13      Q.  When did you look at that report?
14      A,  I can't remember, it's been a long time
15  ago. But that report was Bill Lewineki's report, my
15  report was mine.
17      9.  I understand that. You did not review
18  that report, did you, in connection with this case?
19      A.  I looked at that report, it had nothing to
20  do with the review of this case, though. I won't,
21  my protocol is I am not going to, I won't even read
22  a D.A.'e report before I conduct my own analysis and
23  my own report. Anything like that, that happens,
24  that : feel my opinion or the opinion of this case
25  could be affected by, I would have to get from
```

Page BC

```
 1  counsel and something that I would have to request,
 2  because my opinions come from apply experience and
    my treatment to the analysis of this case.
 3      Q.   The Lake County Task Force?
 4      A.   Yes.
 5      Q.   Prepared a report in this case, that's
    correct?
 6
 7          MR. DICIANNI: Lake County Major Crimes
 8
 9      Task Force prepared.
10      Q.   Prepared a report in this case
11  contemporaneoua with the incident, is that correct?
12          MR. DICIANNI: I will object to the form
13      of the question.
14      A.   Is that question to me?
15      Q.   Yes.
16      A.   I have no idea.
17      Q,   Have you ever heard of the Lake County
18  Major Crimes Task Forces?
19      A.   I have, yes.
20      Q. Have you ever seen their report, their
21  full report on this case?
22      A.   No. Am I correct in saying that's the
23  multi jurisdictional task force out of this
24  district?
25      Q.   Yes. You have not seen the medical
```

Page 81

```
 1  examiner report in this case, have you?
 2      A- No, I have not.
 3      Q. None of the documents listed on the thumb
 4  drive that you gave me today referenced the police
 5  practices of the Zion Police Department, is that
 6  correct?
 7      A.   That's correct,
 8      Q. You didn't review any of the police
 9  practices of the Zion Police Department in
10  preparation?
11          MR. DICIANNI: You mean the policies?
12          MR. ODIM: What did I say?
13          MR. DICIANNI: police practices.
14      A.   No, I did not review the policies.
15      Q. So you don't know whether or not Officer
16  Hill's behavior was consistent with, was within
17  policy of the Zion Police Department?
18      A.   I honestly do not,
19      Q. So when you make reference in your report
20  about standard police practices, you are not making
21  reference to?
22      A.   Nothing specific to Zion, no.
23          MR. DICIANNI: Let me remind you, let him
24      finish the question.
25      A. Sorry.
```

JAMIE BORDEN                                    August 25, 2017

page 62

1    Q.    It's fair to say that standard police
2  practices are riot part of the totality of
3  circumstances that you considered in making your
4  report in this case?
5    A. They are a part of my report, yes.
6    0. How do you know that standard police
7  practices are applicable to the Zion, police
8 Department?
9    A. Twenty years as a police officer.
10   Q. You didn't read any of the Zion police
11 policies?
12   A.    Right. There is a certain level of
13 assumption that they get standardized training about
14 firearms and about pursuit and about the recognition
15 of deadly threats, and that is the general aspect of
16 this case that I am looking at is not what they are
17 policies on deadly force are because we have an
18 officer that's using deadly force in response to a
19 deadly threat, based an the reports and the video.
20 So in looking at this, I don't necessarily rely on
21 whether the policy says that this is reasonable, but
22 how it's reasonable, when I am looking at things of
23 this nature, I am applying Graham versus Connor,
24 am applying all my knowledge of deadly force and
25 threat accuses and looking at the human factor side

Page 83

1  of the decision making and things of that sort.
2    Q.    But you didn't look at any Zion training
3  protocol, for instance, for using deadly force?
4    A.    No, sir.
5    Q.    You didn't look at Officer Hill's training
6  history background?
7    A.    No, pit,
8    0.    You have no idea whether he is a novice
9  shooter or an expert shooter?
10   A,    I don't, but let me dovetail this into
11 that, that knowledge of either of those statuses
12 doesn't change the fact that shots were fired, a
13 subject was hit and deceased.
14   0.    You don't know whether or not Justus
15 Howell had a gun during the incident that you
16 prepared your report about?
17   A.    Yes, I do know that Justus Howell had a
18 gUr"
19   Q.    How do you know that?
20   A.    The statements, the photographs of the
21 scene, the original
22   0. You are making an assumption, are you not?
23   A.    When you say that, I understand what you
24 are saying, I wasn't there, and I didn't see the gun
25 in Justus Howell's hand. Based on the information

Page  84

1  that I have received, I an assuming that .Justus
2  Howell had a weapon in his hand, based on all of the
3  facts that I see on video, the reactions, actions of
4  the officers and the statements.
5    0.    Okay. You don't see a gun in Justus
6  Howell's hand on the video, do you?
7    A.    You can't see a gun in his hand, you
8  cannot.
9    Q.    Meaning you cannot?
10   A.    I don't think that anyone can see a gun in
11 Justus Howell's hand that data doesn't exist on the
12 video, it's not articulate enough. You also cannot
13 see a weapon in the officer's hand.
14   Q.    Would you look at Page, rather paragraph,
15 your paragraph numbered 26, which is at Page 16 of
16 the document. Page 17 of the document?
17   A.    It's on 16?
18   Q. Yea.
19   A.    My bad.
20   0,    At line 15, you say it's impossible to
21 precisely interpret Mr. Hill's orientation and
22 position in relation to Howell's position?
23   A,    Left or right?
24   Q.    Do you mean this, do you not, by looking
25 at the video alone?

Page  El 5

1    A. No, there is other evidence, photographic
2  evidence, that shows where the subjects were running
3  and where they converged.  So when I am saying
4  laterally, that means angle, laterally across two
5  dimensions of the video. Sa it's nearly impossible
6  to tell the orientation to the narrowest foot. But
7  there is lateral separation between the two. Now,
8  general positioning can be determined based on what
9  we are seeing in the video.
10   0, Okay. Let's clarify. Let me clarify
11 something. Ho to Page 16 of the doe orient?
12   A. Okay.
13   Q, The two images on Page 16 axe photographic
14 extracts of the video?
15   A.    Yes, it's a screen shot.
16   Q.    It's a screen shot. And as presented in
17 this printed version, the clarity is not the emne as
18 in the video version, which may not be that clear
19 either?
20   A.    It's a fairly close representation of the
21 blown up video. And so this picture is a fairly
22 close representation, and the purpose of the photo
23 is to show the pixel block and how we lose
24 articulate details.
25   Q. And so what is the picture on the left of

JAMIE BORDEN                                    August 25, 2017

Page 86

1 Page 16, is that the exact sire of the picture on
2 the video?
3         A,  No, that's blown up and a screen shot
4 taken so that you can see that even with an enhanced
5 larger version of it you don't get enhanced detail
6 in the photo.
7         Q. So what you have got is two progressively?
8     A.  Closer, right.
9         Q. And so do you know what the enlargement
10 factor is for the first?
11    A. NO.
12     Q.   110 percent, 150 percent, 200 percent?
13    A. No, they are considerably larger than
14 that. On the next page it will show you that one
15 is, oh, it's too small for me to read, my eyes are
16 failing me. The percentage of enhancements is on,
17 one is 800 percent and one is 11,000 percent. It's
18 basically just an example to show that no matter how
19 much closer you get in terms of zoom on a video, on
20 pictures that exist, it doesn't create data that
21 does not exist on the video. It's a simple
22 explanation that in these video cases, like this,
23 where the data does not exist, no matter how much
24 you enhance it, size wise, the video will not create
25 data that dose not exist. Does that make sense?

Page 87

1     Q. Yes, it does. And the look at the images
2 ie on Page 17?
3     A.  Yes, sir.
4     Q. The image on the right-hand side of the
5 page?
6     A. Right.
7     Q.  It looks like it has two circles on it?
8     A. Correct.
9     Q. Are those, is that your handy work?
10    A. That is simply me circling two points of
11 interest in video that has been enhanced.
12    O. I just want to be clear that the image on
13 the left doaan't have?
14     A.  The Circles?
15    Q. Right.
16    A. Yes,
17    Q. Look at Page 18, there are three images on
18  Page 18.
19    A. Yes.
20    Q. The two top images are from where?
21    A. One of them is a photograph from the
22 scene, the one on the left-hand side, the other is a
23 still shot front the video with Justus Howell running
24 to the rear of that vehicle. The vehicle is
25 connected with a lino between the two photographs.

Page 88

1     That vehicle is the vehicle that is sitting on scene
2     during the investigation. So the silver vehicle
3     that you see on the left has a line drawn to it to
4     the vehicle sitting on the right.
5         Q. Bo you are just making a representation
6     that the line from the photo image?
7         A. Yea.
8         Q. To the still shot of the video image is
9     just saying these are the same cards?
10        A. Yes.
11        Q.   That's all it is?
12        A.  Yes, it's a connecting tissue between the
13     vehicles in the scene,
14        Q. All right,  Now, the third image is from a
15     crime scene photo, is that correct?
16        A,   That is.
17        Q.   And the car represented in the third
18     picture is the same as the oar in the photograph in
19     the upper left?
20        A. Upper left and right, that's correct.
21        Q. Okay. There are two lines on the third
22 picture?
23        A. Correct.
24        Q. One to the right or in front of the car?
25        A. Correct.

Page 89

1        O. The distal point is at the front of the
2     car?
3        A. Correct.
4        Q. The distal paint on the line, on the
5     second line on the left is at the rear of the der?
6        A. Correct,
7        Q.   And there are X marks at each of the
8     distal points, front and back of the car. Did you
9     put those X marks there?
10       A.  I did.
11       Q.   And then the line, there are lines from
12    each of those two X marks into the foreground?
13       A. Correct.
14       Q.   You also drew those lines?
15       A.  I did.
16       Q.   Those lines are not drawn based on any
17    measurements that you have, correct?
18       A.  It's not measurements, it's information
19    that's available on the video.
20       Q.   It's conceptual, these lines are not meant
21    to show an accurate path?
22       A.   Not an exact path, no. Can I explain
23    those lines to you?
24       Q.   Sure.
25       A.   So what this is video is two dimensional.

JAMIE BORDEN                                        August 25, 2017

Page 90

1  we don't get lateral distances between subjects in
2  the video. So everyone who views this video assumes
3  that ,lustus Howell is in front and the officer is in
4  the rear, and many of them equate that to a parallel
5  pursuit, meaning this, and that's not what is
6  happening. The officer is hare, JUstus Howell is
7  Out here.
8      Q.   I mean, if you could try to phrase that in
9  words?
10     MR. DICIANNI: Try t] describe it in
11     words.
12     A.   Got you. Justus Howell is at the rear of
13 the vehicle in the photographs, officer Hill on the
14 video is in front of or close to the building in the
15 photographs in the video. Sc it shows that there is
16 lateral disparage between the individuals running in
17 the video, they are not running parallel or
18 perpendicular, straight in front of each other.
19 They are at an angle. So there is a distance
20 between them, right to left, not only forward and
21 backwards. So during this run that we see on the
22 video, the place where these lines come to a halt is
23 where Justus came to a, where Justus fell during
24 this incident. So they are conceptual that we don't
25 have an exact pattern, but on the video the factual

Page 91

1  evidence shows that they are running, that JUStUO
2  Howell, something catastzwphic happens, he falls,
3  and he falls in this area. The example shows that
4  it isn't straight in front. So there is an angle of
5  approach on Officer Hill and Justus Howell. It is
6  not directly behind. There is a distinct angle of
7  approach that is not considered in video inmost
8  occasions.
9      Q. Now, the angle of approach, you are saying
10 that the third picture shows the angle of an
11 approach?
12     A. An approximate angle between the running
13 individuals.
14     Q. And that's all it shows?
15     A.   Yes, that's it. That's the only, that is
16 what the purpose of those pictures is.
17     Q. This static third picture doesn't account
18 far the difference in time at which Justus Howell
19 passes the rear of the vehicle?
20     A,   No.
21     Q. At which Officer Hill passes the front of
22 the vehicle?
23     A.   Correct, that's depicted on the video.
24     Q. so this static picture may be deceptive in
25 that it looks as if it shows that at the X marks

Page 92

1  Justus Howell and Officer fill are one behind the
2  car respectively, and two in front of the car at the
3  same time?
4      MR. DICIANNI; I object co the form of the
5      question. You can answer.
6      A.   The photographs simply show, and the
7  purpose of them is to show that the individuals were
8  not directly front and back of each other.
9      Q. okay.
10     A.   The pictures are simply to show that there
11 is an angle of approach between the two subjects
12 running. That is an interplay dynamic that's very
13 important in this case. So that is a conceptual
14 video or picture that shows that there is a minimum
15 of the width of that vehicle between the two,
16 Probably a foot or two or more between each one at
17 the point where he is running against the front of
18 the buildings, which we don't know exactly his
19 position there. We know that's he is in front of
20 the vehicles, and if he is in front of the vehicles
21 from the camera angle, and he is in front of the
22 building because we can see the movement and we know
23 that Justus Howell is behind the vehicles, and
24 running at a left to right distance, as well as a
25 front to back distance, that's what that picture is

Page 93

1  for.
2      Q. Now, you have a star, squiggly star?
3      A.   Yes, I would call it a star.
4          At the and of the line in the foreground
5  of where you, I assume Justus Howell?
6      A.   It's an approximate location. It's
7  approximate location for where Justus Howell ended
8  up on the grass in that area, it's not, it is not
9  designed as a specific or an exact accurate
10 location. It was in this area where the items were
11 in the grass area and where the incident came to a
12 close.
13     Q.   So I mean, do you know whether there is a
14 tree in this area that's depicted on that third
15 photograph?
16     A.   Absolutely, you can see it in the video,
17 yes, there is trees, they exist.
18     Q.   so Justus Howell may have fallen in this
19 general area, but it may not be depicted in this
20 picture exactly?
21     A.   It's a general depiction based on the
22 forensic videos from the scene.
23     Q.   I am just trying to figure out how general
24 or how accurate this is. I mean, could Justus
25 Rowell have fallen just outside the frame of what is

JAMIE BORDEN                                          August 25, 2017

Page 94

1 depicted in this third picture?
2    A. No, the video, the photographic evidence
3 shows that he was in this area.
4    Q. Okay. How big is the square footage?
5    A.  I am not certain.
6    Q.  Okay. Are you saying that just outside
7 the frame of the foreground of this third image,
8 isn't part of the general area that Justus Howell
9 may have fallen in?
10   A.  Well, that's not the purpose of the
11 photograph. The purpose is specifically to depict
12 the lateral distance between the two subjects,
13 that's it.
14   Q. All I am trying to do is be accurate about
15 what this photograph may be taken to mean. Is it
16 fair to say that this photograph should not be taken
17 to represent where Justus Howell fell?
18   A-   It's generally where he fell.  It can be
19 taken as generally in the crime scene where Justus
20 Howell came to rest.
21   Q. And does generally include just outside
22 the frame of this picture?
23   A.  I can't tell you definitively that it
24 doesn't say that, but I can tell you that the items
25 Justus Howell was carrying and where they worked on

Page 95

1 Justus Howell are all in this area. Now, they could
2 have thrown those items, and it could have been is
3 circus there, I don't know. But from the pictures
4 that we have available to us, both you and us, show
5 a general area of where he came to rest and it's in
6 that area where that star is at. It's not exact, it
7 could be feet away, I don't know that, but the
8 pictures depict where Justus Howell came to rest.
9    Q. Yes, that we don't have a debate about?
10   A. Okay. So yes, this photograph is
11 specifically to show the angle, that's it.
12   Q. Now, the line that is meant to show the
13 path, conceptual path of Officer Hill ends close to
14 the line that is meant to show the conceptual path
15 of Howell?
16   A.  Just to correct, to show a conceptual
17 conversion to represent the angle of approach.
18   Q. Using the third picture, can you say where
19 officer Hill was standing when he shot?
20   A. NO,
21      MR. DIC/ANNI: Let me clarify just using
22 the third picture?
23   A. The third picture at the lower?
24   Q.  Yes. Do you see the sidewalk that was
25 talked about by officer Hill?

Page 96

1    A.  Yes, sir.
2    Q.  In this third picture?
3    A. Yes.
4    Q. Would you look at your paragraph, 78, at
5 Page 19 of this document, line number ten, or rather
6 from line number six through line number 12, would
7 you read to yourself?
8    A. These general movements can be observed
9 and identified by making comparisons from frame to
10 frame in the broad view of the video in identifying
11 certain behaviors in each participant in the
12 incident. However, considering the limitation of
13 video, the statements of officers and witnesses must
14 he considered as the structure for fact finding and
15 subsequent opinions. The data gleamed from the
16 video review and analysis and my report are
17 considered as supporting investigative data.
18   Q. Do I read, no, do you mean generally, by
19 this that the data you gleam from the video is of
20 less value than the statements of the officers and
21 the witnesses?
22   A.  I am not putting a value on either,
23 because we run into limitations with officer's
24 statements and recall memory and we run into
25 limitation with video. The video is supporting the

Page 97

1 facts that are given to us by the officers, and as I
2 said earlier, there are going to be disparages
3 between those fact patterns as we run into with
4 Gildea and Hill, and where the shots were heard and
5 those types of things. tut the information that's
6 on the video cannot be changed by the contents of
7 the statement, if that makes sense. So neither is
8 less valuable than the other, but the video in this
9 case, as in any case, is supporting the statements
10 that exist from not only officers, but potential
11 witnesses and everyone else involved in the
12 incident.
13   Q. You used the phrase in the paragraph you
14 just read, structure of fact finding?
15   A.  Structure for fact finding.
16   Q. And subsequent opinions.
17   A. The statement of the officers and
18 witnesses must be considered as the structure for
19 fact finding in subsequent opinions.
20   Q. Isn't that because of the limitations that
21 you find in the video, isn't that what you say in
22 the introductory clause?
23   A. Absolutely. We have limitations in video,
24 we have talked about those in the earlier part of
25 this report. So when we are looking at the

JAMIE BORDEN                                         August 25, 2017

Page 9B

1  statements from the officers, especially the
2  involved officer, those statements create the
3  structure in which we use to make, to look at the
4  video to support what the officer's recall of that
5  incident was. And that it may not, when I say
6  support, it may not always line up factually. It's
7  not in place to say that the officer was correct or
8  not correct, but that's the structure that we start
9  to view the video in.
10     Q. Okay, Page 29, I am sorry, Paragraph
11  Number 29, it's on the same page. This is the
12  reference to BP4 that I made earlier in this
13  deposition, what was the enhanced version was given
14  to you as BP4,, so it was converted, the original
15  video was not an MN?
16     A.  I don't believe it was, but the video
17  codes is actually on that, so I believe you will see
18  it's not an MP4.
19     Q.  And you don't know what the conversion
20  factor from the original to the HP4?
21     A.  Can you explain to me what you mean by
22  conversion factor?
23     Q. You know what the conversion values were,
24  I em using lay terms to say this. When you copy
25  video from one codec to another, you can set up

Page 99

1  parameters, right, for the copying?
2     A. To a certain extent you can. The problem
3  is that when a video is copied, regardless of what
4  parameters you set, compression takes place. That
5  compression is part of what we look at in codec and
6  all those other things. And it's extremely
7  confusing and convoluted. The bottom line is that
8  compression exists, meaning that the video is going
9  to lose some clarity, possibly, during that
10  compression, but there is no conversion factor, and
11  I have no idea what was used in the enhancement
12  because I received that video named, enhanced, none
13  of that happened in my video studio.
14     Q. Okay.  The paragraph 31 of your report, on
15  Page 20, you have a heading here called preexisting
16  information.  The first sentence of that paragraph
17  reads the quantity and quality of the information
18  dispatched was information given to officers in a
19  consistent method as related to other similar calls
20  for services. You don't have any other information
21  about similar calls for service in Zion, do you?
22     A. No, but there was no statement that this
23  call was out of the ordinary. So I am not doing a
24  comparative check to what seems to be ordinary, I am
25  making a statement based off the fact that no

Page 100

1  officer involved in the statements said this call
2  seemed out of the ordinary in comparison to any call
3  for service.
4     Q. So the absence of comments by the officers
5  about similar calls allows you to say that the
6  particular call in this case was consistent with
7  similar calls for service?
8     A.  What you are saying is pretty definitive.
9  I am making the statement there that the information
10  received by the officers, in none of their
11  statements did they say it was inconsistent or
12  raised any flags as compared to any other call for
13  service.
14     Q. The second sentence of your paragraph
15  Number 31 says a reported fight further, a reported
16  tight call with shots fired is not a high frequency
17  call, and such calls post very real threats to
18  officers and to the public.  You don't have any
19  evidence that shots fired is not a high frequency
20  call at Zion, do you?
21     A.  Yes, I mean, not from the officer, but a
22  shots fired call with a fight involved is not a high
23  frequency call. That's, in general, across the
24  United States being a statistician that I am, those
25  calls are not a high frequency, high exposure call

Page 101

1  to officers, they happen once in a while.
2     Q.  But you don't know that for a fact in
3  Zion?
4     A.  No, I have no factual data, that call is
5  not a frequent call in the police world. Those
6  calls happen once in a while, but that's a very
7  Serious call, it's considered a high risk call for
8  service.
9     Q.  Is it fair to say you are applying a
10  generalization to the Zion Police Department?
11     A.  Yes, absolutely fair.
12     MR. MC:ANN': Off the record.
13         (Whereupon, an off the record discussion
14  was held.)
15     Q.  Would you look at your paragraph numbered
16  34, which is at Page 20?
17     A.  Four, I have it on Page 21, on.,.
18     Q. Twenty-one, sorry?
19     A.  Yes.
20     Q.  Page 21. I am sorry, your paragraph
21  number 35?
22     A. Okay.
23     Q.  You say in lines 22 and 23 of this or 23
24  24 of this that Officer Felt, based upon
25  objective facts learned up to that point, what

U.S. Legal Support, Inc.
(312) 236-8352

aAMIE BORDEN                                                    August 25, 2017

Page 102

1    objective factors are you referring to?
2         A. His view of the weapon, the fact that the
3    subject was involved in a fight, had fired the
4    weapon, These are coming from the statements of
5    Officer Hill. And the information that he had at
6    that point is he has got a visual on the weapon, he
7    sees the weapon, he sees Justus Howell spotting him,
8    looking back over his shoulder at him, as the
9    pursuit ensues. And all of those facts, those
10   objective facts that are his opinion, in his
11   statements he is saying that he sees these things
12   that are occurring in front of him, and those aren't
13   based on a fact that he could potentially have a
14   weapon, but a guess that he has a weapon, but he
15   sees the weapon, he sees the weapon, he sees Justus
16   Howell looking back, so he is giving those facts to
17   us, objectively, it's not his opinion that he saw
18   happened, it's what he saw.
19        Q. If Jtatus Howell didn't have a gun and
20   Officer Hill says Officer Howell had a gun, that's
21   not an objective fact, is it?
22        A.   If that was the case, it wouldn't.
23        Q. Hut all you are referring to here is what
24   **Officer Hill says Officer Hill saw?**
25        A. That and the fact that there is a gun on

Page 103

1    the scene, there is a weapon near Justus Howell that
2    fell that matched the description of what Officer
3    Hill said he saw. So it's a connective tissue
4    between all of the evidence, not just what the
5    statement says, but what the photographic evidence
6    says, what the other officer said he saw, what the
7    ending result was, and the evidence that was found
8    an the scene. So that information is what compiles
9    because you know if he said he saw a weapon, but
10   didn't, then there wouldn't be a resulting weapon on
11   the scene and things would be different.
12        Q. **But** that's not accurate, you know what a
13   dropped weapon is, a **dropped gun at a scant is?**
14        A.   Yes, I do,
15        Q. **what is the** phrase used **in** the street for
16   that?
17        A. Not certain what it is in Chicago, but
18   planted evidence.
19        Q. Planted evidence?
20        A.   Which is a ridiculous theory.
21        Q. **You are saying officers don't** drop guns in
22   order to?
23        A. No, I am not saying that officers don't.
24   In this case I believe that the officers didn't,
25   that's my opinion.

Page 104

1         Q.   okay. I just, the fact that, let's assume
2    **that what is shown** in the post shooting photograph,
3    that there was a gun on the scene.  There is no
4    evidence, other **than officer Hill's testimony,**
5    right, that gun was pointed at Officer Hai?
6         A.   So are we making an issue of fact on the
7    fact that the gun was pointed at Officer Hill or
8    that he saw a gun?
9         Q.   No, **specifically on this one, I am** going
10   with, there is **no evidence** that other than **Officer
11   Hill's testimony** that a gun was pointed at him by
12   Howell?
13        A.   There is no other evidence that I knew of,
14   other than Officer Hill's statements.
15        Q.   And there is no evidence other than
16   Officer Hillis testimony that he saw a gun in
17   Howell's hand?
18        A.   Yes, there is, there is a weapon on the
19   scene.
20        Q.   No. I am not talking about a weapon on
21   the scene, I am talking **about** a weapon in Howell's
22   hand?
23        A.   Yes, the evidence tied together, with, if
24   you are looking at,
25        Q.   Let me ask re-ask it.

Page 105

1         MR. DICIANNI: I think you should let him
2         finish the answer.
3              MR. ODIm: It's not responsive and maybe
4         it was an unclear question, maybe it's my
5         fault.
6         A. Okay.
7         Q.   when I am talking about a gun being, when
8    I talk about Officer Hill saying he saw a gun in
9    *Howell's* hand, I am not referring to the existence
10   **of a** gun based upon the whole **circumstance** as you
11   **have described, I am not talking about the existence**
12   *of a* gun?
13        A. We are specifically talking about his
14   statement.
15        Q.   **I** am talking about a gun in Howell's
16   hands, that's all I am talking about?
17             MR. DICIANNI:  Corroborative of the
18        testimony, just actually in his hand, just to
19        be clear.
20        12. Yes, there is no evidence?
21        A. There is no other evidence other than his
22   statement, you are correct, of a weapon in his hands
23   during the pursuit.
24        Q. Okay. That's all I was getting at.  Page
25   22 of your **document, Paragraph 36, the first line,**

JAMIE BORDEN                                                    August 25, 2017

Page 106

1   Deffenbacher (1994), is this a quotation?
2        A.   Yes, it's cited from Kenneth Deffenbacher,
3   would you like me to read it?
4        Q.   Ne, I just want to know?
5        A.   It's a quotation from his work.
6        Q.   In this report you have in various places,
7   italicize test, is it your protocol to italicize
8   everything that is a quote?
9        A.   It's not my work, I italicize it if
10  Deffenbacher wrote this, this is cited in
11  Deffentacher's 1994, this is from his work.
12       Q.   What I mean is, it doesn't have quotation
13  marks around it, so my question is, have you in
14  every place in this document?
15       A.   I don't know.
16       Q.   Used italicized language to mean language
17  that is direct quotes from the sources that you
18  reference?
19       A.   They were from the sources I referenced,
20  yes. The work comes from Deffenbacher. A quote
21  would be something that he said, and his statement,
22  bur this is work from Deffenbacher, out of one of
23  his writings, Deffenbacher 1994.
24            MR. DICIANNI: It could be paraphrased?
25       A.   No, this is actual work straight from his

Page 107

1   work.
2        Q.   I just want to make sure the language we
3   axe using is the same?
4        A.   Yes.
5        Q.   It's not significant, I am trying to find
6   out whether or not, I mean, paragraph 36 is direct
7   quotation from Deffenhaeher 1994 whatever that
8   document is?
9        A.   Yes.
10       Q.   It's a direct quote?
11       A.   It is.
12       Q.   What is the document that this direct
13  quote is from?
14       A.   Well, let me go into my, I did not cite
15  it. I will have to get you that citation, my
16  apologies, I did not cite that.
17            MR. DICIANNI: You can probably google it.
18       A.   Yes, you can. My apologies. That should
19  be cited, that's definitely from Deffenbacher.
20       Q.   You don't have any training as a lawyer,
21  do you?
22       A.   No, except for my wife's in law school.
23       Q.   The opinions that you give, your paragraph
24  37, and elsewhere in this report, regarding the
25  applicability of the law, is not meant to be the

Page 108

1   opinion of someone who is an expert on law, is it?
2        A.   It's not an expert on law, it's an expert
3   on use of force where the law applies.
4        Q.   It's not a legal opinion, is it?
5        A.   It's my opinion where Graham versus Connor
6   applies. I can't give legal opinions,
7        Q.   Look at your paragraph 43, which is at
8   Page 24?
9        A.   Okay.
10       Q.   The first sentence reads, it is known in
11  the field of police work that officers are reactive
12  to the actions of an offender, and that initial
13  action is faster than reaction. And then in the
14  middle of that paragraph you say officer Hill then
15  had to be some what predictive in formulating a
16  response to the perceived threat, which in this case
17  was a very rapid procedure and occurring under the
18  compreseion of time, You see those two?
19       A.   Yes.
20       Q.   When you say Officer Hill had to be
21  somewhat predictive, you are applying a general
22  standard that you derive from your reading to
23  Officer Hill aren't you?
24       A.   well, yes, in part.
25       Q.   Okay.

Page 109

1        A.   May I expound on that?
2        Q.   Yes.
3        A.   Officer Hill is chasing an armed subject,
4   based on his statements. During this time the
5   subject is looking over his shoulder and spotting
6   where Officer Hill is at. As police officers we
7   know, generally speaking, across the nation that
8   these are threat cues that say when somebody is
9   trying to identify your location there is a purpose
10  for it, when they are not complying and they are
11  running from you. In those moments, where this
12  information is coming in and perception is coming in
13  to officer Hill, where he sees a weapon, at that
14  converging angle he sees the weapon coming back. At
15  that point he is predicting the fact that he is
16  probably as opposed to possibly going to be under
17  attack, deadly attack from Justus Howell. We have a
18  subject that's non compliant, he is running from
19  police officers, he has a weapon in his hand and as
20  he is looking hack that weapon is coming in and out
21  of view and as he starts to turn, at that point the
22  officer is making the prediction that he is going to
23  be under deadly attack. And at that moment should
24  he have decided to shoot, his actions would have
25  most definitely heat the reaction of Officer Hill.

JAMIE BORDEN                                                    August 25, 2017

Page 110

1  Officer Hill is, and has to be somewhat predictive
2  based on the totality of the circumstances, that
3  this is going to end up in a deadly attack and the
4  threat of that attack is imminent.
5      Q. But you are applying what when you say we
6  as officers?
7      A.   Yes officers in general.
8      Q. You are applying a general standard and
9  saying that you believe that Officer Hill acted in
10 conformity with this general standard?
11     A.   Based on his statement.
12     Q.   Based on his atatements?
13     A.   Yes.  So that takes it out of the general
14 conformity. And I am going off of what officer Rill
15 is stating to me, that when he ie in this area where
16 he has made the decision that he is under deadly
17 attack or will be, he chooses to use deadly force.
18     Q.   Now, you used in your report at several
19 places the phrase decision making?
20     A. Yes.
21     Q. Is it fair to say that this decision
22 making doesn't comport with the lay meaning of
23 decision making that is over that occurs over a long
24 period of time or a longer period of time than a few
25 seconds?

Page 111

1      A.   Yes, this is decision making that's
2  happening nearly intuitively and under the
3  compression of time, it's split second decision
4  making.
5      Q.   It's sot necessarily conscious decision
6  making?
7      A-   No, I would say it's conscious.
8      when you say conscious or when I use the
9  word conscious, I mean the officer saying to
10 himself, in his mind, I am under threat now, I need
11 to take this action now, it looks like I am going to
12 get shot if I don't pull the trigger?
13     A.   Yee, there ie comparators going on in the
14 situation.
15     Q.   So he is, itos your testimony that the
16 officer is actually talking to himself in that way?
17     A.   Not at that time frame, not, that's not
18 representative of the decision making process, it's
19 delineated in here, the complexity of the deoiaion
20 making and how that can change and how that can
21 bifurcate our attention. In this case we see that
22 decision is pending and there are actions that are
23 happening that the officer is perceiving and making
24 his decisions on. And they are very conscious,
25 although they are very rapid. Those decisions are

Page 112

1  I—rapidly occurring based on all of the information
2  that's being perceived and the officer's attention
3  to that information that's coming in. 8o the
4  officer's focus of attention is on the fact that
5  Justus Howell is running and has a weapon in his
6  hand and the position of that weapon and the
7  position of his body and that decision comes in very
8  rapidly, and it is a conscious, albeit very rapid
9  decision.
10         MR. DICIANNI: The answer is no, he is not
11     verbalizing those statements in his head, as he
12     is making the decision.
13     A-   Correct, there is no...
14         MR. ODIM: It's wonderful to have a lawyer
15     summarize your words that way.
15     A. Yes, the abort answer is yes, he is not
17 verbalizing it to himself_
18     O,   Look at your paragraph Number 44 on Page
19 25, line beginning line of seven, you say deputies
20 are trained to identify, and it goes on?
21     A- Yes.
22     Q.   In this case you didn't review any of
23 officer Hills trairing materials?
24     A.   I did not,
25         You have no idea what training he received

Page 113

1  with the Zion Police Department?
2      A.   I don't have any idea what he received.
3      Q.   So any application of a genera], standard
4  about how deputies are trained would not necessarily
5  conform with how Hill was trained?
6      A.   Not necessarily,
7          MR. DIC/ANNI: Can we take a short break?
8      0.   Look at your paragraph 45, human factors,
9  is it fair to say human factors, as you use the term
10 here, come into play in every single human activity
11 in which humans are involved in?
12     A.   Yes, air.
13     Q. Human factors in an extended drum role?
14     A.   Yes.
15     Q.   &moan factors in playing soccer?
16     A.   Yes, sir.
17     Q.   What is the scientific basis of this human
18 factor analysis that you use in this report?
19     A.   That's extremely varied. There is many
20 different human factors and human behaviors that are
21 at play, action, reaction trigger pull time, there
22 is a myriad of human factors at play here.
23     Q.   Is there a course of study at any
24 university that you are aware of that deals with
25 human factors in police shootings?

JAMIE BORDEN                                      August 25, 2017

Page 114

1    A. Not necessarily, and I am not aware of
2  any, doesn't mean that there are riot any.
3       Q. Force Science Institute is referenced as
4  the *source* of much of the information that you give
5  in this report about human factors, is that fair?
6       A-   Yea, the empirical data that is garnered
7  from the scientific studies is conducted by the
8  Force Science Institute, this is not just
9  information that exists but it's information that
10  exists through scientific studies that is reported
11  in several different journals and articles.
12      Q. Are you aware that Lewinski has been
13  barred as an expert in more than one case in the
14  United States, and he is been barred in more than
15  one case based, ha is been barred as en expert on
16  this so-called human factor and human dynamics
17 analysis?
18      A,   Yes, I am aware.
19          MR. DICIANNI: I am going to object to the
20      form of the question.
21      Q. Did you understand the question?
22      A.   I did understand the question, it's not
23  relevant to me though.
24      Q. Is the basis of your testimony about human
25  factors, the scientific basis different from the

Page 225

1  basis of the scientific and different from the basis
2  of Lewinski's -- I will withdrawn the question.
3          MR. DICIANNI: Good idea.
4       Q. Do you have a different scientific basis
5  for your use of human factor analysis as the basis
6  that you learned at Force Science Institute?
7       A. Its a broad question because human
8  factors covers multiple areas. It's not, in one
9  case you might be looking at the human factor of the
10  dynamics of human movement, and in another you might
11  be looking at action versus reaction. So that kind
12  of broad question, Z can't give you a definitive
13  answer because there is too much scientific data on
14  too many different human factors.
15      Q. Look at your paragraph 48, Page 27. You
16  have bolded several concepts here. I presume they
17  are noncepts, perception one, reaction, the second,
18  motor movement time, third.  Again, you know nothing
19  about Officer Hill's training, correct?
20      A.   No, I don't.
21      Q. You know nothing about his training to use
22 firearms?
23      A. NO.
24      Q. You don't have any information about his
25  perception in the context of the shooting that

Page 116

1 occurred?
2       A.   Yes, I do.
3       Q.   In this cage?
4       A. And if I might expand on that a little
5  bit, we rely on his statements for deriving what he
6  states that he perceived from the incident. That's
7  what we have to go on. The only thing we can use to
8  define what officer Hill was focused on or, what he
9  was perceiving is what he states that he was
10  focusing on or perceiving. My analysis of that is
11  what is linked to what I am seeing on the video and
12  any distinct inconsistencies that happened with what
13  his statements are and what is actually happening on
14  the available data that we can garner from the
15 video.
16      Q. About Officer Hill's reaction, as
17  referenced in the concept bolded in Paragraph 48,
18  what was Officer Hill'a reaction from the time he
19  first perceived a threat from Howell to the time he
20  pulled the trigger?
21          MR. DICIANNI: I will object to form of
22      the question. Do you understand the question.
23      A.   I do, but that's a very broad straw
24  question and it begins at the time that Officer Hill
25  encountered Justus and the time that the trigger was

Page 117

1 pulled, which there are several interactions
2  happening during that pursuit, So I can't tell you
3  definitively about reaction time, all we tan do is
4  take the information that's on the video and
5  identify major changes in the behavior of
6  individuals on that video. I can determine a window
7  of time that decisions were being made and reactions
8  were happening to actions that we can pee in the
9  video using comparative frames, body movement,
10  movement dynamics, the end result of the incident
11  where Justus Howell is shot ultimately and lands in
12  the grass. And the information that is occurring on
13  the video, we can take that video and we can
14  delineate and identify windows of time, not specific
15  times. No where in my report do I identify any
16  particular exact moment that a decision was made or
17  that a reaction came into play, Only windows of
18  time that are supported by the video and compared
19  against the statements.
20      Q. You can't say when Officer Hill first saw,
21  says he saw a gun in Howell's hand?
22      A.    Officer Hill states when he first saw the
23  gun in his hand, I can only take that statement for
24  face value.
25      Q. Would you look at your Paragraph 49?

JAMIE BORDEN                                          August 25, 2017

Page lie

1  A. Yes,
2  Q. Jest read the first paragraph and then
3  am going to ask you a question About
4      A.   In this real life scenario.
5      Q.   I meant read it to yourself?
6      A,   Okay. I am familiar with it.
7      Q. Aren't you making an assumption that
8  Officer Hill was acting in conformity with general
9  information about how people react in "extremely
10 complex stimulus situations"?
11     A. NO, Officer Hill fired his weapon, the
12 facts exist that the weapon was fired and Justus
13 Howell was struck. So I am not assuming that he
14 fired, the fact is that he fired, the fact is that
15 this is not a simple laboratory experiment, this is
16 a real life scenario.
17     Q.   That's where I am going.  The difference
18 between the distinction between simple stimulus and
19 extremely complex etimnlus has nothing to de with
20 the individual, directly to do with the individual
21 being stimulated. It has to do with the
22 circumstance in which they are stimulated. Does
23 that make Sense?
24     A.   Is that a statement or is that a question?
25     Qc   That's a question.

Page 119

1      A.   I am not sure. You are telling me --
2  rephrase the question?
3      Q.   There is no way for you to know whether
4  officer Hill considered this a pimple stimulus *OF*
5  quote an "extremely complex stimulus"?
6      A.   In answer to that question, a simple
7  stimulus is a light that turns on or and off there
8  is no consequence to your decision. Simple stimulus
9  meene there is a simple process, simple set of
10 instructions and simple results, and with no
11 interaction, no interplay between the target and the
12 shooter.  Anything outside of a simple experiment
13 where we are simply trying to identify times in
14 action reaction is considered extremely complex,
15 where the movement, the dynamics, the distance that
16 we can see on the video between the two players, the
17 movement and interaction between the officer and
18 Justus Howell, all of these things create complex
19 stimulus.
20     Q.   Okay. So the stimulus is external to the
21 actor in the situation?
22     A.   Yes.
23     Q.   Okay. And calling this an extremely
24 complex stimulus situation is not to say that
25 officer Hill took it oubjectively as an extremely

Page e20

1  complex stimulus situation?
2         MR. DICIANNI: I am going to object to the
3  form of the question.
4      A.   I am not tracking.
5      [R, DICIANNI; I know what you mean, but I
6  don't think it's...
7      Q. To say that this was an extremely complex
8  stimulus situation is not to say that Officer Hill
9  took this as an extremely coeplex stimulus
10 situation?
11     A. Officer Hill never said the words that
12 this was an extremely complex stimulus situation to
13 me or in his statements, all right, and so yes, that
14 much is true.
15     Q. This highly trained officer or an officer
16 highly trained as an expert marksmen, right, may
17 subjectively operate in an extremely complex
18 stimulus situation, much more calmly than a novice
19 shooter?
20     A. Absolutely.
21     Q. By the way, you mentioned in your report
22 that your opinions are part guided by ninth circuit
23 law and the Supreme Court?
24     A.   Some of them, yes.
25     Q. Do you know what circuit governs the

Page 121

1  geographic area in which Zion is located?
2      A.   I believe it's the fifth circuit.
3      Q. Are you excluding from your opinions in
4  this report, law outside the ninth circuit?
5      A. Yes, the only law that I cite in this
6  report, although I exist as an expert in the ninth
7  circuit is supreme court case law that affects every
8  circuit.
9      Q. But you do cite the Forrester versus City
10 of San Diego Case 25F3804, which is a ninth circuit?
11     A. Decided under Graham versus Connor,
12 Graham versus Connor was the guiding case in the
13 decision to eorrester.
14     Q.   I just want to be clear, when you said you
15 didn't cite any ninth circuit case?
16     A. Right, not a ninth circuit case, it was
17 not guided by, it was a supreme court case.
18     Q. Looking at your Page 51, your paragraph
19 51?
20     A. Okay.
21     Q.   You say there are clearly stated facts and
22 circumstances, is that an accurate statement?
23     A.   Yes, there are clearly stated facts and
24 circumstances. They are the officers made clear
25 statements about facts and circumstances that they

JAMIE BORDEN                                                                    August 25, 201.7

Page 122

1    were facing at that moment.
2         Q. So you would view the difference between
3    officer Gildee's statement about where he was when
4    he heard the shots, and Hill's differing statement
5    about where he was as clear about the question of
6    where Hill was?
7         A.   Well, it isn't, it's not clear based on
8    the difference in factual evidence. Again, I can
9    only take the statements and the clarity of the
10   statements from the officer's perspective of what
11   they truly believed happen and then I compare that
12   to the video. And those statements regardless of
13   how true or factual anyone believes they are cannot
14   change the outcome of the video analysis and the
15   contents in the video.
16        O. In Paragraph 53, you rely heavily on Hicks
17   Law, and you made reference earlier to Fitt's Law?
18        A. Hold on. When you say I rely heavily,
19   what do you mean by that?
20        Q.   in the middle of the paragraph you say, as
21   stated by Ticks law, the more complex stimulus is,
22   the more complex it is in the visual field, the more
23   time it can potentially take to respond to the
24   stimulus. You used this sentence for a reason in
25   this paragraph, correct?

Page 123

1         A.   Yes, it's just, it is stating the
2    complexity of the stimulus adding potential time to
3    the decision making, potential time. So Hicks Law
4    is the law that states that, is the only reason it's
5    there. I don't rely on it heavily for anything. I
6    am simply stating that Hicks Law states the similar
7    thing that we talked about in complex stimulus
8    situations.
9         Q.   Is this part of the scientific basin of
10   the human practice analysis, this Hicks Law?
11        A.   Hicks Law is simply a concept in exactly
12   that. Time is added to a decision making process
13   when the Stimula is complex.
14        Q.  what is the formula for Hicks Law?
15        A.   I don't know.
16        Q.   what is the formula for Fitt's Law?
17        A.   I don't know. The concept for Fitt's Law
18   is size of the target and distance equals more time
19   in the decision to shoot or in the time that it
20   takes you to hit that target.
21        O.   Do you know the history of Fitt's Law?
22        A.   I know it was conducted on a computer with
23   a mouse and different size targets, which is
24   specifically to identify the fact that the smaller
25   the target it is the longer it takes you to get your

Page 124

1    mouse pointer on the target.
2         Q. So Fitt'a Law is generated from desktop
3    use of pointers an a computer screen?
4         A. And it's a concept just like the simple
5    stimulus experiment in shooting. It's a very
6    sterile and lacking complexity to identify the time
7    it takes to get to a target that is smaller versus
8    larger,
9         Q. Would you give me the name of a scientific
10   study that applies Fitt's Law as you used it in
11   Paragraph 53?
12        A, Another scientific study.
13        Q.   No, a scientific study that uses Pitt's
14   Law.
15        A.   I know of none, it's simply a concept.
16        Q.  Can you give me the scientific study in
17   the human factors subject area that applies Hicks
18   Law to shooting incidents?
19        A.   Y58.
20        O. what study is that?
21        A- The shoot, don't shoat study is conducted
22   by the Force Science Institute add complexity to the
23   stimulus range, and wherever there is a determinant
24   factor, it increases the time of the decision, Hicks
25   law states that the more complex the information,

Page 125

1    the longer it takes to make a decision. Hicks Law
2    is applied in very simple situations. In that study
3    the simple stimulus was one light, the complexity
4    was simply two lights or a different colored light
5    that added nearly a quarter of a second to the
6    decision making process under very controlled
7    laboratory environments.
8         O. Do you know of any scientific study
9    applying Hicks Law to shooting incidents outside of
10   the study you referred to done by Force Science?
11        A.   I am not aware.
12        Q.   would you look at Paragraph 55?
13        A. Yes.
14        O, Of your report, the first line, you use
15   the word most probable, the phrase most probable?
16        A.   Yes, sir.
17        Q.   You mean that there are other possible
18   conclusions that can be drawn from the information
19   that you reviewed, correct?
20        A. No, what I mean is based en the
21   information that I have gathered in this
22   investigation, and the video evidence and what I am
23   seeing based on my experiences in human dynamics and
24   human movement and human behavior, that the probable
25   occurrence, meaning that there could be other

JAMIE BORDEN                                                    August 25, 2017

Page 126

scenarios, but that wouldn't vary with any profound
2 difference on what we are seeing on the video.
3 Meaning, in time line, meaning in the dynamics of
4 movement, the dynamics of a subject falling, It's
5 probable versus, passible. Passible is a very broad
6 spectrum, probable is much More refined.
7     Q« You refer at the end of paragraph, your
a paragraph 55 to Lewineki 2014?
9     A.   Yes, sir.
10    Q• what does that refer to, what document is
11 that?
12    A.   That is the capes of gunfire. The police
13 officer reaction time to start and stop shooting.
14    Q,   That's the one that's listed at the end?
15    A.   Yes, sir. Sir, those are available or
16 Force Science website, as well.
17    Q. I went to that, They are for sale. would
18 you provide ma those documents?
19    A,   There is only one document that they
20 charge for, that someone else has a property for.
21 Everything else you should be able to get off of
22 their website.
23    Q.   I tried to do so, T couldn't. Would you
24 provide me with the two Lewinski documents?
25         MR. DICIANNI: For a fee.

Page 127

      Q.   And the citation we talked about earlier?
2     A.   I am going to have to do that from my home
3 office, I have to send it to you electronically.
4         MR. DICIANNII Send it to me.
      Q. Okay.
6         MR. DICIANNI: Actually, I would ask you
7 to, could you put that request in writing?
8         MR. ODIM, Yes, I will do it after this,
9     Q.   Do you have any training in analysis of
10 casing, shell casing ejection patterns?
11    A.   Through the Force Science Institute, yes.
12    Q.   what is that training?
13    A-   Ji$t the there is an in depth study, and I
14 believe it's cited in here, it's called the ejection
15 study, the shell casing ejection study.
16    R.   And where is that, you do reference it in
17 your report, but what is the study?
18    A-   It's an in depth study about shell casing
19 ejections.
20    Q.   what is the name of it, when was it
21 published and who wrote?
22    A.   It's Lewinski, and it is just called the
23 shell casing ejection. Is that not on here?
24    Q•   No.
25    A.   I think I got a glitch in my user. I will

Page 128

1 send you that, as well. I will send you that study,
2 as well it should he available.
3     Q.   So the information, the training you have
4 is based on this study?
5     A.   It's based on this study, yes.
6     Q.   You have no field training?
7     A.   There is no training existing on shell
8 casing ejections. It's simply a study that was done
9 to show the variance in shell casing ejections.
10    Q.   You have done no reports in which you have
11 done shell casing study analysis?
12    A.   I have done,
13    Q•   In which?
14    A.   Unfortunately, they are on my department,
15 so they axe not available. Sir, did you find in
16 here that cited, the shell casing ejection Study?
17    Q.   You just have the william Lewinaki 2010,
18 but I don't know what that refers to,
19    A. Okay.
20    Q.   And it has a William Lewinski PW, and you
21 have in your work cited index, a william 1,ewinski,
22 D.A, so?
23    A.   Yes, that's two different studies. The
24 study is not included, I will make sure you get
25 that.

Page 129

1     Q.   what does PW mean?
2     A,   It's just the way that when it's uploaded
into the program, this is how it's printed out on my
3 citations.
4     Q.   That's at Page 32, middle of the page.
5     A.   Got you.
6     Q.   You also refer on Page 32, middle of the
page to a Garrison, what does that refer to, what is
9 the name of that source?
10    A.   That's within william J Lewinski's study.
Garrison is cited ill his study, that's going to be a
12 part of his study.
13    Q.   And again, in paragraph 59, you use
14 italicized?
15    A.   That's work directly from the study.
16    Q.   So that's a quote that doesn't have
17 quotation marks around it?
18    A.   Yes, it isn't a statement from someone,
19 it's just the work from the study itself.
20    Q.   Now, in paragraph SO of your report?
21    A. Yes.
22    Q.   The second line, you refer to an Exhibit
23 6, what does that Exhibit 6, where is that Exhibit
24 5?
25    A.   Photographs Exhibit 6 is the title of the

JAMIE BORDEN                                    August 25, 2017

Page 130

1   photo in the file that I gave you, it's the
2   photographs Exhibit 6.
3        O.   That's in the thumb drive you gave me?
4        A,   Yes, Exhibit 6 is the name of the
5   photograph, it's what the photograph is labeled as.
6        Q. So there is nothing attached to this
7   document?
8        A. No, that's what the photograph depicted in
9   photographs Exhibit 6, that's the title on it.
10       O. Does your resume contain any information
11  about you're having done any reports involving the
12  **analysis of cartridge** shall casing?
13       A, **No.**
14       Q. Does your resume contain any reference to
15  **you're having been** trained to do analysis on
16  cartridge shell casing ejections?
17       A. only through the Force Science Institute.
18       Q.   But it doesn't say that?
19       A. NO,
20       Q. On your resume?
21       A.   No, that's just part of the curriculum.
22       Q. And what part of the curriculum is not
23  stated directly in your resume?
24       A.   No, sir.
25       Q. Would you look at Paragraph 61 of your

Page 131

1   document, which is at Page 33?
2        A.   Yes.
3        Q.   Beginning line 9.
4        A. Okay.
5        **Q. You** *say it* **is** not uncommon in these types
6   of critical incidents from memory to be out of
7   chronological order or suffer from a distortion
8   based on the particular focus of **attention involved**
9   officer or witness officers. Are you applying that
10  general statement to Officer garrison's statement
11  about where he was when he fired shots?
12       A.   Yes, and it really applies to any officer
13  in a critical incident. Often times in some of the
14  investigations, investigations I conduct, the memory
15  is called flash bulb memory. So depending on what
16  your focus of attention is, you will recall things
17  out of order. That's not to say this happened here,
18  but it's not uncommon to see it.
19       Q. Are you discounting Oildea's statement
20  about where he heard the shots fired
21  based on the application of the language I just
22  read?
23       A. **No,** in fact, I am stating that he was
24  probably parallel, just behind the building when
25  shots were fired.

Page 132

1        Q.   Well, based on what he said, not what you
2   say where he probably was, I mean, based on
3   **specifically** what Gildea paid, are you accepting or
4   rejecting the accuracy of his statement **about where**
5   he was when he heard shots fired?
6        A. Well, this is, I would have to say that
7   based on where he said he was when shots were fired
8   and where that is, where my opinion of where shots
9   were fired on the video, they don't line up, so I
10  would have to say this his recall of that, Based on
11  the video evidence is incongruent with the activity
12  that we can see on the video.
13       Q. So you are not accepting as accurate
14  Gildea's version of where he said he was when he
15  heard shots fired?
16       A.   I am stating the video *says* something
17  different to me, so yes, the accuracy of his
18  statements to me is **off.**
19       Q. Okay. Would you look at your paragraph
20  62, again, you have much of this paragraph, well,
21  the whole paragraph italicized, would **it** be fair to
22  say again that this is a quotation lifted from the
23  referenced article?
24       A.   It is, this is not, those are not my
25  words. when they are italicized, that's where it's

Page 133

1   from the published site.
2        Q. And the Gewinski 2008 study is what?
3        A. You know, it's not listed on here either.
4   And I have to say that there is something that's
5   either missing that got punched to another page or
6   something glitched in my program, but that is not
7   listed there either.
8        Q. Do you know what the name of the study is?
9        A. No, I don't have the name of it, but I
10  will forward it to you. I am not certain that is a
11  study or whether that is an article **written by**
12  Dr. Lewinski.
13       Q. sa if you could just get me the actual
14  document?
15       A.   I will have everything that's here that's
16  not listed on my citation.
17       Q. Your paragraph 36, which ends on Page 35,
18  there is a reference to a Hope 2015, which is not
19  followed by a citation to Lawinski, is Hope 2015 a
20  separate reference?
21       A.   Yee, that is.
22       0. And what article is that?
23       A.   Well, again, it's not listed, so I have to
24  send that to you. I have a specific set of articles
25  that I go to, and they are suppose to be listed in

JAMIE BORDEN                                             August 25, 2017

Page 1'34

1   my citations. And for some reason they are not
2   there, and I did not double-check it. And these are
3   again, this is work straight from the article of the
4   study, that's not my work, that is straight from
5   Hope 2015.
6        Q. Okay.  Would you look at paragraph, your
7   Paragraph 66?
8        A. Okay.
9        4. Beginning with Line 24?
10       A. Okay.
11       4.  Well, beginning with Line 23, sorry, this
12  report is particularly focused on the use of force
13  applied by Officer Hill of the Zion Illinois Police
14  Department, an it relates to human factors that may
15  **illustrate** the officer's perspective in his use of
16  **force decision making.**  You mean by this that it,
17  that the use of force **that you have illustrated** in
18  this report, may **or may** not illustrate Officer
19  Hill's perspective **in** the use of force decision
20  making in this incident?
21       A. The human factors that are in play here
22  may illustrate the officer's perspective in his use
23  of force decision making. So when we are looking at
24  all of the human dynodes, the terms, all we have is
25  the statement to go on. So what this is stating is

Page 135

2   that based on the evidence that we have from the
3   video and the forensic evidence on the scene and all
4   of that, ns it applies to the officer and his
5   statements about what is happening, we are looking
6   at the human factors in a comparative fashion
7   between what we are seeing on the video and what the
8   officer's statements are. we cannot determine
a   exactly what his focus of attention is at any given
9   second or split second in that sequence. All we can
10  do is take the information that's available to us
11  visually, and give you an opinion on the things that
12  we see happening, based on all of the surrounding
13  facts and evidence and statements, whether they are
14  subjective or objective, they are all we have to
15  work with. Roth on defense and Plaintiff's side.
16  So what that is saying is that it may, it may
17  reflect a perspective for Officer Hill on the use of
18  force, but his statements may not be exactly
1a  aOCurate, just like officer Gildea's statements may
20  not be exactly accurate, and my opinion has to be
21  something that is most probable based on the video
22  evidence and what we see corroborates all of these
23  other statements.
24       **Q. Is it your opinion that the medical**
25  examiner's report about the entry wounds for the

Page 130

1   bullets **that** were in Justus Howell might have
2   affected your opinions **given in this** report?
3        A. Judging by the dynamic, I would have only
4   used them as comparables to what my opinion was of
5   what I see existing on the video. I can't say
6   whether it would have or would not have had an
7   affect on my opinion, but I know that officer Hill
8   shot two rounds. The two rounds hit Justus Howell.
9   And there was an extremely dynamic interaction with
10  forward motion, with falling, running, all of these
11  different dynamics, so the forensic information
12  from the Corners Report, I would have only used it
13  to compare what information was existing at that
14  time.
15       Q. You don't know **what is in the** report?
16       A.  I don't.
17       Q. Do you know how you would **have used it?**
1e       A.  Well, the unfortunate thing is I don't
19  know how I would have used it,
20       **Q. In the** report that **Lewinski** did for the
21  task force, he reviewed that, do **you know that?**
22       A.  No, I didn't know that.
23       **Q. And he drew** conclusions based on that, do
24  you know that?
25       A. No.

Page 137

1        Q.  Do you know that he did a purported or had
2   a purported ballistics analysis done?
3        A. No, I was not aware of that.
4        Q. Would a ballistics analysis have changed
5   your **opinion given in** this case?
6        A,  without seeing it, I wouldn't be able to
7   answer that.
8        Q.  Do you know why you were not given
9   **Lewinski** report, even though it was a report that
10  the task force relied on in drawing its conclusion
11  that Officer Hill was engaged in the justified
12  shoot?
13       A.  I don't know,
14            MR. DICIANNI: I am going to object to
15       that conclusion. Task force never came to any
16       determinations about whether something was
17       justified or not.
18       Q.  Okay. Let me re-ask it so it's fair. Do
19  you know why you were not given the report done by
20  **Lewinski,** even though it was part of the decision
21  making information that the task force used?
22       A. Was that on a criminal case?
23       **Q.  That was in this case, no, it wasn't.**
24       A. No, I don't know why I was not given that
25  information, I have no idea. I would assume it's

JAMIE BORDEN                                             August 25, 2017

Page 138

because they want my opinion on this, end not
2  Dr, Lewineki's,
3       Q.   Are the opinions or are the findings and
   opinions of the investigation, let me re-ask it. Is
5  the investigation done by the task force in your
   opinion not useful in considering the incident that
7  happened?
8       A.   It may have been, but I didn't have it, I
9  can't answer that, I don't have the report, so.
10      Q.   Would you look at Paragraph 64 of your
11 report, that's Page 35, you say that there is no
12 sufficient detail of an identifiable firearm visible
13 in the video?
14      A.   where are we at?
15      Q.   Your paragraph 64, Page 35?
16      A. Okay.
17      Q.   The first sentence?
18      A. Yes.
19      Q.   There is no sufficient detail of an
20 identifiable firearm. In fact there is no detail of
21 a firearm.
22      A.   In either the officer?
23      Q. So I am just, your adjective sufficient,
24 there 18 no detail, there is no insufficient detail,
25 neither is there...

Page 139

     A.   So let me clarify chat. There is no
2  Sufficient detail of an identifiable firearm visible
3  in the video.
4       Q.   Yes, that's all I am talking about.
     A.   In the case Of Officer Hill or the
6  suspect, Howell.
7       Q.   What I am getting as is then there is no
   detail in the video from which you could identify a
8  firearm in Howell's hand or an officer?
10      A.   Not from the video.
11      Q.   Not from the video?
12      A,   No, sir.
13      Q.   So it's not about sufficiency of evidence,
14 it's about no evidence?
is      A.   Yes, there is no sufficient detail in the
16 video.
17      Q.   I got you. So it's the detail of the
18 video?
19      A.   It's the detail Of the video that we are
20 speaking about, and I think I say that no sufficient
21 detail and identifiable firearm visible in the
22 video. So that goes to say that the distance of the
23 camera from the action, the number of pixels, the
24 quality of the digital video, it's indiscernible at
25 that point who is holding what,

Page 140

1       Q.   Would you look at your Paragraph 62, which
2  is on Page 33?
3       A. Okay.
4       Q.   Again, this is italicised?
5       A.   Yes, this is Dr. Lewinski's work.
12,      The quote begins, during the investigation
7  of officer involved shooting and some homicide
8  incidents, knowing the shooter's location can be a
9  valuable piece 04 information- In understanding the
10 dynamic of encounter?
11      A. Right.
12      Q.   Would not the location of the shooter, the
13 location of the person shot be important factors
14 equally?
15      A.   They are extremely important factors and
16 can show you that on the video, if you would like.
17      Q.   Would the position of the shooter
18 physically, whether he is crouched or standing
19 straight up be an important factor?
20      A. Sure.
21      Q.   Would the position of the person shot be
22 an important factor?
23      A. Sure.
24      Q.   whether they are bending forward, whether
25 they are talked to the right or toward to the left?

Page 141

1       A.   Yes, sir.
2       Q. In order for Howell to have been pointing
3  a gun at Hill, the way Hill says it happened, would
4  Howell not have to have been talked to the right,
5  with his right hand coming across his body pointing
6  the gun, backwards at Hill?
7       A. If they were running directly in front of
8  and behind each other, yes, but they were not.
9       Q. Okay.
10      A. They are running at a disparage of, there
11 is a disparaging angle. The position in this
12 position I am standing directly in front of you.
13      Q. You are going to have to describe it
14 verbally?
15      A. standing directly in front of counsel to
16 exemplify the turning method this way. 8o yes, we
17 would have to come across body extreme and look back
18 and point the weapon, but in this case, based on the
19 angle of convergence, do you mind if I step to the
20 Other side of you, you are running here, Justus
21 Howell is running approximately at this angle, this
22 weapon is much quicker and there is a much less
23 prominent body movement required for that weapon to
24 be seen and to be used. This convergence and this
25 angle is very important because you don't see that

JAMIE BORDEN                                        August 25, 2017

Page 142

1  in two dimensional video, but in location factors
2  that I described in the three pictures we talked
3  about, There is a much less prominent term required
4  for that weapon to be visible and used.
5       O. Okay. You don't know what the angle, the
6  measurement of the angle was **between from** where Hill
7  was standing and where Howell was located when Hill
8  **said** the weapon was pointed at him?
9       A.  I don't know the exact angles, no, but I
10  do know that from the pictures there is a
11  significant angle with a distance of at least the
12  length of the car, plus whatever distance they were
13  running outside of that.
14      Q. **You** don't know, you can't fix a number on
15  the angle?
15'     A.   Can't fix a number on it.
17      Q. Okay.
1d      A. Hut the angle exists.
19      Q. Okay. Aid you don't know in order to fix
20  a number to the angle, you would have to know where
21  Howell was when Hai says Howell pointed the gun and
22  where Hill was when Hill says he saw Howell point
23  the gun, **correct?**
24      A.   Right, so based on those statements, we
25  can look at the video and we can adopt what they are

Page 143

1  Saying right down to the fact where Justus Howell
2  came to rest. The pictures Show a general area, but
3  it isn't going to be significantly different than
4  what **those** pictures show. So we Can identify, well,
5  I can identify an exact angle, but as you watch the
6  video you can identify the momenta based on the
7  statements that are made, down to lees than a
8  second. On where these occurrences happened, based
9  on comparative factors and the video, as it's being
10  played, as the subjects are running, changes in
11  behavior, changes in dynamics, body movement, as
12  this occurrence unfolds.
13      Q. But you don't have a numerical value for
14  significant, what is the phrase you used?
15      A.   Significant angle.
16      O. You don't know what that measurement is?
17      A.   I don't have that exact number, and
18  photographs don't have any measurements on them.
19  There is no measurements. There is only the reality
20  that the vehicle is a distance, and there is a
21  visible distance, not an exact. I have no exact
22  numbers, but there is a visible difference between
23  the two people an they are running.
24      Q. You donit know how long the vehicle was?
25      A.   I don't have an exact measurement.

Page 244

1  You don't have any measurement?
2       A.   No, it's irrelevant to the point.
3       Q. **Well,** how are you in a position to give an
4  opinion that there was a significant angle of
5  divergence when you have no measurements at all?
6       A. From the video and the photographs taken
7  on the scene. So it's a minimum of the length of
8  the car and a maximum of however much distance was
9  between Justus Howell and the back of that car, and
10  every foot that it goes out further is less of a
11  turn that is required by Justus Howell. so at a
12  very minimum the length of that car, which is
13  approximately 12 feet, that very minimum, the
14  distance that Justus Howell will have to rotate is
15  greatly reduced from parallel to whatever that very
16  minimum angle is. Every foot that Justus Howell
17  goes out, that reduces the amount of turn that is
18  required for officer Hill to potentially see that
19  weapon, and I don't have those exact numbers.
20      Q. **But** you also don't know where Officer Hill
21  wan, right?
22      A- Yes, we do on the video. We can see
23  precisely where Officer Hill was. we can see
24  precisely where Justus Howell was.
25      Q. You can't sae where Officer Hill was when

Page 145

1  he said, right, he saw the gun?
2       A.   No, all we have is the video and the
3  statements. I can't pin an exact poeition, but we
4  can show a window, we can show a window of time on
5  the timeline and positioning of the subjects on the
6  video.
7       Q. You don't know how far, is it fair to say
8  that the **further Juatus Howell** ran on the grassy
9  lawn, away from Hill, right, the narrower the angle
10  of the divergence?
11      A.   Sure, it's at an angle.
12      Q. But you donut know how far he ran on the
13  grass?
14      A. We can make that determination from the
15  video, absolutely.
16      Q. **How do** you make that determination?
17      A. By looking at the video and assessing from
18  the photographs, and all of those different things.
19  The area exists, and at this point all we have is
20  the video. If we wanted to measure the crime scene,
21  which there was no diagram that I had access to, but
22  a diagram would have to be done, at which point we
23  can get a definitive angle, we can get a definitive
24  resting place, the information exists.
25      Q.   lay question, you don't have the

U.S. Legal Support, Inc.
(312) 236-8352

JAMIE BORDEN                                    August 25, 2017

Page 146

information, so you didn't make any definitive
2 calculations, right?
3      A.    There ia no definitive calculations, there
4 is only a video showing the action that's happening.
5      Q,    So you are guessing about the angle of
6 divergence here being significant?
7      A,    There is no guess about it. The angle is
a significant. It's a minimum of 12 feet, and that's
9 no guess, that's the length of that vehicle, ten to
10 12 feet.
11     Q. What is the brand of the vehicle?
12     A.    I am not certain.
13     Q. How do you know it's a 12-foot vehicle?
14     A.    It's a guesstimation because most vehicles
15 are ten to 12 feet long. The difference between ten
16 feet, 12 feet, 14 feet is insignificant on the angle
17 as a method of approach. It's simply to identify
18 the fact that any bit of an angle requires less of a
19 turn with Justus Howell. That's just physics. Any
20 angle of convergence on that, even if it's slight
21 requires less of a turn to present that weapon and
22 that's what the point is. That this video is in two
23 dimension and that's never been considered, not by
24 anyone. And I know that because I am, that's what I
25 do is I look at the video. So the evidence reflects

Page 147

an angle of attack, there is an angle of
2 convergence, it exists. I don't know that exact
3 number, but any angle requires or reduces the amount
4 of angle that Justus would have to turn for that
5 weapon to be visible, right hand across body to
6 left-hand side.
7      Q. But that angle of divergence, ae you put
8 it, is significant?
9      A.    It is.
10     Q, And I am trying to drill down on how,
11 significant is a general term?
12     A. Okay.
13     Q, That implies a measurement which you have
14 not done?
15     A. No,
16     Q.    And I am trying to find out whether or not
17 your conclusion of significance or significant angle
18 as opposed to insignificant angle is based on a
19 guess?
20     A.    It's not a guess, it's based on visual
21 information that's available to us in picture and
22 video.
23     Q. So from the video you are able to say that
24 there was a significant angle of divergence?
25     A. And the photographs.

Page 148

1      NR- DICIANNI:  Objection to form.
2      Q.    Even though you are unable to say that the
distance that Howell was from Hill when Hill shot
3 him, even though you are unable to say the distance
4 that Howell was from Hill, when Hill mays he saw
5 Howell point the gown at him?
7      A.    That's correct,
8      Q.    Even though you are unable to specifically
9 locate Hill, at a specific place, coordinates?
10     A.    During the shooting?
11     Q.    No, when he saw the gun being pointed at
12 him, when he says he saw the gun being painted at
13 him?
14     ma. DICIANNI! I will object to that.
15     A.    Yes, I don't think anyone, no one can say
16 exactly where he was at when he says he saw the gun
17 the first time. They can give a general location as
18 he was rounding the corner, all of these different
19 things. There is a bottom line to this, that he saw
20 weapon based on his statements. There is a weapon
21 on the scene and there is an angle of convergence,
22 which reduces the amount of angle in Justus Howell's
23 upper body. Those are physical attributes to this
24 video and to the photographs that I don't make a
25 guess on, that exists in the evidence.  I am not

Page 149

1 guessing on it, but I am apt claiming that I know
2 the exact. footage, I am claiming that it exists.
3      Q.    Hut the angle of convergence, if we accept
4 your view, an angle of divergence exists for the
5 sake of this next question, it exists.  Can you
6 determine significance front watching the video and
7 looking at pictures?
8      A.    Yes, significant from parallel. So
9 significant from this is that.  That's a significant
10 angular difference.
11     Q.    what is the number that you would attach
12 to an angle of divergence that is significant?
13     A.    I don't have a number, I have a visual,
14 that's all I have.
15     Q.    I am trying to pin it.
16     A.    I am going to flat line it, I can't answer
17 it with a number, I cannot.
18     Q.    Not in this case, not in this case. I am
19 trying to figure out what a significant angle is.
20 Geometry we use acute and obtuse angles. You are
21 using the word significant.  What in the abstract is
22 a number that you would apply to a significant angle
23 of divergence; is it ten degrees?
24     MR. DICIANN; I will object to the form
25     of the question.

JAMIE BORDEN                                              August 25, 2017

Page 150

1   Q. Do you understand the question?
2       A, I do understand, you are looking for me to
3   identify what I am calling significant?
4       Q.   Yea.
5       A.   I am calling significant any angle that is
6   outside of parallel, because every little angle that
7   you come out, whether it's one or five or ten
8   degrees, ten degrees, if we want to land on a number
9   that's significant, ten degrees can be considered
10  significant because in that ten degrees, which this
11  is approximately, that is still going to reduce
12  significantly the amount of turn that justice would
13  have had to make in presenting that weapon. Or in
14  Officer Hill seeing the weapon or making the
15  determination that deadly attack might be imminent.
16  So I don't have a number for a significant angle
17  over and above the fact that it's not parallel as is
18  perceived by anyone that is watching this video.
19      Q. So is it fair to say that any angle beyond
20  30 degrees is significant?
21      A- I would say any angle beyond five degrees
22  would be significant.
23      Q. Okay. But you don't know what the degrees
24  would be in this particular case?
25          F'0. DICIANNI: I am going to object to the

                    _ _ _ _ _ _ _ _ _

Page 151

    form of the question, and lack of foundation.
2       A.  NO-
3       Q.   You already answered it. I was just
4   summarizing the question. I think I am done. Did
5   you rely on any other studies, any studies other
6   than the ones that you cite in the report?
7       A.   Yes, the ones that I didn't cite in the
8   report that I should have.
9       Q.   Okay. So other than that set, did you
10  rely on any other studies in arriving at your
11  opinion?
12      A.   Not to my knowledge.
13      Q.   And when I use the word studies, I mean
14  any other written material that may be an article,
15  it may be a study, it maybe a research paper?
16      A.   Not directly. I read extensively so my
17  studies all COW into my experience, and my
18  experimental treatment of my investigation, can I
19  name them all, no.
20      Q.   I mean the ones you specifically looked at
21  for this?
22      A- No, they are all cited in the body of the
23  document, they are not listed in the citation areas.
24      O.   T will give counsel a reminder in writing
25  Shout the documents that are?

Page 152

1       A. And accept my apologies for that mistake
2   because that shouldn't have happened.
3       Q. It happens to the best of it. I have no
4   further questions. We are done.
            (The deposition concluded at
6              2:40 p.m,)
7
a
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                        _____
Rage 153

        DECLARATION UNDER PENALTY OF PERJURY
2
3
       /, JAME BORDEN, do hereby certify
    under penalty of perjury that I have read the foregoing
6   deposition taken an August 21, 20171 her
7   I have made such corrections as appear naked herein in
    ink, initialed by me, that my EettiMOfty Ad contained
9   herein, as corrected, ie true and correct.
10
11
12
13
14      Deted this        day of _____
15
16  2217, at _____
17
18  _____
IP
20
za
        _____
22      JAMIE BORDEN, Deponent
23
24      aisittatute waived.)
25

JAMIE BORDEN                                    August 25, 2017

Page 154

1
2      CERT/PI:CATE OP DEPONENT
       PANE LINE CNANNE

4      _____

6      _____

V      _____

B      _____

10     _____

11     _____

12     _____

13     _____

14     _____

16             ▪ ▪ ▪ ▪

16         I. JAMIE BORDEN, **deponent herein, do** hereby
       **certify and declare under penalty of perjury the within and**
       **fOregoing transcription to be** my **deposition in said action;**
17     **that I have reed, corrected and do hereby affix my signature**
       **to said deposition.**
is

IP                 _____
20                 JAMIE BORDEN, **Deponent**
21
22
23
24
25

Page 155

1      CURTIFICATS OF REPORTER

2

3          I, **Shifra Moscovits, certified Court Reporter,**
4      **State** of **Nevada, do hereby certify;**

           **That I reported the deposition** pf 016118 sOnnzu,
6      commencing on Friday. Augsit 25, ₂ₓ₁₇, **at 1.540** 4.41.

7          **That prior to being deposed, the witness was duly**
B      mworn by me to **testify to** the truth. **That I thereafter**
0      transcribed my **said shorthand notes into typewriting and**
in     that the typewritten transcript is a complete, true and
11     accurate transcription of **My eaid shorthand notes. That**
12     prior to the concluelon of the proceedings, the reading and
13     signing wan not requested by the witness or a party.

14         **I further certify that I am not a relative or**
15     employee of counsel of any of the parties, nor a relative or
16     employee of the parties involved in said action, nor a
17     person financially interested in the action.

18         **In witness whereof, I hereunto subscribe my name**
19     at Las Vegas, **Nevada, this Sth day of September, 2017.**

20
                   jk^k   ℗^~2ɪ▪←
21                 SHIFRA MOSCOVITE, [CR No. 910
22
23
24
25

U.S, Legal Support, Inc.
(312) 236-8352

JAMIE BORDEN

**(**

**(1994)** 106:1

-000- 4:3

1 46:22,23 47:1,5
48:12 54:5
10 51:22
**10:40** 4:2
11 29:25 30:3 33:5
36:5 37:11
**11,000** 86:17
110 86:12
**116** 29:25
**12** 30:1,3 33:5 36:5
50:15 51:15 52:12
96:6 144:13 146:8,
10,15,16
**12-foot** 146:13
**14** 76:14 146:16
**15** 70:21,23 84:20
**150** 86:12
**16** 59:3,6,7 84:15,
17 85:11,13 86:1
**17** 59:8,9,13 84:16
87:2
**18** 87:17,18
**19** 96:5
**1994** 106:11,23
107:7
**1997** 7:4

**2**

**2** 5:11,12,14,23
6:24 17:15 27:18
28:12,21 29:25 30:4
33:5 47:5
**20** 99:15 101:16
**200** 86:12
**2000** 10:12 19:5
**2001** 7:4,14,17
8:3,6,24
**2002** 30:19 31:3
**2003** 7:23
**2008** 7:7,9,10,14,
24 8:24 9:14 10:1
30:19 31:3 32:21
133:2
**2010** 10:1,7,8,10,
14,15,17 11:21 13:7
14:25 21:23 22:2
128:17
**2011** 10:5,617:4
**2012** 17:420:15
**2013** 18:11 19:6
21:9
**2014** 29:21 126:8
**2015** 29:22
133:18,19 134:5
**2016** 7:7,10 18:7,
11 21:9
**2017** 4:1
**21** 101:17,20
**21st** 27:4
**22** 101:23 105:25
**23** 101:23134:11
**24** 59:5,6 76:14
101:24 108:8 134:9
**25** 4:1 112:19
**25F3804** 121:10

**26** 84:15
**27** 57:18 115:15
**28** 96:4
**29** 98:10,11
**2:40** 152:6

**3**

**3** 47:5 48:12 49:14,
19 50:12 59:18,21
**30** 51:22 52:23
150:20
**30(b)(4)** 4:4
**30(b)(5)** 4:6
**31** 99:14 100:15
**32** 129:5,7
**33** 131:1 140:2
**34** 101:16
**35** 60:15 101:21
133:17 138:11,15
**36** 105:25 107:6
133:17
**37** 107:24
**38** 57:20

**4**

**4** 27:18 28:12 47:6
48:12 54:5
**43** 108:7
**44** 112:18
**45** 113:8
**48** 115:15116:17
**49** 117:25

**5**

**51** 121:18,19

**53** 122:16 124;11
**55** 125:12 126:8
**59** 129:13

**6**

**6** 129:23,24,25
130:2,4,9
**60** 129:20
**61** 130:25
**62** 132:20 140:1
**64** 138:10,15
**66** 134:7

**7**

**72** 57:23

**8**

**8** 30:8
800 86:17
**824** 29:2,7,9,11,16,
19

**9**

**9** 31:9 59:13131:3

**A**

**A.M.** 4:2
**Aaron** 44:11
**abilities** 15:25
**ability** 7:22 13:20
38:6 68:7
**absence** 100:4
**absolutely**
16:24 71:13 93:16
97:23 101:11

120:20 145:15
**abstract** 149:21
**academic** 31:23,
25
**academy** 9:16
11:2,3 24:6 32:15,
22
**accept** 57:4 61:19
149:3 152:1
**acceptance**
63:12
**accepted** 21:7
**accepting** 61:21
132:3,13
**access** 145:21
**account** 63:22
91:17
**accountability**
23:20
**accreditation**
18:20 25:2,6,13
**accredited**
18:20 25:4 31:23,25
**accuracies** 58:2
**accuracy** 57:7
67:6 132:4,17
**accurate** 49:17
52:11 57:4 61:20
67:5 68:6,7 69:7
74:16 76:4 89:21
93:9,24 94:14
103:12 121:22
132:13 135:19,20
**accurately** 70:8,
24
**accuses** 82:25
**acronym** 25:11
32:7
**acted** 110:9
**acting** 118:8
**action** 19:17,25
20:1 34:17 40:15

41:13 108:13
111:11 113:21
115:11 119:14
139:23 146:4

**actions** 84:3
108:12 109:24
111:22 117:8

**actively** 75:10

**activity** 75:19
113:10 132:11

**actor 119:21**

**actual** 29:21
50:17 65:19 106:25
133:13

**acute** 149:20

**add** 45:1 68:8
124:22

**added** 34:8 52:24
123:12 125:5

**adding** 123:2

**additional** 5:25
19:23 32:16 48:12,
21 67:5,8

**adjective** 138:23

**adjunct** 11:24
13:25

**adopt** 142:25

**adult** 19:22

**advanced** 12:19
19:13,19 32:17 33:2

**affect** 69:4,20
70:16 136:7

**affected** 69:1
76:24 79:25 136:2

**affects** 121:7

**agencies** 25:7

**agree** 66:2 74:9

**agreed** 37:8

**ailing** 7:23

**aim** 68:10

**aiming** 70:25
71:1,2,5 73:15,21

**air** 59:1 78:24

**airport** 8:10

**albeit** 112:8

**alert** 48:1

**algorithms**
26:12

**amount 11:8
37:3 70:14** 144:17
147:3 148:22
150:12

**analysis** 23:17
24:11,15 26:10,11
27:2,6 30:14 47:2
51:17 53:23 64:18,
23,24 66:11 74:20
79:22 80:3 96:16
113:18 114:17
115:5 116:10
122:14 123:10
127:9 128:11
130:12,15 137:2,4

**analyst** 12:19
20:10,12,17,20
22:20

**analyzed** 53:20

**ancillary** 62:18

**and/or** 43:12

**angle** 85:4 90:19
91:4,6,9,10,12
92:11,21 95:11,17
109:14 141:11,19,
21,25 142:5,6,11,
15,18,20 143:5,15
144:4,16 145:9,11,
23 146:5,7,16,18,20
147:1,3,4,7,17,18,
24 148:21,22 149:3,
4,12,19,22 150:5,6,
16,19,21

**angles** 142:9
149:20

**angular 149:10**

**announcement**
10:22

**anticipated**
8:21

**anymore 66:14**

**apologies** 36:1
107:16,18 152:1

**appeared** 37:3

**appears** 20:15
60:1

**applicability**
107:25

**applicable** 82:7

**application**
19:15 21:18 113:3
131:21

**applied** 32:19
33:18 125:2 134:13

**applies** 19:17
108:3,6 124:10,17
131:12 135:3

**apply** 10:19 70:18
80:2 149:22

**applying** 82:23,
24 101:9 108:21
110:5,8 125:9 131:9

**approach** 91:5,
7,9,11 92:11 95:17
146:17

**approaching**
24:1

**approved 13:15**

**approximate**
91:12 93:6,7

**approximately**
4:25 19:21 68:24
141:21 144:13
150:11

**arbitration** 4:24

**area** 14:19 33:10
61:4 91:3 93:8,10,
11,14,19 94:3,8
95:1,5,6 110:15
121:1 124:17 143:2
145:19

**areas** 14:23 21:1
39:24 115:8 151:23

**armed** 75:12
109:3

**arrive** 65:21

**arriving** 151:10

**article** 132:23
133:11,22 134:3
151:14

**articles** 114:11
133:24

**articulable**
76:19 77:3

**articulate** 84:12
85:24

**artifacts** 77:2

**aspect** 22:15 24:2
82:15

**assessing**
145:17

**assessment**
74:8

**assignment**
10:14 12:2,4,7,8
30:12

**assignments**
10:10,12 11:11 13:1
14:5 30:9,10 31:5

**association**
25:19 37:11,23
38:22 39:6

**assume** 5:7 12:7
18:5 38:24 72:12
75:5 93:5 104:1
137:25

**assumed** 13:25

**assumes** 90:2

**assuming** 19:12
71:20 84:1 118:13

**assumption**
71:8,11,13 72:3
73:24 75:7 82:13
83:22 118:7

**ATO** 31:19

**attach** 149:11

**attached** 130:6

**attaches** 64:9

**attack** 109:17,23
110:3,4,17 147:1
150:15

**attendance**
32:15

**attended 31:15**

**attention** 38:6
56:16 62:1,3,23
111:21 112:2,4
131:8,16 135:8

**attorney** 37:1

**attributes**
148:23

**AUGUST** 4:1

**aware** 47:14,16,
20,23 48:4,25 79:3,
7,9 113:24 114:1,
12,18 125:11 137:3

**Ayala** 45:2

———

**B**

**back 7:25** 9:13,17,
19,25 55:25 60:25
89:8 92:8,25 102:8,
16 109:14,20
141:17 144:9

**background**
83:6

**backtrack** 38:12

**backwards**
90:21 141:6

**bad** 23:10 84:19

**badge** 8:14

**ballistic** 77:20,22

**ballistics** 77:7,9,
25 78:4,6,19,23
137:2,4

JAMIE BORDEN

August 25, 2017
Index: barred.. changed

**barred** 114:13,14, 15

**based** 13:19 18:15 26:13,15 36:18 37:7 38:8 44:20 54:25 55:11 56:24 57:13 66:9 68:7 78:2,3 82:19 83:25 84:2 85:8 89:16 93:21 99:25 101:24 102:13 105:10 109:4 110:2, 11,12 112:1 114:15 122:7 12520,23 128:4,5 131:8,21 132:1,2,7,10 135:1, 12,21 136:23 141:18 142:24 143:6,8 147:18,20 148:20

**basic** 5:1

**basically** 21:3, 18 23:17 25:2 26:12 45:11 46:586:18

**basis** 113:17 114:24,25 115:1,4,5 123:9

**baton** 12:12 14:17,21,22

**beast** 14:14

**beat** 109:25

**began** 12:15,21 22:17,18 32:21

**begin** 29:19 32:13 36:21

**beginning** 112:19 131:3 134:9, 11

**begins 116:24** 140:6

**behalf** 35:742:4

**behavior** 19:16 81:16 117:5 125:24 143:11

**behavioral** 12;17 18;16 40:3

43:5 53:25 55:15

**behaviors** 96:11 113:20

**beings** 74:21

**believed** 122:11

**believes** 56:17 122:13

**bending** 140:24

**Bernardino** 41:11

**bifurcate 111:21**

**big** 94:4

**biggest** 21:12

**Bill** 19:10 79:15

**bit** 28:18 116:5 146:18

**blended** 41:7

**blessing** 13:18

**block** 85:23

**blown** 85:21 86:3

**blue** 23:2125:22 26:9,12 27:6

**blur** 29:23

**body** 18:20 38:5 112:7 117:9 141:5, 17,23 143:11 147:5 148:23 151:22

**bolded** 115:16 116:17

**Borden** 4:9,14 29:13 59:20

**bottom** 30:17 50:20 99:7 148:19

**brand** 146:11

**break** 113:7

**breakdown** 36:19

**briefly** 79:12

**bright** 21:5

**broad** 66:8 96:10 115:7,12 116:23 126:5

**broken** 60:7

**Brown** 33:7,20 35:11,14,18,21 38:13

**building** 61:13 75:10 90:14 92:22 131:24

**buildings** 92:18

**bulb** 131:15

**bullet** 78:5,6,24

**bullets** 72:16 77:10,13 78:9,11,12 136:1

**bureau** 10:4,16 13:21 21:23,24 22:4 24:14

**business** 27:24 28:1,3,13,20 29:1,9, 12,14,20 30:7

**buys** 26:6

_____

C

_____

**C-a-l-e-a-e** 24:25

23:21 24:23 25:5,11 26:1

**calculations** 68:24 146:2,3

**California** 6:7 45:23

**call** 6:25 14:1 83:21 93:3 99:23 100:1,2,6,12,16,17, 20,22,23,25101:4, 5,7

**called** 4:10 37:1 48:7 99:15 127:14, 22131:15

**calling** 119:23 150:3,5

**calls** 99:19,21 100:5,7,17,25 101:6

**calmly** 120:18

**camera** 76:17,21, 25 77:4 92:21 139:23

**cams** 38:5

**capacity** 21:10

**capes** 126:12

**car** 88:17,18,24 89:2,5,8 92:2 142:12 144:8,9,12

**cards** 88:9

**care** 7:22

**career** 8:19

**Carlos** 42:5

**carrying** 94:25

**cartridge** 130:12,16

**case** 4:18 5:25 6:2,4,9,12,16,19,22 12:15 22:6 33:8,15, 20,22,24,25 34:5,9, 12,25 35:2,4,11,22 36:25 37:2,11,12,19 38:7,13,19,22 39:13,18,19 40:10, 12,13,16,21,24,25 41:2,11,14,16,25 42:22 43:3,8,23 44:1,13,24 45:1,9, 14,16,21 46:9 47:2, 14,17,19,23 48:23 52:7 54:9,15 56:9, 10 57:10 58:18,22, 23 60:17 67:15 76:6 79:4,6,8,18,20,24 80:3,6,10,21 81:1 82:4,16 92:13 97:9 100:6 102:22 103:24108:16 111:21 112;22 114:13,15 115:9 116:3 121:7,10,12,

15,16,17 137:5,22, 23 139:5 141:18 149:18 150:24

**cases** 29:25 30:3, 4 33:4 36:4,9,10,11, 14,15 41:20 42:2,7, 10 46:1,2,6,10,15 54:13 56:11 86:22

**casing** 127:10,15, 18,23 128:8,9,11,16 130:12,16

**catalyst** 22:10 46:7

**catastrophic** 75.17 91:2

**categories** 13:8

**causing** 75:17

**caveat** 55:24

**Centennial** 43:25

**century** 27:4

**certificate** 18:3

**certification** 12:10 13:17 14:19 15:11 16:13,19 17:1,7,9,17 19:13, 19 20:12

**certifications** 12:9,20 15:14,20 22:5 31:22,24

**certified** 11:15 12:4,6,11,12,17,18 13:5,9,12 14:6,7,8, 12 15:14,11616:17 20:10,19 30:23

**certify** 14:15

**chain** 63:4

**change** 65:7 68:25 70:6,11,15 76:1,10 83:12 111:20 122:14

**changed** 21:24, 25 76:5 97:6 137:4

channels 48:5

chaotic 62:24
63:13 68:20

charge 34:7,11
126:20

charged 34:20

charges 34:22

chasing 75:12
109:3

check 52:21
99:24

Chicago 47:21
103:17

chief 22:9 23:2,15

Chiefs 25:19

chooses 110:17

chronological
131:7

chronology 9:2

CIR 27:25 28:1,20,
21 29:9,11,20

circles 87:7,14

circling 87:10

circuit 36:3
120:22,25 121:2,4,
7,8,10,15,16

circumstance
105:10 118:22

circumstances
82:3 110:2 121:22,
24,25

circus 95:3

citation 107:15
127:1 133:16,19
151:23

citations 129:4
134:1

cite 107:14,16
121:5,9,15 151:6,7

cited 106:2,10
107:19 127:14

128:16,21 129:11
151:22

citizens 24:6

citizens' 11:3

Citrus 33:24
34:24

city 24:7 43:2,15,
2544:13 45:2 47:3
121:9

civilian 15:7

claim 39:1045:7

claiming 33:8
149:1,2

clarification
56:23

clarify 85:10
95:21 139:1

clarity 53:1 85:17
99:9 122:9

class 17:11,12,20,
21 32:17

classes 21:17
31:18 32:16,25

classrooms
18:1

clause 97:22

clear 85:18 87:12
105:19 121:14,24
122:5,7

close 32:6 45:15
76:25 85:20,22
90:14 93:12 95:13

closer 70:18
74:13 86:8,19

code 51:24

codes 98:17,25
99:5

codex 52:18,19
53:6

coincide 64:11

collective 58:11

collectively
69:10

college 32:19

colored 125:4

combination
58:13

commenceme
nt 4;5,7

comments
100:4

commission
30:19

commissioned
30:24

committee 25:6,
8,16

common 57:10
64:11

Community
32:12

companies
25:13

company 14:10
29:2,11

company's 46:4

comparables
136:4

comparative
99:24 117:9 135;5
143:9

comparators
111:13

compare 122:11
136:13

compared 57:9
100:12 117:18

comparison
75:19 100:2

comparisons
96:9

compiles 103:8

complaint 8:8,
16

complaints 8:5

complete 54:12

completed 18:4
41:9

completely 28:4

complex 118:10,
19 119:5,14,18,24
120:1,7,9,12,17
122:21,22 123:7,13
124:25

complexity
111:19 123:2 124:6,
22 125:3

compliant
109:18

complying
109:10

comport 110:22

compression
51:19,24 52:5,6
99:4,5,8,10 108:18
111:3

computer 67:10
123:22 124:3

concept 67:11
68:10116:17
123:11,17124:4,15

concepts
115:16,17

conceptual
89:20 90:24 92:13
95:13,14,16

concert 75:11

conclude 64:24

concluded
152:5

conclusion
64:25 74:15137:10,
15147:17

conclusions
66:16 125:18

136:23

conclusive 65:7

conduct 79:22
131:14

conducted
114:7 123:22
124:21

confirm 59:23

conflict 61:17

conform 113:5

conformity
110:10,14 118:8

confusing 99:7

confusion 36:1

connected
87:25

connecting
88:12

connection
79:18

connective 58:7
103:3

Connor 82:23
108:5 12111.12

conscious
111:5,7,8,9,24
112:8

consequence
119:8

consequences
63:14

considerably
86:13

consideration
65:23 67:14 69:16
74:17

considered
82:3 91:7 96:14,17
97:18 101:7 119:4,
14 146:23 150:9

consistent
81;16 99:19 100:6

**constrained**
62:22

**contact** 15:7

**contacts** 24:6

**contained** 28:12

**contemporane Gus** 80:11

**content** 51:18
52:22 54:1

**contents** 53:20
74:20 97:6 122:15

**context** 4:1615:6
30:20 58:16 115:25

**continue** 61:14
70:13

**continued** 22:6,
7

**control** 39:4

**controlled** 67:10
125:6

**converged** 85:3

**convergence**
141:19,24 146:20
147:2148:21 149:3

**converging**
109:14

**conversion**
95:17 9819,22,23
99;10

**converted** 98:14

**convoluted**
99:7

**convoluting**
66:12

**coordinates**
148:9

**copied** 53:15
99;3

**copy** 5:11,12
49:12 51:2,10,23
52:1,4,8 98:24

**copying** 51:8
99:1

**corner** 61:13
148:18

**corners** 49:5
136:12

**corporation**
22:22

**correct** 4:19 5:12
7:5,1410:17 20:16
27:9,13 29:10 30:1
33:15 34:1 35:12
42:3 44:8 46:13
51:8,11 53:12 56:7
6117 69:23 77:11
80;7,11,22 81:6,7
87;8 88:15,20,23,25
89:3,6,13,17 91:23
95:16 98:7,8 105:22
112:13 115:19
122:25 125:19
142:23 148:7

**correction** 39:7

**corrections**
35:16,25 39:8

**correctly** 32:23

**corroborates**
135:22

**Corroborative**
105;17

**counsel** 36:22,24
37:8 74:12 78:16
80:1 141;15 151:24

**country** 26:8

**County** 39:14
40:20 41:10 80:4,8,
17

**couple** 5:19
24:19 54:20

**courses** 21:4,16

**court** 43;13
120:23 121:7,17

**courtroom**
42:14

Covering 39:25

**covers** 115:8

**create** 26:23 40:2
55:5 58:16 67:12,22
68:12 75:24 86:20,
24 98:2119:18

**creates** 57:11
66;22 67:7

**creating** 23:7
55:9 56:24 57:13
58:9 67:4

**credit** 32:14,24,25

**credits** 32:4,18,
19

**crime** 60:10 88:15
94:19 145:20

**Crimes** 80:8,18

**criminal** 32:8
34:7 37:2 137:22

**criminally** 34:11

**critical** 19:18
27:21,23 28:2,6,13,
22 2912,14 30:5
56:13 63:13 66:25
67:20 72:7 131:6,13

**CRJ** 32:4,7,16,20,
24

**crosses** 56:9

**crouched**
140:18

**CSN** 32:10,19,20
33;1,2

**cues** 109:8

**current** 5:167:8,
9

**curriculum**
130:21,22

cut 49:4

# 0

---

**D.a** 128:22

**D.A.** 34:10,21

**D.a.'s** 79:22

**Dale** 42:21

**Darren** 33:7,20
35:11,16

**dashboard** 8;15

**data** 19:15,23
26:13,15,23,24,25
27:3,5,7 51:6,9,19
52:2 57:3 58:15
65:7 76:23 84:11
86:20,23,25 96:15,
17,19101:4 114:6
115:13 116:14

**date** 7:8,917:2

**dates** 10:15 12:1
22:3 29:23 30:14
31:2

**day** 21:15

**deadly** 70:17
71:6,24 82:15,17,
18,19,24 83:3
109:17,23110:3,16,
17 150:15

**deal** 16:24

**deals** 113:24

**death** 40:16,18,21
43:17 44:22 45:3
62:16 63:6,14

**debate** 95:9

**deceased** 83:13

**deceases** 64:15

**decedent** 38:19
39:16 40:8 41:14
43:8,10 44:1,14
45:21

**deceptive** 91:24

**decided** 7:25
109:24 121:11

**decision** 19:22
34:10 66:23,24
67:12,22 68:6 69:8
70:16 83:1 110:16,

19,21,23 111:1,3,5,
18,19,22 112:7,9,12
117:16 119:8
121:13 123:3,12,19
124:24 125:1,6
131:201923

**decisions** 67:1
111:24,25 117:7

**deck** 42:12

**deemed 55:6**

**defendants**
4:18 33:15 57:13

**defense** 35:12,14
37:2,6 38:1,11 40:9
54:12 55:10 135:15

**defensive** 11:13

**Deffenbacher**
106:1,2,10,20,22,23
107:7,19

**Deffenbacher'
S** 106:11

**define** 40:3 116:8

**defined** 75:19

**definitive** 77:23
100:8 115:12
145:23 146:1,3

**definitively**
71:21 73:17 94:23
117:3

**degree** 32:3,16,
20

**degrees** 31:23,
25 149:23 150:8,9,
10,20,21,23

**delineate 117:14**

**delineated**
111:19

**department**
7:13,17,25 8:20
9:17 12:23,25
13:10,15,1814:13,
16,25 15:9,16,19,20
16;3,4,15,17,23

JAMIE BORDEN

22:9,14,18 23:12, 14,19 24:3,4,9 25:1, 3,4 26:2,8 27:9,15, 1628:4,10,11,16 30:11,13,21 31:1 46:3,16 48:6 81:5,9, 17 82:8 101:10 113:1 128:14 134:14

**departments** 25:14 26:6 27:1

**depending** 131:15

**depict** 94:11 95:8

**depicted** 70:9 91:23 93:14,19 94:1 130:8

**depiction** 93:21

**deposition** 4:5, 7,16,21 34:3 41:4,6, 15 43:12,22 44:9,19 55:17 60:19,20 98:13 152:5

**depositions** 4:25 35:6

**depth** 127:13,18

**deputies** 112:19 113:4

**derive** 108:22

**derived** 70:23

**deriving** 116:5

**descendant** 40:19

**describe** 90:10 141:13

**description** 103:2

**descriptor** 52:11

**designated** 4:1713:19 15:23 16:5,12

**designation** 16:1,8

**designed** 93:9

**desktop** 124:2

**detail** 86:5 138:12,19,20,24 139:2,8,15,17,19,21

**details** 85:24

**determinant** 124:23

**determination** 57:14 67:1 78:8 145:14,16 150:15

**determinations** 137:16

**determinative** 57:16

**determine** 117:6 135:7 149:6

**determined** 85:8

**determining** 74:4

**develop** 23:5

**developed** 26:17

**development** 21:16

**device** 6:22 23:22 52:3

**diagram** 145:21, 22

**diagrams** 78:17

**DICIANNI** 21:6 25:6,928:17 50:2,7 59:9 65:3 66:5,19 73:2 74:7 80:8,12 81:11,13,23 90:10 92:4 95:21 101:12 106:1,17106:24 107:17 112:10 113:7 114:19 115:3 116:21 120:2,5 126:25127:4,6 137:14 148:1,14 149:24150:25

**die** 6:19

**Diego** 121:10

**differ** 57:9

**difference** 5:22, 24 21:9,12,13,21 54:2 56:14 63:1,8,9, 10 70:22 91:18 118:17 122:2,8 126:2 143:22 146:15 1491 0

**differing** 122:4

**differs** 64:3

**digital** 51:2,6,9, 23,25 74:22 75:1 139:24

**dimension** 146:23

**dimensional** 89:25 142:1

**dimensions** 85:5

**diploma** 31:24 32:1

**diplomas** 31:23

**direct** 24:16 106:17 107:6,10,12

**directly** 91:6 92:8 118:20 129:15 130:23 141:7,12,15 151:16

**directory** 49:14, 16,17,23 59:24 60:21

**discharge** 6:22

**discipline** 46:7

**disclosures** 54:8

**discounting** 131:19

**discovery** 54:8

**discussed** 56:22

**discussion** 41:23 50:9 59:11 101:13

**discussions** 48:22

**disk** 48:16

**disparage** 90:16 141:10

**disparages** 97:2

**disparaging** 141:11

**dispatched** 99:18

**displayed** 53:4

**disqualify** 42:11,20

**disseminated** 23:10

**disseminating** 23:7

**dissemination** 23:13

**distal** 89:1,4,8

**distance** 64:19 65:1,15,1966:1,15, 18,21 67:2,4,7,11, 14,18,21 68:1,5,8, 15,18,19,21,23 69:1,12,14,15,16,19 70:4,17 74:3 76:13, 15,17,21,22,23,24 77:1,3,4,5 90:19 92:24,25 94:12 119:15 123:18 139:22 142:11,12 143:20,21 144:8,14 148:3,4

**distances** 90:1

**distinct** 91:6 116:12

**distinction** 118:18

**distinguish** 15:10

**distortion** 131:7

**district** 60:24

**divergence** 144:5 **145:10 146:6** 147:7,24 149:4,12, 23

**document** 24:22 47:10 84:16 85:11 96:5 105:25 106:14 107:8,12 126:10,19 130:7 131:1 133:14 151;23

**documents** 47:6,8,9 49:24,25 58:3,6 59:24 81:3 126:18,24 151:25

**double** 57:6

**double-check** 134:2

**dovetail** 83:10

**draw** 58:25 67:25 74:15

**drawing** 68:2 137:10

**drawn** 71:24 88:3 89:16 125:18

**draws** 71:15

**drew** 71:23 72:21 73:4,14 89:14 136:23

**drill** 147:10

**drive** 5:21,23 45:18 47:7,13 48:11,16,18 49:15, 18 50:1 59:25 60:4, 19,21 81:4 130:3

**drives** 60:16

**driveway** 61:3,4 68:21,23 74:10

**drop** 103:21

**dropped** 103:13

**drum** 113:13

JAMIE BORDEN

**drummer** 9:4,7, 11 45:24

**drumming** 29:3

**duct** 11:22

**duly** 4:10

**duties** 21:23 30:20 31:7

**dynamic** 64:18, 23,24 65:6,10 66:9 68:11 75:15 92:12 136:3,9 140:10

**dynamics** 19:25 33:17 43:20 44:7 64:16 66:3,9,11 68:12,14 114:16 115:10 117:10 119:15 125:23 126:3,4 134:24 136:11 143:11

— E —

**e-mail** 50:6

**earlier** 27:10 97:2,24 98:12 122:17 127:1

**early** 29:22

**echo** 62:25

**edge** 57:6

**edges** 77:3

**educational** 18:24

**effect** 67:21

**effective** 26:2,3

**egg** 21:5

**ejection** 127:10, 14,15,23 128:16

**ejections** 127:19 128:8,9 130:16

**electronically** 127:3

**emphasis** 36:11 53:15

**empirical** 19:15, 23 114:6

**employed** 7:16 8:25 9:11

**employee** 16:16

**employment** 7:12 9:6,7

**encompass** 57:17

**encounter** 60:23 140:10

**encountered** 116:25

**encumbers** 24:12

**end** 93:4 110:3 117:10 126:7,14

**ended** 8:15 42:15 63:5 93:7

**ending** 103:7

**ends** 95:13 133:17

**Enforcement** 18:18 25:7

**engaged** 137:11

**engagement** 31:18

**engagements** 5:20,24

**enhance** 86:24

**enhanced** 50:11,14,18 52:7, 18,21,22 53:4 86:4, 5 87:11 98:13 99:12

**enhancement** 50:22 53:1,2,3,7,9, 12,13 99:11

**enhancements** 86:16

**enhancing** 52:25

**enlargement** 86:9

**ensues** 102:9

**ensure** 67:5

**entails** 51:24

**entire** 24:14 49:12 57;10 75:10

**entity** 19:2 25:15 28:3,25 29:7 36:13

**entrenched** 12:14

**entry** 7:9 10:8,9 11:3 135:25

**environments** 67:10 125:7

**equally** 140:14

**equals** 123:18

**equate** 90:4

**essence** 55:7

**et al** 4:18

**evasive** 32:5

**event** 62:24

**events** 34:24 63:5

**evidence** 38:5 44:21 53:4 55:12 56:6 58:11,12,17 62:5,11 63:3 64:10 66:10,12 74:24 76:7,9,20 78:4 85:1, 2 91;1 94:2 100:19 103:4,5,7,18,19 104:4,10,13,15,23 105:20,21 122:8 125:22 132:11 135:1,2,13,22 139:13,14 146:25 148:25

**exact** 10;15 12:1 22:3 51:10 70:10 76:22 78:13 86:1 89:22 90:25 93:9 95:6 117:16 142:9 143:5,17,21,25 144;19 145:3 147:2

149;2

**EXAMINATION** 4:12

**examined** 4:11

**examiner** 81:1

**examiner's** 135:25

**exception** 5:19

**excessive** 37:3, 21 39:9 45:7

**excluding** 121:3

**executive** 22:25

**exemplify** 141:16

**exhibit** 5:11,12, 14,23 6:24 17:15 27:18 28:12,21 29:25 30:4 33:5 36:5 46:22,23 47:1, 5 48:12 49:14,19 54:5 59:18,21 129:22,23,25 130:2, 4,9

**exist** 51:6 66:11 68:15 84:11 86:20, 21,23,25 93:17 97:10 118:12 121:6

existence 105:9, 11

**existing** 13:16 36:18 49:8 128:7 136:5,13

**exists** 58:15 62:21 69:6 75:25 99:8 114:9,10 142:18 145:19,24 147:2 148:25 149:2, 4,5

**expand** 22:18 37:22 116:4

**experience** 30:25 55:14 72:5 80:2 151:17

**experiences** 125;23

**experiment** 118:15 119:12 124:5

**experimental** 151:18

**expert** 4:17 61 0, 11 9:10 33:9 35:12 36:6 37:5 39;20 40:14,25 41:12 42:7,11,18 43:19 44:4,6,16 53:25 78:19 83:9 108:1,2 114:13,15 120:16 121:6

**expertise** 39:25 40:5,6 78:20

**experts** 47:3 78:20

**explain** 39:23 89:22 93:21

**explanation** 63:10 86:22

**exposure** 100:25

**expound** 109:1

**extended** 113:13

**extensive** 52:6

**extensively** 151:16

**extent** 64:13 99:2

**external** 119:20

**extract** 68:14

**extracts** 85:14

**extreme** 141:17

**extremely** 99:6 113:19 118:9,19 119:5,14,23,25 120:7,9,12,17 136:9 140:15

**eyes** 86:15

**F** ____

**face** 42:10117:24

**facility** 35:25 39;9

**facing** 122;1

**fact** 34:8,12 55:22
56:14,18 57:9
58:14,19 62:5,19,21
63:20 64:3 69:11
70:6,23 72:13,14
73:14,24 75:20
83:12 96:14 97:3,
14,15,19 99:25
101:2102:2,13,21,
25 104:1,6,7 109:15
112:4 118:14
123:24 131 :23
138:20 143:1
146:18150:17

**factor** 68:15
67:13,19 82:25
86:10 98:20,22
99:10 113:18
114:16115:5,9
124:24 140:19,22

**factors** 12;16
18:16 33:12,13,16
34:16 37:15 39:22
40:3,6,15 41:12
43:5,20 44:7 55:15
57:16 67:16,19
102:1 113:8,9,13,
15,20,22,25114:5,
25 115:8,14 124:17
134:14,21 135:5
140:13,15 142:1
143:9

**facts** 614 34:9
35:2 55:1,2,14 57;2,
12 62:17 67:15
70:11,15 74:25 84:3
97:1 101:25 102:9,
10,16 118:12
121:21,23,25
135:13

**factual** 55:11
58:15 76:8,10 90:25
101:4 122:8,13

**factually** 98:6

**failing** 86:16

**fair** 551 7 82:1
94:16 101:9,11
110:21 113:9114:5
132:21 137:18
145:7 150:19

**fairly** 85:20,21

**fallen** 93:18,25
94:9

**falling** 126:4
136:10

**falls** 91:2,3

**familiar** 24:20
118;6

**family** 7:18

**farther** 66:3 70:19

**fashion** 135:5

**faster** 108:13

**father** 7:22

**fault 105:5**

**feared** 71:6 72;20
73:7,14

**feathered** 23:4

**federal** 2915
34:6 35:6

**fee** 126:25

**feel** 79:24

**feet** 37:22 38:15
68:1 69:17 70;1,4,
14,17,19,21,22 95;7
144:13 146:8,10,15,
16

**fell** 90:23 94:17,18
103:2

**Felt** 101:24

**female** 39:7

**field** 26;23 55:14
108:11 122;22
128:6

**fight** 100:15,16,22
102:3

**figure** 93:23
149:19

**file** 18:647:9
49:11,12 60:7,10
130:1

**filed** 8:5

**files** 49:17 60:20

**financially**
46:15

**find** 97:21 107;5
128;15 14716

**finding** 96:14
97:14,15,19

**findings** 138:3

**finish** 81:24 105:2

**fire** 72:7

**firearm** 15:13
138:12,20,21 139:2,
9,21

**firearms** 11:9
13:12,13 14:24
15:4,6,10,13,22
16:5,12 82:14
115:22

**fired** 45:2158:24
59:16 62:10,15,16,
18,19,20 64:12 65:9
66:1 69:6,9,20 70:7
71:25 74:14 75:16
78:2,9 83:12
100:16,19,22 102:3
118:11,12,14
131:11,20,25 132:5,
7,9,15

**fires** 71:14,16

**firing** 68:2 72:1

**fists** 37:22 38:14

**Fitt's** 67:6 122:17
123:16,17,21 124;2,
10,13

**fix** 142:14,16,19

**flags** 100:12

**flash** 68:1 131:15

**flat** 149:16

**Florida** 36:25

**focus** 11:19 12:22
18:17 19:23 22:16
32:4 33:14 38:6
112:4 131:8,16
135:8

**focused** 22:12
33:12 116:8 134:12

**focuses** 62:1,2,
22

**focusing** 116:10

**folder** 49:25 60:3

**folders** 49:23,24

**foot** 70:19 85:6
92:16 144:10,16

**footage** 70:10
94:4 149:2

**for/position**
31:5

**force** 6:13,21 7:4
9:13 10:3 11:19,25
12:8,10,13,15,20
18:9,12,14,19,23
19:5 20:3,17,22
21:4,11,17 22:5,12,
16,17 23:6,17,18,
24,25 24:1,4,5,11,
15 25:25 28:1,2,19
27:11,14 30;13
31:11,21 33:11,13,
18 34:14 35:17,19
37:14,19 38:3,7,9
39:9,21 40:2,5
41:13 43:5,20 44:7,
21 45:5,7 46:5
53:24 55:16 70:17
71:7 78:21 80:4,9,
23 8217,18,24 83:3
108:3 110:17 114:3,
8115:6 124:22
125:10 126:16
127:11 130:17
134:12,16,17,19,23
135:18 136:21

137:10,15,21 138:5

**forceful** 39;4

**Forces** 130:18

**foreground**
89:12 93:4 94:7

**forensic** 38:5
44:21 49:5,6 51:4,
17 53:4,23 58:11
65;7 93:22 135:2
136:11

**Forgash** 44:11,
24

**forgotten** 25:10

**form** 16:1 22:20,
21 58:15 60:22
65:3,5 66:6,20
80:12 92:4114:20
116;21 120:3148:1
149:24 1511

**formed** 22:19

**formula** 123:14,
16

**formulate** 62:23

**formulating**
108:15

**Forrester** 121:9,
13

**forward** 90:20
133:10 136:10
140:24

**forward/
instruction**
31:10

**forward/
positioned**
30:10

**found** 103:7

**foundation**
151:1

**FICA** 17:13

**frame** 17:5 50:19
75:19 93:25 94:7,22
96:9,10 111:17

**frames** 53:10 117:9

**FRCP** 4:6

**frequency** 100:16,19,23,25

**frequent** 101:5

**Fresno** 43:25

**front** 45:20 88:24 89:1,8 90:3,14,18 91:4,21 92:2,8,17, 19,20,21,25 102:12 141:7,12,15

**full** 21:1545:10 51:17 74:20 80:21

**full-time** 15:15

——————

G

——————

**gained** 19:24

**Galipo** 42:21

**gap** 7:12

**gaps** 77:25

**garner** 116:14

**garnered** 114:6

**Garrison** 129:8, 11

**Garrison's** 131:10

**gather** 67:8

**gathered** 125:21

**gave** 23:2 41:5 42:6 47:13 48:17 49:15 59:25 81:4 130:1,3

**general** 11:4,5,6, 17,18 13:23 14:5,20 82:15 85:8 93:19, 21,23 94:8 95:5 96:8 100:23 108:21 110:7,8,10,13113:3 118:8 131:10 143:2 147;11 148:17

**generalities** 72:9

**generalization 101:10**

**generally** 64:11 72:12 94:18,19,21 96:18 109:7

**generated** 124:2

**geographic** 121:1

**Geometry** 149:20

**Gildea** 58:22 59;14 61:7,12 62:9 63:2,8,23 64:5 97:4 132:3

**Gildea's** 60:19 61:1,19 74:15 75:23,25 122:3 131;19132:14 135:19

**give** 9:2 16:25 17:2 18:2 24:18 34:3 36:19,21 41:4, 15 48:20 70:20 107:23 108;6114:4 115:12 124:9,16 135:11 144:3 148:17 151:24

**giving** 56:10,12 63:21 102:16

**glanced** 79:12

**gleam** 96:19

**gleamed** 96:15

**glitch** 127:25

**glitched** 133:6

**global 13:17**

**gold** 25:4

**good** 4:14,15 23:10 61:23 115:3

**google** 48:1 107:17

**GOP'S** 51:21

**governs** 120:25

**gown** 148:6

**Graham** 82:23 108:5121:11,12

**grass** 93:8,11 117:12 145:13

**grassy** 145:8

**greatly 144:15**

**grew 11:25**

**ground** 5:1

**group** 51:21

**grown** 24:9

**guards** 8:11

**guess** 36:19 55:7 69:18 70:20 102:14 146:7,9 147:19,20 148:25

**guessing** 146:5 149:1

**guesstimation** 146:14

**guided** 120:22 121:17

**guiding 121:12**

**gun** 73:11,16 83:15,18,24 84:5,7, 10 102:19,20,25 103:13 104:3,5,7,8, 11,16 105:7,8,10, 12,15 117:21,23 141:3,6142:21,23 145;1 148:11,12,16

**gunfire** 126:12

**guns** 15:17 103:21

**guys** 28:17

——————

H

——————

**halt** 90:22

**hand** 14:21 15:17 83:25 84:2,6,7,11,

13 104:17,22 105:9, 18 109:19 112:6 117:21,23 139:9 141:5 147:5

**handed** 47:7

**handle** 11:10 13:22 28:15

**handling** 46:2

**hands** 37:22 38:14 105:16,22

**handy** 87:9

**happen** 11:20 22:23 40:1 52:5 101:1,6 122:11

**happened** 5:20 46:8 47:20 56:17 62:6 68:25 74:16 75:4,21 76:1,18 99:13 102:18 116:12 131:17 138:7 141:3 143:8 152:2

**happening** 53:18 66:25 74:1 76:8 90:6 111:2,23 116;13117:2,8 135:4,12 146:4

**hard** 5:21,23 45:18 48:16 52:3 60:4,18,21

**head** 62:4 112:11

**heading** 27:21 99:15

**heard** 59:15 61:8 62:9,15 80:17 97:4 122:4 131:20 132:5, 15

**heavily** 122:16, 18 123:5

**Heights 33:25** 34:24

**held** 41:23 50:10 59:12 101:14

**helped** 16:22

**helpful** 53:23

**Henderson** 7:4, 13,17 12:23,24 13:10,15 14:12,24 15:9,18,19 16:14, 16,23 17:25 26:6 27:6,8,12 30:11,21 31:7

**hey** 8:13

**Hicks** 122:16,21 123:3,6,10,11,14 124:17,24125:1,9

**high** 32:1 100:16, 19,22,25 101:7

**highly** 120:15,16

**Hill** 58:22,23 60:19 61:3,9,20 62:8,10, 21 63:3,9,24 64:6, 12,17,18,25 65:11, 13,23 66:2,4,16 68:16 70:25 72:18, 20 73:18 74:4,9,13 76:2 90:13 91:5,21 92:1 95:13,19,25 97:4 102:5,20,24 103:3 104:5,7 105:8 108:14,20,23109:3, 6,13,25110:1,9,14 113:5 116:8,24 117;20,22 118:8,11 119:4,25 120:8,11 122:6 134:13 135:17 136:7 137:11 139:5 141:3, 6 142:6,7,21,22 144:18,20,23,25 145:9 148:3,5,9 150:14

**Hill's** 61:2,22 63:5 74:18 75:13,14 76:3 81:16 83:5 84:21 104;4,11,14,16 115:19 116:16,18 122:4 134:19

**Hills** 112:23

**hired** 31:2035:12 37:23 40:9 48:20

**history** 83:6
123:21

**hit** 62:20 70:7 71:2,
5,12,16 72:3,8,15
73:15 77:10,13
78:12 83:13 123:20
136:8

**hits** 78:9

**Hockerday**
43:15

**hold** 8:14 9:23
21:10 49:3122:18

**holding** 139:25

**holds** 39:4

**home** 127:2

**homicide** 140:7

**honestly** 25:10,
19 81:18

**hooked** 56:16

**Hope** 133:18,19
134:5

**hour** 19:21

**hours** 32:24,25

**house** 26:24 27:4

**Howell** 4:1847:3
62:20 63:6 64:13,25
65:1,9,12,14,24
66:4,17 68:16,17
70:7 71:2,7,12,25
72:2,4,16,22 73:11,
15,22 74:5,10,14
77:11 78:12 83:15,
17 84:2 87:23 90:3,
6,12 91:2,5,18 92:1,
23 93:5,7,18,25
94:8,17,20,25 95:1,
8,15102:7,16,19,20
103:1 104:12
109:17 112:5
116:19 117:11
118:13 119:18
136:1,8 139:6
141:2,4,21 142:7,
21,22 143:1 144:9,
11,14,16,24 145:8
146:19 148:3,5,6

**Howell's** 83:25
84:6,11,22104:17,
21 105:9,15 117;21
139:9 148:22

**human** 12:16
18:16 19:16,24,25
33:11,13,16 34:16
37:15 39:22 40:3,6,
14 41:12 43:5,20
44:7 53:25 55:14,15
64:16,18,23,24
66:3,8,9,11 67:16,
19 68:11,12 74:21
75:15 82:25 113:8,
9,10,13,15,17,20,
22,25114:5,16,24
115:5,7,9,10,14
123:10 124:17
125:23,24 134:14,
21,24135:5

**humans** 113:11

**hundred** 19:21

—————————————

**IA** 8:16 23:21 26:9

**IACP** 25:18

**ID** 29:15

**idea** 80:16 83:8
99:11 112:25 113:2
115:3 137:25

**identifiable**
138:12,20 139:2,21

**identification**
5:15 46:24 49:20
59:19

**identified** 22:25
23:2 96:9

**identify** 46:6,25
51:21 53:25 58:18
77:25 109:9 112:20
117:5,14,15 119:13
123:24 124:6 139:8
143:4,5,6146:17
150:3

**identifying** 23:5

24:1 57:19,24 58:19
96:10

**Illinois** 134:13

**illustrate** 134:15,
18,22

**illustrated**
134:17

**image** 87:4,12
88:6,8,14 94:7

**images** 85:13
87:1,1720

**imminent** 110:4
150:15

**impact 78:5**

**implies** 147:13

**Important** 22:13
70:3,5 75:20 76:15
78:18 92:13 140:13,
15,19,22 141:25

**Impossible**
51:20 61:9 63:25
67:1 77:15,17,18,
19,24 84:20 85:5

**improving** 24:2,
3,4,5

**in-service** 11:2
24:5

**in-tuned** 12:14

**incident** 19:18
27:21,23 28:2,6,13,
22 29:12,14 30:5
36:19 40:2 56:13
63:13,22 66:25
67:21 72:7 75:17
80:11 83:15 90:24
93:11 96:12 97:12
98:5 116:6 117:10
131:13 134:20
138:6

**incidents** 124:18
125:9 131:6 140:8

**Include** 47:5
94:21

**included** 50:19
128:24

**includes** 5:17
24:14 78:23

**incongruent**
132:11

**inconsistencie
s** 116:12

**inconsistent
100:11**

**incorporated**
28;24 29:7

**increases**
124:24

**index** 128:21

**indicative** 35:7

**indifferent**
23:10

**Indiscernible**
139:24

**individual** 19:9
118:20

**Individuals**
53:22 90:16 91:13
92:7 117:6

industry 30:24

**information**
5:17 22:8 24:19
26:21,22 27:3 28:12
35:8 36:18,21 37:4,
9,25 46:10,11
47:11,22 48:10,13,
14,21 49:6,10 55:3,
4,7 56:2,5,21,25
62:13 75:6,7,23
83:25 89:18 97:5
99:16,17,18,20
100:0 102:5 103:8
109:12 112:1,3
114:4,9 115:24
117:4,12118:9
124:25 125:18,21
128:3 130:10
135:10 136:11,13
137:21,25 140:9
145:24 146:1
147:21

**informed** 54:7,
15

**initial** 6:1732:14
36:17 37:9 45:11
108:12

**initially** 10:24
32:21

**Initiative** 26:25

**ink** 55:21

**inputs** 26:14

**inside** 60:20

**insignificant**
146:16 147:18

**inspector 11:13**

**instance** 11:13
16:4 25:16 60:6
83:3

**Institute** 12:18
18;9,12,14,15,19,
23,24 19:5 203
22:6 114:3,8 115:6
124:22 127:11
130:17

**institutes** 31:24

**institution** 31:25

**Instruct** 21:11

**instructed** 31:14

**instruction**
12:12 21:2,19
31:14,17

**instructions**
119:10

**instructor** 11:9,
14,15,16 12:11
13:5,6,12 14:6,15
15:15 18:8,12 19:5
21:8,10,14,15,20
30:18,23

**Instructors**
14:21

**Insufficient**
138:24

JAMIE BORDEN

August 25, 2017
Index; intention.. limitation

**intention 71:16,** 18,21 72:14,15 73:25

**interaction** 20:8,9 40:7 63:21 119:11,17 136:9

**interactions** 117:1

**interest** 87:11

**interested 19:8**

**internal** 16:7 46:3,16

**internally 46:3**

**International** 25:18

Interplay 33:17 53:21 67:20 69:2 74:21 75;2 78:21 92:12 119:11

**Interpret** 84:21

**interrogatories** 45:12

**Intervene** 38:6

**interview 56:20**

**interviews** 58:2

**introductory** 97:22

**intuitive** 19:14

**intuitively** 111:2

**investigation** 8:1,18 26:19 27:24 75:3 88:2 125:22 138:4,5 140:6 151:18

**investigations** 7:21 27:21 28:6 46:3 131:14

**investigative** 96:17

**investigator** 46:5

**invitation** 47:18

inVOiCeS 21:20

**involve** 6:14 37:17 39:1,3,14 43:17 44:1,14 45:3, 5

**involved** 7:20,21 8:19 21:16 33:5 35:17 36:7 37:24 38:3,13 45:8 68:20 72:6 97;11 98:2 100:1,22 102:3 113:11 131:8 140:7

**Involvement** 36:12 38:2,7

**involving** 6:22 14:24 37:2 39:6 130:11

**irrelevant** 9:9 144:2

**irresponsible** 69:19

**issue** 67:4 68:6,9 104:6

**issued** 15:17

**issues** 7:18 23:6 40:1 46:6 56:1 57:20,25

**Italicize** 106:7,9

**italicized** 106:7, 16129:14 132:21, 25 140:4

**Item** 49:1

**Items** 26:17 31:4 93:10 94:24 95:2

**J**

**jail** 38:15

**Jamie 4;929:13**

**job** 9:1810:21,25 22:18 30:11,20 31:7 32:2

**John** 39:1340:8

**journals** 114:11

**Judging** 136:3

**judgment** 33:23

**jurisdiction** 6:5

**jurisdictional** 80:23

**justice** 32:8 150:12

justified 137:11, 17

**Justus** 47:3 62:19 63:6 64:13 65:9,12,14 68:16,17 70:7 71:2,7,25 72:2, 4,15,21 73:11,15,22 74:14 77:11 78:12 83:14,17,25 84:1,5, 11 87:23 90:3,6,12, 23 91:1,5,18 92:1, 23 93:5,7,18,24 94:8,17,19,25 95;1, 8 102:7,15,19 103:1 109:17 112:5 116:25 117:11 118:12 119:18 136:1,8141:20 143:1 144:9,11,14, 16,24 145:8 146:19 147:4 148:22

**K**

**Kenneth** 106:2

**Kevin** 41:10,24 42:17

**kill** 70:25 71:1,9,10

**killed** 62:20

**kind** 11:22 25:17 37:19 41:7 115:11

**KInesiology** 19:22

**knew** 68:21

**knowing** 62:4 140:8

**knowledge** 18:22 50:16 53:22 82:24 83:11 151:12

**L**

**labeled** 130:5

**labels** 13:23

**laboratory** 118:15 125:7

**lack** 77:2151:1

**lacking** 124;6

**Lake** 80:4,8,17

**land** 36:20150:8

**lands** 117:11

**language** 106:16 107:2 131:21

**large** 22:22

**larger** 86:5,13 124:8

**Las** 4:1 35:25 37:10 38:21 39:5

**late 10:1,6,7,8,15,** 17

**lateral** 85:7 90:1, 16 94:12

**laterally** 85:4

**law** 12:15 18:17 22:6 25:7 67:6 72:6 107:22,25 108:1,2,3 120:23 121:4,5,7 122:17,21 123:3,4, 6,10,11,14,16,17,21 124:2,10,14,18,25 125:1,9

**lawn** 145;9

**lawsuit** 35:24

**lawyer** 107:20 112:14

**lawyers** 48:20

**lay** 98:24110:22

**laying** 8:15

**lead** 11:16 14:21

**leadership** 13:21 15:25

**learned 23:9** 101:25 115:6

**learning** 19:22 60:22

**led** 23:23,24

**left** 10:10,13 41:24 84:23 85:25 87:13 88:3,19,20 89:5 90:20 92:24140:25

**left-hand** 87:22 147:6

**legal** 108:4,8

**length** 142:12 144:7,12146;9

**lesson** 17;13,14

**lessons** 23:9

**letter** 16:5

**level** 82:12

**Lewinski** 19:10 20:5,24 21:4 79:3,5 114:12 126:8,24 127:22 128:17,20, 21 133:2,12,19 136:20 137:9,20

**Lewinski's** 79:15 115:2 129:10 138:2140:5

**license** 26:7

**licenses 26:6**

**lie** 63:2464:1,9

**life** 29:23 63:14 71:6 72:21 73:8,15 118:4,16

**lifted** 132:22

**light** 119:7 125:3,4

**lights** 125:4

**limitation** 96:12,

**25**

**limitations** 96:23 97:20,23

**lines** 75:1488:21 89:11,14,16,20,23 90:22 101:23

**linked** 116:11

list 18:7 45:1 47:6 60:24

**listed** 6:1 9:12 17;14,18 30:3 31:2, 4 35:23 36:4,9,10, 12 37:11 38:22 45:17 46:1,9 48:11 50:25 51:15 60:15, 17,18,21 81:3 126:14 133:3,7,16, 23,25 151:23

**listen** 31:15

**listing** 47:849:17 59:24

lists 29:25

**literally** 25:12 68:3

**load** 46:9

**loading** 8:13

**loan** 25:12

**locate** 148:9

**located** 58:23 121:1 142:7

**location** 61:8 64:13 70:9 76:18 78:13,14 93:6,7,10 109:9 140:8,12,13 142:1 148:17

**long** 9:23 79:14 110:23 143:24 146:15

**longer** 716 66:22 67:22,23 110:24 123:25 125:1

**looked** 79:19 151:20

lose 85:23 99:9

lost 65:5

**lot** 21:5 53:14 59¹1

**lower** 95:23

**LVNPD 39:8**

**LVPPA** 37:23

**lying** 63:11 64:1

_____

M

**made** 20:3 58:5 61:9 67:2 69:8,25 74:23,24 77:23 98:12 110:16 117:7, 16121:24 122:17 143:7

**main** 21;21 27;1

**maintain** 17:25

**major** 60:20 80:8, 18 117:5

**make** 23:25 25:20 29:24 57:5,14 65:25 66:5 67:1 68:24 69:18 70:22 77:23 78:8 81:19 86:25 98:3 107:2 118:23 125:1 128:24 145:14,16 146:1 148:24 150:13

**makes** 97:7

**making** 19:22 23:8 34:10 66:23,24 67:12,22 71:8,11,13 72:3 73:24 81:20 82:3 83:1,22 88:5 96:9 99:25 100:9 104:6 109:22 110:19,22,23 111:1, 4,6,18,20,23 112:12 118:7 123:3,12 125:6 134:16,20,23 137:21 150:14

**map** 23:12

**mark** 5:11 46:21 49:13

**marked** 5:14 46:23 49:19 59:18, 21

**marks** 89:7,9,12 91:25 106:13 129:17

**marksmen** 120:16

**mass** 63:13

**master** 11:9,12, 13 13:6 15:1516:18

**matched** 103:2

**material** 54:16, 17 151:14

**materials** 112:23

**matter** 22:13 74:3,6,8,17 75:21 86:18,23

**maximum** 144:8

**meaning** 5:16 54:11 55;3 84:9 90:5 99:8 110:22 125:25 126:3

**means** 11:11 53:20 55:8 63:11 85:4 119:9

**meant** 89:20 95:12,14 107:25 118:5

**measure** 145:20

**measurement** 142:6 143:16,25 144:1 147:13

**measurements** 69:3,23,25 89:17,18 143:18,19 144:5

**media** 48:3

**medical** 80:25 135:24

**member** 21:19

**memories** 62:24

**memory** 75:8 96:24 131:6,14,15

**mentioned** 120:21

**method** 99:19 141:16 146:17

**mid** 10:15

**middle** 108:14 122:20129:5,7

**Mikum** 33:7 35:11,16 38:13

**milliseconds** 67:24

**mind** 111:10 141:19

**mine** 79:16

**minimized** 38:8

**minimum** 92:14 144:7,12,13,16 146:8

**minus** 70:21

**minute** 8:14

**missing** 49:1 51:20 133:5

**misstate** 48:19

**mistake** 152:1

**moment** 56:15 70:14 109:23 117:16 122:1

**moments** 109:11 143:6

**money** 27:17

**months** 5:18 11:23 12:1

**morning** 4:14,15

**motion** 42:11,19, 23 136:10

**motor** 115:18

mouse 123:23 124:1

mouthful 6:25

**move** 8:11,22

**movement** 19:24 53:21 68:20 75:15 92:22 115:10, 18 117:9,10119:15, 17 125:24 126:4 141:23 143:11

**movements** 96:8

**moving** 22:11 78:24

**MP4** 53:1398:12, 14,15,18,20

multi 80:23

**multiple** 115:8

**municipality** 24:7

rri US io 29:3 30:24

**musician** 9;3

**myriad** 113:22

_____

N

**named** 99:12

**names** 24;20 47:10

**narcotics 7:19**

**narrower** 145:9

**narrowest** 85:6

**nation** 109:7

**nationwide** 25:14

**nature** 55:16 78:1 82:23

**necessarily** 11:16 16:7 46:11 82:20 111:5 113:4,6 114:1

**needed** 23:10 53:16

**Nevada** 4:17:4, 13,17 17:25 32:9,12 35:25

**niche** 12:2,4,7,8
13:1 .8 14:1 19,20

**night** 22:23

**nimble** 23:8

**ninth** 120:22
121:4,6,10,15,16

**norm** 53:2

**normal** 4:2448:5

**notice** 31:22

**novice** 83:8
120:18

**NRA** 15:1416:13,
17,19,25 17:6,10,
12,17,18 18:2

**NRCp** 4:4

**NTA** 31:19

**number** 13:11,13
29:15 46:8 50:12,
14,15 57;18 59:4
96:5,6 98:11 100:15
101:21 112:18
139:23142:14,16,
20 143:17 147:3
149:11,13,17,22
150:8,16

**numbered** 59:2
84:15 101:15

**numbering**
76:13

**numbers** 29:18
143:22 144:19

**numerical**
143:13


**O**

**object** 65:3 66:19
74:7 80:12 92:4
114:19 116:21
120:2 137:14
148:14 149:24
150:25

**objection** 66:6
1481

**objective** 35:10
36:20 37:7,24,25
38:8,10 54:12,19,
23,24,25 55:6,23
56:8 57:2 58:4
101:25 102:1,10,21
135:14

**objectively** 35:3
55:18 56:24 102:17

**objectives** 57:1

**observed** 96:8

**observing** 53:19

**obtuse** 149:20

ObViOLIS 32;2
65:6

**occasions** 46:8
91:8

**occurred** 47:21
61:10,21 70:15 75:1
116:1

**occurrence**
57:11 75:4,9 76:7,
18 125:25 143:12

**occurrences**
143:8

**occurring** 53:3
63:14 6624 75:17
102:12 108:17
112:1 117:12

**occurs** 23:19
110:23

00iNi 4:13 50:4,8
59:10 66:7 81:12
105:3 112:14 127:8

**offender** 108:12

**offense** 37:6

**offer** 21:7 581

office 127:3

**officer** 4:14 7:3,
19 8:9 9:10,2410:2
11:1 ,4,5,6 13:9,13
19:18 22:20 23:3
30:14 3411,19
35:15,17,21 36;7,13

37:2,24 38:1,2,24
39:8 45:25 55:18,22
56:10,12,17,22
58:20 59:20 60:19
61:1,2,3,7,12,24
62:9,21 63:2,3,5,9
64:12,17,18,25
65;11,13 68:16
71:14,15 72:6,10,
18,20 75:11,13,23,
25 76:2,3 78:22
81:15 82:9,18 83:5
90:3,6,13 91:5,21
92:1 95:13,19,25
98:2,7 100:1,21
101:24 102:5,20,24
103:2,6104:4,5,7,
10,14,16 105:8
108:14,20,23109:3,
6,13,22,25 110:1,9,
14 111:9,16,23
112:23 115:19
116:8,16,18,24
117:20,22 118:8,11
119:4,17,25 120:8,
11,15122:3 126:13
131:9,10,12 134:13,
18 135:3,17,19
136:7 137:11
138:22 139:5,9
140:7 144:18,20,23,
25 150:14

**officer's** 15:7
34:24 38:9 56:2,15
57:7 58:10,14,18
72:14,15 84:13
96:23 98:4 112:2,4
122:10 1341 5,22
135:7

**officers** 11:7
15:11,21,24 26:16
35:5 37:23 56:21
61:17 62:17 63:21
74:23 84:4 96:13,20
97:1,10,17 98:1
99:18 100:4,10,18
101:1 103:21,23,24
108:11 109:6,19
110:6,7 121:24
131:9

**open** 43:13 49:22

**opened** 60:7,11

**operate** 120:17

**opinion** 47:3
52:24 55:1,5 58:1
69:4,20 70:5,16,18
78:8 79:24 102:10,
17 103:25 108:1,4,5
132:8 135:11,20,24
136:4,7 137:5
138:1,6 144:4
151:11

**opinions** 42:24
48:15 55;13 5715,
17 58:13 66;16 69:1
70:3 80:2 96:15
97:16,19 107:23
108:6 120:22 121:3
136:2 138:3,4

**opposed** 11:6
61:21 62:9 64:19
65:1 109:16 147:18

**opposing** 42:24

**opt** 36:22

**opted** 34:21 36:17

Oral 16:9

**order** 19:4 20:19
54:12 103:22 131:7,
17 141:2 142:19

**ordinary** 99:23,
24100:2

**organization**
25:8

**orientation**
84:21 85:6

**oriented** 11:9

**original** 35:6
38;9 51:1,5,6,15
52:8,9,11,19 53:18
83:21 98:14,20

**originally** 51:3

**OSHA** 25:16

**outcome** 122;14

**Oxnard** 6;3,6
43:15 45:19

—————————

**P**

**p,m,** 152:6

**P.o** 38:22

**package** 53:9

**packaged** 53:15

**Padia** 6:345:18

**pages** 60:15

**paper** 18:3 55:19
151:15

**paperwork**
35:23

**paragraph**
57:23 59:2,6,13
76:13 84:14,15 96:4
97:13 98:10 99:14,
16 100:14 101:15,
20 105:25 107:6,23
108:7,14112:18
113:8 115:15
116:17 117:25
118:2 121:18
122:16,20,25
124:11 125:12
126:7,8 129:13,20
130:25132:19,20,
21 133:17134:6,7
138:10,15 140:11

**parallel** 90:4,17
131:24 14415
149:8150:6,17

**parameters**
99:1,4

**paraphrased**
106:24

**parked** 8:9

**part** 16:20,24
34:13 46:4 57:24
67:18 68:11 78:18
82:2,5 94:8 97:24
99:5 108:24 120:22
123:9 129:12
130:21,22 137:20

**part-time** 23:4

JAMIE BORDEN

August 25, 2017
Index: partially..presentations

**partially** 48:11

**participant** 96:11

**participate** 11:14

**participation** 11:2

**parties** 4:4,6

**passed** 7:23

**passes** 91:19,21

**path** 89:21,22 95:13,14

**patrol** 9:20,21,24, 25 10:2

**pattern** 58:19 62:21 69:11 70:23 90:25

**patterns** 97:3 127:10

**pending** 6:4 111;22

**people** 21:1 118:9 143:23

**perceived** 58:19 64:2,5 108:16 112:2 116:6,19 150:18

**perceiving** 111:23 116:9,10

**percent** 86:12,17

**percentage** 86:16

**perception** 56:12,15 58:14 76:2 109:12 115:17,25

**perceptions** 57:8 74:23

**perfectly** 75:14

**performed** 26:12

**performing** 45:24

**period** 21:8 110:24

**periodic** 23:24

**perpendicular** 90:18

**person** 13:19 17:21 75:9 140:13, 21

**personal** 30:6

**perspective** 122:10 134:15,19, 22 135:17

**perusing** 56:1

**Ph.d.'s** 20:25

**phone** 78:16

**photo** 85:22 86:6 88:6,15 130:1

**photograph** 87:21 88:18 93:15 94:11,15,16 95:10 104:2 130:5,8

**photographic** 85:1,13 94:2 103:5

**photographs** 70:10 83:20 87:25 90:13,15 92:6 129:25 130:2,9 143;18 144:6 145:18 147:25 148:24

**photos** 60:6,10

**phrase** 25;22 27:23 54:19,24 70:24 90:8 97:13 103:15110:19 125:15 143:14

**physical** 148:23

**physically** 140:18

**physics** 146:19

**pick** 8:10

**picked** 21:5

**picture** 85:21,25 86:1 88:18,22 91:10,17,24 92:14, 25 93:20 94;1,22 95;18,22,23 96:2 147:21

**pictures** 51:22 86:20 91:16 92:10 95:3,8 142:2,10 143:2,4 149:7

**piece** 18:3 55:19 60:22 140:9

**pin** 145:3149:15

**pixel** 85:23

**pixels** 139;23

**place** 23:16 34:6 59:15 67:6 75:9 90:22 98:7 99:4 106:14 145:24 148:9

**placement** 75:16

**places** 56:8 106:6 110:19

**plaintiff** 51:3 55:10

**plaintiffs** 36:15, 22,24 37:8 46:22,25 49;13 135:15

**plan** 17:13,14

**planted** 103:18, 19

**platform** 25:24

**play** 40;1367:4 113:10,21,22 117:17 134:21

**played** 69:23 143:10

**players** 77:5 119:16

**playing** 40:23 43:3 113;15

**plays** 40:7

**plenty** 45:25

**point** 11:17 12:3 13:25 15:3 56:18 68:17 76:9 89:1,4 92:17101;25 102:6 109:15,21 139:25 141:18 142:22 144:2 145:19,22 146:22148:6

**pointed** 30:15 73:10104:5,7,11 142:8,21 148;11,12

**pointer** 124:1

**pointers** 124:3

**pointing** 141:2,5

**points** 87:10 89:8

**police** 6:12 7:3,4, 13,17,25 8:8,19 9;10 13:10,15 14;12,16,24 15:7,9, 1916:14,16,23 18:17 19:18 22:9 23:15,19 24:9 25:1, 3,13,19 26:25 27:4, 7,14,15,16 28:4,9, 11,16 30:11,13,21 31:1,11 35:14 36:13 37:10 38:21,24 39:5 45:25 46:2 47:25 48:1,6 55:15 72:5,6 81:4,5,8,9,13,17,20 82:1,6,7,9,10 101:5, 10 108:11 109;6,19 113:1,25 126;12 134:13

**policies** 23:25 81:11,14 82:11,17

**policy** 24:2 72:12 81:17 82:21

**population** 15:7

**portal** 26:25 27:3

**portfolio** 30:4

**portion** 11:24 31:8

**position** 9:18,23 10;3,19,24 16:18,21

21:22 22:8,19 23:23 28:9 30:9 63:1,2 84:22 92:19 112:6,7 140:17,21 141:11, 12 144:3 145:3

**positioning** 85:8 145:5

**possibly** 41:8,9 99:9 109:16

**post** 100:17 104:2

**potential** 36:24 57:19,24 66:22 67:8,22 97:10 123:2,3

**potentially** 67;11 102:13 122:23 144:18

**practice** 123:10

**practices** 81:5,9, 13,20 82;2,7

**precisely** 70;5 84:21 144:23,24

**predict** 66;9

**predicting** 109:15

**prediction** 109:22

**predictive** 108:15,21 110:1

**preexisting** 99:15

**preparation** 81:10

**prepared** 6:16, 17 80:6,9,10 83:16

**preparing** 47:12

**present** 7:10,11 10:11 11:21 13:7 14:25 18:7 22:2 146;21

**presentation** 31:10,17

**presentations**

31:13

**presented** 20:2
31:14 34:9 49:25
55:18 58:6 85:16

**presenting**
150:13

**press** 34:21

**presume** 11516

**pretty** 100:8

**principal** 34:17

**print** 27:17 50:3,6
60:2

**printed** 85:17
129:3

**printing** 50:4

**prior** 4:4,6 8:3,6
17:6 19:6 20:11
42:2 43:24 47:12,
21,23 48:10

**private** 25:15
26:5 30:19 46:4

**privileges** 22:25

**Pro** 23:21 26:9

**probable** 57:11
63:4 69:11 125:15,
24 126:5,6 135:21

**problem** 28:19
99:2

**procedurally**
71:15

**procedure**
55:15 72:5 108:17

**procedures**
6:12 22:24 23:8

**process** 34:10
36:21 50:21,24
51:25 52:6 66:23,24
67:12,23 68:5
111:18 119:9
123:12 125:6

**produced** 54:9

**produces** 51:9

**product** 23:1

**production** 29:2

**professional**
9:310:9,12

**profit** 18:2419:2
46:14

**profound** 126:1

**profoundly**
76:24

**program** 12:18
32:13 129:3 133:6

**progressed**
23:14

**progressively**
86:7

**prominent**
30:15 141:23 142:3

**promoted** 10:4
21:13 23:15

**proper** 26:21

**property** 126:20

**proprietary**
26:5

**Protection** 39:5

**protective** 37:10
38:21

**protocol** 22:24
49:10 79:21 83:3
106:7

**protocols** 23:5
26:21

**proven** 13:20
15:25

**provide** 15:20
36:5 37:12 41:2
43:6 44:3,16,18
45:13 126:18,24

**provided** 33:14,
25 43:19 44:3 45:9,
10

**Providing** 39:21

**psychology**
21:2 22:7 32:5,25

**public** 30:18,22,
23,25 31:5,10,16,18
100:18

**publically** 46:12

**published**
127:21 133:1

**pull** 111:12113:21

**pulled** 116:20
117:1

**pulling** 68:4

**punched** 133:5

**punching** 68:3

**purported**
137:1,2

**purpose** 53:7
58:4 85:22 91:16
92:7 94:10,11 109:9

**purposes** 15:11
52:24 57:4

**pursuing** 75:11

**pursuit** 82:14
90:5 102:9 105:23
117:2

**put** 23:11 26:15
27:2 35:23 52:23
53:14 68:13 72:11
89:9 127:7 147:7

**puts** 63:4

**putting** 35:3
96:22

**PW** 128:20 129:1

_____

Q

**qualifications**
16:2,20

**qualified** 42:7,18

**quality** 99:17
139:24

**quantity** 99:17

**quarter** 125:5

**question** 9:13
15:2 61:23 64:21,22
65:4,6 66:6,8,14,20
73:2 74:11 80:13,14
81:24 92:5 105:4
106:13 114:20,21,
22 115:2,7,12
116:22,24 118:3,24,
25 119:2,6 120:3
122:5 145:25149:5,
25 150:1 151:1,4

**questioning**
61:1

**questions** 8:21
36:3 61:15 152:4

**quick** 67:24

**quicker** 141:22

**quickly** 23:11

**quotation** 106:1,
5,12 107:7 129:17
132:22

**quote** 106:8,20
107:10,13 119:5
129:16 140:6

**quotes** 106:17

_____

R

**raised** 100:12

**ran** 145:8,12

**range** 15:15 16:18
17:24 124:23

**rapid** 68:5 78:2,9
108:17 111:25
112:8

**rapidly** 112:1,8

**rate** 50:19 51:19,
24 52:5,6,23

**re-ask** 65:12
104:25 137:18
138:4

**re-entered**
32:21

**react** 118:9

**reaction** 19:17.
25 20:1 34:17 40:15
41:13 108:13
109:25 113:21
115:11,17 116:16,
18 117:3,17119:14
126:13

**reactions** 84:3
117:7

**reactive** 108:11

**read** 55:11 57:15
65:17 78:3 79:11,21
82:10 86:15 96:7,18
97:14 106:3 118:2,5
131:22 151:16

**reading** 32:23
108:22

**reads** 54:7 57:23
99:17 108:10

**ready** 42:14 45:16

**real** 76:8 100:17
118:4,16

**reality** 143:19

**realize** 41:19

**realm** 41:1

**rear** 87:24 89:5
90:4,12 91:19

**reason** 9:8 27:1
54:14 70:4122:24
123:4 134:1

**reasonable**
82:21,22

**reasons** 22:13

**recall** 10:21 17:23
37:20 48:22 49:1
58:21 61:2,11,25
62:23 65:15,16
74:23 75:12,13,14
96:24 98:4 131:16
132:10

**recalling** 75:6,7

**receive** 49:11

**received** 37:9
50:17,18 54:8 57:3
60:17 84:1 99:12
100:10 112:25
113:2

**recent** 5:21

**recognition**
82:14

**recognized**
33:2

**record** 16:11
41:21,22 50:8,9
59:10,11 101:12,13

**recording** 29:5
51:2

**reduce 150:11**

**reduced** 38:2
144:15

**reduces** 144:11
147:3148;22

**refer** 50:11 126:7,
10129:7,8,22

**reference** 60:17
81:19,21 98:12
106:18 122:17
127:16 130:14
133:18,20

**referenced** 81:4
106:19 114:3
116:17 132:23

**referred** 23:20
125:10

**referring** 77:4
102:1,23 105:9

**refers** 128:18

**refine** 74:11

**refined** 126:6

**reflect** 9:6135:17

**reflected** 62:11
63:3 65:8 74:22,25
75:1,4,18 76:4

**reflects** 76:7
146:25

**refute** 56:4

**refuted** 56:21
75:5

**rejecting** 132:4

**relate** 33:18

**related** 12:20
28:13 30:10 31:6,
11,17 99:19

**relates** 76:20
134;14

**relation** 84:22

**relevant** 22:8
75:3 114:23

**relied** 137:10

**rely** 82:20116:5
122:16,18 123:5
151:5,10

**remember** 17:2
45:20 63:15,19
65:19 68:11 73:23
79:14

**remembered**
78:15

**remind** 81:23

**reminder** 151:24

**rephrase** 119:2

**report** 6:16,17
29:22 33:12,14,19,
25 34:2,8,14,23
35:2,7,10 36:6,17,
20 37:5,7,12,15,24
38:8,10,18 41:2,9
43:6,19 44:4,6,16,
20 45:9,11 47:12,21
54:13,19,24,25
55:4,7,9,10,25 56:1,
8,22,24 57:5,13
58:16,25 59:14
64:17 65:17 76:12
79:3,7,10,11,13,15,
16,18,19,22,23
80:6,10,20,21 81:1,
19 82:4,5 83:16

**reflects** 76:7

96:16 97:25 99:14
106:6 107:24
110:18 113:18
114:5 117:15
120:21 121:4,6
125:14 127:17
129:20 134:12,18
135:25 136:2,12,15,
20 137:9,19 138:9,
11 151:6,8

**reported** 26:23
100:15 114:10

**reporting** 25:23,
24 26:16

**reports** 24:16
44:23 45:11 55:3
58:9 82:19 128:10
130:11

**represent** 94:17
95:17

**representation**
85:20,22 88:5

**representative**
111:18

**represented**
88:17

**request** 80:1
127:7

**required** 26:1,18
38:1 141:23142:3
144:11,18

**requirements**
10:22 32:2

**requires** 146:18,
21 147:3

**requiring** 7:20

**research** 151:15

**resigned** 7:18,19

**resigning** 8:3,6

**respond** 122:23

**response** 45:11
82:18 108:16

**responses** 5:4
54:9

**responsibilities** 10:2524:17

**responsible**
21:1 23:18

**responsive**
105:3

**rest** 94:20 95:5,8
143:2

**resting** 145:24

**result** 103:7
117:10

**resulting** 62:16
63:6 103:10

**results 119:10**

**resume** 5:11,12,
16 6:24 7:1 9:7 10:9
17:14,18 18:8 30:8
31:9130:10,14,20,
23

**retain** 36:22,23

**retained** 31:19
36:23

**retention** 39:4

**review** 23:24
28:2,14,22 29:12,14
30:5 36:14 44:23
47:2 53:17 79:17,20
81:8,14 96:16
112:22

**reviewed** 36:15
47:7 53:19 57:25
58:3 125:19 136:21

**reviewing** 22:17
23:18

**rid** 51:25

**ridiculous**
103:20

**right-hand** 87:4

**risk** 101:7

**Riverside** 39:14
40:20 43:2 44:13
45:2,19

**rod** 51:6 52:2

**Rodarte** 40:12,19
41:6 42:5,8,12

**Rodriguez**
40:20 45:2

**role** 6:9 14:1 33:8
39:18,19 40:13,23
41:11 43:2 113:13

**Rose 38:22,24**

**rotate** 144:14

**Roughly** 17:3

**round** 64:14

**rounding** 148:18

**rounds** 70:8
71:25 72:2 136:8

**rule** 4:4,6 48:25

**rules** 5:2 54:15

**run** 90:2196:23,24
97:3

**running** 85:2
87:23 90:16,17
91:1,1292:12,17,24
109:11,18 112:5
136:10141:7,10,20,
21 142:13143:10,
23

———— S ————

**safety** 13:13

**sake** 64:1149:5

**salary** 46:17

**sale** 126:17

**sampled** 53:6

**San** 41:10 121:10

**Sawyer** 43:1

**scenario** 118:4,
16

**scenarios** 126:1

**scene** 26:19 35:4,
5 58:12 60:8,10

69:23,24 70:10
76:21,25 77:1,5,6
83:21 87:22 88:1,
13,15 93:22 94:19
103:1,8,11,13
104:3,19,21 135:2
144:7 145:20
148:21

**school** 32:1
107:22

**science** 12:16,
17,18 18:9,12,14,
16,19,23 19:5,16
20:3,17,22 21:4,11,
17 22:5 40:3 43:5
55:15 114:3,8 115:6
124:22125:10
126:16 127:11
130:17

**sciences** 19:16

**scientific** 19:24
113:17 114:7,10,25
115:1,4,13123:9
124:9,12,13,16
125:8

**screen** 49:14
50:5 85:15,16 86:3
124:3

**secondary** 38:2
60:10

**seconds** 110:25

**section** 76:12,15

**sector** 30:19
65:19

**security** 8:11

Sees 102:7,11,15
109:13,14

**Self-employed**
9:3

**send** 16:4 37:8
50:5 127:3,4 128:1
133:24

**senior** 18:8
21:10,13,19,20

**sense** 29:24 57:3,
5 86:25 97:7 118:23

**sentence** 99:16
100:14 108:10
122:24 138:17

**separate** 76:15
133:20

**separated** 75:10

**separation** 85:7

**sequence** 135:9

**sergeant** 23:15,
16 24:10,13 26:18

**series** 65:16,17

Service 99:21
100:3,7,13101:8

**services** 99:20

**session** 54:21

**set** 8:21 13:20
15:24 27:5 48:1
57:3 60:10,14 98:25
99:4 119:9 133:24
151:9

**settled** 40:25
43:14,24 44:10
45:16

**settling** 42:15

**sheets** 60:24

**shell** 127:10,15,
18,23 128:7,9,11,16
130:12,16

**shoot** 67:25 68:2
73:21 109:24
123:19 124:21
137:12

**shooter** 67:3
83:9 119:12 120:19
140:12,17

**shooter's** 140:8

**shooting** 36:8,
13 37:17 36:13,17
39:1,11,12,14
401 8,22 43:10
44:22 45:8 47:20,25
48:4 61;5,8,21 63:5
64:19 65:1 66:17
71:9,10,12 72:3

104:2 115:25 124:5,
18125:9 126:13
140:7 148:10

**shootings** 46:7
48:2 113:25

**short** 36:3112:16
113:7

shot 49:14 50:5
62:8 64:25 65:14,24
66:4 72:21,23 74:5,
10 85:15,16 86:3
87:23 88:8 95:19
111:12 117:11
136:8 140:13,21
148:3

**shots** 45:21 58:24
59:15 61:10 62:9,
15,18,19,20 64:12
66:1 69:6,8,20 70:7
74:14 75:15,16 78:2
83:12 97:4 100:16,
19,22 122:4 131:11,
20,25 132:5,7,8,15

**shoulder** 102:8
109:5

**show** 5:1046:21
49:16 85:23 86:14,
18 89:21 92:6,7,10
95:4,11,12,14,16
128:9 140:16 143:2,
4 145:4

**showed** 19:14

**showing** 59:20
146:4

**shown** 104:2

**shows** 85:2 9015
91:1,3,10,14,25
92:14 94:3

**side** 36:15 42:24
49:10 51:4 56:19
82:25 87:4,22
135:15 141:20
147:6

**sidewalk** 95:24

**significance**
147:17 149:6

**significant**
107:5 142:11
143:14,15 144:4
146:6,8 147:8,11,
17,24 149:8,9,12,
19,21,22 150:3,5,9,
10,16,20,22

**significantly**
143:3 150:12

**silver** 88:2

**similar** 99:19,21
100:5,7 123:6

**simple** 68:10
86:21 118:15,18
119:4,6,8,9,10,12
124:4 125:2,3

**simply** 25:25 26:4
28:1,6,15 35:2,9
39:9 53:3 54:25
58:19 67:7,11 87:10
92:6,10 119:13
123:6,11 124:15
125:4 128:8 146:17

**single** 113:10

**sir** 4:20,22 5:6,9,
13,19 6:8,18,20,23
7:2,6,8,15 8:2,4 9:1,
5 10:7,13,18 15:5
17:8,19,22 20:6
27:13,22 29:8,15
30:2,6,12,22 31:12
33:6,16,21 34:2,5
35:13,16 37:16,18,
22 38:14,20,23
39:2,12,15,17
41:3,7,19 42:1,9,12,
21,25 43:11,14,18,
18,24 44:5,10,20,25
45:4,6,10,15,24
46:1,13,1749:21
50:13,16,23 54:6,22
55:24 581 60:3
77:12 83:4,7 87:3
96:1 113:12,16
125;1 6 126:9,15
128:15 130:24
139:12 141:1

Sit 62:2

**site 133:1**

**sits** 26:22

**sitting** 88:1,4

**situation** 72:11
111:14 119:21,24
120:1,8,10,12,18

**situations** 67:8
118:10 123:8 125:2

**size 88:1,24
123:18,23**

**skill** 13:2015:24

**slight** 146:20

**small** 86:15

**smaller** 123:24
124:7

Smith 39;6

**so-called** 114:16

**soccer** 113:15

**software** 23:20
25:22,23 26:4,6,13,
14,16 27:6

SOilhaS 33:24
38:16,17

**sort** 67:2 83:1

**sound** 62:24

**sounds** 39:24

**source** 51:9,16
114:4 129:9

**sources** 106:17,
19

**southeast** 61:13

**Southern** 32:12

**speak** 23:12
31:20 40:4

**speaker** 30:23

**speaking** 5:20,
24 30:18,22,25
31:6,10,16,18 71:15
109:7 139:20

**special** 30:9,10,
12 31:5 34:5

**specialist** 12:19
32:18 33:2

**specialized**
11:8

**specialty** 11:12
1221

**specific** 15:1
22:10 27:8,12 65:15
70:9 72:10,11 81:22
93:9 117:14 133:24
148:9

**specifically**
49:1 58:9 94:11
95:11 104:9 105:13
123:24 132:3 148:8
151:20

**spectrum** 126:6

**speed** 78:6

**spell** 24:24

**spend** 45:22

**spent** 19:12

**split** 111:3135:9

spoke 24:12

**spotting** 102:7
109:5

**square** 94:4

**squiggly** 93:2

**staff** 21:19

**stand** 42:13,14,17

**standard** 11:1
23:22 24:23,25
25:3,4,12,17 81:20
82:1,6 108:22
110:8,10 113:3

**standardized**
82:13

**standing** 25:13
64:20 65:2,8 74:10
95:19 140:18
141:12,15 142:7

**standpoint** 55:8

**stands** 28:21

**star** 93:2,3 95:6

**start** 57:23 98:8
126:13

**started** 11:24
12:1 13:23 22:21
23:4,5

**starts** 109:21

**state** 53:2

**stated** 61:12
65:16,22 71:23
72:24 121:21,23
122:21 130:23

**statement** 56:3,
4,5,7 58:8,10 61:20
64:22 65:25 75:23
76:3,5,10 77:23
97:7,17 99:22,25
100:9 103:5105:14,
22 106:21 110:11
117:23 118:24
121:22 122:3,4
129:18 131:10,19
132:4 134:25

**statements**
35:5 55:12 67:25
58:5 61:16,24
62:13,14 63:2,7
64:11 69:10 71:4
73:20 74:19,22,24
75:2,20,25 78:3
83:20 84:4 96:13,
20,24 97:9 98:1,2
100:1,11 102:4,11
104:14 109:4
110:12 112:11
116:5,13 117:19
120:13 121:25
122:9,10,12132:18
135:4,7,13,18,19,23
142:24 143:7 145:3
148:20

**states** 18:21 62:8
100:24 114:14
116:6,9 117:22
123:4,6 124:25

**static** 91:17,24

**stating 110:15**
123:1,6 131:23
132:16 134:25

**statistical** 23:22
26:4,10,11 27:2

**statistically**
25:24

**statisticians**
100:24

**statuses 83:11**

**stayed** 7:24

**step** 141:19

**sterile** 124:6

**stimulated
118:21,22**

**stimulus** 118:10,
18,19119:4,5,7,8,
19,20,24 120:1,8,9,
12,18 122:21,24
123:2,7,13 124:5,23
125:3

**stipulation** 64:2

**stipulations**
34:7

**stop** 71:7,25 72:2
126:13

**straight 90:18**
91:4 106:25 134:3,4
140:19

**strange** 34:12

**straw** 66:8 116:23

**streamline** 52:1

**street** 103:15

**strictly** 15:18

**strike** 42:24

**strive** 25:1

**struck** 64:14
118:13

**structural 25:20**

**structure** 13:22
49:14,16,23 96:14
97:14,15,18 98:3,8

**studies** 19:24
22:6,7 114:7,10
128:23 151:5,10,13,
17

studio
6,7,9,11,16,19
99:13

**study** 12:15,16
18:16 19:21 78:5
113:23 124:10,12,
13,16,20,21 125:2,
8,10127:13,15,17,
18 128:1,4,5,8,11,
16,24 129:10,11,12,
15,19 133:2,8,11
134:4 151:15

**subject** 22:12
27:5 31:20 35:19
67:3 75:12,16,18
78:9,21 83:13 102:3
109:3,5,18 124:17
126:4

**subjective** 55:6
56:11,19 57:8 61:24
135:14

**subjectively**
119:25 120:17

Subjects 14:1,3
67:20 85:2 90:1
92:11 94:12 143:10
145:5

**subsequent**
96:15 97:16,19

**subsequently**
22:21

**subsets** 60:16,18

**substantial**
63:1

**successfully**
18:4

**succession**
78:2,9

**suffer** 131:7

**sufficiency**
139:13

**sufficient**
138:12,19,23139:2,
15,20

**suggested** 79:5

**suggesting**
46:19

**suggestion**
28:17

**suggests** 36:11

**suing** 35:21

SUM 29:16

**summarize**
112:15

**summarizing**
151:4

**summary** 33:23

**supplied** 52:14,
20 56:25

**support** 35:9
98:4,6

**supported**
117:18

**supporting**
96:17,25 97:9

**supportive**
34:23 35:1 38:11

**supports** 62:5

**suppose** 133:25

**supreme** 120:23
121:7,17

**surface** 78:5

**surprise** 19:1

**surrounding**
135:12

**suspect** 6:19
139:6

**sword** 57:7

JAMIE BORDEN

August 25, 2017
Index: sworn–turn

**sworn** 4:10

**synonomous** 57:1

**synopsis** 78:18

———

**T**

**tab** 50:11,14,15 51:15 52:12

**tactic** 11:13

**tailed** 11:22

**takes** 99:4110:13 123:20,25124:7 125:1

**taking** 7:21 11:24 35:2 57:12 58:4,10

**talk** 43:1 46:11 64:16 105:8

**talked** 24:23 42:2 95:25 97:24 123:7 127:1 140:25 141:4 142:2

**talking** 12:7 28:18 67:19,23 72:9,10 78:15 104:20,21 105:7,11, 13,15,16111:16 139:4

**tape** 75:4

**target** 67:9,25 68:4 71:17 79:1 119:11 123:18,20, 25 124:1,7

**targets** 123:23

**taxer** 6:1511:9,12 12:11 13:4,5,6 14:3, 4,6,8,14,15 26:3 37:3 38:16

**tasering** 45:20

**task** 9:16 23:8 28:7 46:18 80:4,9, 18,23 136:21 137:10,15,21 138:5

**tasked** 57:19,24 58:17

**tasks** 23:5 28:15 30:16

**taught** 20:5 31:18

**teach** 13:12 20:24 21.14

**teaching** 21:15

**team** 23:21 25:22 26:9,11,13,14,20 27:6

**telling** 6317,18, 2464:1,5,8,9 74:4 119:1

**template** 68:13, 14

**ten** 70:21,2296;5 146:9,15 149:23 150:7,8,9,10

**tenure** 11:20

**term** 113:9 142:3 147:11

**terms** 24:19 86:19 98:24 134:24

**test** 9;15

**testified** 4:11 13:3 33:22 41:17, 18,25 42:16

**testify** 43:12,22 44:9

**testimony** 34:3, 4,13 36:6 37:12 41:4,6,15 42:4,6,13 44:18 45:13 55:18, 22 56:10,11,19 58:21,22 61:1,2 104:4,11,16105:18 111:15 114:24

**tests** 67:9

**text** 106:7

**theory 103:20**

**Thereupon--** 4:8

**thin** 59:1

**thing** 11:12 48:3 75:22 76:6 116:7 123:7 136:18

**things** 11:15 12:11,13 13:11 22:23 23:11 24:12 25:25 31:14 34:18 51:4 52:5 53:18 54:13 55:16 60:2,4 62:6,25 75:2 78:1 82:22 83:1 97:5 99:6 102:11 103:11 119:18 131:16 135:11 145:18 148:19

**thread** 57:11 64:12

**threat** 71:24 82:19,25108:16 109:8 110:4 111:10 116:19

**threats** 82:15 100:17

**thrown** 95:2

**thumb** 47:7,12 48:11,18 4915,18 50:1 59:25 60:16 81:3 130:3

**tie** 62:13

**tied** 104:23

**ties** 40:5

**time** 7:19,208:9 11:8 17:4 19:12 21:12,18 22;10,11 24:0 32:5 34:17 35:6,8 40:15 45:22, 25 50:19 53:5 62:10 67:4,5,8,12 68:4,10, 22 69:7,21 73:25 76:8 78:1 79:14 91:18 92:3108:18 109:4 110:24 111:3, 17 113:21 115:18 116:18,19,24,25 117:3,7,14,18 122:23 123:2,3,12, 18,19 124:6,24

126:3,13 136:14 145:4 148:17

timeline 145:5

**timer** 52:24

**times** 4:23,25 19:17 26:3 37:4 41:13 54:20 62:6 68:15 117:15 119:13 131:13

**timing** 52:23 75:15

**tissue** 58:8 88:12 103:3

**title** 50:17 129:25 130:9

**today** 24:10 47:7 81:4

**Todd** 33:24

**told** 8;11,1219:1,7 37:5

**top** 60:9 87;20

**topic** 27:20

**topics** 6:11

**totality** 82:2 110:2

**track** 26:1

**tracking** 23:22 26:4 120:4

**tracks** 25:24

**trade** 28:24

**trained** 13:16 112:20 113:4,5 120;15,16130:16

**trainer** 14:20 16:6,12

**trainers 13:16**

**training** 10:4,16 11:1,2,4,5,6,7,10 13:1,8,14,21 14:4, 19,22,23 15:3,10, 21,24 16:2 18:6 21:23,24 22:4,15,20

23:7,13,17 24:2,3,5, 7,11,14,15 30:14 77:8,9,20,22,25 82:13 83:2,5 107:20 112:23,25115:19, 21 127:9,12128:3, 6,7

**trajectory** 78:23

**transcribed** 58:2

**transferred** 32:18 53:16

**transparency** 22:14

**transparent 27:3**

**travels** 62:25 78:7

**treatment** 80:3 151:18

**tree** 93:14

**trees** 93:17

**trends** 24:127:11

**trial** 34:4,6 35:6 41:18,25 42:3,5,6 43:22,24 44:9,19

**triangular** 65:18

**trigger** 68:4 111:12 113:21 116:20,25

**truck** 8:12

**true** 57:2 120:14 122:13

**trust** 54:17

**truth** 56:13,14,17 57:8 63:12,17,18 64:2,5,8 74:5

**truthfulness** 56;1 57:19,25 58:1, 18

**turn** 27:18 57:21 109:21 144:11,17 146:19,21 147:4

JAMIE BORDEN

August 25, 2017

150:12

**turning** 141:16

**turns** 65:17,18
119:7

**Twenty** 82:9

**Twenty-one**
101:18

**types** 34:18 97:5
131:5

———

U

**ultimate** 70:16

**ultimately**
117:11

**umbrella** 24:15
29:1

**unable** 148:2,4,8

**unclear** 105:4

**uncommon**
131:5,18

**underlined**
27:20

**Underlying** 6:14

**understand** 5:1,
5,7 24:8 35:20
53:17,24 54:1,14
64:21 69:22 79:17
83:23 114:21,22
116:22 150:1,2

**understanding**
19:14 61:25 140:9

**unfolds** 143:12

**unfortunate**
136:18

**unfounded** 8:16

**unit** 22:11,18,21,
22 23:17 24:11,16
251 2 261 8

**United** 18:20
100:24 114;14

**university** 32:9
113.24

**updated** 23:24

**uploaded** 129:2

**upper** 88:19,20
148:23

**usable** 58:12

**user** 127:25

———

V

**vague** 37:1

**valuable** 97:8
140:9

values 98:23

**variability** 57:16

**variance** 128:9

**varied** 113:19

**varies** 75:13

**vary** 56:18 126:1

**Vegas** 4:1 35:25
37:10 38:21 39:5

**vehicle** 87:24
88:1,2,4 90:13
91:19,22 92:15
143:20,24 146:9,11,
12

**vehicles** 88:13
92:20,23 146:14

**verbalize** 5:4

**verbalizing**
112:11,17

**verbally** 141:14

**verify** 26:20

**version** 34:24
45:18 50:15,18
61:19,22,25 74:16,
18 85:17,18 86:5
98:13 132:14

**versus** 4:186:3
20:1 33:7,24 35:11

38:13 39:13 40:12,
20 41:10 432,15,25
44:13 45:2,18 47:3
82:23 108:5 115:11
121:9,11,12124:7
126:5

**Victorville** 40:12

**video** 29:5 38:5
44:21,24,25 50:11,
18,20,25 51:1,3,4,5,
15,16,18,21,25
522,5,7,8,13,16,18,
19,21,22,23,25
53:1,3,11,17,19,20,
22,23 55:2 58:13,16
62:5,7,11,12 63:4
64:10 68:16 69:5,13
74:21,22,25 75:1,4,
18,21,24,25 76:1,4,
6,9,11,20,24 77:2,3
78:4 82:19 84:3,6,
12,25 85:5,9,14,18,
21 86:2,19,21,22,24
87:11,23 88:8
89:19,25 90:2,14,
15,17,22,25 91:7,23
92:14 93:16 94:2
96:10,13,16,19,25
97:6,8,21,23 98:4,9,
15,16,25 99:3,8,12,
13 116:11,15117:4,
6,9,13,18 119:16
122:12,14,15
125:22 126:2 132:9,
11,12,16135:2,6,21
136:5 138:13 139:3,
8,10,11,16,18,19,
22,24 140:16 142:1,
25 143:6,9 144:6,22
145:2,6,15,17,20
146:4,22,25 147:22,
23 148:24 149:6
150:18

**videos** 50:17 51:7
93:22

View 49:5 57:8
96:10 98:9 102:2
109:21 122:2 149:4

**viewing** 54:1
62:12

**views** 90:2

**visible** 76:19 78:4
138:12 139:2,21
142:4 143:21,22
147:5

visit 35:4 68:23

**visual** 34:17
102:6 122:22
147:20 149:13

**visually** 135:11

———

**waiting** 23:9

**waived** 4:4,68:13

**waives** 62:22

**wanted** 145:20

**watch** 143:5

**watching** 149:6
150:18

**ways** 8:14

**weapon** 65:9
68:2,3,8,9 71:14,16,
23,24 72:7,21 73:5,
14,16 84:2,13
102:2,4,6,7,14,15
1031,9,10,13
104:18,20,21
105:22 109:13,14,
19,20112:5,6
118:11,12 141:18,
22,23 142:4,8
144:19 146:21
147:5 148:20
150:13,14

**website** 26:24
125:16,22

**week** 20:10 24:13

**well-being**
22:14,15

**white** 26:24 27:4

**width** 92:15

**wife** 8:8,10,12

**wife's** 107:22

**William** 128:17,
20,21 129:10

**window** 69:7,21
117:6 145:4

**windows**
117:14,17

**wise** 52:22 53:5
54:1 86:24

**withdrawn**
115:2

**withheld** 54:14

**witnesses** 62:22
96:13,21 97:11,18

**wonderful**
112:14

**word** 27:10 52:10
53:2 111:9 125:15
149:21 151:13

**words** 19:14 90:9,
11 112:15120:111
132:25

**work** 9:9 18:17
23:1,3 25:18 38:10
46:4,15 47:18 56:20
58:5 72:6 78:17,19
87:9106:5,9,11,20,
22,25 107:1 108:11
128:21 129:15,19
134:3,4135:15
140:5

**worked** 22:4
94:25

**working** 12:2
45:22 75:11

**works** 40:1

**world** 101:5

**worry** 27:16

**wounds** 135:25

**writing** 127.7
151:24

JAMIE BORDEN

**writings** 106:23

**written** 1611
18:2 33:19 36:16
133:11 151:14

**wrote** 106:10
127:21

——————— Y ———————

**yards** 70:1,4

**years** 9:25 10:1
82:9

**Young** 41:10,24
42:8,18,23

—————————————

**Zion** 4:18 33:15
47:4 48:6 81:5,9,17,
22 82:7,10 83:2
99:21 100:20 101:3,
10 113:1 121:1
134:13

**zone** 8:10

zoom 86;19